

COURT COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MFS, INC.<br>RR5, Box 5151<br>Easton Road<br>Bethlehem, Pennsylvania 18015,<br><br>PLAINTIFF<br><br>v.<br><br>THOMAS A. DILAZARO,<br>  Individually<br>493 Midland Road<br>Nazareth, Pennsylvania 18064<br><br>and<br><br>SEAN L. ROBBINS, Individually<br>174 Ferguson Avenue<br>Shavertown, Pennsylvania 18708<br><br>and<br><br>MARK WEJKSZNER, Individually<br>3 Hazlenut Drive<br>Mountain Top, Pennsylvania 18707<br><br>and<br><br>MICHAEL D. BEDRIN, Individually<br>255 Deer Run Drive<br>Mountain Top, Pennsylvania 18707<br><br>DEFENDANTS. | FILED<br>MAY 29 2008<br>MICHAEL E. KUNZ, Clerk<br>By_____Dep. Clerk<br><br><br>Civil Action No. 08cv2508 |



## COMPLAINT AND REQUEST FOR JURY TRIAL

The Plaintiff, MFS, Inc., by and through its undersigned attorneys, files the within Complaint against Michael D. Bedrin, individually, Sean L. Robbins, individually, Thomas A. DiLazaro, individually, and Mark Wejkszner, individually, and alleges as follows:

**A.      Nature Of The Action**

1.      Plaintiff, MFS, Inc., owns a mineral wool manufacturing plant located in Bethlehem, Northampton County, Pennsylvania (the "Mineral Wool Plant"). At all times relevant, the Mineral Wool Plant was subject to the permitting requirements of Title V of The Clean Air Act, 42 U.S.C.A. §§7401-7642 and, accordingly, MFS was issued a Title V Operating Permit through the Pennsylvania Department of Environmental Protection ("PaDEP") pursuant to 40 C.F.R. Parts 52 and 70, and 25 Pa. Code 127, Subchapter G. Also at all times relevant, MFS was also subject to, inter alia, the National Emission Standards for Hazardous Air Pollutants Maximum Achievable Control Technology standard for mineral wool production facilities set forth in 40 C.F.R. 63 Subpart DDD.

2.      In this Complaint, MFS alleges a continuing course of conduct by the Defendants, rising to a level of government custom, practice and policy under the color of federal and state law, which was known by the Defendants to violate the Plaintiff's constitutional and civil rights. The Plaintiff's rights that have been violated include the rights to exercise free speech and to petition the government for redress of grievances under the First and Fourteenth Amendments to the Constitution of the United States of America, rights guaranteed by the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States of America, rights protected by 42 U.S.C. §1983 and §1988, and rights protected by the

laws of the Commonwealth of Pennsylvania. As a result, the Plaintiff seeks as relief an award of monetary damages, including compensatory and punitive damages, and attorneys' fees.

**B.    Jurisdiction And Venue**

3.    The causes of action and claims for relief alleged herein arise under the First and Fourteenth Amendments of the Constitution of the United States of America, and under 42 U.S.C. §1983 and §1988. There is also a claim for relief under the laws of the Commonwealth of Pennsylvania.

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343 and 1367.

5.    Venue is proper pursuant to 28 U.S.C. §1391 (b)-(c).

**C.    The Parties**

6.    The Plaintiff, MFS, Inc. ("MFS"), is a corporation duly formed and existing under the laws of the Commonwealth of Pennsylvania. At all times relevant, MFS has owned the Mineral Wool Plant.

7.    The Defendant, Thomas A. DiLazaro ("DiLazaro"), is an adult individual believed to be residing at 493 Midland Road, Nazareth, Northampton County, Pennsylvania 18064. Until recently, DiLazaro had been employed as the Program Manager for the Northeast Regional Office Air Quality Program of PaDEP, which is the region where the Mineral Wool Plant is located. Upon information and belief, DiLazaro has continued, from time to time after his retirement, to communicate with and to provide assistance and information to the other Defendants regarding the Mineral Wool Plant. DiLazaro is being sued individually only.

8.    The Defendant, Sean L. Robbins ("Robbins"), is an adult individual believed to be residing at 174 Ferguson Avenue, Shavertown, Luzerne County, Pennsylvania 18708. At all

3

times relevant, Robbins has been and is currently employed as an attorney assigned to the Northeast Regional Office of PaDEP, which is the region where the Mineral Wool Plant is located. Robbins is being sued individually only.

9. The Defendant, Mark Wejkszner ("Wejkszner"), is an adult individual believed to be residing at 3 Hazelnut Drive, Mountain Top, Luzerne County, Pennsylvania 18707. Wejkszner is the current Program Manager for the Northeast Regional Office Air Quality Program of PaDEP, which is the region where the Mineral Wool Plant is located. Wejkszner is being sued individually only.

10. The Defendant, Michael D. Bedrin ("Bedrin"), is an adult individual believed to be residing at 255 Deer Run Drive, Mountain Top, Luzerne County, Pennsylvania 18707. Bedrin is the Regional Director of the Northeast Regional Office of PaDEP, which is the region where the Mineral Wool Plant is located. Bedrin is being sued individually only.

**D.   Statement Of Facts Common To All Counts**

11. At all times relevant, the Plaintiff, MFS, Inc. ("MFS"), owned the Mineral Wool Plant, which employed approximately 60 people.

12. Mineral wool is a fibrous material produced by melting blast furnace slag, silica, and limestone in a cupola furnace using coke as fuel. The molten material is then discharged onto rapidly rotating wheels which spin the molten material into fibers. The fibers are then cooled, collected, baled and shipped to manufacturers of ceiling tile, insulation, and fireproofing products for use in their own manufacturing processes.

13. The Mineral Wool Plant began operations in 1970 as a part of the stone and slag division of Bethlehem Steel Corporation, which had operated its facilities on surrounding and adjacent properties since the 1860s. MFS acquired the Mineral Wool Plant from Bethlehem

Steel Corporation in or about April, 1988. Thereafter, in approximately 1990, MFS expanded the operations at the Mineral Wool Plant to also include fireproofing and insulating material.

14. The Mineral Wool Plant remained in continuous operation from 1970 until February 2006, when MFS temporarily ceased manufacturing.

15. The Mineral Wool Plant is one of only approximately ten mineral wool manufacturing facilities remaining in the United States, as the manufacturing of mineral wool has been shifting overseas to China, South America, Europe and elsewhere. Of the few mineral wool manufacturing facilities remaining in the United States, the Mineral Wool Plant was one of the two most modern facilities in the United States. The Mineral Wool Plant is unique in its design because it is the only facility equipped with a single, large fabric filter baghouse that controls both the fiber particulates from its mineral wool operation and the emission particulates from its cupola furnaces.

16. The Mineral Wool Plant is subject to the permitting requirements of Title V of The Clean Air Act, 42 U.S.C.A. §§7401-7642. MFS was issued a Title V Operating Permit for the Mineral Wool Plant, Operating Permit No. 48-00020, through the Pennsylvania Department of Environmental Protection (hereinafter "PaDEP"), which administers the Title V Operating Permit program with the United States Environmental Protection Agency ("EPA") pursuant to 40 C.F.R. Parts 52 and 70, and 25 Pa. Code 127, Subchapter G. The Mineral Wool Plant has not undergone any significant equipment changes or changes in the method of its operation since the Title V Operating Permit was issued to MFS.

17. The Mineral Wool Plant is also subject to the National Emission Standards for Hazardous Air Pollutants Maximum Achievable Control Technology ("MACT") standard for mineral wool production facilities, 40 C.F.R. 63 Subpart DDD. The MACT standard, i.e., an

emission limit for particulate matter ("PM") from cupola furnaces, was written by EPA based on testing at two of the other mineral wool manufacturing facilities in the United States. Unlike the Mineral Wool Plant, however, these other mineral wool manufacturing facilities use a baghouse to control only the PM emitted from their cupola furnaces, which enables a straightforward comparison of PM at the baghouse exhaust with the PM standard specified in MACT.

18.  As explained in paragraphs 16 and 17 above, MFS is configured differently than all of the other mineral wool manufacturing facilities in the United States. MFS has a single, large baghouse that controls and comingles both the PM from its cupola furnaces and the PM from its mineral fiber handling operations. The flow rates and PM loading from the fiber handling operations (which are not subject to MACT) are substantially higher than the PM loading and exhaust flow rates from its cupola furnaces (which are subject to MACT). As a result, testing the baghouse exhausts for PM emissions at the Mineral Wool Plant would not accurately measure PM emissions solely from the cupola furnaces as required by MACT and, instead, would result in inflated levels of PM due to the inclusion of PM from the Mineral Wool Plant's fiber handling operations.

19.  On account of the unique configuration of the Mineral Wool Plant, MFS petitioned EPA for either a different MACT emission standard for PM or for a different test method to account for the comingling of PM from MFS' fiber handling operations with PM from MFS' cupola furnaces. After years of effort on the part of MFS, EPA's headquarters in Washington, DC ultimately denied MFS' request for an alternative MACT emission standard. However, it advised MFS that EPA would consider an alternative test method for the Mineral Wool Plant in light of its unique configuration, and it instructed MFS to contact EPA's Regional Office in Philadelphia to discuss an alternative test method.

20. For reasons unbeknownst to MFS at this time, EPA's Regional Office in Philadelphia would not approve, or even discuss, an alternative test method for MFS when MFS contacted that office in accordance with the instructions from EPA's headquarters in Washington, DC. Instead, EPA's Regional Office insisted that MFS conduct the compliance test as prescribed in MACT, which MFS could not do because of its unique configuration.

21. In or about August 2005, after negotiations between MFS and EPA proved unsuccessful in resolving the MACT compliance test issue, the Regional Office of EPA referred the matter to the civil division of the United States Attorney's Office in Philadelphia, for the purpose of filing an enforcement action against MFS.

22. In or about December 2005, after further negotiations between EPA and MFS proved unsuccessful in resolving the MACT compliance test issue, the United States Attorney's Office instituted an enforcement action against MFS in the United States District Court for the Eastern District of Pennsylvania (the "District Court"), styled as <u>United States of America v. MFS, Inc.</u>, Civil Action No. 05-6656 (the "EPA Litigation").

23. On or about February 17, 2006, MFS temporarily ceased manufacturing operations at the Mineral Wool Plant.

24. On August 10, 2006, MFS wrote to DiLazaro to advise that MFS had reached an agreement in principle with EPA to resolve the MACT compliance test issue. MFS further advised DiLazaro that the agreement in principle contemplated that, due to MFS' unique configuration, MFS would be allowed to implement an agreed upon alternative test method to demonstrate compliance with MACT within six months of re-starting operations at the Mineral Wool Plant. Thus, EPA's Regional Office finally acknowledged that MFS was, in fact, configured differently than the other mineral wool manufacturing facilities in the United States

and that an alternative test method was therefore warranted as MFS had been requesting all along. The agreement in principle between EPA and MFS had to be reduced to writing in the form of a consent decree and approved by the District Court in the EPA Litigation.

25. On or about March 9, 2007, a proposed consent decree between MFS and EPA, reflecting the agreement in principle referred to in paragraph 24 above, was filed with the District Court (the "Consent Decree").

26. On or about March 23, 2007, the Consent Decree between MFS and EPA was published in the Federal Register at Volume 72, Number 56. The notice in the Federal Register advised that EPA would receive comments on the Consent Decree for a period of thirty (30) days. DiLazaro and Robbins were aware of the publication of the Consent Decree and of the thirty (30) day comment period. DiLazaro and Robbins were also aware from communications with MFS that MFS intended to resume operations at the Mineral Wool Plant upon approval of the Consent Decree by the District Court.

27. It is believed and therefore averred that, at this time in March, 2007, DiLazaro and Robbins began and thereafter continued, with the knowledge and acquiescence of the other named Defendants, a pattern of wrongful conduct, that rose to a level of government custom, practice and policy under the color of federal and state law, to prevent MFS from resuming operations at the Mineral Wool Plant and, later, to prevent MFS from benefitting from a sale of the Mineral Wool Plant to a third party. As alleged herein, the pattern of wrongful conduct engaged in by the Defendants violated MFS' constitutional and civil rights.

28. Specifically, it is believed and therefore averred that, at this time in March, 2007, DiLazaro and Robbins agreed that they would take action, under the color of federal and state law, to disrupt the entry and/or implementation of the Consent Decree in the EPA Litigation and

to compel MFS to address an alleged malodor issue even though there had never been any adjudication, pursuant to applicable law, that the Mineral Wool Plant is the source of any malodor and that, if it was the source of any malodor, that such malodor rose to the level of a public nuisance. It is believed and therefore averred that DiLazaro and Robbins knew that, if they were successful in either of these two efforts, they would prevent MFS from resuming operations at the Mineral Wool Plant, in knowing violation of MFS' constitutional and civil rights and in excess of any legal authority they possessed. It is further believed and therefore averred that the other named Defendants subsequently acquiesced and participated in the effort to knowingly violate MFS' constitutional and civil rights as alleged herein.

29. It is commonly understood by officials and employees of PaDEP, including the Defendants, that the presumptive remedy for the emission of proven malodor is to install a control device, which is extremely expensive. As the Pennsylvania Environmental Hearing Board stated in <u>Commonwealth of Pennsylvania Department of Environmental Resources v. Franklin Plastics Corporation</u>, EHB Docket No. 90-316-CP-E (1996):

> ". . . . there must be a public interest sufficiently strong enough to require a lawful business to invest in odor control equipment . . . . In [Pennsylvania] the presumptive remedy for the emission of malodors is incineration. This may well be an extremely expensive remedy which should not be required by the Department if the odor amounts to no more than a private nuisance."

It is believed and therefore averred that the decision of the Environmental Hearing Board in <u>Franklin Plastics</u> has, at all times relevant, been known or reasonably should have been known to the Defendants.

30. The alleged malodor issue at the Mineral Wool Plant is erroneous, and it is believed and therefore averred that it has been used by the Defendants as a mere pretext in their attempt to justify their pattern of wrongful conduct described in this Complaint. Each of the

Defendants knew or reasonably should have known that the alleged malodor issue was without basis because, <u>inter alia</u>:

 (A) The applicable law in Pennsylvania places on PaDEP the burden of proving that an odor rises to the level of a malodor and, in turn, that the malodor rises to the level of a public nuisance. PaDEP has never met that burden with respect to the Mineral Wool Plant.

 (B) There has never been a finding by either the Pennsylvania Environmental Hearing Board or any court that MFS has ever been in violation of Pennsylvania's malodor laws.

 (C) MFS did not receive any notices of violation ("NOVs") for alleged malodor between April 1988 and November 2001; nor did MFS receive any NOVs for alleged malodor from March 2004 until the date it shutdown in February 2006. Rather, the NOVs for alleged malodor that were issued to MFS were concentrated in a brief period of time during the Mineral Wool Plant's thirty-year history of operations and those NOVs came at a time that MFS was petitioning officials at PaDEP and elected officials in Pennsylvania for a redress of grievances against DiLazaro, Robbins and their staff, as described more fully in paragraph 56, <u>infra</u>.

 (D) The NOVs issued to MFS, moreover, were legally defective in certain respects, including:

  (i) One NOV was either false or in error because MFS was not even operating at the time in question.

  (ii) One NOV was false or in error because it was issued by a PaDEP representative who did not actually investigate the alleged incident, and the

10

PaDEP representative who did investigate the alleged incident had advised MFS that he had found no malodor; and

(iii) Some of the NOVs were contradicted by PaDEP's own complaint logs, which PaDEP eventually provided to MFS after numerous requests by MFS that PaDEP do so.

(E) The NOVs issued to MFS for alleged malodor were not final actions of PaDEP and were not appealable by MFS. Moreover, none of the NOVs issued to MFS for alleged malodor ever resulted in a fine against MFS, nor was a fine ever attempted to be imposed against MFS by PaDEP for alleged malodor.

(F) Within close proximity to the Mineral Wool Plant are approximately a half dozen other sources of such possible malodor. One of those other sources, which ceased its slag operations at or about the same time that MFS ceased manufacturing operations in February 2006, was located directly adjacent to the Mineral Wool Plant.

(G) In or about January 2007, the Bethlehem Wastewater Treatment Facility, which is one of the other sources located in close proximity to MFS, admitted that it has been a source of malodor for many years and that it was trying to do something to prevent the smell in the future. The malodor coming from the Bethlehem Wastewater Treatment Facility is hydrogen sulfide (which produces a rotten egg smell) and that is the same smell that had been attributed to MFS.

31. On or about April 24, 2007, in furtherance of the Defendants' pattern of wrongful conduct referred to in paragraphs 27 and 28 above, Robbins, with the assistance and acquiescence of DiLazaro, wrote to EPA to lodge a series of objections to the proposed Consent Decree between EPA and MFS. Although Robbins and DiLazaro knew that EPA had absolutely

no enforcement authority over alleged Pennsylvania malodor issues, Robbins and DiLazaro strongly encouraged EPA to erroneously and impermissibly exercise such authority over MFS and to include in the Consent Decree a provision to require MFS to install a control device for malodor before MFS would be allowed to resume operations at the Mineral Wool Plant.

32.   It is believed and therefore averred that DiLazaro and Robbins knew that the cost to MFS of a control device for malodor was approximately $2 million to install and approximately $1 million a year to operate once installed. It is further believed and therefore averred that DiLazaro and Robbins knew that such a control device was cost prohibitive to MFS and that, if the Defendants could persuade EPA to make it a requirement of the Consent Decree, it would have the effect of preventing MFS from resuming operations at the Mineral Wool Plant.

33.   On or about July 2, 2007, after reviewing Robbins and DiLazaro's comments to the proposed Consent Decree, one of MFS' representatives wrote to EPA to remind EPA that the EPA Litigation dealt solely with compliance issues relating to MACT and that the EPA Litigation did not involve any state law claims relating to alleged malodor. It is believed and therefore averred that EPA had been and continued to be in communication with DiLazaro and Robbins at this time regarding the inappropriateness of their objections and comments to the proposed Consent Decree in the EPA Litigation. It is believed and therefore averred that EPA knew that DiLazaro and Robbins were asking EPA to erroneously and impermissibly exercise jurisdiction over MFS that it could not lawfully exercise and that EPA so advised DiLazaro and Robbins of that fact. EPA further believed that other comments and objections from PaDEP were unwarranted.

34.   On or about July 19, 2007, after it became clear to Robbins and DiLazaro that EPA would not agree with their efforts to re-write the Consent Decree as they requested in their