letter of April 24, 2007, Robbins wrote to EPA to advise that they would withdraw their objections to the entry of the Consent Decree provided that EPA gave them copies of all written documents received by EPA from MFS pursuant to the terms of the Consent Decree.

35. In a letter dated on or about July 25, 2007, EPA wrote to Robbins to advise that EPA would provide the documentation that it receives from MFS pursuant to the terms of the Consent Decree. In the same letter, EPA also confirmed its understanding that PaDEP was no longer objecting to the entry of the Consent Decree in the EPA Litigation. Neither Robbins, DiLazaro nor anyone else at PaDEP advised EPA that its understanding, as expressed in its letter of July 25, 2007, was incorrect in any way.

36. On August 13, 2007, the Consent Decree between EPA and MFS was signed and entered by the District Court in the EPA Litigation. PaDEP filed no objection in the District Court to the entry of the Consent Decree, which was substantially in the form published in the Federal Register and which did not contain any of the revisions demanded by Robbins and DiLazaro. The Consent Decree allows MFS to conduct an alternative test to demonstrate compliance with MACT, due to the unique configuration of the Mineral Wool Plant, within six months of resuming operations at the Mineral Wool Plant. Such an alternative test method is what MFS had been requesting since the promulgation of the MACT.

37. In or about September 2007, MFS was advised that DiLazaro had retired and that all future communications should be sent directly to Robbins. MFS was further advised at that time that Wejkszner would be assuming DiLazaro's duties and responsibilities until DiLazaro's permanent replacement was hired. It is believed and therefore averred that DiLazaro continued, from time to time, to communicate with and supply information about the Mineral Wool Plant to the Defendants and others at PaDEP. It is further believed and therefore averred that, when

Wejkszner assumed DiLazaro's duties and responsibilities, he had knowledge of and acquiesced in the continuing pattern of wrongful conduct to violate MFS' constitutional and civil rights as alleged herein.

38. Also in or about September 2007, in furtherance of the Defendants' pattern of wrongful conduct referred to in paragraphs 27 and 28 above, Robbins, with the knowledge and acquiescence of Wejkszner, advised MFS that, notwithstanding the entry of the final Consent Decree in the EPA Litigation, to which PaDEP did not object, the Defendants still considered the MACT compliance test issue to be unresolved. Moreover, Robbins, with the knowledge and acquiescence of Wejkszner, advised MFS that MFS still had to resolve the alleged malodor issue at the Mineral Wool Plant, even though there still had never been any adjudication, pursuant to applicable law, that the Mineral Wool Plant is a source of any malodor and that, if it was the source of any malodor, that such malodor rose to the level of a public nuisance. It is believed and therefore averred that the reason that the Defendants never pursued an enforcement action against MFS for alleged malodor is that the Defendants knew that they could not meet their burden of proof pursuant to applicable law.

39. In or about September or October 2007, MFS entered into negotiations with a prospective purchaser of the Mineral Wool Plant.

40. On or about October 3, 2007, representatives of MFS met with Robbins, Wejkszner and others at PaDEP's Office of Chief Counsel in Wilkes-Barre, Pennsylvania. At that meeting, MFS' representatives explained how the Defendants' pattern of wrongful conduct, as alleged herein, was prejudicing MFS and violating its constitutional and civil rights. By way of example, MFS' representatives explained that, inter alia: MFS was unable to resume operations at the Mineral Wool Plant; MFS had not been able to negotiate the sale of the Mineral

Wool Plant as an operating concern to a third party; MFS incurred and continued to incur significant costs associated with maintaining and securing the Mineral Wool Plant as it sat idle; MFS had been unable to enter into and/or maintain long-term supply agreements for raw materials, including blast furnace slag, that are necessary to operate the Mineral Wool Plant; and MFS had difficulty convincing prior or new employees to work at the Mineral Wool Plant under the cloud of uncertainty caused by the Defendants' pattern of wrongful conduct alleged in this Complaint.

41. When Robbins suggested at the October 3, 2007 meeting that MFS resume its operations under a "permit shield," and thereby assume the risk that the Defendants would take no further arbitrary and/or adverse action against MFS, MFS' representatives explained how that was not a realistic business option. MFS' representatives explained that the cloud of uncertainty that comes with re-starting operations under a "permit shield" provides little protection to a prospective purchaser of the Mineral Wool Plant as an operating concern or to employees who would leave other positions to return to work at the Mineral Wool Plant, particularly in light of the Defendants' pattern of wrongful conduct directed at MFS. Peter DiSabella, who was the Regional Air Quality District Supervisor for the Northeast Region Air Quality Program of PaDEP, agreed with MFS' representatives' comments and stated at the meeting that he would not buy a facility or resume operations at a facility under such circumstances either. Robbins and Wejkszner quickly dismissed DiSabella's comment.

42. In the days and weeks following the October 3 meeting referenced in paragraph 41 above, MFS repeatedly advised Robbins and Wejkszner that time was of the essence and that their actions were interfering with MFS' ability to sell the Mineral Wool Plant as an operating concern to a third party and/or its own ability to resume operations at the Mineral Wool Plant.

Robbins, Wejkszner and, later, Bedrin acted with a reckless indifference and a callous disregard to the fact that their pattern of wrongful conduct, as described herein, was interfering with MFS' ability to either sell the Mineral Wool Plant as an operating concern or resume operations at the Mineral Wool Plant itself.

43. In or about December 2007, when it became clear to MFS that the Defendants were persisting with their pattern of wrongful conduct described herein, MFS contacted the Office of the Secretary of PaDEP, Kathleen McGinty ("Secretary McGinty"), to request a meeting with her. It is believed and therefore averred that the Defendants were angry at and resentful towards MFS for petitioning the Office of the Secretary of PaDEP, i.e., the office with supervisory authority over the Defendants, to intercede in this matter and to redress MFS' grievances with the Defendants.

44. On or about December 17, 2007, a meeting was held at the office of Secretary McGinty in Harrisburg, Pennsylvania, as requested by MFS. In attendance at the meeting were Secretary McGinty, Robbins, Bedrin and others on behalf of PaDEP. Two of MFS' representatives attended the meeting on behalf of MFS. At the meeting, MFS' representatives complained about the Defendants' treatment of MFS. At the conclusion of the meeting, MFS' representatives were assured by Robbins, in the presence of Bedrin, that he and Bedrin would work with MFS, in good faith and without further delay, to reasonably resolve any outstanding issues. However, following the meeting, Robbins and Bedrin, with the knowledge and acquiesce of Wejkszner, failed and/or refused to do so. Instead, the Defendants continued the pattern of wrongful conduct described herein. It is believed and therefore averred that DiLazaro was, from time to time, continuing to assist and/or communicate with the other Defendants about the Mineral Wool Plant in furtherance of the pattern of wrongful conduct described herein.

45. On or about January 18, 2008, by way of example, Robbins, with the knowledge and acquiescence of Bedrin and Wejkszner, forwarded to MFS a draft of a conditional Title V Operating Permit for the Mineral Wool Plant, in which they included a series of unreasonable and legally impermissible provisions designed to further abrogate MFS' constitutional and civil rights and otherwise prevent MFS from either selling the Mineral Wool Plant as an operating concern or resuming operations at the Mineral Wool Plant itself. By way of background, MFS' Title V Operating Permit had been issued in 1998 and it came up for renewal in late 2003. MFS submitted a timely renewal application that PaDEP had found to be administratively complete but that PaDEP had not acted on until issuing this draft of a conditional permit in January 2008. It is believed and therefore averred that the Defendants were selectively, arbitrarily, and impermissibly using the Title V Operating Permit process as a further means to advance their pattern of wrongful conduct, as described herein, and to further violate the constitutional and civil rights of MFS.

46. On or about January 30, 2008, MFS' representatives wrote to Robbins and, with respect to the alleged malodor issue, stated as follows:

> "Condition No. 028 on page 22 of the Proposed Permit, by way of example, strips MFS of all of its due process rights with respect to the issue of alleged malodor. Rather than follow the applicable law and procedure of the Commonwealth of Pennsylvania relating to alleged malodor, PaDEP has conditioned the Proposed Permit on PaDEP having the absolute right to immediately and indefinitely shut down MFS upon the mere issuance by PaDEP of a notice of violation ("NOV") for an alleged malodor. As you know, however, an NOV is not generally viewed as a final action by PaDEP and, accordingly, it is not typically enforceable in and of itself by PaDEP nor appealable by the recipient. It is not surprising, therefore, that the legal authority cited by PaDEP in Condition No. 028 does not support or authorize such a shut down.
>
> Moreover, in the over 30-year history of the continuous operation of this facility, only approximately eight NOVs for alleged malodor have ever been issued. More importantly, none of these NOVs has ever been proven

17

> to be factually correct, nor has any liability by MFS ever been imposed, in accordance with applicable law and enforcement proceedings. In addition, at the time of the issuance of those NOVs, there were other known and/or admitted sources of such malodor in close proximity to MFS.
>
> Notwithstanding the above facts, PaDEP apparently is expecting MFS (or any prospective purchaser of the facility) to make the substantial economic investment and long-term commitments necessary to re-start operations while waiving its due process rights as they relate to this issue of alleged malodor – an issue which the courts have recognized is highly subjective in nature. MFS simply cannot agree to such a condition.
>
> Not only is Condition 028 an example of the unreasonableness of the Proposed Permit, it also appears to be an example of PaDEP's over-reaching. Clearly, PaDEP has a right to administer the laws and regulations of the Commonwealth of Pennsylvania as they relate to malodor, but its manner of doing so must be lawful, constitutional and within its grant of authority. We are aware of no authority that would allow PaDEP to permissibly engraft a state malodor regulation, let alone a truncated version of a regulation, onto a Federal Title V Operating Permit in the manner attempted here by PaDEP. The legal authority cited by PaDEP in Condition No. 028 does not authorize it. If you have any such authority, we request that it be identified and/or provided to us for our immediate review and consideration."

With respect to the Consent Decree entered by the District Court in the EPA Litigation, MFS' representatives wrote as follows:

> "Equally troublesome is Condition No. 027 which begins on page 20 of the Proposed Permit. Condition No. 027 is an attempt by PaDEP to re-write the Consent Decree that was negotiated and agreed to by the Environmental Protection Agency ("EPA") and MFS in a case that arose from PaDEP's relinquishment of authority back to EPA. As you know, that Consent Decree was published in draft form for public comment, approved in final form by the U.S. District Court, and subsequently implemented by the parties. PaDEP's attempt to now re-write provisions of this Consent Decree is neither appropriate nor reasonable under these circumstances, and MFS cannot agree to this Condition."

MFS' representatives concluded the letter by stating:

> "The unreasonable, if not impermissible, positions taken by PaDEP in the Proposed Permit, as discussed above, are disappointing, to say the least. PaDEP's regional office's prior, inappropriate conduct as it related to MFS is well documented, and PaDEP's continued actions have prevented

MFS from resuming its operations and/or from being acquired by another company."

47. On or about February 14, 2008, after receiving no meaningful response from the Defendants, MFS' representatives wrote to Secretary McGinty to again petition for her assistance in preventing the Defendants from further violating MFS' constitutional and civil rights.

48. On or about March 10, 2008, MFS' representatives again wrote to Robbins and stated, in pertinent part, as follows:

> "MFS thinks it is important to remind you, briefly, of the history whereby local officials of PaDEP previously made false and inflammatory public statements about MFS. Those erroneous comments directly caused public complaints about MFS and, although the local PaDEP officials were required to retract those comments months after they were made, the damage to MFS was done. You are now compounding that damage by continuing to treat MFS as a proven violator (which it is not) and by ignoring the fact that there were other admitted and/or possible sources of such malodor operating adjacent to or near MFS at the time in question.
>
> Your position on the above issues is simply unfair and unreasonable, and you have severely, if not irreparably, damaged MFS. In light of your apparent unwillingness to change your position, MFS has little choice now except to attempt to mitigate its damages by dismantling the plant and selling whatever machinery, equipment and parts that it can. It is regrettable that you have placed MFS in this position and, inter alia, prevented MFS from resuming operations, prevented the sale of the facility to a third party, and prevented the return of approximately 60 good paying jobs to the area."

Secretary McGinty was copied on this letter.

49. Beginning in or about late March 2008, in accordance with the letter referenced in paragraph 48 above, and after receiving no response whatsoever from the Defendants, MFS began the process of selling off parts, equipment and materials, so as to attempt to mitigate the damages caused to it by the Defendants' pattern of wrongful conduct alleged herein. At this

19