point, and as a direct result of the Defendants' pattern of wrongful conduct described in this Complaint, the damage to MFS and the Mineral Wool Plant was irreparable.

50. As described herein, the Defendants have engaged in a pattern of wrongful conduct, under the color of federal and state law, which has resulted in the harassment and punishment of MFS and which has unlawfully interfered with and abridged MFS' constitutional and civil rights. The Defendants' course of conduct constitutes a continuing and on-going pattern of action in violation of the rights, privileges and immunities guaranteed to MFS by the Constitution and laws of the United States of America and the laws of the Commonwealth of Pennsylvania. The constitutional and civil rights of MFS that have been violated by the Defendants include, but are not limited to: (i) MFS' rights to exercise free speech and to petition the government for redress of its grievances without unlawful retaliation; (ii) MFS' liberty and property interests in being free to operate a business without undue governmental interference and to use its property in furtherance of that purpose; and (iii) MFS' property interest in lost profits and revenue from the operation of that business and/or from the sale of that business as an on-going concern.

51. It is believed and therefore averred that the continuing course of conduct of the Defendants to retaliate against, harass and punish MFS, as alleged herein, rose to the level of an unconstitutional policy, procedure, and/or decision. Alternatively, it is believed and therefore averred that the continuing course of conduct of the Defendants to retaliate against, harass and punish MFS, as alleged herein, reflected conduct of the Defendants that became so permanent, prevalent, and well-settled as to constitute an unconstitutional custom or practice with the force of law.

## COUNT I
## RETALIATION UNDER 42 U.S.C. §1983

52. For the first cause of action herein, MFS incorporates the allegations of paragraphs 1 through 51 above, and alleges further that:

53. Section 1983 of the Civil Rights Act of 1964, as amended, provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges, or immunity secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

54. Pursuant to the First and Fourteenth Amendments to the United States Constitution, the right of freedom of speech and the right to petition the government for redress of grievances shall not be abridged.

55. It is believed and therefore averred that the pattern of wrongful conduct of the Defendants, as alleged in paragraphs 27 through 51 above, is and has been motivated or substantially caused by MFS' exercise, and intent to continue to exercise in the future, the right of freedom of speech and the right to petition the government for redress of grievances in connection with its treatment by the Defendants.

56. It is believed and therefore averred that, in the years leading up to the Defendants' pattern of wrongful conduct that commenced in March 2007, as alleged in paragraphs 27 through 51 above, DiLazaro and Robbins developed a deep-seated animus and ill-will towards MFS. The background of the dealings between MFS, on the one hand, and DiLazaro and Robbins, on the other hand, which planted the first seeds of their animus and ill-will towards MFS was as follows:

21

(A)     The Mineral Wool Plant is very visible in the Lehigh Valley area in which it is located because it is situated near Interstate 78 and because it has a tall smoke stack that emits a large plume of steam that is sometimes visible from far distances. The steam plume, which consists of 100 percent water vapor, has often been mistaken by persons who are not knowledgeable about the Mineral Wool Plant for other types of emissions, including malodorous emissions and/or emissions adverse to one's health. The actions of DiLazaro and his staff, as described below, substantially contributed to, if not directly caused, this public misconception.

(B)     On or about November 8, 2001, DiLazaro caused an NOV for alleged malodor to be issued to MFS. This was the first NOV for alleged malodor ever issued to and/or served on MFS since it took over operation of the Mineral Wool Plant in 1988. MFS had asked for details about the complaint giving rise to the issuance of the NOV so that it could look further into the matter, but PaDEP refused to provide any additional information to MFS.

(C)     On or about Friday, January 24, 2003, at approximately 5:10 p.m., DiLazaro instructed that a Field Enforcement Order be served on MFS based solely on the single NOV for alleged malodor that had been issued to MFS over one year earlier in November 2001. The Field Enforcement Order also had as an attachment a Request for Determination of Requirement for Plan Approval/Operating Permit ("RFD") form that MFS was directed to complete and submit by 5:00 p.m., on Monday, January 27, 2003, one business day later.

(D)     On or about Monday, January 27, 2003, MFS completed the RFD form as best as it could in the limited time allotted and submitted it to DiLazaro. DiLazaro knew

that MFS could not respond to the RFD completely since the necessary information to complete the form was not available to MFS. Consequently, MFS did not understand the purpose of DiLazaro's actions in issuing the Field Enforcement Order and of requiring a response one business day later, other than to position MFS for an alleged failure to respond.

(E) Thereafter, MFS contacted various elected officials in Pennsylvania to complain about its selective and arbitrary treatment by DiLazaro and his staff.

(F) On or about February 5, 2003, DiLazaro caused a second NOV for alleged malodor to be issued to MFS. Although the NOV was written by Becky Easley, an Air Quality Specialist on DiLazaro's staff, she was not the person from PaDEP who allegedly conducted the subject investigation, and the person from PaDEP who did conduct the inspection advised MFS that he had found no violation. In addition, no information pertaining to the alleged complaint(s) was provided to MFS, despite MFS' repeated requests for that information.

(G) Also on or about the evening of February 5, 2003, at DiLazaro's direction, Ron Mordosky, a PaDEP employee also on DiLazaro's staff ("Mordosky"), attended and made numerous false and inflammatory comments regarding MFS at a public meeting in an adjacent township. Mordosky also asserted, falsely, that PaDEP had no information regarding MFS' emissions. Mordosky then explained how the public should go about filing complaints against MFS for alleged malodor, and he distributed the cell phone number for at least one PaDEP field inspector so that complaints could be filed more easily against MFS. There was no mention by Mordosky of the other possible sources of such malodor in the area referred to in paragraphs 29 (E) and 29 (F) above. As a result,

23

by Mordosky singling out MFS at this public meeting, there was a presumption by those in attendance at the meeting that MFS was, in fact, the proven and only source of alleged malodor in the area.

(H) Thereafter, MFS again complained to various elected officials and to officials at PaDEP who were superior in position to DiLazaro and his staff.

(I) On or about February 7, 2003, representatives of MFS met with representatives of PaDEP in the Bethlehem District Office. At the meeting, DiLazaro explained that he and Mordosky had been "chewed out" for the false statements made publicly at the township meeting and that, on account of MFS' complaints to their superiors, pressure was now being put on DiLazaro by his superiors to resolve the matter with MFS. DiLazaro indicated clearly and unmistakably that he was not happy with MFS as a result. At that meeting, MFS asked Mordosky why he would make the public comments that he made, with knowledge that they were untrue, but DiLazaro instructed him not to answer the question.

(J) On or about February 12, 2003, DiLazaro caused a third NOV for alleged malodor to be issued to MFS.

(K) On or about February 13, 2003, DiLazaro caused a fourth NOV for alleged malodor to be issued to MFS.

(L) On or about February 21, 2003, a local Pennsylvania State Representative sent a letter to the then Acting Secretary of PaDEP, Kathleen McGinty, to express concerns about the way in which MFS was being treated by DiLazaro and his staff.

(M) On or about February 25, 2003, on the last day possible for filing an appeal of the Field Enforcement Order referenced in subparagraph (F) above, MFS filed

24

an appeal with the Pennsylvania Environmental Hearing Board because of the way it was continuing to be treated by DiLazaro and his staff. Robbins, who is believed by this time to have been working closely with DiLazaro on matters regarding MFS and the Mineral Wool Plant, handled the appeal for PaDEP.

(N)   On or about March 4, 2003, DiLazaro caused a fifth NOV for alleged malodor to be issued to MFS.

(O)   On or about April 23, 2003, during a conference call hearing on MFS' appeal of the Field Enforcement Order to the Environmental Hearing Board, the Administrative Judge questioned Robbins about issuing the Field Enforcement Order at 5:10 p.m. on a Friday and requiring compliance by the close of business on the following Monday. The Judge stated that such actions evidence PaDEP's hostility and that such actions look bad to judges. The Judge told Robbins that PaDEP should not take similar actions in the future and that, of all the issues in this case, the timing of the Field Enforcement Order is the most salient thing, that this is not a positive thing for PaDEP, and that it appears to the judges on the Environmental Hearing Board that DiLazaro and his staff are acting like "little children."

(P)   On or about May 14, 2003, DiLazaro caused a sixth NOV for alleged malodor to be issued to MFS.

(Q)   On or about May 21, 2003, at a public meeting in an adjacent township, DiLazaro erroneously attributed concentrations of benzene, a commonly known carcinogen, to MFS. DiLazaro's public comments caused an uproar in the surrounding communities and further prejudiced MFS in those communities. DiLazaro's comments about MFS causing a concentration of benzene in the area were false.

(R) Following DiLazaro's false public comments regarding benzene, MFS again protested to DiLazaro's superiors and to various elected officials in Pennsylvania. When DiLazaro was confronted by his superiors and MFS about his false public comments, DiLazaro asserted that his public comments were misunderstood. DiLazaro's superiors instructed him to give a public presentation retracting his false comments about MFS and explaining that emissions from MFS pose no health risks to the surrounding communities. Although DiLazaro gave such a presentation months following his false public comments, the damage to MFS had been done in that the Mineral Wool Plant now carried the erroneous stigma that it was a proven health risk and a perpetual polluter in the community in which it was located.

(S) In early 2004, PaDEP rescinded the Field Enforcement Order, and, on February 12, 2004, MFS' appeal of that Field Enforcement Order was dismissed as moot. MFS had no right to appeal the various other NOVs which had been issued for alleged malodor, since they did not constitute final actions of PaDEP and since PaDEP took no further actions to enforce them against MFS at the times in question.

57. As alleged in paragraph 27 above, beginning in March 2007, when DiLazaro and Robbins realized that the MACT compliance test issue between EPA and MFS was likely to be resolved and that MFS intended to resume operations at the Mineral Wool Plant, DiLazaro and Robbins, and later the other named Defendants, engaged in a pattern of wrongful conduct, that rose to a level of government custom, practice and policy under the color of federal and state law, to violate the constitutional and civil rights of MFS. It is believed and therefore averred that the motive of DiLazaro and Robbins for doing so was the animus and ill-will that they harbored towards MFS from prior dealings, as described in paragraph 56 above, and their personal desires

to protect their reputations at PaDEP. It is further believed and therefore averred that Bedrin and Wejkszner subsequently acquiesced and participated in this pattern of wrongful conduct with DiLazaro and Robbins.

58. The excessive and unreasonable pattern of wrongful conduct engaged in by the Defendants, as alleged in paragraphs 27 through 51 above, was intentionally directed towards MFS to punish MFS and to discourage MFS from engaging in its rights as guaranteed by the Constitution and laws of the United States, namely MFS' right under the First Amendment of the United States Constitution to petition the government for redress of grievances and to complain to appropriate authorities about potential violations of its constitutional and civil rights. It is believed and therefore averred that the excessive and unreasonable pattern of wrongful conduct engaged in by the Defendants, as alleged in paragraphs 27 through 51 above, was also in retaliation for MFS' exercise of these constitutional and civil rights.

59. As described more fully in paragraphs 27 through 51 above, through all of the actions of the Defendants alleged herein, they have abridged MFS' freedom of speech by, inter alia:

(A) adopting, implementing and continuing a policy or custom to retaliate against MFS based upon the content or expected content of MFS' comments to state government officials and at public meetings; and

(B) adopting, implementing and continuing a policy or custom to retaliate against MFS based upon its exercise of its right of freedom of speech as guaranteed by the United States Constitution.