IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MFS, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 08-2508 |
| | : | |
| v. | : | |
| | : | |
| THOMAS A. DILAZARO, et al., | : | |
| | : | |
| Defendants. | : | |

**OPINION AND ORDER**

**Slomsky, J.**                                                    **September 25, 2009**

Before the Court is a Motion for Reconsideration of the Order of August 3, 2009 denying Defendants' Motion for Summary Judgment (Docket No. 30) filed by Defendants Thomas DiLazaro, the former Program Manager for the Northeast Regional Office Air Quality Program of the Pennsylvania Department of Environmental Protection ("PaDEP"); Mark Wejkszner, the current Program Manager; Sean Robbins, an attorney for the Northeast Regional Office of PaDEP; and Michael Bedrin, Regional Director of the Northeast Regional Office.   In the Complaint, Plaintiff MFS, Inc. ("MFS") alleges a retaliation claim under 42 U.S.C. § 1983 in Count I, procedural and substantive due process and equal protection claims under 42 U.S.C. § 1983 in Count II, and a claim under Pennsylvania law for intentional interference with prospective contractual relations and prospective advantage in Count III.   Defendants argue that the Court's August 3, 2009 Order Denying Summary Judgment (Docket No. 28) contains clear errors of law and seek reconsideration. Specifically, Defendants argue that: (1) MFS has failed to establish its First Amendment Claim; (2)

1

any First Amendment claim based on events prior to May 29, 2006 is time barred [1]; (3) Defendant DiLazaro was not personally involved in the actions giving rise to this suit; (4) they are entitled to sovereign immunity on MFS's state law claim; and (5) as government officials sued in their individual capacity, they are entitled to qualified immunity.[2]  On September 8, 2009, the Court held oral argument on the Motion for Reconsideration and afforded all parties the opportunity to provide supplemental briefing.  For the reasons detailed below, the Motion for Reconsideration is granted in part and denied in part.  The following facts are contained in the record and viewed in the light most favorable to Plaintiff as the party opposing summary judgment.

---

[1] In their original Motion for Reconsideration, Defendants did not raise the statute of limitations defense.  At oral argument held on September 8, 2009, Defendants, for the first time, brought O'Connor v. City of Newark, 440 F.3d 125 (3d Cir. 2006), a case relevant to the statute of limitations defense, to the Court's attention. The Court afforded both parties the opportunity to submit supplemental briefs on this issue.  Both parties submitted supplemental briefs and the Court will address this issue infra.

[2] In their Supplemental Brief in Support of their Motion for Reconsideration (Docket No. 37), Defendants contend that they were not personally responsible for issuing the Notices of Violation ("NOV") at issue here and that the NOVs are therefore irrelevant to this action.  The Court disagrees.  It is axiomatic that a defendant in a § 1983 action must have personal involvement in the alleged wrongs.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Id.  MFS has presented evidence that Defendants Robbins and DiLazaro acquiesced in and even directed the NOVs to be issued.  Moreover, the NOVs are relevant because they were later relied upon by all four Defendants as a reason for delaying MFS's Title V permit application.  MFS has presented evidence that Defendants knew the NOVs were issued based on factually insufficient information and were relied upon to wrongfully delay a decision on the Title V permit.  Because the NOVs were so factually deficient, no reasonable official would have relied upon them.  Simply because Defendants did not personally investigate the NOVs or sign the NOV forms does not mean that the NOVs have no bearing on this case. Accordingly, to the extent Defendants are requesting the Court not to consider the NOVs as evidence, the Court declines to do so.  In addition, at the summary judgment stage, the Court is required to view the facts in the light most favorable to the non-moving party, which is MFS.

I.    STATEMENT OF FACTS

    A.    Mineral Wool Production and Malodors

MFS owned a mineral wool manufacturing facility ("Mineral Wool Plant") in Bethlehem

Pennsylvania.  MFS began operating the Mineral Wool Plant in 1988.  The mineral wool produced

by the plant was shipped to manufacturers of ceiling tile, insulation and fireproofing products.

During the mineral wool production process, the plant emitted a clear smoke, which MFS

classifies as pure steam.  PaDEP asserts, however, that the plant emits a malodor which caused

neighbors to complain.  MFS has never admitted that it was the cause of a malodor and does not

believe that it ever emitted a malodor.  (Trans. Sept. 8, 2009 Oral Arg. at 59:8-60:2.)    To the

contrary, Defendant's argue that air monitor readings, neighbor complaints and a letter from MFS

in 2001 show that MFS was emitting malodors.[3]  (See Complaint and Answer at 30(A); Trans. Sept.

8, 2009 Oral Arg. at 79:16-80:24.)

PaDEP has legal authority to regulate all malodors, but not all odors are malodors.  After

properly investigating claims of malodors, PaDEP has the authority to issue a Notice of Violation

("NOV") against the owner of the source of the malodor.  As Ronald Mordosky, the Bethlehem

District Supervisor for the Air Quality Program in the Northeast Regional Office for PaDEP testified,

it is PaDEP policy that there must be three residences simultaneously complaining about  malodor

before a NOV can be issued. (See Plaintiff's Amend. Response in Opp. to Mot. For Sum. Judg.,

_____

[3]Defendants cite data collected by an ambient air monitor to support their contention that
MFS was responsible for the malodor.  However, this air monitor was first used in March 2004,
after PaDEP had issued thirteen Notices of Violations ("NOV") to MFS (See Docket No. 23, Ex.
33, Answer to interrogatory No. 2.)  Moreover, there is evidence in the record that the vector
wind direction ideal for collecting readings from the monitor is inconsistent with the approximate
location of MFS.  (See Docket No. 27, Ex 34, Ambient Air Quality Services, Inc. Report dated
May 11, 2009.)

(hereinafter "Docket No. 23"), Ex. 7, Mordosky Dep. 19:11-13; see also Ex. 13, Section 5.9.3 of Guidance Manual; Ex. 14, Com. Of Pa. Dep't of Env't Resources v. Franklin Plastics Corp. at p. 10.) The occupants must detect the malodor from their residence; an inspector must then be present at each residence and detect the odor; the inspector must determine that it is in fact a malodor; and the inspector must determine the source from which it is emanating.  (See Docket No. 23,  Ex. 7, Mordosky Dep. 18:17-19:24.)  A NOV is merely an allegation; it is not a final action by PaDEP and is not appealable.  PaDEP bears the burden of proof that the odor rises to the level of a malodor and, in turn, that the malodor rises to the level of a public nuisance.  (See Complaint and Answer, at ¶ 30(A).)

### B.      NOVs and Field Enforcement Order

On November 8, 2001, Defendant DiLazaro caused a NOV for alleged malodor to be issued to MFS.  (See Docket No. 23, Ex. 15,  Notice of Violation.)  This was the first NOV issued to MFS in the thirteen years it had run the Mineral Wool Plant.  (See Complaint and Answer, at ¶56(c).) Defendant Dilazaro did not comply with PaDEP policy noted above in issuing this NOV.  (See Docket No. 23, Ex. 15, NOV, dated Nov. 8, 2001.)  MFS requested background information that led to the issuance of the NOV, but PaDEP ignored this request.  (See Complaint and Answer at 56(B).) MFS was not able to appeal the issuance of the NOV because it is not a final action.

On January 24, 2003, based solely on the November 8, 2001 NOV, Defendant Dilazaro, with knowledge and consent of Defendant Robbins, issued a Field Enforcement Order to MFS.  Unlike a NOV, a Field Enforcement Order is a final action and can be appealed. The Field Enforcement Order was issued after 5:00 p.m. on a Friday evening and required a response from MFS by the next business day, Monday January 27, 2003.  (See Complaint and Answer, at ¶ 56(c).)  Thereafter, on

January 28, 2003, MFS began petitioning state legislators to complain about this treatment by Defendant DiLazaro and his staff. (See Docket No. 23, Exs. 17, 18, and 19.)  On or about February 21, 2003, in response to MFS's petitioning of legislators, a Pennsylvania State Representative sent a letter to PaDEP expressing concern about Defendant DiLazaro and his staff's treatment of MFS. (See Docket No. 23, Ex. 4, Letter, dated Feb. 21, 2003.)

On February 24, 2003, MFS filed an appeal of the Field Enforcement Order.  (See Complaint and Answer at ¶ 56(M).)  During a telephone conference on MFS's appeal, an Administrative Law Judge: (1) questioned Defendant Robbins about issuing the Field Enforcement Order at 5:10 p.m. on a Friday; (2) stated that the actions evidence hostility; (3) cautioned Defendant Robbins that he should not take similar actions in the future; and (4) stated that Defendant DiLazaro and his staff were acting like "little children."  (See Complaint and Answer at ¶ 56(O).)  In early 2004, PaDEP withdrew the Field Enforcement Order and MFS's appeal became moot. (See Docket No. 23, Ex. 9, 40:12-17.)

Soon after MFS petitioned state legislators, PaDEP began issuing NOVs to MFS.  Despite receiving at this point just one NOV from PaDEP in fifteen years, MFS received thirteen NOVs from February 5, 2003 to February 24, 2004.  (See Docket No. 23, Ex. 10, Hauff Aff. at ¶ 7.)  Of these thirteen NOVs, ten were based on a single complainant.  (See Docket No. 23, Ex.16, Email, dated Nov. 26, 2003.)  None of the NOVs contained any information about the location of the complainant in relation to the Mineral Wool Plant.  (See Docket No. 23, Ex. 6, DiLazaro Dep. 48:11-49:12.) PaDEP's complaint log demonstrates that the majority of these complaints came from one single residence.  (See Docket No. 23, Ex. 26, Complaint Log.)  Defendants DiLazaro and Robbins knew that each NOV was based on the one complaining residence. (See Docket No. 23, Email dated

November 26, 2003, at Ex. 16.)  Defendant DiLazaro, with the assistance of Defendant Robbins, caused all of the NOVs in question to be issued to MFS.  (See  Docket No. 23, Ex. 9, Robbins Dep. 38:15-19.)

In addition to the timing of the NOVs, MFS has put forth other evidence which supports the inference that this influx of NOVs may have been in retaliation for MFS petitioning state representatives.  Defendant DiLazaro admitted in a meeting with James Hauff, the Operations Manager at MFS, that he was "pissed off" at MFS "going over his head" while he pounded the table with his fist. (See Docket No. 23, Ex 5, Hauff Dep. 125:3-23.)  Defendant DiLazaro publicly declared that "MFS is definitely a nuisance" and attributed concentrations of benzene, a commonly known carcinogen, to MFS.  (See Docket No. 23, Ex. 27, Newspaper Article, dated May 22, 2003.) These comments appeared in a newspaper article.

Despite DiLazaro's public statements targeting MFS, there is evidence in the record that, as early as 2002, he was aware of other potential causes of malodor in the area . (See Docket No. 23, Ex. 29, Inspection Report, dated March 6, 2002.)  Specifically, PaDEP files for publicly owned and operated Bethlehem Sewage Treatment Plant reveal that officials at PaDEP were aware that the sewage plant was emitting malodors.  (See id.; Ex. 9, Robbins Dep. 197:14-21.)  In January 2007, Bethlehem Sewage Treatment Plant even admitted publicly that it has been a source of hydrogen sulfide malodor in the Bethlehem area for years, and they had been trying to correct the problem since 2005. (See Docket No. 23, Ex. 30 Inspection Report, dated April 7, 2006.)   However, no NOVs were issued to the Bethlehem Sewage Plant.  (See Docket No. 27, Ex 29; Ex. 30.) Moreover, Defendant Robbins admitted that PaDEP was aware of a malodor issue at the IESI Bethlehem

Landfill, but despite receiving several complaints, PaDEP did not issue any NOVs.[4]  (See Docket No. 23, Ex. 9, Robbins Dep. 197:5-13.)

### C.     MACT Compliance and Consent Decree

In April 2003, MFS had applied for a renewal of its Title V Operation Permit with PaDEP. In order to be eligible for renewal of its Title V permit, MFS had to meet compliance standards set forth by the Environmental Protection Agency ("EPA").  EPA requires all mineral wool production facilities to meet a Maximum Achievable Control Technology ("MACT") standard.  Due to the unique configuration of the MFS facility, it was impossible for MFS to meet the standard required to comply with MACT.  (See Docket No. 23, Ex. 5, Hauff Dep. 35:3-40.)  In July 2001, MFS submitted a request to EPA and PaDEP for either an alternative test standard or method.  (See Docket No. 27, Ex. 35, Letter dated July 31, 2001).  On April 9, 2003, EPA notified MFS and PaDEP that it would not grant MFS's request for an alternative test standard, but MFS's request for an alternative test method would remain under consideration.  (See Docket No. 23, Ex. 6, DiLazaro Dep. 40:18-41:17.)  Because MFS was unable to comply with MACT standards, PaDEP would not approve MFS's application to renew its Title V permit.  On December 20, 2005, EPA filed suit against MFS in the Eastern District of Pennsylvania seeking enforcement of compliance with MACT.  (See Complaint ¶ 22.)  In 2006, while awaiting a decision on its Title V permit application, MFS ceased all operations at the plant.

On August 10, 2006, MFS wrote Defendant DiLazaro to inform him that MFS and EPA had

---

[4] Despite his public comments blaming only MFS for malodor in the area, Defendant Dilazaro also required investigators to inspect "other sources in the area" including Bethlehem Sewage Treatment Plant and Connectiv Power.  (See Docket No. 23, Ex. 32, Email, dated November 3, 2005.)

reached an agreement in principle permitting MFS to use an alternative testing method in compliance with MACT.  (See Complaint and Answer, at ¶ 24.)  On March 23, 2007, the Consent Decree between MFS and EPA was published in the Federal Register at Volume 72, Number 56, advising that EPA would receive comments on the Consent Decree for a period of thirty days.  (See id., at ¶ 26.)  Defendants were aware that the Consent Decree was published and was open to public comment.  (Id.; see also Docket No. 23, Ex 9, Robbins Dep. 156:4-9.)  Defendants were also aware that MFS intended to resume operations.  (Id.)

On April 24, 2007, Defendant Robbins wrote to EPA and objected to the Consent Decree, "strongly" recommending that it be revised to require MFS to address alleged malodor issues from 2001 and 2003.  (See Docket No. 23, Ex. 9, Robbins Dep 60:22-61:5.)  Defendants Bedrin, DiLazaro and Wejkszner were aware of the substance of Defendant Robbins letter to EPA and agreed to the representations made therein.  (See Docket No. 23, Ex. 9, Robbins Dep. 59:21-60:8; Ex. 6, DiLazaro Dep. 69:20-70:5.)  EPA disregarded Defendants' objections and would not incorporate suggested changes about malodor into the Consent Decree.  (See Docket No. 23, Ex. 9, Robbins Dep. 60:22-62.)  On July 19, 2007, Defendant Robbins informed EPA that PaDEP would withdraw its objections to the Consent Decree.  (Id. at 65:8-67:16.)  On August 13, 2007, the Consent Decree was entered by a U.S. District Court and did not address any of the concerns raised by PaDEP.  (See Complaint and Answer, at ¶ 36.)

**D.     PaEPA Does Not Renew Title V Operational Permit**

On August 28, 2007, in anticipation of reopening its Mineral Wool Plant, MFS wrote to Defendants DiLazaro and Robbins advising in part:

> With respect to the alleged malodor issue, MFS did not receive any alleged malodor violations during the last two years of its operation.  Moreover, and as we have discussed in the past, the eight or so violation notices for alleged malodor, that were issued to MFS for alleged violations in 2002-2003, were legally deficient in various respects including, for example, a notice being issued to MFS for a time that MFS was not even operating and therefore, could not have been the source of any odor.  In addition, earlier this year, the Bethlehem Wastewater Treatment Plant, which is located in close proximity to MFS, acknowledged that it has been emitting a hydrogen sulfide odor for years in that area.

> Accordingly, MFS trusts that its Title V permit will be reissued promptly since MFS is continuing to be prejudiced by the continued delay.

(See Docket No. 23, Ex. 41, Letter dated August 28, 2007.)

Soon after sending this letter, MFS began receiving correspondence from Thermafiber, Inc. ("Thermafiber"), another mineral wool manufacturing company, which was interested in purchasing the Mineral Wool Plant.  (See Docket No. 27, Ex. 5, Hauff Dep. 82:2-83:21.)  During negotiations, Thermafiber expressed concern about the status of the pending Title V permit renewal.  (Id.)  Prior to Thermafiber expressing its concern, Defendant Robbins had informed Armstrong World Industries, a purchaser of both MFS and Thermafiber products, that MFS had malodor and compliance issues.  (See Docket No. 23, Ex. 5, Hauff Dep. 138:11-25.)

In response to MFS's August 28, 2007 letter, MFS received a letter from Defendant Robbins on September 27, 2007, informing MFS that PaDEP was not renewing its Title V permit.  The letter claimed that MFS could still be emitting malodors even though it had not received a NOV in over two years.  (See Docket No. 23, Ex. 42, Letter, dated Sept. 27, 2007.)  Moreover, the letter placed the burden of proof on MFS because MFS had presented no evidence that it did not produce malodor.  (See id.)

9

On October 3, 2007, MFS representatives met with Defendants Robbins and Wejkszner at a PaDEP office in Wilkes-Barre, Pennsylvania.  (See Complaint and Answer, at ¶ 40.)  At the meeting, MFS representatives detailed how Defendants' conduct, under the color of state law, was unfairly prejudicing MFS by preventing it from reopening and/or selling their plant.  Defendant Robbins suggested that MFS could continue its operations under a "permit shield,"– the terms and duration of which were determined at Defendants' discretion–while a decision on the Title V permit was pending.  (See Docket No. 23, Ex. 9, Robbins Dep. 164:23-165:6.)  MFS responded that enduring the costs of reopening the plant only to be subject to the risk that Defendants continued their ongoing pattern of wrongful conduct was not a realistic business option.  (See Docket No. 23, Ex. 8, Wejkszner Dep. 17:14-18:3.)  Defendant Robbins admitted that MFS's concerns regarding the permit shield were "valid concerns." (See Docket No. 23, Ex. 9, Robbins Dep. 164:23-165:6.)[5]

On October 24, 2007, Defendant Robbins sent a letter to MFS denying MFS was being prejudiced and stating that the Title V permit would not be reissued because of the alleged malodor and MACT compliance issues.  (See Docket No. 23, Ex. 44, Letter, dated October 24, 2007.) Following its receipt of this letter, MFS petitioned the Secretary of PaDEP (the "Secretary") for a meeting to discuss Defendants' pattern of wrongful conduct.  On December 17, 2007, the Secretary held a meeting with MFS.  Defendants Bedrin and Robbins were ordered to attend. (See Docket No. 27, Ex. 9, Robbins Dep. 104:5-13.)  The Secretary informed MFS that Defendants had briefed her prior to the meeting and that she was leaving it to Defendants to address the matter. (See Docket No. 27, Ex. 12, Bedrin Dep. 60:1-22.)

---

[5]Defendant Bedrin was aware of and acquiesced to the meeting and all actions taken as a result of the meeting by Defendants Robbins and Wejkszner. (See Docket No. 27, Ex. 12, Bedrin Dep. 43:1-9; 44:22-45:21; 48:23-49:22.)

During discovery in this case, MFS obtained the "briefing" memorandum ("Memorandum"), drafted by Defendant Robbins, and provided to the Secretary for the December 17, 2007 meeting. (See Docket No. 23, Ex. 46, Memorandum). The Memorandum was reviewed by Defendants Bedrin and Wejkszner before it was submitted to the Secretary. (Docket No. 27, Ex. 9, Robbins Dep. 110:2-111:16; Ex. 12, Bedrin Dep. 55:2-23.) The Memorandum contained several false and/or misleading statements concerning: (1) the validity of the 2003 Field Enforcement Order or the underlying NOVs; (2) the truthfulness of MFS's representations that it could not comply with MACT; (3) EPA's adoption of an alternative testing method; and (4) that MFS had an SO2 problem. (Docket No. 23, Ex. 46, Memorandum.) Attached to the Memorandum were several newspaper articles in which scandalous claims were made concerning MFS that were irrelevant to the malodor issue. (Id.)

On January 18, 2008, as directed by the Secretary at the December 17, 2007 meeting, Defendant Robbins, Bedrin and Wejkszner forwarded a draft of a conditional Title V permit to MFS. The draft permit contained 91 conditions. MFS objected to two conditions, 027 and 028, arguing that they were neither legally valid nor reasonable. (See Docket No. 23, Ex. 49, Draft Title V Operating Permit.) Condition 028 granted PaDEP the absolute right to shut down MFS upon the issuance by PaDEP of a NOV. (See Docket No. 23, Ex. 49, Draft V Operating Permit.) Condition 027 imposed an operating permit compliance schedule which, as admitted by Defendant Wejkszner, was an attempt to rewrite the Consent Decree entered in the federal case because Defendants felt that EPA was not "strict enough." (See Docket No. 23, Ex. 8, Wejkszner Dep. 38:5-41:16.)

On January 30, 2008, MFS wrote to Defendant Robbins objecting to these two conditions. MFS argued that Condition 028 interfered with its due process rights because it gave Defendants the power to shut down MFS's Mineral Wool Plant without affording MFS an opportunity to explain

11

or review any charges made against it.  (See Complaint and Answer, at ¶ 46.)  MFS also argued that the authority Defendants cite in support of the condition did not authorize such action.  (Id.)  As to Condition 027, MFS argued that it was an improper attempt by Defendants to rewrite the Consent Decree.  (Id.)  Defendant Wejkszner admitted that, contrary to the Consent Decree, Condition 027 provided Defendants with authority to shut down MFS if it failed to follow a compliance schedule and did not contain any timetable under which Defendants had to review the decision to close the Mineral Wool Plant.  (See Docket No. 23, Ex. 8, Wejkszner Dep. 41:4-24.)  Defendants also did not include a dispute resolution provision similar to the one in the Consent Decree, which gave MFS the right to contest any action taken thereunder.  (See id.)

In late March, 2008, unable to reopen their Mineral Wool Plant and with no indication from PaDEP that their Title V Operation Permit would be reissued, MFS sold its machinery and parts.  (See Docket No. 23, Ex. 51, Campbell Aff.)  On March 10, 2008, MFS wrote Defendant Robbins explaining that because of Defendants' actions, it had no choice but to liquidate its assets.  (See Complaint and Answer, at ¶ 48.)  On May 29, 2008, this suit was instituted.

On January 18, 2009, approximately eight months after MFS commenced this suit and ten months after MFS began liquidating assets, Defendants forwarded to MFS a draft Title V Operating permit omitting Conditions 027 and 028.  (See Docket No. 23, Ex. 8, 57:23-58:6; 59:19-60:4.)

## II.     DISCUSSION

### A.     Motion for Reconsideration Standard

Defendants have moved the Court to Reconsider its August 3, 2009 Opinion denying Defendants' Motion for Summary Judgment. "Reconsideration of a Court order is appropriate where (1) there has been an intervening change in the controlling law; (2) new evidence is available or; (3)

there is a need to correct a clear error of law or prevent manifest injustice." North River Ins. Co. v. Cigna Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995); Fed R. Civ. P. 59; E.D.Pa R. 7.1(g).  In their Motion, Defendants assert four grounds under which they contend reconsideration is warranted because the Court made clear errors of law.  The Court will now address each ground as well as the additional one on the alleged statute of limitations violation which the Court permitted Defendants to argue at the September 8, 2009 oral argument and thereafter brief.

> **B.      The First Amendment Retaliation Claim**

Defendants assert that the Court failed to address MFS's First Amendment Claim in its August 3, 2009 Opinion.  While the Court did not provide a detailed analysis of the claim in the August 3, 2009 Opinion, it was referenced throughout the Opinion and was carefully considered by the Court.  Nevertheless, at the request of Defendants, the Court will now provide a more detailed analysis of its reasons for denying Defendants' Motion for Summary Judgment on MFS's First Amendment retaliation claim.

To establish a First Amendment retaliation claim under § 1983, a plaintiff must demonstrate that: (1) he or she engaged in an activity protected by the First Amendment; (2) he or she suffered an adverse action; and (3) the protected activity was a substantial or motivating factor in the alleged retaliatory action.  Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).  Once a plaintiff establishes these elements, a defendant may rebut the plaintiff's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct.  Id.

As to the first requirement, Defendants do not dispute that requesting and meeting with the Secretary are protected activities under the First Amendment.  (See Docket No. 17, Defendants' Motion for Summary Judgment at p. 16.)  Defendants challenge the second and third requirements:

(2) whether MFS suffered an adverse action and if so, (3) whether MFS's participation in protected activity was the reason for the adverse action.  There are genuine issues of material fact on these two requirements.

As to the second requirement, Defendants argue that the only "adverse action" MFS asserts is the failure to receive a Title V permit without any conditions.  MFS, however, raises additional adverse actions it suffered, including the misleading Briefing Memorandum Defendants sent to the Secretary to prepare her for the meeting,[6] Defendants' attempt to rewrite the terms of the Consent Decree and Defendants' use of the withdrawn Field Enforcement Order against MFS's interests.  Most notably, the failure to timely reissue a permit contributed to MFS's decision to close the Mineral Wool Plant and deprived it of the ability to sell its assets to Thermafiber, an interested

---

[6] At the September 8, 2009 oral argument, Defendants, for the first time, suggested the Briefing Memorandum is inadmissible evidence because it is protected under the attorney-client privilege.  Even assuming that the Memorandum, sent from Defendant Robbins to his client, PaDEP, contains legal advice that would bring it within protection of the privilege, the privilege here was waived.  The attorney-client privilege belongs solely to the client and only the client can waive the privilege.  "It is well-settled that when a client voluntarily discloses privileged communications to a third party, the privilege is waived."  Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991).  A client waives the attorney-client privilege by "failing to assert it when confidential information is sought in legal proceedings."  Nguyen v. Excel Corp., 197 F.3d 200, 206 (5th Cir. 1999) (finding defendant waived attorney-client privilege by disclosing confidential communications to third party not rendering legal services on client's behalf).  Here, the client, PaDEP, disclosed the Memorandum in response to a discovery request by MFS.  MFS's counsel represented at oral argument that this document was one of a handful of documents produced at the time, decreasing the likelihood that such disclosure was inadvertent.  Accordingly, PaDEP, which is not a defendant, has waived the attorney-client privilege with respect to the Memorandum.  Defendants' argument that it is inadmissible evidence is unpersuasive.  See Church of Universal Love & Music v. Fayette County, No. 06-872, 2009 U.S. Dist. LEXIS 4371, at *4 (W.D. Pa. Jan. 22, 2009) (holding party waived any privilege claim that may have existed as to document when party did not treat document as confidential until later in proceedings after disclosure and use in exhibits).

purchaser.

The facts offered by MFS at the summary judgment stage are more than sufficient to constitute an adverse action.  The Supreme Court has held that an act as trivial as failing to hold a birthday party constituted an adverse action.  See Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990); O'Connor, 440 F.3d 125, 127-28 (3d Cir. 2006).  The actions described above could be adverse if proven at trial.

As to the third requirement, the evidence raises the inference that the Briefing Memorandum containing misleading information and the two onerous conditions in the draft permit were prepared by Defendants in retaliation for MFS's requesting and attending a meeting with the Secretary.[7]  In the Memorandum, Defendants falsely accused MFS of having malodor and SO2 issues, attached misleading and irrelevant newspaper articles, falsely stated that EPA had denied MFS's request for both an alternative test limit and an alternative test method to comply with MACT and attempted to use the withdrawn Field Enforcement Order as a ground for denying the permit.  (See Docket No. 23, Ex. 46, Memorandum; Ex. 9, Robbins Dep. 118:20-119:12.)  Viewing the evidence in the light most favorable to MFS, an inference can be drawn that these misleading statements made to the Secretary evidence an attempt to retaliate against MFS for the meeting.  An inference can also be drawn that Conditions 027 and 028 to the draft permit were inserted by Defendant Robbins, with the participation of Defendants Wejkszner and Bedrin, in retaliation for meeting with the Secretary.  Defendants admit that under the terms of the draft permit, merely issuing an NOV to MFS would justify PaDEP in indefinitely shutting down MFS without affording MFS with any safeguards to

---

[7] As noted infra, there is no evidence that Defendant DiLazaro participated in these matters.

challenge the action.  (See Docket No. 23, Ex. 8, Wejkszner Dep. 38:5-41:16.)  A reasonable jury could find that the harshness of these terms evidences Defendants' animus towards MFS which was caused by MFS's request for and meeting with the Secretary.

Although MFS has presented evidence to satisfy the three elements of a retaliation claim, summary judgment in favor of Defendants would still be appropriate if Defendants present evidence that their conduct was not retaliatory but rather was done in the best interest of the public.  See Baldassare, 250 F.3d at 185 (holding defendants could rebut plaintiffs' retaliation claim by demonstrating that same adverse action would have occurred in absence of protected conduct). Defendants have presented evidence that they inserted the two conditions in the draft permit, not as retaliation, but because they believed EPA was not strict enough in the Consent Decree with MFS in regard to malodors.  (See Docket No. 23, Ex. 8, Wejkszner Dep. 38:5-41:16.)  MFS, however, has presented evidence to the contrary, namely that Defendants: (1) knew MFS did not have a malodor problem and (2) included these provisions simply as retaliation for MFS's participation in protected activities.  The determination of whether MFS did in fact emit malodor or whether Defendants knew MFS was not the source of the malodor go directly to the primary issue of the retaliation claim– what were Defendants' motivations in drafting the Briefing Memorandum for the Secretary and proposing the two onerous conditions in the draft Title V permit?

A court within this Circuit has reasoned that: "Faced with facts from Plaintiff tending to prove that Defendants' motives were retaliatory and facts from Defendants tending to prove that their motives were pure, the court is at an impasse.  The decision of which evidence to credit and which to reject properly lies with the jury, not the court on summary judgment." Smith v. Central Dauphin School District, 511 F. Supp. 2d 460, 480 (M.D.Pa. 2007); Thomas v. Independence Township, 463

F.3d 285 (3d Cir. 2006) (holding it was a question of fact whether harassment was retaliation for participation in protected activity); Suppan v. DaDonna, 203 F.3d 228 (3d Cir. 2000) (same). Here, the Court is facing a similar impasse. The Motion for Reconsideration on the First Amendment claim will be denied because genuine issues of material fact exist as to whether MFS's request for and meeting with the Secretary was the cause of the adverse action it suffered.

**C.     Statute of Limitations On the First Amendment Claim**

Defendants, with permission of the Court, argue in their Supplemental Memorandum that MFS cannot rely on the equitable tolling doctrine to defeat the statute of limitations defense on the First Amendment claim. In support of this argument, Defendants rely on the O'Connor case, supra. As discussed below, the Court does not find that the O'Connor case warrants the dismissal of the retaliation claim in its entirety. However, for statute of limitations purposes, it prevents MFS from using acts prior to May 29, 2006 to form the basis of the retaliation claim. Nevertheless, O'Connor, does not prevent MFS from relying on the equitable tolling doctrine to toll the statute of limitations as to MFS's other constitutional and state law claims.

**1.     First Amendment Claim**

In O'Connor, a former police officer brought a § 1983 action against a city and its police department alleging retaliation for assistance in a federal corruption investigation. 440 F.3d 125. The court noted that actions brought under § 1983 are governed by the personal injury statute of limitations of the state in which the action accrued. See id. at 126. In New Jersey, where the action accrued, a two year statute of limitations applied. See id. Similarly, here in Pennsylvania, where the instant action accrued, a two year statute of limitations period applies to the retaliation claim. See 42 P.C.S.A. § 5524.

In O'Connor, with minor exceptions, all of the events described in O'Connor's complaint occurred more than two years before filing. Id. at 127. O'Connor argued, however, that the statute of limitations was equitably tolled because his complaint stated a hostile work environment claim involving a "continuing violation." Id. The Third Circuit resolved the statute of limitations issue by relying on National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Morgan established a bright line distinction between discrete acts which are individually actionable and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim. Morgan, 536 U.S. at 113. The former must be raised within the applicable statute of limitations or they will not support a lawsuit. Id. The latter can occur at any time so long as they are linked in a pattern of actions which continue into the applicable limitations period. Under these circumstances, behavior occurring outside the statute of limitations is permissible for purposes of assessing liability. Discrete acts, however, cannot be aggregated into a continuing liability theory.[8]

As the court noted in O'Connor:

> Furthermore, the Morgan rule that individually actionable allegations cannot be aggregated is of particular import in the context of First Amendment retaliation claims. First Amendment retaliation claims are always individually actionable even when relatively minor. Even an act of retaliation as trivial as failing to hold a birthday party for a public employee, "if intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to deter a person of ordinary firmness" from exercising his or her First Amendment rights. . . .

---

[8]  In O'Connor, the Third Circuit held that Morgan applies not only to a Title VII case, but also to a § 1983 case. Although Morgan and O'Connor involved employment litigation, it is apparent that the enunciated principles would apply in other contexts to cases brought under § 1983.

> \*       \*       \*       \*       \*       \*
>
> A First Amendment retaliation claim will lie for any
> individual act which meets this "deterrence threshold,"
> and that threshold is very low: as we said in <u>Suppan</u>, a
> cause of action is supplied by all but truly de minimis
> violations.

<u>O'Connor</u> 440 F.3d at 127-28 (citations omitted).

Here, unlike in <u>O'Connor</u>, MFS alleges discrete acts of retaliatory conduct which occurred

within the two year statute of limitations period.  The protected activities in which MFS claims it

participated are the requesting of and meeting with the Secretary.  Since these protected activities

are well within the limitations period, it follows that any retaliation which occurred would also be

within that period.  Accordingly, <u>O'Connor</u> does bar MFS's retaliation claim to the extent it relies

on discrete acts occurring after May 29, 2006.

To the extent, however, that MFS may be attempting to advance a retaliation claim using

events that occurred before May 29, 2006, it may be prohibited from doing so for statute of

limitations purposes under <u>O'Connor</u>.  MFS's petitioning of state legislators, for example, in 2003

would be a protected activity.  There is evidence in the record to suggest that Defendant Dilazaro

caused the thirteen NOVs to be issued as a result of MFS "going over" DiLazaro's head.

Nevertheless, these acts are discrete and cannot  be tolled under the continuing violations doctrine

to support a First Amendment claim. Under  <u>O'Connor</u>, MFS would have been required to file suit

on these facts prior to 2006.  Accordingly, to the extent MFS is attempting to assert a retaliation

claim for actions occurring before May 2006, these claims would be time barred.[9]

---

[9]  Although the Court finds that discrete acts occurring before May 29, 2006 cannot be
used to sustain MFS's First Amendment claim for statute of limitations purposes, the Court's

2.     The Remaining Constitutional and State Law Claims

Defendants do not assert that O'Connor prevents MFS from using events prior to May 29, 2006 to support the other constitutional and state law claims.  As long as the continuing violations doctrine equitably tolls the two year statute of limitations on these claims, there is no violation of the statute of limitations.  As the Court indicated in its August 3, 2009 Opinion and Order, the doctrine of equitable tolling applies in this case.  In determining whether equitable tolling would apply, the Court considered three factors: (1) the subject matter factor; (2) the frequency factor; and (3) the permanence factor.  See Larsen v. State Employee's Retirement System, 553 F. Supp. 2d 403 (M.D. Pa. 2008).

In Larsen, the plaintiff asserted that an on-going, five year long delay in ruling on the appeal of his benefits determination was the defendants' continuing violation which warranted tolling the statute of limitations.  Id.  The court held that the "course of conduct alleged by Larsen, from the alleged miscalculation of his benefits to the current 'stonewalling' of his attempts to correct the miscalculation, is sufficiently continuing and connected to invoke the equitable relief of the continuing violations theory."  Id.  In reaching this conclusion, the Court applied the three factors noted above:

> With regard to the first factor, subject matter, Larsen's due process claim based on the delay in his administrative appeal is bound up with his claims that SERS defendants have deprived him of his pension without requisite process and is directly connected to the alleged initial wrongs of these

_____

ruling does not address whether these acts can be used as evidence of retaliation.  The Court is not holding, for example, that MFS is barred from using at trial the 2003 Field Enforcement Order or the consequences of its petitioning state representatives as evidence of retaliatory motives if they otherwise would qualify as admissible evidence under the Federal Rules of Evidence or case law.

defendants.   The second factor, frequency, also supports tolling the statute of limitations.   Larsen alleges that, from 2002 to the present, he attempted to move his appeal forward, but the SERS defendants blocked his efforts.   Finally, the third and most important factor, permanence, also weighs in Larsen's favor.   Although Larsen was aware of the alleged miscalculation of his benefits in 2002, he immediately appealed the decision.   Larsen reasonably could have anticipated that his claims would be addressed through the administrative process, giving his initial benefits determination less "permanence" for purposes of this analysis. Larsen did not sit on his rights, but diligently pursued his claims as far as SERS would allow him.

Id.

Here, similar to the position of the plaintiff in Larsen, MFS has presented evidence of an ongoing seven year dispute with Defendants that finally culminated in May 2008 with MFS's realization that Defendants were never going to renew MFS's Title V permit.  The subject matter factor is present  in the form of the NOVs and malodor issues which occurred from 2001 to 2007. Defendants consistently cited these malodor issues to EPA and to the Secretary in order to delay and complicate MFS's permit renewal process.  The frequency factor also weighs in MFS's favor because, similar to Larsen, MFS has detailed a pattern of attempts since 2001 to address the malodor issue with Defendants by, for example, requesting the factual information resulting in the issuance of the NOVs, appealing the Field Enforcement Order, petitioning state legislators, writing letters to Defendants and requesting meetings with Defendants and PaDEP officials.  Finally, the permanence factor also favors MFS because like Larsen, MFS constantly challenged Defendants' decisions and reasonably believed that its frustration with Defendants' position could be resolved through alternative administrative means.  Moreover, the permanence factor is lessened here because Defendants' actions were not final.  The issuance of the NOVs was not appealable and Defendants

never issued a final decision on MFS's Title V permit.   Accordingly, there are facts in the record to support the conclusion that equitable tolling should apply in this case.  While acts occurring before May 29, 2006 are barred by the statute of limitations from forming the basis of MFS's First Amendment retaliation claim, they can be used under the equitable tolling doctrine to support MFS's other constitutional and state law claims.[10]

### D. Defendant DiLazaro Should Be Dismissed On Count I Only

Defendant DiLazaro contends that he should be dismissed as a party to MFS's § 1983 First Amendment retaliation claim and the other claims because he retired from PaDEP in September 2007.  Defendant DiLazaro correctly argues that a defendant must have personal involvement in order to be liable for a § 1983 claim.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("[a] defendant in a civil rights action must have personal involvement in the alleged wrongs . . .") Defendant DiLazaro argues that his personal involvement is time barred because it occurred before the applicable two year statute of limitations.  The Court agrees with Defendant DiLazaro as to Count I only.

 Based on the holding in O'Connor and the Court's determination that MFS's retaliation claim should be limited for statute of limitations purposes to events occurring before and after the meeting with the Secretary but within two years of May 29, 2008, Defendant DiLazaro should be dismissed as a party to Count I.  He retired before MFS requested the meeting with the Secretary and there is no evidence he contributed to the Briefing Memorandum or to the draft permit conditions.  Since there is no evidence that Defendant DiLazaro participated in retaliatory conduct within the two

---

[10] Apart from the applicability here of the continuing violations doctrine, MFS has alleged at this stage acts by Wejkszner, Robbins and Bedrin within the statute of limitations period to support the other constitutional and state law claims.

year statute of limitations, Defendant DiLazaro will be dismissed as a Defendant in Count I.

This same reasoning does not apply to MFS's claims in Counts II and III of the Complaint. As discussed above, under O'Connor and Larsen, acts which do not give rise to an independent claim, but constitute a part of a continuing violation, may be relied upon under the equitable tolling doctrine. See O'Connor, 440 F.3d at 127; Larsen, 553 F. Supp. 2d at 417.

In considering events that occurred before 2006, Defendant DiLazaro's actions are at the core of many of MFS's constitutional claims. Defendant DiLazaro had the most significant involvement in alleging MFS was a nuisance and in accusing MFS of having malodor issues. Defendant DiLazaro directed that the first NOV be issued to MFS in November 2001. (See Complaint and Answer, at 56(B).) Defendant DiLazaro directed the Field Enforcement Order to be issued to MFS at 5:10 p.m. on a Friday afternoon with a response due by Monday. These actions were characterized as childish by an EHB Administrative Law Judge. (See Complaint and Answer, at 56(C).) Defendant DiLazaro knew the majority of the thirteen NOVs issued to MFS were based on one complaining residence, which MFS argues violated PaDEP policy. (See Docket No. 23, Ex. 16, Email, dated Nov. 26, 2003.) Defendant DiLazaro admits he was upset with MFS for "going over his head" and petitioning state officials. (See Docket No. 23, Ex. 5, Hauff Dep 125:3-23.) Defendant DiLazaro publicly called MFS a nuisance even though he was aware as early as 2002 that other operations were emitting malodors in the Bethlehem area. (See Docket No. 23, Ex. 4, Letter, dated February 21, 2003.) MFS wrote Defendant DiLazaro in 2006 to inform him that they had reached an agreement with EPA. Defendant Robbins, with Defendant DiLazaro's acquiescence, wrote to EPA objecting to the terms of the Consent Decree. (See Docket No. 23, Ex. 9, Robbins Dep. 59:21-60:8.) At the summary judgment stage, these actions by Defendant DiLazaro evidence

23

an animus toward MFS and are relevant to the equal protection and substantive and procedural due process claims. Accordingly, Defendant DiLazaro is only dismissed as a Defendant on the First Amendment retaliation claim.

### E.    Sovereign Immunity And Plaintiff's State Law Claims

Defendants next argue that they are entitled to sovereign immunity on Count III of MFS's Complaint which contains a state law claim of intentional interference with prospective contractual relations and prospective advantage. The Court previously denied summary judgment on this ground because there is a genuine issue of material fact as to whether Defendants acted outside the scope of their employment. The Court will not change its previous ruling.

Under Pennsylvania law, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly specifically waives sovereign immunity . . . ." 1 Pa. C.S.A. § 2310. The Sovereign Immunity Act, 42 Pa C.S.A. 8522(b), excludes nine categories of actions from sovereign immunity. Intentional interference with a prospective relationship is not a listed exception. Accordingly, absent an express waiver of sovereign immunity by the Commonwealth, its officials and employees acting within the scope of their employment are shielded from liability for the tort of intentional interference with prospective contractual relationships. See Holt v. Northwest Pennsylvania Training Partnership Consortium Inc., 694 A.2d 1134, 1140 (Pa. Commw. Ct. 1997).

MFS argues that Defendants acted outside the scope of their employment and therefore are not entitled to sovereign immunity. As previously indicated by the Court, under Pennsylvania law, which has adopted the Restatement (Second) of Agency § 228 test, the "[c]onduct of an employee

is within the scope of employment only if: (1) it is of the kind that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is calculated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, it is not unexpected by the employer." Restatement (Second) of Agency § 228.  Defendants have the burden of proving that they were acting within the scope of their employment within the time frame at issue and are entitled to sovereign immunity.  See La Frankie v. Miklich, 618 A.2d 1145 (Pa. Cmwlth. 1992).

Defendants argue that, viewing the facts in a light most favorable to MFS, they were acting within the scope of their employment.  In support of their argument, Defendants cite three additional cases not previously cited in their Motion for Summary Judgment.  Defendants assert that these cases stand for the proposition that an employee may still be acting within the scope of his or her employment even if they act disobediently or criminally.  See First Nat'l Bank of Altoona v. Turchetta, 181 A.2d 285, 288 (Pa. 1962); Potter Title and Trust Co. V. Knox, 113, A.2d 549, 551 (Pa. 1955); Commonwealth v. Cox, 476 A.2d 1012, 1014 (Pa. Cmwlth. 1984).  None of these cases, however, involve claims of sovereign immunity.  More importantly, these cases note that, although the standard is high, an employee acting on behalf of the employer can still exceed the scope of his or her employment.  See Potter Title and Trust, Co., 113 A.2d at 551.  "The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business . . . .  In such cases, the facts may indicate that the servant is merely using the opportunity afforded by the circumstances to do the harm."  Id. (quoting Restatement of Agency § 235, cmmt. c).

Here, MFS has provided sufficient evidence for a reasonable jury to conclude that

Defendants' conduct was "outrageous" or "abnormal" and not done with the intent to perform their public duties but instead with intent "to do harm" to MFS. MFS has alleged facts that Defendants were upset with them as early as 2003 for petitioning state officials. Defendant DiLazaro admitted to being upset because MFS had "gone over his head." (See Docket No. 23, Ex. 5, Hauff Dep 125:3-23.) Defendant DiLazaro publically stated MFS was a nuisance. (See Docket No. 23, Ex. 4, Letter, dated February 21, 2003.) MFS has alleged facts that Defendants knew that other operations, Bethlehem Sewage Plant and IESI Bethlehem Landfill, were emitting malodors in the area. (See, e.g. Docket No. 23, Ex. 29, Report, dated March 6, 2002; see also Ex. 9, Robbins Dep. 197:5-13.) Defendants, however, never issued a NOV to these operations. With this history of hostility as a backdrop, Defendants continuously tried to thwart MFS's efforts to obtain its Title V permit by arguing that it was the source of malodor, despite never meeting its burden of proof on this issue. The misleading Briefing Memorandum sent to the Secretary by Defendant Robbins was approved by Defendant Wejkszner and Bedrin. Defendants issued MFS a draft permit containing harsh conditions, only to drop these conditions eight months after this action was filed. (See Docket No. 23, Ex. 8, Wejkszner Dep. 59:16-60:4.)

Defendants dispute these allegations and argue that they are not controverted material facts about which there is a genuine issue. The Court disagrees. A reasonable jury could find these facts, if proven at trial, amount to outrageous conduct which did not further any purpose of PaDEP and were outside the scope of Defendants' duties. See Estate of Shuman v. Weber, 419 A.2d 169, 172 (Pa. Super. 19890) (holding issue of whether person acted within scope of his or her duties is generally issue of fact for jury). Accordingly, the defense of sovereign immunity does not prevent this case from moving beyond the summary judgment stage.

26

**E.      Qualified Immunity is Inappropriate Where Genuine Issues of Material Fact Exist.**

Finally, Defendants argue that the Court erred by not identifying genuine issues of material fact that warrant the denial of qualified immunity as to each Defendant on each of MFS's constitutional claims, citing Forbes v. Township of Lower Merion, 313 F.3d 144 (3d Cir. 2002).  In Forbes, the Third Circuit held that a district court resolving a motion for summary judgment on the grounds of qualified immunity must make specific findings of fact and law.  Id. at 148.  Under Forbes, the district court must provide both an "identification of relevant factual issues and an analysis of the law that justifies the ruling with respect to those issues."  Id.  Pursuant to Forbes, the Court will explain in more detail the basis for denying qualified immunity at the summary judgment stage in the August 3, 2009 Opinion and Order.

Defendants assert that they are entitled to qualified immunity in their personal capacity because MFS has failed to demonstrate a violation of any clearly established constitutional right. The doctrine of qualified immunity protects government officials "from liability for civil suit damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In resolving claims of qualified immunity, a court must decide (1) whether the facts alleged or shown by plaintiff make out a violation of a constitutional right and (2) whether that right was clearly established at the time of the defendant's misconduct.  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (altering decision in Saucier v. Katz, 533 U.S. 194 (2001) and holding that it is appropriate for district court to address second prong of two part test first).   "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable

[official] that his conduct was unlawful in the situation he confronted."  See Saucier, 533 U.S. at

203.  The Court will examine each of MFS's four constitutional claims to determine if (1) the facts

alleged evidence a violation of a constitutional right and (2) whether that right was clearly

established at the time of Defendants' alleged misconduct.   In light of this analysis, the Court

concludes that qualified immunity is inappropriate at this stage of the proceeding because there are

genuine material facts in dispute as to whether a constitutional violation has occurred and whether

that violation was clearly established.[11]

     1.  Evidence of a Constitutional Violation

       a.  First Amendment Retaliation

As detailed above, the Court holds that MFS has produced sufficient evidence for a

reasonable jury to find that Defendants Robbins, Wejkszner and Bedrin violated MFS's First

---

   [11]  The Court is not holding that qualified immunity is not warranted in this case as a matter of law.  The Court simply finds that there are genuine issues of material fact throughout the record which prevent the Court from finding as a matter of law that qualified immunity applies at the summary judgment stage.  The Court may later find, after the close of evidence at trial, either by motion of a party or sua sponte, that as a matter of law, Defendants are entitled to qualified immunity.  Compare Fed. R. Civ. P. 50(a)(1) (court may grant judgment as matter of law when "party has been fully heard on issue during jury trial and court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue") with Fed. R. Civ. P. 56(c) (summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."); see also Footnote 13 infra.  Based on the record before it, however, the Court cannot hold that Defendants are entitled to qualified immunity at this time.

    This distinction is important because the Supreme Court's holding in Johnson v. Jones, 515 U.S. 304 (1995), establishes that a denial of qualified immunity at the summary judgment stage, based on the lower court's findings that genuine issues of material fact exist, is not immediately appealable.  See id. at 319-320 ("we hold that a defendant entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial.")

Amendment rights.

        b.      Equal Protection

MFS also asserts a § 1983 claim for equal protection under a "class of one theory." The Court finds that MFS has presented sufficient evidence for a reasonable jury to find an equal protection violation.

To succeed in a "class of one" equal protection claim, MFS must demonstrate that: (1) Defendants treated it differently from others similarly situated; (2) Defendants did so intentionally; and (3) there was no reasonable basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006); see also Ryan v. Lower Merion Twp., 205 F. Supp. 2d 434, 442 (E.D. Pa. 2002) (denying summary judgment on equal protection claim because disputed material facts existed as to whether plaintiff was reviewed under different standards than other similarly situated businesses). Public officials engage in unconstitutional discriminatory application or administration of a facially impartial law when they seek to enforce the law "on the basis of an unjustifiable standard, such as race, or religion, or some other arbitrary factor," or in order "to prevent the exercise of a fundamental right." Kaplan v. Chertoff, 481 F. Supp. 2d 370, 392 (E.D.Pa. 2007).

Here, MFS has presented evidence that Defendants treated it differently than other similarly situated operations in the immediate vicinity and it did so knowingly and intentionally. Specifically, other operations in the same vicinity as MFS's Mineral Wool Plant have publicly admitted to emitting malodor in the Bethlehem, Pennsylvania area. (See Docket No. 23, Ex. 30, Inspection Report, dated April 7, 2006.) MFS has put forth evidence that each of the four Defendants knew that other operations were emitting malodor. Indeed, Defendant DiLazaro privately acknowledged to his

29

air quality inspectors and to Defendant Robbins that Bethlehem Sewage Treatment Plant, the ISEI Bethlehem Landfill and Connectiv Power were sources to be investigated when a complaint for malodor was received.  (See Docket No. 23, Ex. 32, Email, dated Nov. 3, 2005.)  Despite this knowledge, PaDEP never issued NOVs to these companies.  (See Docket No. 23, Ex. 9, Robbins Dep. 2:5-9; 197:5-13.)

Despite these facts and the lack of proof to support the issuance of the NOVs to MFS, Defendant DiLazaro insisted on publicly declaring that MFS is a nuisance (Docket No. 23, Ex. 27, Newspaper Article, dated May 22, 2003). Defendant Robbins informed a major customer of Thermafiber, an interested buyer of the Mineral Wool Plant, that the Plant had malodor issues (see Docket No. 23, Ex. 9, Robbins Dep. 115:7-116:19).  Defendants Robbins, Wejkszner, and Bedrin made false representations to the Secretary that MFS had a history of malodor problems. (See Docket No. 23, Ex. 9, Robbins Dep.  110:2-111:16).  Defendants used the malodor issue to prevent MFS from renewing its Title V permit.  Based on this evidence a reasonable jury could conclude that Defendants' actions of intentionally treating MFS differently from other similarly situated, culpable operations were not rationally related to a government interest but were instead driven by unconstitutional considerations.  If a jury were to find that Defendants' actions were motivated by personal animus or other improper reasons, then Defendants' conduct of denying MFS the fundamental right to conduct its business could amount to an equal protection violation.

c.    Procedural Due Process

Defendants next assert that MFS was not denied procedural due process.  The Court disagrees and will expand upon the analysis set forth in the August 3, 2009 Order.

The Fourteenth Amendment forbids a state from depriving persons of life, liberty, or property

without due process of law.  U.S. Const. amend. XIV, § 1.  To prove a procedural due process violation, a plaintiff must demonstrate (1) the asserted individual interests are encompassed within the Fourteenth Amendment's protection of life, liberty or property; and (2) whether the procedures available provided plaintiff with due process of the law.  See Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984).

Defendants do not appear to challenge that MFS has a property interest at issue here. Instead, Defendants argue that MFS was not denied due process of law.  Procedural due process is the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  City of Los Angeles v. David, 538 U.S. 715 (2003).  The Supreme Court has set forth three factors a court should consider in determining whether the claiming party received due process of law: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens that additional or substitute procedures would entail.

Here, MFS has presented evidence that tip the three factors in its favor.  First, MFS has lost the ability to operate its plant or to sell the plant to an interested buyer due to Defendants' actions. Second, because of Defendants' actions and the limited procedures available to MFS to appeal those actions, MFS was in fact deprived of its property interest in the plant.  Finally, there is no evidence on the record to suggest that Defendants or PaDEP would be overly burdened by affording Defendants with proper procedures and safeguards.

The crux of Defendants' argument on this point is that MFS has no procedural due process claim because it did not pursue available procedures.  After reviewing the record, the Court is

unaware of what procedures Defendants refer to.  MFS has presented evidence, and Defendants

admit, that MFS could not have appealed the NOVs because they were not final actions.  MFS

appealed the first Field Enforcement Order, issued by Defendant Robbins at the direction of

Defendant DiLazaro.  (See Complaint and Answer, at 56(M).)  This Order was filed after the

issuance of the first NOV.  However, after MFS filed the appeal, Defendants withdrew the Field

Enforcement Order and never filed another one despite issuing thirteen more NOVs to MFS.  (See

Complaint and Answer at ¶ 56(O).)  Moreover, all four Defendants were involved in PaDEP's

petition to EPA objecting to the Consent Decree.  (See Docket No. 23, Ex. 9, Robbins Dep. 59:21-

60:8.)  When the Consent Decree was issued without including or covering Defendants' objections,

Defendants Wejkszner, Bedrin and Robbins still refused to reissue MFS a Title V permit.  (See

Docket No. 23, Ex. 42, Letter, dated Sept. 27, 2007.)  MFS pursued a meeting with the Secretary.

However, Defendants thwarted this attempt by providing the Secretary in advance of the meeting

with the Memorandum containing misinformation.  (See Docket No. 23, Ex. 46, Memorandum.)

The Secretary relied on the Memorandum during the meeting and then relinquished all decision-

making authority in the matter to Defendants.  See Docket No. 23, Ex. 12, Bedrin Dep. 60:1-22.)

Defendants responded by issuing a draft permit containing two conditions which would allow

Defendants to shut down MFS through the issuance of a single NOV without providing MFS with

any procedural safeguards to challenge this potential result.  (See Docket No. 23, Ex. 49, Draft

Permit.)  Neither party is able to identify a PaDEP process available to MFS to appeal the draft

permit.  Defendants argue that MFS could have appealed a permit decision to the Pennsylvania

Environmental Hearing Board, but to this day, there has never been a decision on MFS's renewal

application.  It has been listed as pending for over six years.  MFS tried mightily to avail itself of any

possible process it could obtain to challenge Defendants' actions.  Only when it felt that it had

exhausted all remedies did it file this action.  Consequently, the Court finds that MFS has presented

evidence sufficient to create a genuine issue of material fact as to whether it was denied procedural

due process in violation of the Fourteenth Amendment.

> d.      Substantive Due Process

MFS's final constitutional claim alleges Defendants violated its substantive due process

rights.  Defendants argue that Plaintiff has not provided any material facts  to show a violation of

substantive due process.  The Court disagrees, and consistent with Forbes, expands upon its prior

reasoning.

The Due Process Clause of the Fourteenth Amendment contains a substantive component that

bars arbitrary, wrongful government action "regardless of the fairness of the procedures used to

implement them." Zinerman v. Burch, 494 U.S. 113, 125 (1990).  In order to meet the standard for

establishing a violation of substantive due process rights, MFS must present evidence of state action

that "shocks the conscience." Sanford v. Stiles, 456 F.3d 298, 306 (3d Cir. 2006); see also Ryan v.

Lower Merion Twp., 205 F. Supp. 2d 434 (E.D. Pa. 2002) (finding that actions of township officials

in arbitrarily delaying decision and ultimately denying application for taproom permit could satisfy

"shock the conscience" standard).  The Third Circuit has found three possible standards that can be

used to determine if a government action shocks the conscience: (1) deliberate indifference; (2) gross

negligence or arbitrariness that shocks the conscience; or (3) intent to cause harm.  See Phillips v.

County of Allegheny, 515 F.3d 224 (3d Cir. 2008).  The Third Circuit has held that "where the state

actor had ample time for deliberation before engaging in the allegedly unconstitutional conduct, the

appropriate standard will be deliberate indifference." Patrick v. Great Valley School District, 296

Fed. Appx. 258, 261-62 (3d Cir. 2008).

Defendants argue that even when viewing the facts in a light most favorable to MFS, there is no basis for holding that their conduct "shocks the conscience." The Court disagrees. In Lonzetta Trucking & Excavating Co. v. Schan, 144 Fed. Appx. 206 (3d Cir. 2005), the owner of a quarry filed a § 1983 action, alleging violation of its substantive due process rights, against a number of township defendants relating to a permit for mining operations. The Third Circuit affirmed the lower court's findings that genuine issues of material fact existed as to whether defendants' conduct shocked the conscience. Id. at 212. The Third Circuit found that a factual dispute existed as to whether "the Board acted out of a belief that they could regulate the quarry under its Ordinances and whether [plaintiff] was in violation of the 1996 Ordinance or whether the Board was arbitrarily trying to close the quarry." Id.

Here, the Court faces an identical situation as addressed by the Third Circuit in Lonzetta Trucking. As discussed above, there is a genuine issue of material fact as to whether MFS was in fact emitting malodor which would provide Defendants and PaDEP with the authority to regulate MFS. There is also a genuine issue of material fact as to whether Defendants knew that their actions in blocking the issuance of the Title V permit were wrong and/or in violation of their authority. Similar to Lonzetta Trucking, there is a genuine and material dispute here as to whether Defendants were acting in the public interest or whether they were arbitrarily attempting to close the plant. If the latter is proved at trial, an inference can be drawn that Defendants' conduct shocks the conscience. Accordingly, MFS has alleged facts sufficient to establish a substantive due process violation at the summary judgment stage.

Moreover, applying the deliberate indifference standard, MFS has provided sufficient

evidence for a reasonable jury to conclude that Defendants' conduct shocks the conscience.  Indeed, Defendants cannot argue they lacked "ample time for deliberation" in their actions.  To the contrary, MFS asserts a pattern of wrongful conduct spanning approximately seven years.  During that time, Defendants were made aware by multiple sources that their conduct may be questionable.  Specifically, the EHB Administrative Law Judge, hearing MFS's appeal of the Field Enforcement Order, informed Defendant DiLazaro that he and his staff were "acting like children" and that he sensed hostility in Defendant Robbins decision to issue the Field Enforcement Order on a Friday evening.  (See Complaint and Answer, at 56(O).)  A Pennsylvania State Representative sent a letter to Defendants expressing concerns about the way MFS was being treated by Defendant DiLazaro and his staff.  (See Docket No. 23, Ex. 4, Letter, dated Feb. 21, 2003.)  On several occasions, MFS wrote letters to and requested meetings with Defendants to discuss the unfair prejudice they were suffering as a result of Defendants' actions.  Despite all of these warnings, Defendants continued to create hurdles to prevent MFS from renewing its Title V permit.  Accordingly, MFS has presented evidence that Defendants' conduct shocks the conscience and thus violated MFS's substantive due process rights.

### 2.    The Constitutional Violations Were Clearly Established

Since MFS has presented facts to support each of its alleged constitutional violations, the Court must now consider whether these violations were clearly established, meaning would a reasonable official know that his or her conduct was unlawful or unconstitutional.  The Court finds that MFS has put forth evidence which creates an inference  that a reasonable official would know Defendants' conduct was unconstitutional.  However, Defendants have also advanced justifications for their conduct which raises a genuine issue of material fact which must be resolved by a judge or

jury depending on the evidence presented at trial.

In disputing that any constitutional violation was clearly established, Defendants argue that each Defendant was unaware that the actions he took were in violation of MFS's constitutional rights. Defendants argue that Defendants Wejkszner, Bedrin and Robbins were unaware that, in their official roles with PaDEP, their conduct of preparing and approving a draft Title V permit with the challenged conditions was unlawful. Defendants also assert that it would not be clear to Defendants Bedrin, Robbins and Wejkszner that their conduct of preparing and approving a Memorandum to the Secretary about MFS was unlawful. Finally, Defendants also argue that there is nothing to indicate Defendant DiLazaro was aware that he violated any constitutional rights when he declared MFS a public nuisance, prepared comments for EPA objecting to the Consent Decree, or denied MFS's renewal application for its Title V permit. Stated in this simplistic way, the Court might agree with Defendants' assertions. However, MFS has presented a considerable amount of evidence of retaliatory and other conduct which raises genuine issues of material fact as to the intent and motive behind Defendants' conduct. These inquiries cannot be framed as simply as Defendants suggest.

If a jury finds, for example, that Defendants knew MFS was not the source of malodor and yet continued to assert that MFS was the source in order to prevent MFS from renewing its Title V permit as retaliation for MFS requesting and meeting with the Secretary, then as a matter of law, Defendants are not entitled to qualified immunity on the First Amendment Claim. MFS has produced evidence that Defendants knew other plants were the source of malodor, yet never issued a NOV to these operations nor denied them a renewal of their Title V permit. Based on this evidence, a reasonable jury could draw an inference that Defendants knew their discrimination

against MFS was unlawful. Finally, a reasonable jury could find that an official would know that denying a company its Title V permit to fulfill a personal agenda to unjustifiably shut down that company, without affording the company any meaningful process, would violate the company's substantive and procedural due process rights. Accordingly, the outcome of this qualified immunity determination hinges upon the intent of Defendants. As explained by the Third Circuit, "[i]n cases in which constitutional violations depend on evidence of specific intent, 'it can never be objectively reasonable to act with the intent that is prohibited by law.'" Monteiro v. City of Elizabeth, 436 F.3d 397, 404 (3d Cir. 2006). A reasonable official would know that retaliatory conduct is illegal, a violation of the constitutional rights of the company and outside the scope of his/her duties.[12] Consequently, if a jury found that Defendants acted with an unlawful motive or intent, by definition, their conduct would not be reasonable.

The determination of what motivated Defendants is purely factual and must be resolved by a jury. The inquiry as to the intent behind Defendants' conduct will depend solely on the facts proven at trial. The Third Circuit has reasoned that where the motives of an official are at issue, an

---

[12] The claims MFS asserts have been clearly established by Supreme Court and Third Circuit precedent. See Crawford-El v. Bretton, 523 U.S. 574, 589 n. 10 (1998) (standing for notion that retaliation offends the constitution because it threatens to inhibit free speech); See Abbot v. Latshaw 164 F.3d 141 (3d Cir. 1998) (finding that failure to provide advance notice and or the right to be heard upon a deprivation of liberty or property offends the constitutional right to procedural due process); United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003)("the core of the concept [of due process is] protection against arbitrary action [and that] only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'") (internal citations omitted); Hill v. Borough of Kutztown, 455 F.3d 225 239 (3d Cir. 2006)("the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.")

analysis of qualified immunity "cannot be conducted without factual determinations as to the officials' subjective beliefs and motivations . . . ." <u>Larsen v. Senate of Com. Of Pa.</u>, 154 F.3d 82, 94 (3d. Cir. 1998); <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 142 n. 15 (3d Cir. 2001) (concluding that qualified immunity defense is unavailable where jury finds that defendants possessed the requisite wrongful intent.)[13]   Accordingly, the Court cannot find as a matter of law at this stage that Defendants acted reasonably.   Because genuine issues of material fact exist throughout the record, the Court reaffirms its previous denial of qualified immunity at this stage of the proceedings and the Motion for Reconsideration of the ruling on qualified immunity will be denied.

An appropriate Order follows.

---

[13] The ultimate determination of qualified immunity is a matter of law which must be resolved by the Court. <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991). However, "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." <u>Curly v. Klen</u>, 298 F.3d 271, 278 (3d Cir. 2002). Material disputes of historical facts relevant to the qualified immunity analysis must be resolved by a jury at trial. <u>See</u> <u>Estate of Smith v. Marasco</u>, 430 F.3d 140, 152-53 (3d Cir. 2005). Once the jury has resolved issues of fact, however, the court, as a matter of law, must resolve the ultimate question; whether qualified immunity applies. <u>See</u> <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 242 (3d Cir. 2004) ("The jury...determines disputed historical facts material to the qualified immunity question...District Courts may use special interrogatories to allow juries to perform this function...The court must make the ultimate determination on the availability of qualified immunity as a matter of law.")