IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - -X

MFS, INC.,                                     :

      Plaintiff,                         :

v.                                             :       Civil Action No. 08CV2508

THOMAS A. DILAZARO, Individually,              :
  et al.
                                               :

      Defendants.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - -X

**PLAINTIFF MFS, INC.'S
PRETRIAL STATEMENT**

The Plaintiff, MFS, Inc., by and through its undersigned counsel, pursuant to this Court's

Scheduling Order of September 29, 2009, hereby submits its Pretrial Statement, stating as

follows:

**1.  BRIEF STATEMENT OF THE NATURE OF THE ACTION AND THE
BASIS ON WHICH THE JURISDICTION OF THE COURT IS INVOKED**

The causes of action and claims for relief arise under the First and Fourteenth

Amendments of the Constitution of the United States of America and under 42 U.S.C. § 1983

and § 1988.  There is also a claim for relief under the laws of the Commonwealth of

Pennsylvania.  This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343

and 1367.

2.      **BRIEF STATEMENT OF THE FACTS OF THE CASE**

A detailed statement of the facts of this case have been set forth by MFS on pages 5 through 49 of its Amended Response in Opposition to Defendants' Motion for Summary Judgment filed on July 14, 2009 (Docket No. 23) and is incorporated herein by reference. For the Court's convenience, those facts are summarized below as follows:

    A.      Background

            (i)      Brief History Of The Mineral Wool Plant

At all times relevant, MFS owned a mineral wool manufacturing facility located in Bethlehem, Pennsylvania (the "Mineral Wool Plant"). The Mineral Wool Plant was constructed in 1969-1970 by Bethlehem Steel Corporation ("BethSteel") pursuant to a purchase order from Armstrong World Industries. In or about February, 1988, MFS acquired the Mineral Wool Plant from BethSteel. The Mineral Wool Plant was in continuous operation for approximately 36 years, from 1970 until February, 2006. Throughout that time, it employed approximately 68 local residents, most of whom were the primary providers for their families. It also utilized the services and products of dozens of area businesses, and it supplied its mineral wool to customers for incorporation into finished goods that were sold both nationally and internationally.

            (ii)     Brief Description Of Mineral Wool
                     And The Manufacturing Process

Mineral wool is a non-hazardous fibrous material that was produced at the Mineral Wool Plant from recycled blast furnace slag, which otherwise would have been a landfill waste product. The recycled blast furnace slag was combined with silica rock and limestone and, then, the combined material was melted in two cupola furnaces at temperatures as high as $3000^0$ Fahrenheit to produce a molten, lava-like material. The molten material was then discharged onto rapidly rotating discs which would spin the molten material and cool it into fibers about

one-tenth the diameter of a human hair. The fibers were then cleaned using a proprietary process, collected, baled and shipped by MFS to manufacturers of ceiling tile, insulation, and fireproofing products.

During the manufacturing process, particulate matter ("PM") was produced from both the operation of the Mineral Wool Plant's two cupola furnaces and the operation of its mineral fiber handling equipment. The Mineral Wool Plant, which was one of the newer mineral wool manufacturing facilities in the United States, was unique in its design because of the fact that it comingled and controlled the PM from both its cupola furnaces and its mineral fiber handling equipment in a large, single baghouse. The older mineral wool plants in the United States only controlled PM from their cupola furnaces.

B.    The Distinction Between An Odor And A Malodor

The laws relating to malodor have been in existence in the Commonwealth of Pennsylvania since the 1970s. There is a distinction in the law between an odor and a malodor, and the Pennsylvania Department of Environmental Protection ("PaDEP") can only lawfully exercise authority over a malodor. In order for a specific incident of an alleged odor to even possibly be considered an alleged malodor, each of the following is required: (i) there must be at least three complainants from at least three separate residences; (ii) each complainant must be simultaneously complaining about the same odor at each of their respective residences (as opposed to smelling something while driving on a road); (iii) a PaDEP air quality inspector must be present at each residence when the alleged odor is present there; (iv) the inspector must determine that it is, in fact, a malodor; and (v) the inspector must determine the source or sources from which it is emanating. A complaint about an odor is not proof that a malodor actually exists, and it is not a violation of the law to cause a malodor on your own property.

3

Pursuant to applicable law, the PaDEP only has authority to enforce a public as opposed to private nuisance, and a public nuisance must involve an offense that is so prevalent that it annoys the whole community. PaDEP bears the burden of proof that an odor rises to the level of a malodor and, in turn, that the malodor rises to the level of a public nuisance, as well as the burden of proving the source or sources of the alleged malodor. Thus, even if PaDEP issues a notice of violation ("NOV") alleging that a violation has occurred, that is merely an allegation and the recipient has no right to appeal it since it is not a final action of PaDEP.

C.     The Field Enforcement Order Issued To MFS

On Friday, January 24, 2003, at approximately 5:10 p.m., Defendant DiLazaro, with Defendant Robbins' acquiescence, directed that a Field Enforcement Order be served on MFS, requiring a response from MFS on the very next business day. The Field Enforcement Order was based solely on a single NOV for alleged malodor that had been issued to MFS over one year earlier on November 8, 2001 (for an alleged incident on November 7, 2001). Defendant DiLazaro caused the NOV for alleged malodor to be issued to MFS on November 8, 2001, and this was the first NOV for alleged malodor ever issued to MFS since it took over operation of the Mineral Wool Plant in 1988. However, Defendant DiLazaro did not comply with the applicable law when he directed that the NOV be issued to MFS on November 8, 2001 (for an alleged violation on November 7, 2001).

Given the circumstances by which the Field Enforcement Order was issued, MFS began petitioning various elected officials to complain about its treatment by Defendant DiLazaro and his staff. Elected officials, in turn, began contacting PaDEP. By way of example, on or about February 21, 2003, in response to MFS' petitioning, a Pennsylvania State Representative sent a

4

letter to PaDEP, expressing concerns about the way in which MFS was being treated by Defendant DiLazaro and his staff.

On February 24, 2003, which was the last possible day to file an appeal, MFS appealed the Field Enforcement Order to the Environmental Hearing Board ("EHB") since the matter had not been otherwise resolved.   During a telephonic hearing on MFS' appeal, the EHB Administrative Law Judge:   (i) questioned Defendant Robbins about issuing the Field Enforcement Order at 5:10 p.m. on a Friday and requiring compliance by the close of business on the following Monday; (ii) stated that the actions evidence hostility; (iii) cautioned Defendant Robbins that PaDEP should not take similar actions in the future; (iv) stated that the timing of the issuance of the Field Enforcement Order is the most salient thing and that this is not a positive thing for PaDEP; and (v) stated that it appears to the judges on the EHB that Defendant DiLazaro and his staff are acting like "little children."   In early 2004, the Field Enforcement Order was withdrawn by PaDEP.  MFS' appeal was then dismissed as moot.

By the time of the appeal in February, 2003, Defendant Robbins was working closely with Defendant DiLazaro on these matters relating to the Mineral Wool Plant, and Defendant Robbins has continued to work on these matters at least through the date of his deposition on March 24, 2009.  Defendant Wejkszner testified that he started working regularly with others in NERO regarding the Mineral Wool Plant when he was New Source Review Chief for the Air Quality Program headed by Defendant DiLazaro; his involvement continued when he succeeded Defendant DiLazaro as Air Quality Program Manager through at least January 2009.  Defendant Bedrin, who became Regional Director of NERO in June 2004, was being kept informed about what Defendants DiLazaro, Robbins and Wejkszner were doing relating to MFS, and Defendant Bedrin participated in and acquiesced to their conduct in regards to the Mineral Wool Plant.

D.    The NOVs For Alleged Malodor Issued To The Mineral Wool Plant

The Defendants have admitted that they have never met PaDEP's burden of proof for malodor with respect to the Mineral Wool Plant. The Defendants have also admitted that there has never been any adjudication resulting in a finding of fact that the Mineral Wool Plant has ever been in violation of the malodor laws or has ever been the source of any malodor. The Defendants have further admitted that any action taken by MFS to address alleged malodor reasonably could be interpreted as being done by MFS so as to appease the Defendants, as opposed to being an admission of any liability.

The NOVs for alleged malodor that were issued to MFS were concentrated in a very brief period of time during the Mineral Wool Plant's 36-year history of operations, and at a time when MFS had both contested the Field Enforcement Order and petitioned government officials for redress of grievances against the Defendants. According to PaDEP's records, the Mineral Wool Plant has received seven NOVs for alleged malodor (citing 13 alleged incidents at 13 specific times) over approximately 12,000 manufacturing days between 1970, when it began operations, and February 17, 2006, when it ceased operations. Of the thirteen specific incidents of alleged malodor identified in the NOVs, all of them are legally deficient. In addition, the Defendants knew that, although MFS could not appeal the NOVs for alleged malodor, MFS nevertheless contested the legal validity of all of them.

James Hauff was employed as either the Operations Manager or the General Manager of the Mineral Wool Plant on the date of each of the alleged incidents of malodor. Defendant DiLazaro admitted in a meeting with James Hauff that he was "pissed off" at MFS, and he "pounded the table with his fist," "got really red in the face," and stated that he "did not appreciate us [MFS] going over his head." Defendant DiLazaro also declared publicly and

6

without legal justification that "MFS is definitely a nuisance" in response to inquiries about malodor.   Defendant DiLazaro also erroneously and publicly attributed concentrations of benzene, a commonly known carcinogen, to MFS.   Defendant Robbins admitted that he was aware of the false public comments made about the Mineral Wool Plant.

The false public comments caused unjustified concerns about the Mineral Wool Plant to be amplified in the surrounding communities and caused the Mineral Wool Plant to carry the erroneous stigma that it was a proven health risk and a perpetual polluter in the community in which it was located.   Following the false public comments referred to above, MFS continued its petitioning of government officials for redress of its grievances.   In a meeting with James Hauff, Defendant DiLazaro "admitted he made those comments," and that he had been "castigated by his superiors at the urging of MFS" because there was no factual basis for those comments.

(i)     Sources Of Malodor In The Vicinity Of The Mineral Wool Plant

At the time the false public comments were made, and at all other times relevant to MFS' claims, the Defendants were on notice and/or actually knew that there were sources in the vicinity of MFS causing malodor.   For example, the PaDEP files relating to the publicly owned and operated Bethlehem Sewage Treatment Plant reveal that PaDEP was aware that the sewage treatment plant was emitting malodors as far back as March 2002, but PaDEP never issued any NOVs for malodor to the sewage treatment.   In January 2007, after MFS had ceased operations, the Bethlehem Sewage Treatment Plant admitted publicly that it has been the source of the hydrogen sulfide ($H_2S$) malodor (which smells like rotten eggs) in that area for years and that they have been taking measures since 2005 to try to control the $H_2S$ malodor from their sewage treatment plant.

7

In addition to the information in PaDEP's own files, James Hauff specifically told representatives of PaDEP about sources in the vicinity of MFS, but the Defendants continued to exclusively and publicly blame the Mineral Wool Plant for the malodor.  As a result, when someone detected an odor, they automatically attributed it to the Mineral Wool Plant when they called PaDEP to complain.  By way of example, a complainant stated to a PaDEP inspector that, until Defendant DiLazaro made his public comments about the Mineral Wool Plant at a public meeting, he had thought that the Bethlehem Sewage Treatment Plant was the cause of the rotten egg odor that he smelled.  MFS learned in discovery that, in November 2005, a few months before MFS ceased operations, Defendant DiLazaro privately acknowledged to Defendant Robbins and others at PaDEP that the Bethlehem Sewage Treatment Plant, the landfill and other such facilities were sources.

        (ii)     The $H_2S$ Ambient Air Monitoring Data

The Defendants contend in their answers to interrogatories in this case that data collected by a PaDEP hydrogen sulfide ($H_2S$) ambient air monitor located at the Lower Saucon Sportsmen Association (the "$H_2S$ Monitor") supports their assertion that the Mineral Wool Plant was the source of malodor.  The data collected by the $H_2S$ ambient air monitor, however, is not a legally sufficient basis to establish a violation for malodor.  In addition, the $H_2S$ ambient air monitor was not even in operation until March 2004, which was after each of the NOVs for alleged malodor were issued to MFS.  The $H_2S$ Monitor was an ambient air monitoring device that merely indicated what was in the air at that particular location.  Since the $H_2S$ Monitor merely measures ambient air at the particular location of the monitor, it does not identify the source or sources of the data collected by the monitor.

8

In addition, in September 2006, Becky Easley, who was an air quality inspector at NERO, prepared a memorandum for Defendant DiLazaro analyzing the data collected from the $H_2S$ Monitor, and she stated in her memorandum that the readings at the $H_2S$ Monitor were highest when the vector wind direction was between 255 degrees to 305 degrees in relation to the $H_2S$ Monitor. The Mineral Wool Plant is located at a vector wind direction of approximately 250 degrees in relation to the $H_2S$ Monitor. However, the Bethlehem Sewage Treatment Plant and the IMS Waylite baghouse are located at a vector wind direction of approximately 290 degrees and 280 degrees, respectively, which is in the middle of the area identified in Ms. Easley's memorandum as the direction from which the highest $H_2S$ readings were recorded at the monitor.

E.    The Consent Decree Between EPA And MFS

EPA promulgated a Maximum Achievable Control Technology ("MACT") standard for mineral wool production facilities. The MACT standard delineated both a compliance test standard and a compliance test method for particulate matter ("PM") from cupola furnaces only, as opposed to PM from mineral fiber handling equipment. Unlike the configuration of the Mineral Wool Plant as described above, the mineral wool manufacturing facilities which were used by EPA to develop the MACT had a baghouse to control the PM from only their cupola furnaces, which enabled a straightforward comparison of PM at the baghouse exhaust with the PM standard specified in the MACT.

As a result of its unique configuration, the Mineral Wool Plant was unable to use the test method for PM set forth in the MACT and, in July 2001, it submitted a request to EPA and PaDEP for either an alternative test standard or an alternative test method. As confirmed in the preamble to MACT, MFS had the right to apply for an alternative test to demonstrate compliance

with MACT. Moreover, it was the opinion of everyone involved in the matter at PaDEP, including the Defendants, that the existing control equipment at the Mineral Wool Plant could meet the PM standard prescribed in MACT, but everyone at PaDEP also acknowledged that the Mineral Wool Plant simply could not perform the test as prescribed in MACT due to its unique configuration.

EPA was taking the lead to resolve all MACT compliance issues with MFS, and PaDEP deferred to EPA on those issues. On April 9, 2003, EPA notified MFS and PaDEP that it would not grant MFS' request for an alternative test standard, but MFS' request for an alternative test method remained under consideration by EPA. Notwithstanding that fact, on April 15, 2003, an NOV was sent to MFS, incorrectly asserting that EPA had denied MFS' request for an alternative test method. The NOV was subsequently withdrawn by PaDEP because MFS' request for an alternative test method was, in fact, still pending with EPA.

On August 10, 2006, MFS wrote to Defendant DiLazaro to advise that MFS had reached an agreement in principle with EPA to resolve the MACT compliance issues. Also on August 10, 2006, MFS further advised Defendant DiLazaro that the agreement in principle contemplated that, due to MFS' unique configuration, MFS would be allowed to implement an agreed upon alternative test method to demonstrate compliance with MACT within six months of re-starting operations at the Mineral Wool Plant. On or about March 9, 2007, a proposed consent decree between MFS and EPA, reflecting the agreement in principle referred to above, was lodged with the United States District Court for the Eastern District of Pennsylvania (the "Consent Decree").

On or about March 23, 2007, the Consent Decree between MFS and EPA was published in the Federal Register at Volume 72, Number 56, advising that EPA would receive comments on the Consent Decree for a period of thirty (30) days. Also in March 2007, Defendants

DiLazaro and Robbins were advised that MFS intended to resume operations at the Mineral Wool Plant. In anticipation of resuming operations, MFS was working with the railroad to have a spur run to the Mineral Wool Plant to transport materials and it had identified alternate blast furnace slag.

On April 24, 2007, Defendant Robbins wrote to EPA to object to the Consent Decree, and he "strongly recommends" that it be revised to require MFS to address the alleged malodor issue. Defendants Bedrin, DiLazaro and Wejkszner were aware of the substance of Defendant Robbins' letter to EPA, and they agreed with all of the objections to the entry of the Consent Decree set forth therein. At the time of these objections, however, the Defendants knew that the alleged malodor issue at the Mineral Wool Plant still had never been proven in accordance with applicable law.

EPA rejected the Defendants' objections to the Consent Decree, including the objection to require that MFS address the alleged malodor issue. As a consequence, on or about July 19, 2007, Defendant Robbins, with the knowledge and acquiescence of the other Defendants, notified EPA that they would withdraw their objections to the entry of the Consent Decree, provided that EPA gave them copies of all written documents received by EPA from MFS pursuant to the terms of the Consent Decree. In a letter dated July 25, 2007, EPA confirmed its understanding that PaDEP was no longer objecting to the entry of the Consent Decree and that EPA would provide copies of the documentation requested by PaDEP in Defendant Robbins' letter of July 19, 2007. Neither the Defendants nor anyone else at PaDEP advised EPA that its understanding, as expressed in the EPA letter of July 25, 2007, was incorrect in any way.

On August 13, 2007, the Consent Decree between EPA and MFS was signed and entered by the U.S. District Court. PaDEP filed no objections in the U.S. District Court to the entry of

the Consent Decree, which did not contain any of the revisions demanded by Defendants. The Defendants knew that, if they filed their objections in Court, there would have been a hearing and MFS would have had an opportunity to present evidence at that hearing to refute the Defendants' contentions.

In the Motion to Enter Consent Decree, Plaintiff United States stated that the Consent Decree "is based on the expert judgment of EPA and will ensure future compliance with all aspects of the CAA mineral wool NESHAP." The Consent Decree allows MFS to use an alternative test method to demonstrate compliance with MACT, due to the unique configuration of the Mineral Wool Plant, within six months of resuming operations at the Mineral Wool Plant. Such an alternative test method is what MFS had been requesting since the promulgation of the MACT.

Thus, at all times relevant, the Defendants were aware that: (i) the existing control equipment at the Mineral Wool Plant could meet the MACT standard; (ii) the Mineral Wool Plant could not use the prescribed test method in MACT because of its configuration; (iii) MFS had made an authorized request to EPA and PaDEP for either an alternative test standard or an alternative test method due to the configuration of the Mineral Wool Plant; (iv) that, although the request for an alternative test standard was denied by EPA on April 9, 2003, MFS' request for an alternative test method remained pending; (v) that an agreement in principle for an alternative test method was reached in August, 2006; and (vi) that the alternative test method was approved in final form in March, 2007, with the consent of PaDEP and the approval of the U.S. District Court.

F.    The Continuing Prejudice To MFS And MFS' Petitioning Of
      The Secretary Of PaDEP For Redress

In September 2007, Thermafiber, Inc., the largest mineral wool manufacturing company

in the United States and a company that also supplied mineral wool to Armstrong World

Industries (the principal customer of the Mineral Wool Plant) contacted MFS to express interest

in purchasing the Mineral Wool Plant as an operating unit.  In furtherance of their due diligence,

the President and CEO, Chief Financial Officer, and Operating Manager of Thermafiber each

visited the Mineral Wool Plant and extensively toured the facility with James Hauff.

Thermafiber, who was only interested in purchasing the Mineral Wool Plant as an operating unit,

expressed concern about the status of the reissuance of the Title V operating permit by PaDEP.

Previously, Armstrong World Industries also conducted due diligence in connection with

its interest in purchasing the plant.  Armstrong World Industries had approximately 14 people

examine the plant in connection with its due diligence.  However, Defendant Robbins told

Armstrong World Industries of the alleged "malodor concerns" and "compliance issues" at the

Mineral Wool Plant, which he knew would make the acquisition of the Mineral Wool Plant cost

prohibitive.  Defendant Bedrin had knowledge of Defendant Robbins' contact with Armstrong

World Industries.

On or about October 3, 2007, in furtherance of MFS' intent and desire to resume

operations at the Mineral Wool Plant and/or to sell the Mineral Wool Plant as an operating

concern, representatives of MFS met with Defendants Robbins, Wejkszner and others at

PaDEP's office in Wilkes-Barre, Pennsylvania.  At the October 3, 2007 meeting, MFS'

representatives explained that the Defendants' continuing course of wrongful conduct was

prejudicing MFS by, inter alia:  (i) preventing MFS from negotiating the sale of the Mineral

13

Wool Plant as an operating concern to a third party; (ii) preventing MFS from resuming operations at the Mineral Wool Plant; (iii) preventing MFS from entering into and/or maintaining long-term supply agreements for raw materials, including blast furnace slag, that are necessary to operate the Mineral Wool Plant; (iv) preventing MFS from convincing prior or new employees to work at the Mineral Wool Plant under the cloud of uncertainty caused by the Defendants' pattern of wrongful conduct alleged in this Complaint; and (v) causing MFS to incur and to continue to incur significant costs associated with maintaining and securing the Mineral Wool Plant as it sat idle.  At the conclusion of the October 3, 2007 meeting, Defendants Robbins, Wejkszner and Bedrin understood that time was of the essence to MFS' ability to either resume operations or sell the Mineral Wool Plant as an operating concern.

The Defendants admitted at deposition that they knew of no facts to refute the prejudice to MFS described above during the October 3, 2007 meeting.  Defendant Wejkszner testified that, even as of the date of his deposition on March 31, 2009, he still was not aware of any facts to refute the prejudice to MFS described above.  Defendant Robbins admitted at deposition that MFS' concerns "were valid concerns."

Notwithstanding the above, on October 24, 2007, Defendant Robbins, with the acquiescence and participation of Defendants Wejkszner and Bedrin, sent a letter denying that MFS was being prejudiced.  They also reiterated that MFS' Title V Operating Permit would not be reissued because of the alleged malodor issues and MACT compliance issues.  Following the receipt of this letter, MFS petitioned the Secretary of PaDEP (the "Secretary") to request a meeting on account of its grievances arising from the Defendants' on-going course of wrongful conduct.

On December 17, 2007, a meeting was held with the Secretary in Harrisburg, Pennsylvania. Defendants Bedrin and Robbins were directed by the Secretary to attend. Defendant Wejkszner was also aware of the meeting with the Secretary and that MFS had requested it because of MFS' concerns about its treatment by the Defendants. This was the first time in Defendant Robbins' career that he had been summoned to the Secretary's office for a meeting, which he agreed was a "command performance."

At the beginning of the December 17, 2007 meeting with the Secretary, the Secretary advised that she already had been briefed by the Defendants. The Secretary allowed MFS' representatives to briefly explain how the refusal of the Defendants to reissue MFS' Title V Operating Permit was currently prejudicing MFS and interfering with its ability to either resume operations at the Mineral Wool Plant or sell the Mineral Wool Plant to a third party. At the conclusion of the meeting, the Secretary advised that she was still leaving it to Defendants Bedrin and Robbins to address the matter.

G.   The Briefing Memorandum Submitted To The Secretary In Advance
     Of The December 2007 Meeting

During discovery in this case, MFS learned that, in advance of the December 17, 2007 meeting with the Secretary, Defendant Robbins drafted a briefing memorandum at the Secretary's direction "to get her up to speed" (the "Memorandum"). The Memorandum was reviewed and approved by Defendants Wejkszner and Bedrin before it was submitted to the Secretary. The Defendants understood that the Secretary expected the Memorandum to be fair and accurate. The Memorandum was neither in that, among other things:

(i)   it is stated in the Memorandum that the "Department issued a Field Compliance Order ("FCO") to MFS on January 24, 2003 after attempting to have the company resolve malodor violations" (emphasis added), but the Defendants failed to disclose that, inter alia: (a) at the time of the

FCO, the Mineral Wool Plant had only received <u>one</u> notice of violation for a single incident in its 36 years of operation (as opposed to "malodor violations"); (b) this one notice of violation did not comply with applicable law; (c) Defendant Robbins was involved personally in the issuance of the FCO; (d) the EHB judge criticized their conduct towards MFS and stated that it evidenced hostility; (e) the FCO had been withdrawn by PaDEP; and (f) PaDEP has <u>never</u> met its burden of proof that MFS has ever violated the applicable malodor laws;

(ii) it is stated in the Memorandum that MFS "has a history of malodor problems," but none of the facts set forth above were disclosed, creating the false impression that the issues had been adjudicated and that the Defendants had met their burden of proof in accordance with applicable law;

(iii) it is stated in the Memorandum that "MFS has blamed the delay in complying with [MACT] on the <u>alleged</u> (emphasis added) unique configuration of the facility," creating the false impression that MFS' statement was untruthful and that it was possible for MFS to test the Mineral Wool Plant in accordance with MACT when all of the Defendants knew that MFS could not do so and that EPA had in fact resolved the issue with MFS, with PaDEP's consent, by giving MFS an alternative test method to demonstrate compliance in light of its unique configuration;

(iv) it is stated in the Memorandum that MFS "<u>claimed</u> (emphasis added) that the [testing] proposal provided by the EPA would not work on the basis that it had been attempted once before and was considered to be unsafe" when, in fact, the Defendants knew that PaDEP and EPA both agreed that it was unsafe and that it could not be used by MFS;

(v) it is stated in the Memorandum that, on "April 9, 2003, EPA sent MFS a letter rejecting their request for an alternative limit or test method" when, in fact, the Defendants knew that EPA only rejected MFS' request for an alternative test <u>limit</u> and that MFS' request for an alternative test <u>method</u> remained pending until an alternative test method was agreed to in principle in August 2006 and, then, approved in March 2007;

(vi) it is falsely represented in the Memorandum that there was an $SO_2$ problem at MFS when, in fact, PaDEP had tested the Mineral Wool Plant and determined that $SO_2$ was not a problem; and

(vii) attached to the Memorandum is an old newspaper article from 2004 relating to scandalous claims about the company by a former employee who had been discharged by MFS for participating in a theft, even though those claims by the discharged employee had been dismissed years earlier

16

and even though Defendant Robbins admitted at his deposition that such matters had no relevance to MFS' Title V Operating Permit.

H.    The January 2008 Draft Title V Permit

The Defendants admitted that they were aware that there are legal standards they have to follow and that they do not have the legal authority to compel a company to do whatever they want that company to do in order for that company to get its Title V Operating Permit. The Defendants also admitted that they have to comply with applicable law with respect to any conditions they impose, or positions they take, with respect to a Title V Operating Permit. Notwithstanding these admissions, on or about January 18, 2008, Defendant Robbins, with the participation and acquiescence of Defendants Bedrin and Wejkszner, forwarded to MFS a draft of a conditional Title V Operating Permit for the Mineral Wool Plant, in which they included two legally impermissible and unreasonable conditions.

The draft permit sent to MFS on January 18, 2008 contained a total of approximately 91 conditions in 8 sections. MFS objected to only two of the approximately 91 conditions (i.e., Condition 027 on pages 20-22 of the draft permit and Condition 028 on page 22 of the draft permit) because those two conditions were contrary to both applicable law and the Consent Decree between EPA and MFS that had been approved by the U.S. District Court, with the consent of PaDEP. For example, with respect to Condition 027 and Condition 028:

   (i)    the Defendants admitted at deposition that Condition 028 would have enabled the Defendants to: (a) shut down the Mineral Wool Plant within 24 hours upon notifying MFS by letter that PaDEP received a single complaint of malodor; (b) not let the Mineral Wool Plant resume operations until the Defendants granted it permission to do so; and (c) take as much time as they wanted to decide whether and under what circumstances to allow the Mineral Wool Plant to resume operations;

   (ii)   Defendant Wejkszner admitted at deposition that the Defendants used Condition 027, which purportedly related to the Consent Decree that had

17

been approved by the U.S. District Court and agreed to by PaDEP, as a pretext to really address the alleged malodor issue;

(iii)   Defendant Wejkszner admitted that the Defendants wrote Condition 027 so as to force the Mineral Wool Plant to immediately cease operations while it awaited approval from the Defendants to resume operations, even though there was no timeframe in Condition 027 by which the Defendants would have to give their approval;

(iv)   Defendant Wejkszner admitted that the Defendants could take years to give the approval that would be necessary under Condition 027 to enable the Mineral Wool Plant to resume operating;

(v)   Defendant Wejkszner admitted that, contrary to the terms of the Consent Decree to which PaDEP had agreed Condition 027 was written so as to require MFS (or any subsequent purchaser) to do whatever the Defendants directed them to do in order for the Mineral Wool Plant to be able to resume operations.

I.   MFS' Sale Of Machinery, Equipment And Parts

On March 10, 2008, after the Defendants again reaffirmed their position on the alleged compliance issues and their refusal to remove Condition 027 and Condition 028, MFS advised the Defendants that it had little choice now except to attempt to mitigate its damages by dismantling the plant and selling whatever machinery, equipment and parts that it could sell. The Defendants never responded to MFS. Beginning in late March 2008, therefore, MFS began the process of selling off parts, equipment and materials.

J.   The January 2009 Draft Permit

On January 18, 2009, approximately eight months after this lawsuit was filed and ten months after the Defendants were advised that the Mineral Wool Plant had started selling off its parts, equipment and materials so as to mitigate its damages, the Defendants forwarded a proposed Title V Operating Permit to MFS that no longer contained Condition 027 and Condition 028. When Defendant Bedrin was questioned as to why, in January 2009, the Defendants now removed from the draft permit those two conditions, his response was that

18

Defendants Robbins and Wejkszner recommended to him that they should now do so. The only relevant events that had occurred between the time of the two draft permits in January, 2008 and January, 2009, was that MFS had filed this lawsuit to hold the Defendants accountable for their continuing pattern of wrongful conduct under color of law and that MFS had sold off parts, equipment and material from which the Defendants could conclude that the Mineral Wool Plant would neither be resuming operations nor be sold to a third party as an operating concern. As of this date, MFS' Title V Operating Permit for the Mineral Wool Plant still has not been reissued in any form.

3.   **LIST OF MONETARY DAMAGES**

MFS' compensatory damages in this case total $9,279,978.00.  MFS' compensatory damages are described in detail in the Damages Report, dated April 30, 2009, prepared by Tucker & Meltzer Valuation Advisors, a copy of which was provided previously to the Defendants. The compensatory damages are summarized in the Damages Report as follows:

| | |
|---|---|
| Conclusion of Value for the Business | $7,698,000 |
| Less: Value as of Closing Date, February 17, 2006 | 0 |
| Net Damage From Loss of Value for the Business | 7,698,000 |
| | |
| Consulting and Professional Fees Incurred | 159,840 |
| Post-Closing Costs | 831,827 |
| Accrued Interest | 747,916 |
| Less: Orderly Liquidation Value of Machinery and Equipment | (167,605) |
| | |
| Total Compensatory Damages Incurred | $9,279,978 |

In addition to its claim for compensatory damages, MFS is claiming attorneys' fees pursuant to 42 U.S.C. § 1988, and punitive damages.