IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MFS, INC.,                        :        CIVIL ACTION
                                  :
            Plaintiff             :
                                  :
        v.                        :
                                  :
THOMAS A. DILAZARO, et al.,       :
                                  :
            Defendants            :        NO.  08-2508

**ORDER**

AND NOW, this        day of        , 2010, upon

consideration of defendants' Motion for Judgment as a

Matter of Law and plaintiff's response thereto, if any, it

is hereby ordered that said motion is granted. Judgment is

entered in favor of the defendants and against the

plaintiff.

_____
                                                    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MFS, INC.,                              :          CIVIL ACTION
                                        :
                Plaintiff               :
                                        :
        v.                              :
                                        :
THOMAS A. DILAZARO, et al.,             :
                                        :
                Defendants              :          NO.  08-2508

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Rule 50 of the Federal Rules of Civil Procedure

defendants by their attorney, Randall J. Henzes, Deputy Attorney

General, hereby move this Court to enter judgment in their favor

and against the plaintiff. In support of their motion, they rely

on the attached memorandum of law.

Wherefore, the defendants respectfully request judgment be

entered in their favor and against the plaintiff.

                        THOMAS W. CORBETT, JR
                        ATTORNEY GENERAL

                BY: /s/RANDALL J. HENZES
                    Randall J. Henzes
                    Deputy Attorney General
                    Identification No. 53256

                    Susan J. Forney
                    Chief Deputy Attorney General
                    Chief, Litigation Section

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215)560-2136
Fax:       (215)560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MFS, INC.,                          :        CIVIL ACTION
                                    :
            Plaintiff               :
                                    :
        v.                          :
                                    :
THOMAS A. DILAZARO, et al.,         :
                                    :
            Defendants              :        NO.  08-2508

## I.  STATEMENT OF THE CASE

Plaintiff MFS, Inc., ("MFS"), a Pennsylvania Corporation,
filed this Section 1983 action against Thomas DiLazaro, former Air
Quality Program Manager for the Northeast Regional Office ("NERO")
of the Pennsylvania Department of Environmental Protection
("DEP"); Mark Wejkszner, the current Air Quality Program Manager
for NERO of DEP; Michael Bedrin, the Regional Director of the NERO
of DEP and Sean Robbins, an Assistant Counsel assigned to the NERO
of DEP.  MFS claims that these individuals violated its First and
Fourteenth Amendment rights when its existing Title V permit was
in the process of being reviewed for renewal, the defendants
provided it a draft of the proposed permit that contained two
conditions it found unacceptable and unreasonable.  It also claims
because the draft contained these unreasonable and unacceptable
conditions, it could not restart or sell its facility.  MFS also
claims the defendants intentionally interfered with prospective
contractual relations.

From February 16, 2010 through February 24, 2010, a jury trial was held.   The evidence is now closed.   Pursuant to Rule 50 of the Federal Rules of Civil Procedure, defendants moved for judgment as a matter of law.   This memorandum of law is submitted in support of their motion.

## II.   STATEMENT OF FACTS

The evidence at trial established the following facts that no reasonable jury could find otherwise:

1.   MFS owns and operated a mineral wool product plant in the city of Bethlehem, Pennsylvania.

2.   MFS is subject to the National Emission Standards for Hazardous Air Pollutants ("NESHAP") for mineral wool manufacturers modified at 40 C.F.R. Part 63, Subpart DDD, specifically §§ 63.1175 - 63.1196.

3.   In order to operate its facility, the law required MFS apply for and be issued a "Title V" operating permit by DEP. 25 Pa. Code § 127.502.

4. On October 8, 1998 Thomas DiLazaro issued MFS a Title V operating permit. Ex. D-2.

5. The permit was for a period of five years with an expiration date of October 31, 2003. Id.

6.   The permit is still in effect and valid today because MFS filed a timely and complete renewal application of its existing Title V permit in April of 2003. Ex. D-24.

7.   No defendant has ever taken any action to revoke MFS' 1998 Title V permit.

8.   MFS was required by federal law to demonstrate compliance with the Mineral Wool ("MW") NESHAP by June 2, 2002.   40 C.F.R. § 63.1180(a)(1).

9.   To date MFS has never complied with the Mineral Wool MW NESHAP.

10. On July 31, 2001, MFS wrote to Thomas DiLazaro, Air Quality Program Manger for NERO of DEP requesting an alternative test plan to demonstrate compliance under the MW NESHAP for its mineral wool plant. Ex. P-31.

11.   DiLazaro wrote back to MFS informing it that he did not have the authority to grant the request so he was forwarding the request to EPA.

12. On November 8, 2001, Becky E. Easley, Air Quality Specialist for the DEP, issued MFS a Notice of Violation ("NOV") alleging a malodor was coming from the MFS facility and leaving the property. Ex. D-6.

13. Emissions of malodorous air contaminants outside of the property of the person on whose land the source is being operated is a violation of 25 Pa. Code § 123.21(b), and is also a violation of the Title V permit.

14. On November 16, 2001, MFS responded to the NOV admitting that it was the cause of the malodor and stating it was going to take measures to correct the problem. Ex. D-7.

15. On February 25, 2002, Ronald Mordosky, District Supervisor for the Air Quality Program for NERO of DEP, informed MFS in writing that its odor control plan had not been effective in addressing MFS' malodor problem and DEP continued to receive malodor complaints from residents near the MFS facility. Ex. D-8.

16. On January 24, 2003, Thomas DiLazaro, DEP's Air Quality Program Manager for NERO, issued MFS a Field Enforcement Order which required MFS to take immediate measures to control malodors at its facility and to complete and submit to DEP by January 27, 2003 a Request for Determination ("RFD") concerning the afterburner system MFS had installed at its facility. Ex. D-12.

17. On January 27, 2003 MFS submitted the RFD for DEP's review and approval. Exs. D-13; D-14.

18. On February 5, 2003, Easley issued MFS an NOV because a malodor was coming from the MFS facility and leaving its property. Ex. P-19.

19. On February 12, 2003, Easley issued MFS an NOV because a malodor was coming from the MFS facility and leaving its property. Ex. P-19.

20. On February 5, 2003, Susan Bostrum issued MFS an NOV because a malodor was coming from the MFS facility and leaving its property. Ex. P-19.

21. On or about February 24, 2003, MFS filed a Notice of Appeal of the Field Enforcement Order to the Commonwealth of Pennsylvania Environmental Hearing Board. Exs. P-16; D-19.

22. On March 4, 2003, Easley issued MFS an NOV because a malodor was coming from the MFS facility and leaving its property. Ex. P-19.

23. On April 9, 2003, EPA informed MFS that it would not honor its request for an alternate standard under the MW NESHAP. EPA also told MFS that there were test methods available to it to use to demonstrate compliance with the MW NESHAP. Ex. P-32.

24. In April of 2003, MFS filed an application for the renewal of its Title V permit. Ex. D-24.

25. On April 15, 2003, Mordosky issued MFS an NOV for MFS' failure to conduct performance testing and demonstrate compliance with the MW NESHAP. Ex. D-23.

26. On May 14, 2003, Mordosky issued MFS an NOV because a malodor was coming from the MFS facility and leaving its property. Ex. P-19.

27. On June 19, 2003, Chinu Patel, a Permit Reviewer for DEP's NERO, wrote to James Hauff, General Manager of MFS, advising

him that DEP reviewed MFS' application for a Title V permit and deemed it timely and "complete". Ex. D-29.

28. The letter advised Hauff that due to the number of applications received at this time, some Title V permit applications may not be acted upon for three years after they are received by the Department. Id.

29. The letter authorized MFS to continue to operate the facility pending the renewal of MFS' existing Title V permit provided: all fees have been paid; all sources are in compliance with the Air Pollution Control Act, the Clean Air Act and all applicable regulations, or are on a Department approved compliance schedule; and, the conditions of all outstanding permits are met. Id.

30. On January 23, 2004, MFS submitted a plan approval application to address the malodor issue and the MW NESHAP issues. MFS' plan proposed a thermal oxidizer to control odors and new cyclone to control the PM.  MFS' plan indicated that in addition to controlling the odors, the thermal oxidizer would reduce MFS' Carbonyl Sulfide and Hydrogen Sulfide emissions and increase its Sulfide Dioxide emission. Exs. D-38; D-82

31. On February 6, 2004, DiLazaro withdrew the Field Enforcement Order that was issued in January of 2003.

32. Sometime thereafter, MFS withdrew its Notice of Appeal of the Field Enforcement Order.

33. On February 24, Mordosky issued MFS an NOV which contained seven dates on which DEP confirmed that malodors were coming from the MFS facility and leaving its property. Ex. P-19.

33. DEP reviewed MFS' plan and determined the proposed cyclone would not enable MFS to meet the particular matter ("PM") standard, which was being used as a surrogate for the hazardous air pollutants that are regulated by the MW NESHAP.

34. MFS was informed the proposed cyclone would not enable MFS to meet the PM standard set forth in the MW NESHAP.

35. In February of 2005, MFS addressed this issue by submitting a revised plan approval application calling for a baghouse in lieu of the cyclone to address the PM issue. Ex. D-48.

36. On April 4, 2005, William Nuver, Air Quality Permit Reviewer, thru Mark Wejkszner, Chief, New Source Review Section of NERO for DEP, recommended to DiLazaro that MFS' plan approval be issued. Ex. D-86.

37. On or about May 18, 2005, Dilazaro sent to Thomas Zagami of MFS a proposed plan approval for his review. Exs. D-48; D-87.

38. In June of 2005, a court decision from the United States Court of Appeals for the District of Columbia changed the applicable law so that MFS could not increase its SO2 emissions in order to reduce its emissions of other pollutants.

39. As a result of the ruling, MFS' revised plan approval could not be issued by DEP.

40.   On August 17, 2005, at a meeting between MFS and EPA, MFS was instructed by EPA to deal with EPA and DEP individually, and to devise separate plans for compliance with each of them. Ex. D-50.

41.   By letter dated August 30, 2005, MFS advised EPA it was prepared to take steps necessary to shut down its plant immediately. Id.

42.   By letter dated September 20, 2005, MFS advised EPA that EPA's actions were leaving MFS with no alternative except to shut down its facility because EPA was seeking a monetary penalty from MFS during the time MFS had been working with DEP in good faith to resolve the MW NESHAP issue. Ex. D-51.

43. On December 20, 2005, EPA, through the United States Attorney's Office, instituted an enforcement action against MFS in the United States District Court for the Eastern District of Pennsylvania under Case No. 05-6656. Ex. D-53

44. The United States alleged that MFS violated and continued to violate the MW NESHAP. Ex. P-34.

45.   On January 11, 2006, DiLazaro advised MFS that DEP had reviewed MFS' Title V application and the application had several deficiencies. Ex. D-54.  The deficiencies were MFS' failure to demonstrate compliance with the emission limits for hazardous air pollutants specified in the MW NESHAP; MFS' failure to install monitoring systems and conduct required performance testing at the

outlet of the cupolas as required by the MW NESHAP; MFS' failure

to install, adjust and continually operate a bag leak detection

system for each fabric filter as required MW NESHAP; MFS' failure

to submit an operations, maintenance and monitoring plan as

required by the MW NESHAP and MFS' failure to submit reports,

including a performance test report; startup, shutdown and

malfunction plan and reports; an operations, maintenance and

monitoring plan and necessary semiannual reports as required by

the MW NESHAP[1]. Id.[2]

46. The letter specifically advised MFS that its lack of

compliance with the MW NESHAP is a basis for not renewing its

Title V permit. Id.

47. The letter also informed MFS that DEP confirmed odor

problems and malodors from the MFS facility on fifteen (15)

different occasions from November of 2001 to March of 2004 and

informed MFS that causing air pollution in this fashion is grounds

for not renewing the Title V permit. Id.

48. The letter advised MFS that if should have any questions

regarding the deficiencies to contact DiLazaro to either discuss

the concerns or schedule a meeting. Id.

---

[1] These deficiencies were also the basis for the enforcement action that EPA filed against MFS. Ex. 1, pp. 59, 63, 64.

[3] The record shows that DiLazaro retired prior to any of the meetings with the Secretary and prior to the issuance of the draft Title V permit in January of 2008. Therefore, DiLazaro cannot be held liable in the event the court finds that MFS suffered an adverse action after the meeting with Secretary McGinty.

49. The meeting was to be scheduled within the 30 day period allotted for MFS' reply. Id.

50. The letter allowed MFS to submit further information or to decline to submit further information and have the DEP make a decision on the Title V permit application on the information already provided. Id.

51. Lastly, the letter informed MFS that if it failed to respond within 30 days of receipt of this letter, the application would be denied. Id.

52. On February 9, 2006, MFS, through Hauff, responded to DEP's letter of January 11, 2006. Ex. D-89.

53. In the letter, MFS asked DEP to consider issuing MFS a Title V permit that included a compliance schedule. Id.

54. On February 17, 2006, MFS voluntarily shut down the operation of its Bethlehem facility.

55. On August 10, 2006, MFS supplemented its response of February 9, 2006, by informing DiLazaro that MFS had negotiated an agreement in principle with EPA to resolve the pending litigation involving MFS' failure to comply with the MW NESHAP. Ex. D-58.

56. On February 9, 2007, MFS signed a proposed Consent Decree with EPA to resolve the litigation filed against it by EPA over the MW NESHAP issues. Ex. P-34. This proposed Consent Decree was published by the Court for public comment.

57. On February 6, 2007, Larry Campbell, President of MFS wrote to DEP enclosing a maintenance plan informing DEP that it intended to restart its facility in the future and requesting that its emissions from the facility be preserved in the emissions inventory. Ex. D-61.

58. Robbins, Assistant Counsel to NERO of DEP, wrote to Zagami informing him DEP received Mr. Campbell letter. Id.  He further informed him that DEP has determined that there are still deficiencies associated with the operation of the facility and MFS' Title V application. Id.  Robbins further advised him that without a demonstration that these deficiencies have been corrected, DEP cannot renew MFS' Title V permit. Id.

59. On April 24, 2007, having learned the proposed consent decree between MFS and EPA was noticed for public comment, Robbins, on behalf of DEP, with assistance from DiLazaro, wrote to EPA expressing DEP's concerns and comments regarding the terms of the proposed Consent Decree between MFS and EPA. Ex. D-62.

60. In the letter, Robbins again reiterated that MFS' failure to comply with the MW NESHAP as a basis for denying the Title V permit. Id.

61. Likewise, Robbins identified the malodors as another potential concern preventing the issuance of the Title V permit. Id.

62. The Consent Decree was entered by the court as a final order on August 13, 2007. Ex. P-34.

63. The Consent Decree specifically provided the provisions of the decree shall apply and be binding on the United States and MFS; Id. ¶ 2: in any compliance plan MFS may achieve compliance by ceasing to operate the facility; Id. ¶ 28: the Consent Decree is not and shall not be construed as a permit issued pursuant to the Subchapter Five of the Clean Air Act and nor shall it relieve MFS of its obligations to comply with permits or to comply with any new permit or modifications of existing permits. Id. ¶ 70.

64. On August 28, 2007, MFS, through Thomas Zagami, its counsel, supplemented MFS' responses to DEP submitted on February 9, 2006 and August 10, 2006 to the Title V renewal application. Ex. D-65

65. Zagami informed DiLazaro the Consent Decree which had been entered on August 13, 2007, would allow MFS to implement an agreed upon test method to demonstrate compliance with the MW NESHAP. Id.

66. Zagami requested that MFS' Title V permit be reissued promptly. Id.

67. On September 14, 2007, MFS, through Zagami, sent a letter to DiLazaro requesting a meeting with DEP to address the Title V permit. Ex. D-66.

68. On September 27, 2007, Robbins wrote to Zagami informing him that DiLazaro retired and was no longer with the Department. Ex. D-67.

69. In the letter, Robbins advised Zagami that DEP still had concerns that MFS had not demonstrated compliance with the MW NESHAP and that MFS had not instituted any controls or process changes to control malodorous emissions from the facility. Id.

70. Robbins offered Zagami 5 dates to meet with DEP to discuss the issues regarding the Title V permit. Id.

71. On October 3, 2007, Robbins and Wejkszner and other employees of DEP met with attorneys for MFS, Paul Bruder and Thomas Zagami. Id.

72. During the meeting, Zagami informed Robbins and Wejkszner that MFS was having trouble selling the plant or resuming operations because it did not have a renewed Title V permit. Id.

73. Robbins suggested to Bruder and Zagami that MFS continue to operate under the "permit shield" as it had for several years while the permit issues were being resolved. Id.

74. The "permit shield" allowed MFS to continue to operate past the expiration date of its current permit as long as it had applied for a new one in a timely manner which MFS did. Id.

75. MFS can operate under the "permit shield" until DEP issues a new permit or DEP orderd MFS to shut down. Id.  MFS could still operate under the "permit shield" today.

76. Robbins and Wejkszner informed Zagami and Bruder that DEP appreciated MFS' concerns and that they were going to look at them in relation to DEP's concerns. <u>Id</u>.

77. On October 18, 2007, Zagami wrote Robbins requesting MFS' Title V permit. Ex. D-68.

78. On October 24, 2007, Robbins responded to Zagami's October 18, 2007 letter reiterating DEP's concerns regarding the MW NESHAP issues and the malodor issue. Ex. D-69.

79. Robbins again informed Zagami that MFS may continue to operate its facility under the "permit shield". <u>Id</u>.

80. October 24, 2007, Robbins, by letter advised MFS as follows: "In light of the outstanding compliance concerns, a renewed permit issued by the Department at this stage would need a compliance schedule pursuant to 25 Pa Code § 127.445". <u>Id</u>.

81. Sometime after October 24, 2007, Michael Bedrin learned that MFS contacted Kathleen McGinty, Secretary for DEP, to request a meeting with her to discuss MFS' Title V permit application.

82. To prepare the Secretary for the meeting, Robbins was asked to prepare a briefing memo according to the DEP template for such briefings. Ex. P-6.

83. The memo provided the Secretary with a background of the permitting issues and informed her that MFS may operate under the permit shield. <u>Id</u>. Robbins provided the Secretary with NERO's

recommendation that the Title V permit should not be issued until MFS demonstrates compliance with the applicable requirements. Id.

84. On December 17, 2007, Zagami, Bruder, Bedrin and Robbins met with Secretary McGinty.

85. After this meeting, Zagami, Bruder, Bedrin and Robbins met in a separate room without Secretary McGinty present.

86. The meeting ended with Bedrin and Robbins agreeing to send MFS a draft of a Title V compliance permit within two to three weeks for MFS' review and comment.

87. On January 18, 2008, through Robbins, DEP sent MFS a draft of the Title V permit for MFS' comments and review. Ex. D-72.

88. On January 30, 2008, Zagami wrote to Robbins informing him that although Zagami and Bruder had not completed their review of the entire proposed permit, a couple of the conditions stand out as being neither fair nor reasonable in their opinion. Ex. D-73. Zagami goes on to state proposed Conditions 27 and 28 are not acceptable to him. Id.

89. On February 11, 2008, Robbins acknowledged receipt of Zagami's letter dated January 30, 2008. Ex. D-74

90. Robbins asked Zagami to propose any changes MFS wants to the draft Title V permit. Id.

91. On February 14, 2008, Zagami wrote Secretary McGinty asking that she intercede to have DEP issue the permit under conditions acceptable to MFS. Id.

92. On February 25, 2008, Robbins responded to Zagami's letter to Secretary McGinty and to Zagami's letter to him dated January 30, 2008. Ex. D-76

93. Robbins again expressed DEP's concerns regarding MFS' failure to comply with the MW NESHAP and the potential malodor problem at the MFS facility. Id.

94. Robbins informed Zagami that DEP had a duty and the authority to require MFS to comply with those provisions prior to DEP issuing the Title V permit. Id. In response to Zagami's request in his letter of January 30, 2008, D-73, asking for legal authority that would allow the DEP to request a company to shut down in the event of a malodor NOV, Robbins referred Zagami specifically to 35 P.S. § 4004. Id. Robbins further advised Zagami that DEP would agree to amend the language in condition 28 and remove the cease operations language as originally proposed. Id.

95. On March 10, 2008, Zagami responded to Robbins' letter of February 25, 2008. Ex. D-77.

96. In the letter, Zagami provided MFS' position regarding the MW NESHAP provisions and malodor provision in the draft Title V permit. Id. Zagami again was requesting Condition 27 be removed. Id. Zagami offered alternative language to Condition 28. Id.

97. On April 22, 2008, Robbins responded to Zagami's letter of March 10, 2008. Ex. D-78. In the letter, Robbins informs Zagami that DEP is willing to completely remove Condition #28 from the permit. Id. Robbins' letter also provided alternate language regarding the MW NESHAP issues including removing the cease operations provision of Condition 27. Id.

98. On April 25, 2008, Zagami responded to Robbins' letter of April 22, 2008. Ex. D-79. Zagami requested clarification on the DEP's position regarding Condition 27. Id.

99. On May 13, 2008, Robbins and Bedrin attempted to contact Zagami by telephone to discuss the Title V permit issues. Ex. D-80 Zagami was not available. Id.

100. Thereafter, on May 29, 2008, Robbins sent Zagami a letter outlining the new proposed language that would be placed in the Title V permit regarding the MW NESHAP issue in Condition 27. Ex. D-80.

101. On that same day, MFS filed this instant action against Bedrin, DiLazaro, Robbins and Wejkszner.

102. The defendants were served with the complaint in this action in June of 2008.

103. Prior to restarting its facility, MFS was required to provide sixty days written notice to DEP and EPA that it intended to restart its facility.

104. MFS has never submitted a sixty day written notice to DEP and EPA that it intends to restart its facility.

105. DEP's regulatory authority under 35. P.S. § 4004(9) and 25 Pa Code § 125.445 provided the defendants with the authority to place the conditions in the draft proposed Title V permit for MFS review and comment in January of 2008.


## III.  ARGUMENT

### A.  STANDARD APPLICABLE TO A MOTION FOR JUDGMENT AS A MATTER OF LAW

A district court should grant this motion only if "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1166 (3d Cir. 1993). In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. <u>Fineman v. Armstrong World Indus., Inc.</u>, 980 F.2d 171, 190 (3d Cir. 1992), <u>cert</u>. <u>denied</u>, 507 U.S. 921 (1993). Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. <u>Walter v. Holiday Inns, Inc.</u>, 985 F.2d 1232, 1238 (3d Cir. 1993). "The question is not

whether there is literally no evidence supporting the party
against whom the motion is directed but whether there is evidence
upon which the jury could properly find a verdict for that party."
Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978) (citation
omitted) (quotation omitted). "[A] directed verdict is mandated
where the facts and the law will reasonably support only one
conclusion." McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356,
(1991).

> **B.  ANY CONSTITUTIONAL CLAIM MFS HAS AGAINST THE INDIVIDUAL
>     DEFENDANTS PRIOR TO MAY 30, 2006 IS BARRED BY THE STATUTE
>     OF LIMITATIONS**

MFS filed this action against DiLazaro, Wejkszner, Bedrin and
Robbins claiming that these individuals violated its
constitutional rights when they did not renew MFS' Title V permit
in a manner acceptable to MFS. It alleges that these violations
occurred as far back as 2003. It seeks redress pursuant to 42
U.S.C. § 1983.

A Section 1983 cause of action accrues on the date when a
plaintiff knew or should have known his or her rights had been
violated. See Genty v. Resolution Trust Corp., 937 F.2d 899, 919
(3d Cir. 1991). In Section 1983 actions, the applicable period of
limitations is borrowed from the statute of limitations for
personal injury actions in the state where the alleged violations
occurred. Wilson v. Garcia, 471 U.S. 261, 275 (1985). In
Pennsylvania, personal injury actions are subject to a two-year

limitations period. 42 Pa.C.S.A. § 5524. <u>See</u> also <u>Bougher v. Univ. of Pittsburgh</u>, 882 F.2d 74, 78 (3d Cir. 1989).

MFS filed this Section 1983 action on May 29, 2008. Therefore, the only claims that it can purse against DiLazaro, Wejkszner, Bedrin and Robbins are claims that occurred on or after May 29, 2006. Viewing the evidence in the light most favorable to MFS and giving it the advantage of every fair and reasonable inference, the only event that could possibly give rise to a section 1983 claim against DiLazaro is when he and Robbins provided comments on the proposed Consent Decree between MFS and EPA. However, as the evidence clearly showed those comments were never filed as formal objections, and DiLazaro was no longer employed by DEP when the Consent Decree was approved by the Court.

Viewing the evidence in the light most favorable to MFS and giving it the advantage of every fair and reasonable inference, the only events that could possibly give rise to a section 1983 claim against Wejkszner, Bedrin and Robbins is their involvement with the proposed draft Title V permit in January of 2008 and the negotiations over the terms of the permit thereafter, and Sean Robbins' memorandum for the Secretary. Therefore, any claim that MFS had prior to May 29, 2006, including DiLazaro providing MFS with a letter outlining the technical deficiencies in its Title V renewal application in January of 2006, is barred by the statute of limitations.

**C.  MFS FAILED TO ESTABLISH A FIRST AMENDMENT CLAIM
AGAINST ANY OF THE INDIVIDUAL DEFENDANTS**

MFS claims that after it contacted public officials about the treatment it was receiving from the defendants regarding its Title V permit renewal application, Bedrin, Robbins and Wejkszner retaliated against it by placing two unreasonable and unacceptable conditions in a proposed Title V permit for its review and comment.  MFS contends the defendants knew that MFS would not accept those terms and yet still placed the terms in the draft Title V permit to delay the process and cause MFS economic harm.

Viewing the evidence in the light most favorable to MFS and giving it the advantage of every fair and reasonable inference, a reasonably jury could not find for MFS on this claim.

The evidence at trial established the following facts that no reasonable jury could find otherwise:

1. MFS still has an existing valid Title V permit.  It could continue to operate its facility under the Title V permit, and if it chose to restart its facility, it could also operate the facility under the existing permit.

2. MFS closed its facility as a result of no actions of Robbins, Bedrin and Wejkszner.

3. MFS agreed to an entry of a Consent Decree with EPA which required it to demonstrate compliance with the MW NESHAP when and if it restarted its facility.

4. Prior to restarting its facility, MFS was required to provide sixty days written notice to DEP and EPA that it intended to restart its facility.

5.  MFS was required to provide to DEP a startup, shutdown and malfunction plan, and an operations and maintenance plan.

6.  MFS was required to install bag leak detectors on its baghouse.

7.  On October 24, 2007, Robbins, by letter advised MFS as follows: "In light of the outstanding compliance concerns, a renewed permit issued by the Department at this stage would need a compliance schedule pursuant to 25 Pa. Code § 127.445".

8.  25 Pa. Code § 127.445 authorizes the Department to include in a permit a compliance schedule, a civil penalty for past violations, a stipulated penalty for future violations, and/or a condition stating if the company fails to meet the final compliance date that the permit shall be revoked:

§ 127.445. Operating permit compliance schedules.

1(a) The Department may issue an operating permit to an existing and operating source that is out of compliance with the act, the Clean Air Act or the regulations thereunder.
(b) An operating permit issued under subsection (a) shall contain an enforceable schedule requiring the source to attain compliance as soon as possible but no later than the date required by the act or the Clean Air Act.
(c) The compliance schedule required by subsection (b) may contain interim milestone dates for completing any phase of the required work, as well as a final compliance date and may contain stipulated penalties for the failure to meet the compliance schedule.

(d) If the permittee fails to achieve compliance by the final compliance date or fails to pay the stipulated penalties for failure to meet an interim compliance date, the permit shall be revoked.

(e) The operating permit shall be part of an overall resolution of the outstanding noncompliance and may include the payment of an appropriate civil penalty for past violations and shall contain other terms and conditions the Department deems appropriate.

(f) An operating permit may incorporate by reference a compliance schedule contained within a consent order and agreement, including provisions related to the implementation or enforcement of the compliance schedule or consent order and agreement.

To establish a First Amendment retaliation claim under § 1983, a plaintiff must show that he or she engaged in activity protected by the First Amendment, suffered an adverse action and "the protected activity was a substantial or motivating factor in the alleged retaliatory action." Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). Once the plaintiff establishes these elements, the defendants may rebut the plaintiff's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct. Id. (citing Mt. Healthy, 429 U.S. at 287).

Defendants do not dispute that plaintiff's right to request a meeting with Secretary McGinty, and the meeting with the Secretary are protected activities under the First Amendment. Defendants

dispute MFS suffered an adverse action as a result of those activities.[3]

MFS' alleged adverse action is not being issued a valid Title V permit without any conditions relating to the MW NESHAP issues and the malodor issue.  The evidence clearly shows before the meeting with the Secretary, MFS had a valid Title V permit.  The permit was still effective despite having an expiration date of October 31, 2003.  From that time and until it voluntarily shut down its operations in February of 2006, MFS operated its facility under its existing 1998 permit or the "permit shield".  After the meeting with Secretary McGinty, MFS still had a existing valid Title V permit which would allow it to operate its facility.  For reasons unknown to the defendants, it chose not to operate the facility under the permit shield as it had for years.  MFS was in no different position after the meeting with the Secretary than before the meeting with the Secretary with respect to its existing 1998 Title V permit.

The evidence at trial established that before the meeting with the Secretary, NERO's position on MFS' Title V renewal application was to take no action on it until MFS had satisfied the compliance requirements.  After the meeting with the Secretary, it was provided with a draft of a compliance permit for its review and comment.  The exact type of permit it had requested in February of 2006.  The fact the draft proposed permit contained

tough conditions that MFS' counsel found to be neither fair or
reasonable does not make it an adverse action for First Amendment
claim.  MFS suffered no adverse action as a result of Bedrin's,
Robbins' and Wejkszner's actions in sending it a draft of the
Title V permit with the provisions relating to the MW NESHAP
issues and the malodor issue for its review.  In fact, it received
exactly what it requested at the meeting with the Secretary.

Even if providing MFS with a draft of proposed Title V permit
that contained tough conditions is considered an adverse action,
the evidence clearly established MFS would be provided with a
compliance permit, and 35 P.S. § 4004 and 25 Pa. Code § 125.445
authorize the defendants to place conditions in the permit to
require MFS to achieve compliance with the applicable laws.

The evidence clearly established as of January 2006, MFS'
Title V renewal application had many deficiencies. DiLazaro
informed it of these deficiencies relating to the MW NESHAP and
odor issues. Robbins repeatedly conveyed to MFS those deficiencies
by letters dated:  March 26, 2007 (Ex. D-61); April 24, 2007 (Ex.
62); July 19, 2007 (Ex. 64); September 27, 2007 (Ex. D-67) and
October 24, 2007 (Ex. 69).  The last letter specifically informed
MFS about the issue of a compliance permit.  Further, the evidence
shows that no jury could find other than during the meeting on
October 3, 2007 and during the meeting with the Secretary in
December of 2007 those deficiencies were conveyed to MFS.  It

should not have been a surprise to MFS when it received the draft
Title V permit in January of 2008 for its review and comment, that
it contained provisions covering those deficiencies.  While MFS
believed the provisions in the draft Title V permit covering the
MW NESHAP and odor issues to be neither fair or reasonable, MFS'
disagreement over terms defendants used to address MW NESHAP and
odor issues in the Title V permit renewal application does not
convert the defendants' actions into an adverse action that would
support a First Amendment claim.

Moreover, defendants' concerns regarding the MW NESHAP issues
were valid.  MFS had to comply with the MW NESHAP by June 2002.
It had not.  It has not today.  It entered into a Consent Decree
with EPA to get into compliance with the MW NESHAP. Without
showing compliance with the MW NESHAP, the defendants could not
reissue MFS the Title V permit unless the permit addressed those
issues.  Therefore, no reasonable jury could find that the
defendants' actions in placing conditions in the draft Title V
permit relating to those issues as retaliatory.

The defendants disagree with MFS' assertion that if there are
factual inaccuracies or omissions in Sean Robbins' memo that it
supports a claim that the memo was in retaliation for MFS asking
to meet with the Secretary.  MFS did not even suggest or examine
whether there were mistakes in the memo when Robbins testified at
trial.  Even so, assuming there were any mistakes, making a

mistake is not evidence of a protected activity being a substantial factor in making the mistake.   Nonetheless the defendants will rebut each claim of inaccuracy or omission made by MFS' counsel in its pleadings:

1.   There were not malodor violations before the Field Compliance Order ("FCO").

The evidence is clear that there were malodor violations on November 7, 2001 (Ex. D-6) and August 25, 2002 (Ex. D-39 and testimony of Ronald Mordosky).

2.   The NOV cited in the FCO was based upon a single complaint.

While the November 7, 2001 was based upon a single complaint, that is all that is necessary to establish a malodor. (Testimony of Becky Easley)   There is no evidence on the record of how many complainants were involved in the August 25, 2002 violation.   Also the defendants had received 18 complaints about malodor from MFS and they are authorized to issue an order if they believe a facility is likely to emit a malodor.   35 P.S. 4009

3.   Saying MFS has a "history of malodor problems".

The evidence shows the defendants received at least 64 complaints from people living on at least 12 different city blocks resulting in 15 confirmed malodors. Ex. D-39.   That is a history of malodor problems.

4.   Saying EPA had denied MFS' request for an "alternate limit or test method" – (note that MFS inaccurately claims the memo says limit and method).

MFS' Title V permit renewal application states "MFS received a letter dated April 9, 2003 from EPA Region 3 denying our request for an alternative emission limit and test method."  Ex. D-24, page 3-2, emphasis added.  Robbins' memo stated EPA denied the limit or the method which is a correct statement.

5. Saying MFS had an SO2 issue.

MFS' plan approval application states that SO2 emissions will increase by 496.8 tons.  Ex. D-82.  When the federal Court case removed the pollution control project exemption, that MFS had relied upon, this increase caused such an issue the plan approval could not be issued.

6.   Attaching newspaper articles to the memo.

Sean Robbins and Mike Bedrin testified that the template the Secretary requires for her briefing memos includes newspaper articles.  Robbins was following the same template everyone uses.

7.   Omitting MFS' side of the story.

The memo attached many letters from several people including Thomas Zagami and Representative Rooney (Ex. P-15) which are very critical of the defendants and give MFS' side of the story.  The testimony also showed the Mr. Zagami gave a full recitation of MFS' side of the story at the meeting.  There is simply no

evidence in the record that this memo was either misleading or intentionally misleading, or that is was retaliatory in any way. There is also evidence that Secretary McGinty ever read this memo.

There is no evidence that this memo was in retaliation or that it led to an adverse action. The draft Title V permit had to be a compliance permit because MFS and EPA took a decade to agree upon an alternative test method to show compliance with the MW NESHAP, not because the defendants were retaliating against MFS. Accordingly, MFS has failed to put forth evidence upon which the jury could properly find a verdict for MFS on its First Amendment claim.

### D. MFS CANNOT ESTABLISH A DUE PROCESS CLAIM

MFS claims that defendants' decision to place unreasonable and unlawful conditions in the draft Title V permit deprived it of both a property and liberty interest in operating its business. It claims that the defendants' actions violated its Fourteenth Amendment right to due process.[4]

### 1. Procedural Due Process

The Fourteenth Amendment of the Constitution forbids a state from depriving persons of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. When a plaintiff sues

---

[4]MFS does not state whether defendants violated the procedural or substantive component of the due process clause of the Fourteenth Amendment. Defendants will address both.

under 42 U.S.C. § 1983 for a state actor's failure to provide
procedural due process, a plaintiff must show (1) the asserted
individual interests are encompassed within the fourteenth
amendment's protection of life, liberty, or property; and (2)
whether the procedures available provided the plaintiff with "due
process of law. <u>Robb v. City of Philadelphia</u>, 733 F.2d 286, 292
(3d Cir. 1984).

For MFS' procedural due process claim, MFS must produce
evidence establishing the plaintiff must prove (1) a deprivation
of an individual interest encompassed by the Fourteenth
Amendment's protection of life, liberty, or property, and (2) that
the procedures available did not provide due process of law. <u>Hill
v. Borough of Kutztown</u>, 455 F.3d 225, 233-34 (3d Cir. 2006).
Procedural due process does not protect every benefit; rather, to
have a property interest in a benefit, a person must clearly have
more than an abstract need or desire and more than a unilateral
expectation of receiving the benefit. <u>Gonzales,</u> 545 U.S. at 756.
Thus, in constitutional parlance, the plaintiff must have a
legitimate claim of an "entitlement." <u>Id</u>. Entitlements, however,
are not established by the Constitution; rather, they are created
and defined by existing rules or understandings that stem from an
independent source, such as state law. <u>Id</u>.

This Court has held that an applicant for a license or a
benefit like a permit does not have a property interest in that

license or benefit.  Ronald Mash v. Township of Haverford Department of Codes Enforcement, 2007 U.S. Dist. LEXIS 56987.  In that case the plaintiff did not receive a license he applied for and this Court held he did not have a property right in that license.  This Court has also stated that an applicant does not have a property interest in a benefit where the governing statute or regulation provides for discretion in the decision to grant the benefit.  Mash, citing Anderson v. City of Philadelphia, 845 F.2d 1216 (3rd. Cir. 1988).  It is undisputed that Pennsylvania law gives the defendants the discretion in deciding whether or not to renew and/or issue a Title V permit.  The Pennsylvania statute that empowers DEP to issue permits does not create the reasonable expectation that would rise to a level of a property interest. Envirotech Sanitary Systems, Inc. v. Edward Shoener and DER, 745 F.Supp. 271. There is no property interest in a permit because it is a privilege.  Brock v. Roadway Express, Inc., 481 U.S. 252, 107 S. Ct. 1740 (1987).  An applicant for a benefit who has not met all the necessary qualifications does not have a property interest in the benefit.  Hayes v. Reed, 1997 U.S. Dist. LEXIS 17044 (E.D. Pa. Oct. 29, 1997).  As MFS had no legal right to the renewed Title V permit it had no property interest in the permit.  Frank E. Acierno v. Philip Cloutier, et al., 40 F.3d 597 (3rd Cir. 1994).  An expectation of gaining entitlement to a benefit is insufficient to constitute a property right in the benefit.  Dean

<u>Tarry Corporation v. Stanley J. Friedlander</u>, 826 F.2d 210 (2nd

Cir. 1987) A permit issued by the Department does not rise to a

level of a property interest as a permit is a privilege, not a

right.  <u>Tri-State Transfer Company Inc. v. DEP</u>, 722 A.2d 1129,

1132 n. 3 (Pa Cmwlth. 1999). Pennsylvania Courts have repeatedly

held that permits and licenses are a mere privilege, and do not

constitute a property right of the holder. <u>Crooks v. Pennsylvania</u>

<u>Securities Commission</u>, 706 A.2d 360 (Pa. Cmwlth. 1998), <u>Spruce,</u>

<u>Inc. v. Pennsylvania Liquor Control Board</u>, 70 Pa. Commw. 501, 453

A.2d 382 (Pa. Cmwlth. 1982) aff'd 504 Pa. 394.  Also, courts have

held it is "quite clear" that the possibility of a future contract

is not a property interest that warrants due process protection.

<u>Mun. Revenue Servs. V. McBlain</u> 2009 U.S.  App. LEXIS 22216, <u>Bd. Of</u>

<u>Regents v. Roth,</u> 408 U.S. 564 (1972). Therefore, the fact the

Defendants sent MFS a proposed draft Title V permit for review and

comment, but did not renew MFS' still existing permit because MFS

refused to agree with it, does not violate any federally protected

fundamental property right. Since no federally protect right is at

issue, there is no need for notice and opportunity to be heard.

There is no constitutional right in having a renewed permit that

is a little different from the one you already have, especially

when the State has offered one to you and you reject it. Since

there is no federally property right in the permit, there was no

need to afford notice and the opportunity to be heard before any

action was taken on the permit.

To the extent, MFS is complaining defendants denied it due process by not allowing it to operate it business, the evidence clearly established MFS was told that it had the explicit right to operate its facility. Therefore, it was not denied the property right to operate its business, if such a right existed. If MFS was not denied a property right, it cannot be denied due process. This is especially true in this case since MFS was afforded proper due process to appeal the non-renewal of its Title V permit by 35 P.S. § 4006.1(b.2) and 25 Pa. Code § 127.446(d).

## 2. Substantive Due Process

The due process clause of the Fourteenth Amendment to the United States Constitution protects an individual against arbitrary action of government. County of Sacramento v. Lewis, 523 U.S. 833, 845. Allegations that government power has been arbitrarily and oppressively exercised implicate the substantive aspects of the due process clause. Id. at 846.

In order to allege a violation of substantive due process, a plaintiff must aver that each individual defendant's conduct deprived plaintiff of a protected interest involving an arbitrary abuse of official power which "shocks the conscience". United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392, 399 (3d Cir. 2003). Thus, to prevail on a substantive due process claim arising from a municipal land use decision, a

plaintiff must establish that (1) it has a property interest protected by due process, and (2) the government's deprivation of that property shocks the conscience. Cherry Hill Towers, L.L.C. v. Township of Cherry Hill, 407 F.Supp.2d 648, 654 (D.N.J.2006).

The Third Circuit has recognized two strands of substantive due process correlating to the nature of the government action, i.e. whether it was legislative or non-legislative. See Nicholas v. Pa. State Univ., 227 F.3d 133, 139 (3d Cir. 2000). Non-legislative, or executive, actions "typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." Id. at 139 n. 1. In this case, CTS argues that Defendants' refusal to qualify its training program for the wage exemption violated its due process rights; therefore, CTS argues it was deprived by non-legislative action.

To prevail on a non-legislative substantive due process claim, CTS must establish a protected property interest to which the Fourteenth Amendment's protection applies. Id. at 139-40. This Court has required plaintiffs in such circumstances to identify a "particular quality of property interest." Id. at 140. Whether a certain property interest embodies this particular quality is not determined by reference to state law, but depends on whether that interest is "fundamental" under the Constitution. Id. The asserted property interest must be considered against the background of

constitutional purposes, rationally developed and historically perceived, with respect for the teachings of history and a solid recognition of the basic values that underlie our society. Id. (quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229-30 (1985) (Powell, J., concurring)).

The Third Circuit has limited non-legislative substantive due process rights to real property ownership. Id. at 141. Further, the Third Circuit has declined to recognize a fundamental property interest in a variety of other circumstances. See, e. g., Gikas v. Wash. Sch. Dist., 328 F.3d 731, 736-37 (3d Cir.2003) (holding there is no property interest in statutory veterans' employment preference for substantive due process purposes); Nicholas, 227 F.3d at 143 (declining to find interest in tenured employment); Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1178, 1179-80 (3d Cir.1997) (concluding lowest bidder has no fundamental property interest in municipal contracts even though state statute requires municipality to award contract to lowest bidder); Reich v. Beharry, 883 F.2d 239, 244-45 (3d Cir. 1989) (finding no interest in prompt payment for professional services); Ransom v. Marrazzo, 848 F.2d 398, 411-12 (3d Cir. 1988) (asserting that state-law entitlement to water and sewer services is not a protected property interest); Mauriello v. Univ. of Med. & Dentistry of N.J., 781 F.2d 46, 52 (3d Cir. 1986) (dicta) (suggesting graduate student has no property interest in continued

enrollment in program). <u>Connection Training Services v. City Of
Philadelphia</u>  2009 WL 4918102, 3 -4 (3d. Cir.  2009). The Third
Circuit, or for that matter no Court in this district, has ever
held the an individual has substantive due process right in the
receiving for review and comment a draft proposed Title V permit
that contains conditions that an individual would consider as fair
and reasonable conditions.

If this Court should find that MFS had a substantive due
process right in receiving for review and comment a draft proposed
Title V permit that contains conditions that MFS considered fair
and reasonable conditions, if would still have to show the
defendants' conduct "shocks the conscience".  The meaning of the
shocks-the-conscience standard varies based upon the factual
context of each case. <u>United Artists</u>, 316 F.3d at 399-400.
However, the standard reaches only conduct at the edges of tort
law's scheme of culpability. <u>Lewis</u>, 523 U.S. at 848-849.

Moreover, as a general matter if MFS is saying it could not
use its land because of the defendants' actions, "land-use
decisions are matters of local concern and such disputes should
not be transformed into substantive due process claims based only
on allegations that government officials acted with 'improper'
motives." <u>United Artists</u>, 316 F.3d at 399-400. Only the most
egregious conduct can be said to be arbitrary in the
constitutional sense. <u>Lewis</u>, 523 U.S. at 846. For the purpose of

due process, government conduct is arbitrary and irrational where it is not rationally related to a legitimate government purpose. Sameric Corporation of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 595 (3d Cir. 1995).

There is no evidence that MFS was denied use or enjoyment of its property when defendants did not renew its valid existing Title V permit at its request. MFS did not need a new permit to operate its facility. It was able to operate its facility under its existing valid 1998 permit or the "permit shield" while its permit was being finalized. MFS voluntarily shut down its facility. Defendants did not take any action that caused MFS to lose the use or enjoyment of its property.

The shocks the conscience "standard reaches only conduct at the edges of tort law's scheme of culpability.... Allegations of mere negligence are insufficient to constitute a substantive due process violation." County of Sacramento v. Lewis, 523 U.S. 833, 848-849, (1998)). The standard for conduct which shocks the conscience greatly exceeds the threshold for conduct which is merely unreasonable. M & M Stone Co. v. Hornberger, 2009 WL 3245460, *13 (E.D.Pa. 2009)

Drawing all reasonable inferences from the evidence favorable to MFS, the most a reasonable jury could find regarding the defendants' conduct as it relates to conditions 27 and 28 is that in MFS' opinion, or at least their counsel's opinion, see Ex. D-

73, conditions 27 and 28 as first proposed were neither fair nor reasonable.  Conduct that is described as unfair or unreasonable is not enough to establish liability on substantive due process claim.  See M & M Stone Co. v. Hornberger, 2009 WL 3245460, *13 (E.D.Pa. 2009).

MFS put forth no evidence that defendants' conduct shocks the conscience.  What the evidence shows and no jury could find otherwise is at the time MFS' Title V permit application was being reviewed, MFS had not demonstrated compliance with the MW NESHAP. As a result of MFS' lack of compliance with the MW NESHAP, defendants Bedrin, Robbins, and Wejkszner placed in a draft proposed Title V permit for MFS' review and comment an admittedly tough condition requiring MFS to cease operations if EPA determined it failed the compliance test under the MW NESHAP. This provision applied only if EPA determined that MFS failed to demonstrate compliance with the MW NESHAP.  If EPA determined MFS could comply with the MW NESHAP, the proposed provision had no effect on MFS.  The provision as proposed was rationally related to the governmental purpose of requiring businesses within Pennsylvania to comply with the environmental laws while operating.  Because MFS had not demonstrate compliance with the MW NESHAP, Bedrin, Wejkszner, and Robbins only had two choices: let MFS continue operating after EPA determined it was emitting more hazardous air pollutants than allowed by law into community near

the facility, or to make it stop.  Deciding to allow MFS to
continue to emit illegal amounts of hazardous air pollutants would
have shocked the conscious: preventing that from happening does
not.

Also, at the time MFS' Title V permit was to be renewed, DEP
had many confirmed odor complaints coming from the MFS' facility.
Therefore MFS should have proposed a compliance plan in its
application for its Title V permit.  It failed to do so.  As
result of MFS failing to comply with the regulations governing
permit applications and these confirmed odor complaints, Bedrin,
Robbins, and Wejkszner placed in the draft proposed Title V permit
for MFS review and comment an admittedly tough condition.  It
required MFS to cease operations if it was determined that it was
the source of the odor, and the provision required MFS not to
resume operation until it submitted a compliance plan that was
acceptable to DEP. This provision, as with the MW NESHAP
provision, is well within the regulatory authority of DEP, 35 P.S.
§ 4004(9) and is rationally related to the legitimate governmental
purpose of requiring businesses in Pennsylvania to comply with
Pennsylvania environmental laws while operating. This condition
was first proposed on January 18, 2008 (Ex. D-72), the shut down
requirement was removed on February 25 (Ex. D-76), and the
condition was removed from the draft Title V permit completely on
April 22, 2008 (Ex. D-78).  Therefore, MFS is claiming that

because the defendants left a proposed Condition 28 on the
negotiating table for just five weeks out of a long negotiation
process they somehow violated MFS' constitutional rights.

Given the evidence established no defendants took any action
to shut down MFS' operations; the defendants encouraged MFS to
operate its facility under its existing valid Title V permit; the
law authorize the defendants Bedrin and Wejkszner to place
admittedly tough conditions in a draft of a proposed Title V
permit and MFS found only draft conditions 27 and 28 to be neither
fair or reasonable and Wejkszner, Bedrin and Robbins eventually
removed condition 28 and amended Condition 27 by removing the
cease operation language in the condition, no jury could
reasonably find for MFS on its substantive due process claim even
if had a property right protected by substantive due process.
Judgment should be entered in favor of the defendants on MFS'
substantive due process claim.

**E.   MFS CANNOT ESTABLISH AN EQUAL PROTECTION CLAIM**

MFS claims that the actions of the defendants violate its
right to equal protection under the law.  MFS claims a violation
of the equal protection clause of the Fourteenth Amendment.

MFS does not contend that it is a member of a protected class
or group, but rather argues that it is a "class of one" under
Village of Willowbrook v. Olech, 528 U.S. 562 (2000). "[T]o state
a claim under [the "class of one"] theory, a plaintiff must allege

that (1) the defendant treated him differently from others

similarly situated, (2) the defendant did so intentionally, and

(3) there was no rational basis for the difference in treatment."

Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).

"In order to succeed [on a class of one equal protection claim],

the [plaintiff] must demonstrate that [it was] treated differently

than someone who is prima facie identical in all relevant

respects." Purze v. Vill. of Winthrop Harbor, 286 F.3d 452, 455

(7th Cir. 2002); see also Neilson v. D'Angelis, 409 F.3d 100, 104

(2d Cir. 2005). Once plaintiff establishes that it was treated

differently, the plaintiff then bears a heavy burden of

demonstrating that defendants had no rational justifications for

any allegedly different treatment among similarly situated

individuals. Eichenlaub v. Twp. of Indiana, 214 Fed. Appx. 218,

224 (3d Cir. 2007). The defendants' action will be upheld if there

is "any reasonably conceivable state of facts that could provide a

rational basis." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307,

313, 315 (1993).  Those attacking the rationality have the burden

of negating every conceivable basis which might support it. Id.

Under the rational basis standard, differential treatment does not

violate the Equal Protection Clause if there is "a rational

relationship between the treatment and a legitimate government

interest." Heller v. Doe, 509 U.S. 312, 329 (1993).

MFS has not put forth any evidence that it was treated differently than someone who is prima facie identical to it in all relevant respects.  MFS has presented to no evidence from which a jury could reasonable find it was treated differently than someone who is prima facie identical to it in all relevant respects, i.e another Mineral Wool plant in Pennsylvania that had not complied with the MW NESHAP, had caused malodors and was issued a draft of a proposed Title V permit for its review and comment by the defendants without any conditions similar to the one it received. In fact, Mark Wejkszner testified there was another Mineral Wool Plant in the region that had malodor issues and installed an oxidizer to take care of it.  MFS did not cross examine him about this facility or put any evidence on the record that it was treated in any different way. Further, MFS presented no evidence from which a jury could reasonable find defendants Bedrin, Wejkszner and Robbins issued a Title V permit without any conditions to a facility that had any outstanding compliance issues.

Further the evidence clearly established there is a rational relationship between the treatment MFS received from defendants Robbins, Wejkszner and Bedrin and the governmental interest they were protecting.

The evidence clearly and unequivocally established MFS had not complied with the MW NESHAP when its Title V permit

application was being reviewed for renewal. In fact, the evidence established that to this day MFS has not established compliance with the MW NESHAP. In the event that MFS ever restarted its facility, Robbins, Bedrin and Wejkszner, to protect the citizens from being exposed to hazards air pollutants, placed a condition in the draft of a proposed Title V permit requiring MFS to shut down operations if EPA determined MFS failed to demonstrate compliance with the MW NESHAP and if it wished to restart the facility, it was to submit a plan to DEP describing the measures MFS would undertake to achieve compliance.  MFS took issue with that draft proposed condition.  This provision, however, is rationally related to the governmental interest reducing the amount of hazards air pollutants in the air. This Court has stated that DEP's regulatory authority under 35. P.S. § 4004(9) and 25 Pa Code § 125.445 provided the defendants with the authority to place the provision in the draft proposed Title V permit for MFS' review and comment.

Defendants Robbins, Bedrin and Wejkszner also proposed in the draft proposed Title V permit a provision that required MFS to cease operations if DEP notified it that it was causing a malodor off its property.  As with the MW NESHAP provision, this provision is also rationally related to governmental interest of ensuring the citizens living near the MFS's facility are living in an malodor free environment. DEP's regulatory authority under 35.

P.S. § 4004(9) and 25 Pa Code § 125.445 provided the defendants
with the authority to place the provision in the draft proposed
Title V permit for MFS' review and comment.

MFS presented evidence that it received NOVs for malodor
violation beginning in November of 2001 and ending in March of
2004. Without any evidence to support its inference, MFS wants the
jury to infer that other facility in the area were the source of
the odors and they did not get NOVs. While that might be a fair
inference, it is irrelevant since MFS offers no evidence that
Bedrin, Robbins, DiLazaro and Wejkszner were aware other
facilities were emitting malodors and were not being issued NOVs.

MFS appears to believe that since employees of the air
quality program at NERO, who worked under DiLazaro and Bedrin,
issued NOVs to MFS, but not to other facilities in the area, all
the defendants violated MFS' equal protection rights.  First, the
fact that Mrs. Easley and Mr. Mordosky issued NOVs is irrelevant
to the named individual defendants.  Second, the evidence is
undisputed that none of the defendants had any responsibility to
issue NOVs to the facilities MFS claims were treated differently.
There is no evidence of one single citizen's complaint about odors
from any facility other than MFS which is a prerequisite for DEP
to establish a malodor. On one hand MFS claims that DEP needs lots
of citizens complaining to establish an odor is a malodor, but on
the other hand MFS claims other facilities emit malodors without

any citizen complaints at all. MFS cannot claim it was treated differently from other facilities emitting malodors because there is no evidence of a determination that any other facility emitted a malodor. Even assuming the Bethlehem sewage treatment plant did emit malodors, the testimony is undisputed that the water program had the responsibility for issuing NOVs to the sewage treatment plant and none of the named defendants worked for the water program. Accordingly, defendants are entitled to judgment on MFS' equal protection claim under the 14th Amendment.

## F. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON MFS CONSTITUTIONAL CLAIMS

State officials are immune from damage claims brought under 42 U.S.C. § 1983 if reasonable officials in their positions could have believed that their actions or decisions were lawful in light of existing law and the information they possessed at the time they acted. Anderson v. Creighton, 463 U.S. 635 (1987). They are immune unless a reasonable official would have believed that their actions violated clearly established law. Id. This qualified immunity serves the social interest of protecting public servants from the time and expense of litigation and the threat of personal monetary liability, which divert officials' energies from the public's business and inhibit them in the discharge of their duties. Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982).

The Court must evaluate both the facts known to defendants and the law at the time defendants acted. Anderson, 483 U.S. at 641. An official does not lose his immunity unless the law existing at the time clearly and obviously proscribed the action that he took. Id. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Anderson, 483 U.S. at 640. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law. Malley v. Briggs, 475 U.S. 335, 341 (1986). An officer loses immunity only if "it is obvious that no reasonably competent officer would have [taken the action in question]." Id. Officials are immune unless "the law clearly proscribed the actions" that they took. Mitchell v. Forsyth, 472 U.S. 511, 523 (1985).

The Supreme Court stressed that the qualified immunity question must be resolved "at the earliest possible stage in the litigation." Saucier v. Katz, 533 U.S. 194 (2001). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Id. (quoting Mitchell v. Forsyth, 472 U.S. at 526 (1985)). "The privilege is 'an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Id.

In _Saucier_, the Supreme Court held that claims of qualified immunity are to be evaluated using a two step process. _Id_. First, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. _Bennett v. Murphy_, 274 F.3d 133, 136 (3d Cir. 2002). If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity. _Id_.

If it is determined that evidence of a constitutional violation has been adduced, courts evaluating a qualified immunity claim then move to the second step of the analysis to determine whether the constitutional right was clearly established. _Id_. That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that their actions were prohibited? _Id_. The focus in this step is solely upon the law. _Id_. If it would not have been clear to a reasonable officer what the law required under the facts alleged, he is entitled to qualified immunity. _Id_. at 137. If the requirements of the law would have been clear, the officer must stand trial. _Id_.

Here, reasonable officials in defendants Bedrin's, Wejkszner's and Robbins' positions, with the facts they possessed, would not believe that they were violating MFS' constitutional rights when they placed conditions in a draft proposed Title V permit for MFS' review and comment. Reasonable officials in their

47

positions could reasonable believe, since MFS had not demonstrated compliance with the MW NESHAP and they had sufficient basis to believe that MFS was a "potential" source of malodors, DEP's regulatory authority under 35. P.S. § 4004(9) and 25 Pa Code § 125.445 provided them with the authority to place in a draft of a proposed Title V permit for MFS review and comment conditions in the draft of a Title V permit without violating MFS' First and Fourteenth Amendment rights. In fact, this Court has already determined the defendants had the legal authority under Pennsylvania law to include such conditions in the draft of a proposed Title V permit. Reasonable officials in their positions, with the facts they possessed, could logically believe that the law did not proscribe their actions.

In MFS' brief in opposition to Defendants' motion for judgment as a matter of law at the end of MFS' case, it lists seven assertions it believes show DiLazaro, Wejkszner, Bedrin and Robbins knew their conduct was unlawful:

1.   They knew that MFS was not the source of the malodor.

Not only is there no evidence for this claim, it is not possible. None of the defendants ever determined an odor from MFS was a malodor. Robbins testified he could not go back in time to smell what the inspectors smelled to check if it were really a malodor. Moreover, the evidence established that MFS' operation has the potential to emit hydrogen sulfur during the melting of

the slag, and in fact emitted about 60 tons of hydrogen sulfur in one year. (testimony of Easley)  No reasonable person, including defendants Bedrin, Robbins, Wejkszner, and DiLazaro would believe that by relying on the Department's inspectors' reports of malodors they were violating MFS' or anyone's constitutional rights.

2.  The defendants did not issue NOVs to other facilities.

The named defendants did not issue any of the NOVs in this case.  There is no evidence of anyone from DEP speaking with a complainant about another facility and determining it was emitting a malodor. There is undisputed evidence on the record that none of the defendants issued an NOV to MFS, and none of the defendants had any responsibility to issue NOVs to any other facility MFS named.

3.  The defendants knew denying MFS a Title V permit was illegal.

The evidence is undisputed that no defendant ever revoked MFS' Title V permit or denied its application for a permit. The evidence is such that no jury could reasonably find that MFS does not still have a valid existing Title V permit today. No reasonable person, including defendants Bedrin, Robbins, Wejkszner, and DiLazaro would believe that the actions they took while negotiating the terms of a Title V permit and including the

provisions they proposed would violate MFS' or anyone's
constitutional rights.

4.   The defendants knew Robbins' memo was false and
misleading.

As discussed above there was nothing false or misleading
about Robbins' memo. Moreover, the evidence showed that MFS was
able to provide its side of the events to Secretary McGinty.  Even
if the memo contained some inaccuracies, no reasonable attorney
like Robbins, would believe that his drafting of the memo would
violate MFS' or anyone's constitutional rights.

5.   DiLazaro knew he violated MFS' rights by saying it was a
nuisance and that there was benzene in the air.

It is disputed whether DiLazaro said these things.  The
newspaper article, which is one of the worst forms of hearsay,
says he said there was benzene in the air, it did not claim he
said it was coming from MFS. Ex. P-18.  DiLazaro was attending a
public meeting of people angry about the malodors from MFS; it
would hardly injure MFS' reputation at that meeting to say it was
a nuisance.  This is also barred by the statute of limitations.
No reasonable Regional Air Quality Manager of DEP like DiLazaro
would believe that responding to citizen questions about malodors
would violate MFS' or anyone's constitutional rights.

6.   The defendants' comments on the Consent Decree violated
MFS' right.

The defendants, just like every other member of the public, had every right to submit public comments on the Consent Decree with the EPA.  The defendants did not violate MFS' rights by exercising their own first amendment rights.  The comments submitted reflected DEP's continuing and lawful concerns about malodor problems at MFS.  No reasonable person, including defendants Bedrin, Robbins, Wejkszner, and DiLazaro would believe that providing comments to EPA about DEP's continuing concerns about the malodors at the MFS facility would violate MFS' or anyone's constitutional rights.

7.  The defendants took retaliatory, onerous, punitive actions.

These four gentlemen went out of their way for years to help MFS keep operating.  Despite having more than enough evidence, legal support, and reasons none of them ever denied MFS' permit application, never revoked its permit, never assessed a penalty, and never shut down its plant.  No reasonable person, including defendants Bedrin, Robbins, Wejkszner, and DiLazaro would believe that any actions that any one of them took, would violate MFS' or anyone's constitutional rights.

Consequently, the individual defendants are entitled to qualified immunity on MFS' constitutional claims. Judgment, therefore, should be entered in favor of DiLazaro, Wejkszner, Bedrin and Robbins and against MFS.

G.   **SOVEREIGN IMMUNITY BARS PLAINTIFF'S STATE LAW CLAIM
FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE
CONTRACTUAL RELATIONS AND PROSPECTIVE ADVANTAGE**

MFS allege in Count III of its complaint the defendants'
conduct prevented them from entering in business contracts or
prevented it from selling it business.  It claims that the
defendants' conduct intentionally interfered with prospective
contractual relations.  This claim, however, is barred by
sovereign immunity.

Article I, § 11 of the Pennsylvania Constitution specifies,
in relevant part, "Suits may be brought against the Commonwealth
in such manner, in such courts and in such case as the legislature
may by law direct."  As the Pennsylvania Supreme Court has
explained, "the Framers intended that the legislature have
complete control over suits brought against the Commonwealth."
Smith v. City of Philadelphia, 512 Pa. 129, 516 A.2d 306, 309
(1986), appeal dismissed, 479 U.S. 1074 (1987).

The legislature, in turn, has explicitly affirmed the
sovereign immunity of the Commonwealth and its officials and
employees, except in those instances where immunity is
specifically waived by the General Assembly.  1 Pa. C.S.A. § 2310.
Thus, the legislature has proclaimed that "Sovereign immunity is
the constitutional rule."  E-Z Parks v. Philadelphia Parking
Authority, 110 Pa. Commw. 692, 532 A.2d 1272, 1276 (1987), appeal
denied, 546 A.2d 60 (Pa. 1988).  Commonwealth officials acting
within the scope of their duties enjoy the same immunity as the

Commonwealth itself.  <u>Moore v. Commonwealth</u>, 114 Pa. Commw. 56,

538 A.2d 111, 115 (1988), <u>appeal, dismissed</u>, 567 A.2d 1040 (Pa.

1990).  <u>See also</u> <u>LaFrankie v. Miklich</u>, 152 Pa. Commw. 164, 618

A.2d 1145, 1148-49 (1992). (employee of a Commonwealth agency

acting within the scope of his or her duties is protected by

sovereign immunity from imposition of liability for intentional

tort claims.)

The Sovereign Immunity Act in Title 42 of the Judicial Code

waives the Commonwealth's immunity only in nine narrow categories

of negligence:

    1.  vehicle liability,

    2.  medical-professional liability.

    3.  care, custody or control of personal property

    4.  a dangerous condition of Commonwealth real estate,

highways and sidewalks,

    5.  a dangerous condition of Commonwealth highways,

particularly potholes or sinkholes,

    6.  care, custody or control of animals,

    7.  liquor store sales,

    8.  National Guard Activities and

    9.  toxoid and vaccines.

42 Pa. C.S.A. § 8522(b).

Here, at all times relevant, the defendants were acting

within the scope of their duties as Commonwealth employees when

they acted.  To extent MFS is claiming defendants' conduct in

placing conditions 27 and 28 is outside the scope of their

employment, DEP's regulatory authority under 35. P.S. § 4004(9)
and 25 Pa Code § 125.445 provided the defendants with the
authority to place the conditions in the draft proposed Title V
permit for MFS' review and comment. Therefore, they were acting
within the scope of their authority when proposing conditions 27
and 28.

MFS' claim that the defendants' conduct intentionally
interfered with prospective contractual relations and prospective
advantage is not one of the categories in which the Pennsylvania
legislature has waived sovereign immunity.  Absent waiver to
sovereign immunity, the Commonwealth, its political subdivisions
and respective employees acting within the scope of their
employment are shielded from liability for intentional torts,
including the tort for intentional interference with contract.
Holt v. Northwest Pennsylvania Training Partnership Consortium,
Inc., 694 A.2d 1134, 1140 (Pa.Commw.Ct. 1997).

Accordingly, the evidence established the defendants were
acting within the scope of their employment and MFS' state law
claim is not one of the categories in which the Pennsylvania
legislature has waived sovereign immunity, the defendants are
entitled to sovereign immunity. Judgment should be entered in
favor of the defendants Bedrin, Robbins and Wejkszner on MFS'
claim that the defendants intentionally interfered with
prospective contractual relations and prospective advantage.

**H.   THE EVIDENCE DOES NOT SUPPORT MFS' CLAIM OF INTENTIONAL INTERFERENCE WITH CONTRACTUAL OR PROSPECTIVE CONTRACTUAL RELATIONS**

Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are:

(1)   the existence of a contractual, or prospective contractual relation between the complainant and a third party;
(2)   purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
(3)   the absence of privilege or justification on the part of the defendant; and
(4)   the occasioning of actual legal damage as a result of the defendant's conduct.

Crivelli v. General Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000) (citing Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa.Super.1997. Pennsylvania has expressly adopted the Restatement (Second) of Torts, which states that a necessary element of this tort is improper conduct by the alleged tortfeasor. Id. (citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1183 (1978); Restatement (Second) of Torts §§ 766-67).   Therefore, to prove tortuous interference with prospective contractual relations under Pennsylvania law, "[Plaintiff] must establish that: . . . [Defendant] had a purpose or intent to harm [Plaintiff] by preventing the relationship from occurring." Synthes (U.S.A.) v. Globus Medical, Inc., 2005 WL 2233441 at *6-7 (E.D. Pa. 2005) (citing Advent Sys., Lt. V. Unisys Corp., 925 F.2d 670, 672 (3d Cir. 1991).

To determine whether conduct was improper, Pennsylvania courts
must consider the following factors:

(a)   the nature of the actor's conduct,
(b)   the actor's motive,
(c)   the interests of the other with which the actor's conduct
      interferes,
(d)   the interests sought to be advanced by the actor,
(e)   the social interests in protecting the freedom of action of
      the actor and the contractual interests of the other,
(f)   the proximity or remoteness of the actor's conduct to the
      interference and
(g)   the relations between the parties.

Id. (citing Restatement (Second) of Torts § 767).

The Pennsylvania Supreme Court has defined a "prospective
contractual relation" as "something less than a contractual right,
but something more than a mere hope." Synthes (U.S.A.) v. Globus
Medical, Inc., 2005 WL 2233441 at *6-7 (E.D. Pa. 2005) (citing
Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979)).
A plaintiff must therefore establish a "reasonable probability"
that a contractual relationship would have been established absent
the defendant's tortuous conduct. Id. (citing Santana Products,
Inc. v. Bobrick Washroom Equipment, Inc., 401 F.3d 123, 140 (3d
Cir. 2005).

There is no evidence from which a jury could reasonable find
that DiLazaro, Wejkszner, Bedrin, and Robbins interfered with
contractual or prospective contractual relation between MFS and
some unknown party. There is no testimony from a potential buyer
of MFS or evidence of negotiations to buy the facility. There is

no evidence of any of the elements of a contract: offer, acceptance, consideration.  There is no evidence the defendants induced anybody not to do business with MFS.  Mark Wejkszner testified that 27 of the 87 Title V facilities in his region were operating under the permit shield provision, and that several of them were sold while operating under the permit shield.  This undisputed evidence proves that a facility operating under the permit shield could be sold to another company.

During his testimony Hauff testified that Armstrong World Inc. ("AWI") was considering buying the facility after MFS voluntarily closed its facility in February of 2006.  MFS then presented evidence that Robbins may have spoken to a lawyer from ("AWI') who was asking about regulatory issues MFS may have had with the DEP.  Drawing all reasonable inference in favor of MFS from this evidence, it establishes AWI might have had interest in the company and its attorney spoke with Robbins.  There is no evidence that AWI did not go through with the purchase because of what Robbins may have said to him during this phone conversation. It also establishes, however, to the extent Robbins said anything to induce AWI not to buy AWI, Robbins was justified in providing this person with the correct information, i.e that as of February of 2006, MFS did have regulatory issues with DEP.  Accordingly, the defendants are entitled to judgment as a matter of law on MFS'

claim for intentional interference with contractual or prospective contractual relations.

## IV.   CONCLUSION

For all the foregoing reasons, defendants respectfully request that their motion be granted.

THOMAS W. CORBETT, JR
ATTORNEY GENERAL

BY: /s/RANDALL J. HENZES
Randall J. Henzes
Deputy Attorney General
Identification No. 53256

Susan J. Forney
Chief Deputy Attorney General
Chief, Litigation Section

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone:  (215) 560-2136
Fax:        (215) 560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MFS, INC.,                          :        CIVIL ACTION
                                    :
            Plaintiff               :
                                    :
            v.                      :
                                    :
THOMAS A. DILAZARO, et al.,  :
                                    :
            Defendants              :        NO.  08-2508

**CERTIFICATE OF SERVICE**

I, Randall J. Henzes, Deputy Attorney General, hereby

certify that defendants' Motion for Judgment as a Matter of Law

was faxed on February 27, 2010. I further certify that a true

and correct copy of said document was served on February 27,

2010, by electronic means to:

tzagami@HPKLegal.com

                    THOMAS W. CORBETT, JR.
                    ATTORNEY GENERAL


            BY:  /s/RANDALL J. HENZES
                    Randall J. Henzes
                    Deputy Attorney General
                    Identification No. 53256