IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MFS, INC.,                                            :
                                                     :
              Plaintiff,                             :
                                                     :          CIVIL ACTION
       v.                                            :
                                                     :          NO. 08-2508
THOMAS A. DILAZARO, et al.,                          :
                                                     :
              Defendants.                            :

## OPINION

Slomsky, J.                                                     February 16, 2011

### TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       A.    Testimony of James Hauff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
             i.     Mineral Wool Plant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
             ii.    Notices of Violation and Field Enforcement Order. . . . . . . . . . . . . . . . . . 8
             iii.   Mineral Wool NESHAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
             iv.    Defendant DiLazaro's Public Comments. . . . . . . . . . . . . . . . . . . . . . . . 14
             v.     Other Facilities Near MFS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
             vi.    January 2006 Deficiency Letter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
             vii.   Consent Decree Between EPA and MFS. . . . . . . . . . . . . . . . . . . . . . . . 26
             viii.  Briefing Memorandum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
             ix.    January 2008 Draft Permit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
       B.    Testimony of Becky Easley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
       C.    Testimony of Defendant Thomas DiLazaro. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
             i.     Title V Permits Generally. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
             ii.    Field Enforcement Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
             iii.   Defendant DiLazaro's Public Comments. . . . . . . . . . . . . . . . . . . . . . . . 42
             iv.    MFS's Title V Application. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       D.    Testimony of Jack Cahalan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       E.    Testimony of Defendant Michael Bedrin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
       F.    Testimony of Defendant Mark Wejkszner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
       G.    Testimony of Defendant Sean Robbins. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
             i.     Defendant Robbins's Comments on the Consent Decree . . . . . . . . . . . . 51

      ii.     December 2007 Meeting with Secretary McGinty.. . . . . . . . . . . . . . . . 53

      iii.    January 2008 Draft Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

III.    LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

IV.    DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    A.    Defendants Bedrin, Wejkszner, and Robbins are Entitled to Judgment as a Matter of Law on MFS's First Amendment Retaliation Claim . . . . . . . . . . . . . 59

      i.      Protected Activity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

      ii.     Adverse Action and Motivating Factor. . . . . . . . . . . . . . . . . . . . . . . . . . 60

          a.    Briefing Memorandum.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

          b.    Draft Permit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

      iii.    Causation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    B.    Defendants are Entitled to Judgment as a Matter of Law on MFS's Due Process Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

      i.      Procedural Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

          a.    Fourteenth Amendment Interests. . . . . . . . . . . . . . . . . . . . . . . . 85

              1.    Property Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

              2.    Liberty Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

          b.    Due Process of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

      ii.     Substantive Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

          a.    Fourteenth Amendment Interests . . . . . . . . . . . . . . . . . . . . . . . 96

              1.    Property Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

              2.    Liberty Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

          b.    Defendants' Actions Do Not Shock the Conscience. . . . . . . . . . 98

    C.    Defendants are Entitled to Judgment as a Matter of Law on MFS's Equal Protection Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

      i.      Similarly Situated and Intentional Treatment. . . . . . . . . . . . . . . . . . . . 106

      ii.     Rational Basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

    D.    Defendants are Entitled to Qualified Immunity on all Federal Claims. . . . . . . 111

      i.      First Amendment Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

      ii.     Procedural and Substantive Due Process . . . . . . . . . . . . . . . . . . . . . . . 115

      iii.    Equal Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

      iv.    Questions of Historical Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    E.    Defendants are Entitled to Judgment as a Matter of Law on MFS's State Claim for Intentional Interference with Prospective Contractual Relations . . . . . . . . 123

      i.      Defendants are Entitled to Sovereign Immunity on the State Claim . . . 123

      ii.     Defendants are Entitled to Judgment as a Matter of Law on the State Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

          a.    Prospective Contractual Relationship for Sale of MFS Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

          b.    Prospective Contract with Armstrong for Continued Sale of Mineral Wool . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

2

        c.      Long Term Supply Agreements and Employee Retention
and Hiring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

F.      In the Alternative, a New Trial is Warranted in This Case. . . . . . . . . . . . . . . . 140

V.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

## I.    INTRODUCTION

On February 17, 2010, a ten-day jury trial commenced in this case.  On March 3, 2010,

the Jury rendered a verdict in favor of Plaintiff Mineral Fiber Services, Inc. ("MFS") on nearly all

of its claims.  The Jury found Defendants Thomas DiLazaro, Michael Bedrin, Mark Wejkszner,

and Sean Robbins each liable in his individual capacity.  Defendants DiLazaro, Bedrin, and

Wejkszner were employees of the Pennsylvania Department of Environmental Protection

("PaDEP" or "Department").  Defendant Robbins was an attorney employed by the Pennsylvania

Governor's Office assigned to the PaDEP.  The Jury returned a verdict in favor of MFS and

against Defendant DiLazaro in the amount of $2,600,000; against Defendant Bedrin in the

amount of $1,625,000; against Defendant Wejkszner in the amount of $650,000; and against

Defendant Robbins in the amount of $1,625,000.  On March 5, 2010, the Court entered judgment

in favor of MFS and against each Defendant for the amount awarded by the Jury.  (Doc. No.

115.)

Before the Court is Defendants' Post-Trial Motion Pursuant to Federal Rules of Civil

Procedure 50(b) and 59 for Judgment as a Matter of Law, or, in the Alternative, for a New Trial.

(Doc. No. 121.)[1]  On June 30, 2010, MFS filed a Response in Opposition to Defendants' Post-

---

[1] Defendants moved for a judgment as a matter of law pursuant to Rule 50(a), Fed. R.
Civ. P., after MFS rested its case (Trial Transcript, February 19, 2010, p.m. session, 15: 15-20),
and renewed their motion after Defendants rested their case and before final instructions on the
applicable law were given to the Jury.  (Trial Transcript, February 24, 2010, p.m. session, 50:10-
22.)  The Court took the Rule 50 Motions under advisement.

Trial Motion. (Doc. No. 166.) On August 13, 2010, Defendants filed a Reply in Support of the

Motion. (Doc. No. 169.) Defendants' Post-Trial Motion is now ripe for adjudication. For the

reasons that follow in this Opinion, the Court will grant Defendants' Post-Trial Motion for

Judgment as a Matter of Law, vacate the judgments entered against Defendants, and dismiss this

case in its entirety.

## II.      STATEMENT OF FACTS

On May 29, 2008, Plaintiff MFS filed the instant action pursuant to 42 U.S.C. § 1983,

alleging a violation of its rights under the First and Fourteenth Amendments to the United States

Constitution. The protected rights allegedly violated were the right to petition government for

redress of grievances without retaliation (Count I), and the rights guaranteed by the Due Process

and Equal Protection Clauses of the Fourteenth Amendment to substantive and procedural due

process and to equal treatment under law (Count II). MFS also alleged that its right under

Pennsylvania law not to be subjected to intentional interference with prospective contractual

relations was violated (Count III). (Doc. No. 1.) Plaintiff brought this suit against each

Defendant in their individual capacity only, since an action against them in their official capacity

or against the PaDEP is the same as one against the Commonwealth of Pennsylvania, which is

immune from suit in federal court under the Eleventh Amendment.

Defendants in this case are Thomas DiLazaro, the former Program Manager for the Air

Quality Program of the Northeast Regional Office of the PaDEP;[2] Mark Wejkszner, the current

Air Quality Program Manager of the Northeast Regional Office; Michael Bedrin, Regional

Director of the Northeast Regional Office of the PaDEP; and Sean Robbins, the attorney assigned

---

[2] Defendant DiLazaro retired from the PaDEP in June 2007.

to the Northeast Regional Office of the PaDEP.  The PaDEP is an executive agency of the

Commonwealth of Pennsylvania responsible for administering and enforcing state environmental

laws.  While the PaDEP is not a party to this case, the individual Defendants worked for the

PaDEP - directly or as counsel - during the relevant time period.[3]

---

[3] 35 P.S. § 4004 provides a list of powers and duties of the PaDEP, including, among other things, the following: The department shall have power and its duty shall be to –

(1) Implement the provisions of the Clean Air Act in the Commonwealth.

(2) Enter any building, property, premises or place and inspect any air contamination source for the purpose of investigating an actual or a suspected source of air pollution or for the purpose of ascertaining the compliance or non-compliance with this act, any rule or regulation promulgated under this act or any plan approval, permit or order of the department.
. . .
(5) Require the owner or operator of any air contamination source to install, use and maintain such air contaminant monitoring equipment or methods as the department may reasonably prescribe.

(6) Require the owner or operator of any air contamination source to sample the emissions thereof in accordance with such methods and procedures and at such locations and intervals of time as the department may reasonably prescribe and to provide the department with the results thereof.
. . .
(8) Receive, initiate and investigate complaints, institute and conduct surveys and testing programs, conduct general atmospheric sampling programs, make observations of conditions which may or do cause air pollution, make tests or other determinations at air contamination sources, and assess the degree of abatement required.

(9)(i) Issue orders to any person owning or operating an air contamination source, or owning or possessing land on which such source is located, if such source is introducing or is likely to introduce air contaminants into the outdoor atmosphere in excess of any rate provided for by this act, any rule or regulation promulgated under this act or any plan approval or permit applicable to such source, or at such a level so as to cause air pollution.  Any such order may require the cessation of any operation or activity which is introducing air contaminants into the outdoor atmosphere so as to cause air pollution. . . .
. . .
(27) Do any and all other acts and things not inconsistent with any provision of this act, which it may deem necessary or proper for the effective enforcement of this act and the rules or regulations promulgated under this act.

After the Court ruled on numerous Motions *in Limine* (Doc. Nos. 82-89), the case proceeded to trial.  Testimony of witnesses and exhibits admitted into evidence at trial are set forth *infra*.[4]

### A.   Testimony of James Hauff

#### i.   Mineral Wool Plant

MFS owned a mineral wool manufacturing facility in Bethlehem, Pennsylvania.  (James Hauff Trial Testimony ["Hauff"], February 17, 2010 ["2/17/10"], a.m. session ["a.m."], 57:1-4.) MFS began operating the mineral wool plant in 1988, when it purchased the plant from Bethlehem Steel.  (Id. at 54:14-18.)  James Hauff was employed by MFS from March 20, 1989 until January 10, 2007.  (Id. at 50:17-23.)  Mr. Hauff was initially the quality control manager at MFS.  In March 2002, he became the general manager.  (Id.)  At any given time, MFS had between sixty and eighty employees.  (Id. at 74:2-3.)

Mineral wool is a fibrous material which is produced from several raw ingredients.  The primary raw ingredient is called "blast furnace slag," a byproduct of the manufacture of steel. "Blast furnace slag" is produced during the first stage of steel production.  (Id. at 57:12-15.) When iron used in the manufacturing process is removed from a furnace, the remaining material is a molten-like lava called "slag."  (Id. at 57:25-58:2.)  The slag is shipped to mineral wool

---

[4] On June 3, 2009, Defendants filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.  (Doc. No. 17.)  On August 3, 2009, the Court denied Defendants' Motion.  (Doc. No. 27.)  Two days later, Defendants filed a Motion for Reconsideration, requesting the Court to reconsider its decision on Defendants' Motion for Summary Judgment.  (Doc. No. 30.)  On September 8, 2009, the Court held a hearing on Defendants' Motion.  On September 28, 2009, the Court granted in part and denied in part Defendants' Motion for Reconsideration.  (Doc. No. 40.)  The Court granted the Motion for Reconsideration and dismissed Defendant DiLazaro as a defendant in Count I of the Complaint alleging retaliation in violation of the First Amendment. The Motion was denied in all other respects.

manufacturing facilities.  The World Health Organization places mineral wool in category 3,

which covers material non-injurious to human beings.  (Id. at 58:18-59:1.)  Mineral wool has a

high thermal capacity and is used as an insulating cement.  It is often used in ceiling tiles and in

panels that coat boilers or hot pipes.  (Id. at 59:4-11.)  On average, MFS produced 50,000 tons of

mineral wool a year.  (Id. at 71:21-25.)

In the United States, there are approximately ten mineral wool manufacturing facilities,

several of which Mr. Hauff visited during his tenure at MFS.  (Id. at 72:10-19.)  Unlike other

mineral wool plants, MFS had a comprehensive and precise fiberization mechanism, which

allowed MFS to produce a clean material that did not have many defects.  (Id. at 72:23-25.)  The

slag used in mineral wool production, however, contains levels of sulfur.  Under certain

conditions, slag has the potential to emit into the air hydrogen sulfide, which has a foul smell

similar to a "rotten egg."  (Hauff, February 18, 2010 ["2/18/10"], a.m., 30:2-7.)  MFS might emit

over twenty tons of hydrogen sulfide during a year of operation.  (Id. at 62:4-7.)

MFS's primary customer was Armstrong World Industry, Ceiling Tile Division

("Armstrong").  MFS supplied Armstrong with one-hundred percent of its mineral wool

requirements from 1990 until MFS stopped operating its plant in February 2006.  (Hauff,

2/17/10, a.m., 76:4-7.)  MFS worked closely with Armstrong's engineers to try to create the

highest noise reduction coefficient ceiling tile in the world, which would have been a

revolutionary product to improve indoor air and noise quality.  (Id. at 77:17-78:5.)  MFS and

Armstrong entered into a long-term purchasing contract.  The contract was revised and renewed

every five years.  (Id. at 78:7-15; 79:1-4.)  The most recent one was set to expire in April 2007.

It was terminated in 2006 when MFS ceased operating the mineral wool plant.  (Hauff, 2/18/10,

a.m., 10:9-11.)  MFS also provided mineral wool to facilities around the world and to local

contractors.  (Hauff, 2/17/10, p.m. session ["p.m."], 76:10-24.)  Because MFS produced mineral

wool for its existing customers while operating its plant at full capacity, it often had to turn away

potential customers that sought to purchase its product.  (Id. at 81:7-25.)

ii.     Notices of Violation and Field Enforcement Order

On November 8, 2001, Becky Easley, an Air Quality Specialist with the PaDEP, issued a

Notice of Violation ("NOV") to MFS.  (Plaintiff's Trial Exhibit ["Pl. Ex."] 12.)  The NOV stated

that on the previous day, the PaDEP's Emergency Response Team conducted an investigation of

the MFS facility after receiving a complaint of an odor coming from the plant.  A member of the

Emergency Response Team confirmed the presence of a sulfur-type malodor at the complainant's

home, and the team member confirmed that the malodor was coming from MFS's facility.  (Id. ¶

2.)[5]  The PaDEP, as a matter of policy, does not disclose the name of a complainant.  The NOV

provided that by November 30, 2001, MFS was required to submit a written response to the

violation, including a list of measures taken to abate the violation.  (Id. ¶ 3.)  The November 8,

2001 NOV was the first NOV that MFS and its mineral wool plant had received in thirty years of

operation, including years of prior ownership by Bethlehem Steel.  (Hauff, 2/17/10, a.m., 87:3-6.)

On November 16, 2001, John Folck, President of MFS, wrote a letter to Ms. Easley about

the NOV.  (Defendants' Trial Exhibit ["Def. Ex."] 7.)  In the letter, Mr. Folck explained, "We

have found that our emission capture system was not fully effective in removing all the cupola

---

[5] Eric Garner was a member of the Emergency Response Team.  In his report underlying
the NOV issued by Ms. Easley, he identifies that there was just one complainant and confirmed
that he smelled an odor at the complainant's home.  (Easley, 2/22/10, p.m., 26:8-14.)  Ms. Easley
stated the odor could be carried there by the wind.  Mr. Garner did not specifically write in his
report that the odor was coming from MFS.  (Id. at  27:1-4.)

fumes for travel to the baghouse where these malodorous contaminants are normally filtered and removed.  We have taken several steps to correct this temporary upset to our emission control systems."  (Id.)

As noted in Folck's letter, MFS took steps to stop or reduce gas or vapor leakage from the ductwork around the cupolas of the plant.  (Hauff, 2/17/10, a.m., 91:5-10.)  It attempted to run furnaces at a lower carbon level.  (Id. at 91:1-4.)  MFS also conducted a more rigorous cleaning of the baghouse, which included changing part of the software for the cleaning program.  (Id.)  Mr. Hauff testified that even though MFS did not admit to the allegation contained in the November 8, 2001 NOV, it aimed to work with the PaDEP and to be "a good corporate neighbor."  (Id. at 92:4-9.)  MFS claimed, however, that it encountered several insurmountable safety issues in installing equipment to address the potential malodor problem.

During 2002, Defendant Thomas DiLazaro, the Program Manager for the Air Quality Program, corresponded with MFS about the alleged malodor issue described in the NOV.  In response, in a letter dated January 13, 2003, Thomas Zagami, counsel for MFS,[6] wrote a letter to Defendant DiLazaro.  (Def. Ex. 10.)  In his letter, Mr. Zagami stated, "MFS remains optimistic that its current mode of operation will result in the elimination of malodors detectable offsite which are attributable to MFS.  MFS has and will continue to look at other techniques utilized by other similar facilities to determine if there is any other proven and cost effective technology."  (Id. at 2.)

On Friday, January 24, 2003, at 5:05 p.m., the PaDEP issued a Field Enforcement Order ("FEO") to MFS for failing to undertake sufficient measures addressing the malodor problem at

---

[6] Mr. Zagami was a lead counsel for MFS at trial.

the facility as described in the November 8, 2001 NOV.  (Pl. Ex. 11.)  The FEO directed MFS to complete an attached two-page form describing new equipment that would be used to solve the problem and to submit it by the close of business on the following Monday, January 27, 2003. Defendant DiLazaro signed the FEO as the PaDEP representative.  Directions on how to appeal the FEO appear directly above Defendant DiLazaro's name on the FEO.  This FEO is the only FEO that MFS ever received.  (Hauff, 2/17/10, a.m., 112:13-17.)

In response to the January 24, 2003 FEO, MFS prepared a letter to the PaDEP.  (Id. at 99:7-9.)  The letter, written by Mr. Zagami and dated January 27, 2003, noted, "MFS has not admitted and it has not been determined that MFS is the source of the alleged malodor complaint(s)."  (Def. Ex. 13.)  Further, on February 24, 2003, MFS filed an appeal to the Environmental Hearing Board ("EHB").  (Pl. Ex. 16.)  The EHB is a quasi-judicial agency that adjudicates appeals from "final" administrative actions taken by the PaDEP.[7]  In the appeal, MFS argued that "[t]o the extent any malodors existed, there are multiple emission sources in close proximity to the Plant that are likely causing or contributing to the alleged malodors.  [Pa]DEP has failed to investigate these sources as potentially causing the alleged malodorous conditions." (Pl. Ex. 16 ¶ 7(b).)  Mr. Hauff testified that these alternative emission sources included, among

---

[7] 35 P.S. § 7514 codifies the EHB's jurisdiction and provides, in relevant part, as follows:

(a) General Rule. - The board has the power and duty to hold hearings and issue adjudications . . . on orders, permits, licenses or decisions of the department.
. . .
(c) Departmental action. - The department may take an action initially. . . but no action of the department adversely affecting a person shall be final as to that person until the person has had the opportunity to appeal the action to the board under subsection (g).  If a person has not perfected an appeal in accordance with the regulations of the board, the department's action shall be final as to the person.

others, the Bethlehem Wastewater and Sewage Treatment Plant ("Bethlehem Wastewater"),

Bethlehem Landfill, Waylite Plant ("Waylite"), and Connectiv Power Plant ("Connectiv").

(Hauff, 2/17/10, a.m., 101:13-21.)

On April 23, 2003, during a hearing conducted over the telephone regarding MFS's

appeal of the FEO to the EHB, the administrative judge questioned Defendant Robbins, as

counsel representing the PaDEP, about issuing the FEO at 5:05 p.m. on a Friday and requiring a

response by the close of business on the following Monday.  The judge stated that such actions

evidence the PaDEP's hostility toward MFS and that such actions appear bad to judges.  The

judge told Defendant Robbins that the PaDEP should not take similar action in the future.

Finally, the judge stated that it appeared that Defendant DiLazaro and his staff were acting like

"little children."  (Pl. Ex. 4 ¶ 56(o); Pl. Ex. 5 ¶ 56(o).)  Ultimately, in 2004, the PaDEP rescinded

the FEO, and the EHB dismissed MFS's appeal of the FEO as moot.  (Hauff, 2/17/10, a.m.,

104:3-4; Pl. Ex. 5 ¶ 56(s).)

From February 2003 to February 2004, MFS received six more NOVs from the PaDEP

for alleged emission of malodor.  The NOVs are dated February 5, 2003; February 12, 2003;

February 13, 2003; March 4, 2003; May 14, 2003;[8] and February 24, 2004.  (Pl. Ex. 19.)  The

NOVs do not state the name or address of the complainant.  Each NOV notes the number of

complaints the PaDEP received before a member of the Emergency Response Team conducted

an investigation.  (Id.)  Although the PaDEP issued these NOVs to MFS, no court or governing

---

[8] When asked about the May 14, 2003 NOV, which noted that the PaDEP received
complaints of sulfur odor on May 12, 2003, Mr. Hauff testified that the MFS plant did not
operate on May 12, 2003, which was a routine maintenance day.  (Hauff, 2/17/10, a.m., 111:1-8.)

body has ever determined that MFS violated malodor regulations.  (Hauff, 2/17/10, a.m., 105:11-15; Pl. Ex. 5 ¶ 30(b).)  The NOVs were not final actions of the PaDEP and were not appealable by MFS.  (Pl. Ex. 5 ¶ 30(c).)  Despite issuing these NOVs and the FEO, the PaDEP never sought to collect a fine from MFS.  (Hauff, 2/18/10, a.m., 22:7-14; Pl. Ex. 5 ¶ 30(c).)

iii.  Mineral Wool NESHAP

MFS, as a mineral wool manufacturer, must comply with state and federal environmental law, including the National Emission Standards for Hazardous Air Pollutants ("NESHAP"), 40 C.F.R. Part 63, Subpart DDD, §§ 63.1175-63.1196.  Mineral wool production facilities must also meet a Maximum Achievable Control Technology ("MACT") Standard, which is part of the overall NESHAP regulation.[9]  Pursuant to these regulations, MFS was required to demonstrate compliance with mineral wool NESHAP by June 2, 2002, or June 2, 2003, if granted a one-year extension by the United States Environmental Protection Agency ("EPA").  To demonstrate compliance with mineral wool NESHAP, MFS was required to conduct a certain stack test to determine the amount of hazardous pollutants it was emitting.

Mr. Hauff testified that during the drafting stage of the mineral wool NESHAP regulations, MFS representatives had met with EPA employees and explained that its mineral wool plant was uniquely configured and needed special consideration in order to comply with the proposed regulations.  (Hauff, 2/17/10, p.m., 31:14-18.)  The EPA responded to MFS's request by adding a paragraph to the preamble of the regulation which stated that "any plant that was configured differently than as described in the act could apply for either a different standard or a

---

[9] "NESHAP" and "MACT" were used interchangeably at trial to describe the pertinent federal environmental regulations.

different test method." (Id. at 32:7-10.)

On July 31, 2001, MFS representatives sent a request to Defendant DiLazaro to be considered for either a different standard or a different test method in order to demonstrate compliance with NESHAP. (Id. at 35:18-24; Pl. Ex. 31.) Defendant DiLazaro responded by explaining that the request would have to be made to the EPA, rather than to the PaDEP, because as a state agency, the PaDEP did not have authority to grant the request of MFS.

On April 9, 2003, the EPA denied MFS's request for use of an alternative standard under NESHAP. (Pl. Ex. 32.) The EPA's letter stated, "[s]ince alternative testing options exist that will enable MFS to demonstrate compliance with the current PM emission limits under Subpart DDD, EPA is not willing to amend the current Subpart DDD standards." (Id.) Mr. Hauff maintained that in the letter the EPA was merely denying MFS's request for an alternate test standard, but that MFS was permitted to use an alternate test method. (Hauff, 2/17/10, p.m., 37:6-21, 40:9-12.) Defendant DiLazaro confirmed this interpretation. (DiLazaro, 2/22/10, p.m., 76-78.)

On April 15, 2003, one week after the EPA denied MFS's request for an alternative test standard, Ronald Mordosky, District Supervisor of the Air Quality Program of the PaDEP, issued a NOV to MFS for failure to comply with mineral wool NESHAP. (Pl. Ex. 33.) Mr. Mordosky wrote, "My file review indicates that there is no record of MFS ever conducting the performance testing and implementing all of the other measures required by this regulation. Since MFS has not demonstrated compliance with this regulation, you are in violation of 25 Pa. Code § 124.3

13

**and** 40 CFR part 63 § 63.1180(a)(1)"[10] (emphasis in original).  MFS did not comply with the testing and other requirements of mineral wool NESHAP to the date of plant closure in February 2006.

      iv.    Defendant DiLazaro's Public Comments

      After MFS received the January 24, 2003 FEO for failure to address the malodor problem set forth in the November 8, 2001 NOV, MFS representatives sent a series of letters to government officials describing mistreatment of the corporation by the PaDEP.  (Pl. Exs. 13, 14.) Thereafter, on February 21, 2003, Pennsylvania State Representative T.J. Rooney sent a letter on MFS's behalf to Kathleen McGinty, Acting Secretary of the PaDEP, urging her to review the relationship between MFS and the PaDEP.  Representative Rooney stated that the "actions being taken against MFS, by [the Pa]DEP, are not warranted and are grossly disproportionate to the facts and circumstances presented here."  (Pl. Ex. 15 at 3.)  MFS had supplied Representative Rooney with the information contained in his letter to Secretary McGinty.  (Hauff, 2/18/10, p.m., 7:18.)

      Mr. Hauff testified that during this same period in early 2003, Defendant DiLazaro made numerous public comments concerning MFS, including that MFS was a known air polluter, a

---

[10] 25 Pa. Code § 124.3 provides as follows: National Emission Standards for Hazardous Air Pollutants ["NESHAPS"] promulgated in 40 C.F.R. Part 61 (relating to NESHAPS) by the Administrator of the United States Environmental Protection Agency ["EPA"] under section 112(d) of the Federal Clean Air Act (42 U.S.C.A. § 7412(d)) are hereby adopted in their entirety by the Department and incorporated herein by reference.

    40 CFR § 63.1180(a) provides as follows: (a) Existing cupolas and curing ovens.  You must install any control devices and monitoring equipment necessary to meet the standards in this subpart, complete performance testing, and demonstrate compliance with all requirements of this subpart no later than the following: (1) June 2, 2002; or (2) June 3, 2003 if you apply for and receive a one-year extension under section 112(i)(3)(B) of the Act.

known nuisance, the source of odors in the Lower Saucon region, and an emitter of benzene,

which was a toxic, cancer-causing agent.  (Hauff, 2/17/10, p.m., 11:7-11.)  Mr. Hauff explained

that MFS's customers, including Armstrong, expressed concern after Defendant DiLazaro made

these comments because MFS previously had a favorable reputation in the community.  (Id. at

11:14-22.)  Mr. Hauff was not present when Defendant DiLazaro made these comments.  He read

them in a newspaper article reporting on a Lower Saucon Town Hall meeting.  (Hauff, 2/18/10,

a.m., 9:10-12.)

At some point in the fall of 2004, Mr. Hauff met with Defendant DiLazaro at the PaDEP

office in Bethlehem, Pennsylvania.  At the meeting, Mr. Hauff and Defendant DiLazaro

discussed Defendant DiLazaro's public comments about MFS and MFS's subsequent letters to

state representatives.  Mr. Hauff testified that Defendant DiLazaro was displeased with being

disciplined by his superiors, presumably in response to the letters from elected officials and was

"angry" and "ticked off" because "[MFS] had gone over his head."  Mr. Hauff described

Defendant DiLazaro as "red in the face, very angry-looking . . . he pounded his fist on the table,

said he did not appreciate what we had done to him."  (Hauff, 2/17/10, p.m., at 13:16-14:1.)

<h5>v.     Other Facilities Near MFS</h5>

Mr. Hauff maintained that the PaDEP specifically targeted MFS for alleged malodor

violations even though other potential emitters of malodor operated in the area.  Other facilities

in the vicinity of MFS are also subject to the PaDEP's malodor regulations.  One facility,

Bethlehem Wastewater, is publicly owned and located approximately three-quarters of a mile

northwest of MFS's mineral wool plant.  (Id. at 14:9-13.)  At the wastewater facility, gases are

released during the anaerobic bacterial decomposition process.  Mr. Hauff testified that these

gases include, among other things, hydrogen sulfide, carbonyl sulfide, carbon disulfide, methane, and ammonia.  (Id. at 15:12-24.)  These gases commonly have a smell similar to a rotten egg. (Id. at 16:3.)  In a 2002 Inspection Report of Bethlehem Wastewater by the PaDEP, the inspector noted that an oxidizing chemical with the name potassium permanganate is added at the rotary and belt-press areas to control odors.  (Id. at 16:20-22; Pl. Ex. 25 at 2.)  Similarly, in a 2006 Inspection Report of Bethlehem Wastewater, the inspector noted that a chemical named magnesium hydroxide is added at a certain point in the treatment process for odor control.  (Id. at 18:10-12; Pl. Ex. 26 at 2.)

Notwithstanding the Inspection Report issued as early as 2002, which stated that Bethlehem Wastewater used potassium permanganate to control odors, a January 5, 2007 article in the Morning Call Newspaper stated that Bethlehem Wastewater had only recently begun implementing the deodorizing chemical agent process.  The article read that for several years, "a drive past Bethlehem's wastewater treatment plant evoked a reflexive gasp from the odor hanging in the air."  (Pl. Ex. 30.)  At no point before Bethlehem Wastewater began using deodorizing chemicals, however, had it received a NOV from the PaDEP for emitting malodor. (Hauff, 2/17/10, p.m., 22:12.)[11]

Another local plant, Waylite, was located within one mile of MFS's mineral wool plant. Waylite mined blast furnace slag, which it supplied to MFS and other customers.  (Id. at 23:6-14.)  Like Bethlehem Wastewater, Waylite never received a NOV from the PaDEP for emitting malodor.  (Id. at 24:15.)

_____

[11] Based on the evidence, this point in time would be before 2002, despite the statement in the January 5, 2007 article in the Morning Call Newspaper.  The article did not pinpoint an exact time when the chemical was first used.

Also within one mile of MFS was the Bethlehem Landfill.  On April 10, 2003,

representatives of the PaDEP met with representatives of Bethlehem Landfill "to discuss

proactive measures being taken by [Bethlehem Landfill] to control possible malodor sources

during the upcoming summer months."  (Pl. Ex. 27.)  On March 17, 2004, representatives of the

PaDEP held a similar meeting with Bethlehem Landfill personnel to discuss procedures to

"alleviate potential malodors during the upcoming summer months."  (Pl. Ex. 28.)  Like

Bethlehem Wastewater and Waylite, Bethlehem Landfill never received a NOV from the PaDEP

for emitting malodor.  (Hauff, 2/17/10, p.m., 27:9.)

vi.     January 2006 Deficiency Letter

If an operating plant in Pennsylvania emits more than ten tons of a single "hazardous air

pollutant" in one year, it is considered a "major source" edifice and therefore a "Title V facility."

A Title V facility is required to obtain a Title V operating permit from the PaDEP under 25 Pa.

Code § 121.1.  The MFS plant emitted as much as 750 tons of one hazardous air pollutant,

carbonyl sulfide, in one year.  Consequently, in order to operate the facility, MFS was required

under the federal Clean Air Act and Pennsylvania law to obtain a Title V operating permit from

the PaDEP.

An application for renewal of an existing Title V permit must be submitted at least six

months, and not more than eighteen months, before the expiration date of the permit.  See 25 Pa.

Code § 127.446(e).  If an application to renew a Title V permit is duly filed, but the permit is not

renewed prior to its expiration date, the party seeking renewal has the right to challenge the

PaDEP's failure to renew the permit by filing an appeal to the EHB.[12]  In the alternative, a permit renewal applicant may continue to operate under its existing Title V permit while its renewal application is pending, pursuant to the "permit shield" provision in its Title V permit.[13]

In April 2003, MFS filed a renewal application for its Title V Operating Permit.  (Hauff, 2/17/10, p.m., 75:24-25.)  On June 19, 2003, Chinu Patel of the PaDEP sent a letter to Mr. Hauff regarding the Title V Permit application.  (Def. Ex. 29.)  In the letter, Mr. Patel noted as follows:

> Given the large number of Title V applications received, it may be as much as three years before all permits are finally issued.
>
> This letter authorizes you to continue to operate your facility pending issuance of a facility operating permit, provided: all fees have been paid; all sources are in compliance with the Air Pollution Control Act, the Clean Air Act and all applicable regulations, or are on a Department approved compliance schedule; and, the conditions of all outstanding operating permits are met.

(Id.)

In other words, MFS was permitted to and did operate under a "permit shield" from June 2003 until February 2006, when MFS made the decision to shut down its mineral wool plant.  At no point did the PaDEP revoke the permit shield.  (Hauff, 2/18/10, a.m., 87:8-17.)  Nevertheless,

---

[12] 25 Pa. Code § 127.446(d) provides: Failure of the Department to issue or deny a new permit prior to the expiration date of the previous permit for which a timely renewal application has been filed shall be an appealable action. The EHB may require that the Department take action on an application without delay.

[13] 25 Pa. Code § 127.446(c) provides: The terms and conditions of an expired permit are automatically continued pending the issuance of a new permit when the permittee has submitted a timely and complete application and paid the fees required by Subchapter I (relating to plan approval and operating permit fees) and the Department is unable, through no fault of the permittee, to issue or deny a new permit before the expiration of the previous permit. An application is complete if it contains sufficient information to begin processing the application, has the applicable sections completed and has been signed by a responsible official.

Mr. Hauff testified that operating under a permit shield, rather than having a renewed Title V

permit, created problems for the plant and MFS.  As Mr. Hauff explained:

> It was totally unpredictable when it would either be rescinded or it
> would be approved.  There was no assurance that you'd continue to
> operate from day to day or for how long.  At any point, the way we
> had been treated in the past, they could have decided to just pull the
> permit because that was their right.  They could deny our application
> for a new permit, and that would have been the end of it.  But we
> couldn't enter any business arrangements of any sort at that time, any
> long term.

(Hauff, 2/17/10, p.m., 76:15-23.)

Eventually, on January 11, 2006, Defendant DiLazaro sent a letter to Mr. Hauff

explaining that several critical deficiencies existed in MFS's Title V renewal application

("Deficiency Letter").  (Pl. Ex. 88.)  In the letter, Defendant DiLazaro informed Mr. Hauff that

the PaDEP had adopted NESHAP standards and incorporated them into the PaDEP's Air

Resources Regulations, 25 Pa. Code § 121.1 *et seq.*, *supra*.  Defendant DiLazaro listed the

following deficiencies with MFS's facility:

> 1) MFS has failed to install monitoring systems and conduct required
> performance testing at the outlet of the cupolas as required by 40
> C.F.R. § 63.1180, in accordance with 40 C.F.R. §§ 63.[1]188 and
> 63.[1]189.[14]

---

[14] 40 C.F.R. § 63.1188 provides as follows:  You must meet the following performance
test requirements: (a) All monitoring systems and equipment must be installed, operational, and
properly calibrated before the performance tests. (b) Do a performance test, consisting of three
test runs, for each cupola and curing oven subject to this subpart at the maximum production rate
to demonstrate compliance with each of the applicable emission limits in §§ 63.1178 and
63.1179 of this subpart. (c) Measure emissions of PM [particulate matter] from each existing
cupola. (d) Measure emissions of PM and CO [carbon monoxide] from each new or
reconstructed cupola. (e) Measure emissions of formaldehyde from each existing, new or
reconstructed curing oven. (f) Measure emissions at the outlet of the control device if complying
with a numerical emission limit for PM, CO, or formaldehyde, or at the inlet and outlet of the
control device if complying with a percent reduction emission limit for CO or formaldehyde. (g)

2)  MFS has failed to demonstrate compliance with the emission limits specified in 40 C.F.R. § 63.1178.[15]

---

To determine the average melt rate, measure and record the amount of raw materials, excluding coke, charged into and melted in each cupola during each performance test run. Determine and record the average hourly melt rate for each performance test run. Determine and record the arithmetic average of the average hourly melt rates associated with the three performance test runs. The average hourly melt rate of the three performance test runs is used to determine compliance with the applicable emission limits. (h) Compute and record the average emissions of the three performance test runs and use the equations in § 63.1190 of this subpart to determine compliance with the applicable emission limits. (i) Comply with control device and process operating parameter monitoring requirements for performance testing as specified in this subpart.

40 C.F.R. § 63.1189 provides as follows: You must use the following test methods to determine compliance with the applicable emission limits: (a) Method 1 in appendix A to part 60 of this chapter for the selection of the sampling port locations and number of sampling ports. (b) Method 2 in appendix A to part 60 of this chapter for stack gas velocity and volumetric flow rate. (c) Method 3 or 3A in appendix A to part 60 of this chapter for oxygen and carbon dioxide for diluent measurements needed to correct the concentration measurements to a standard basis. (d) Method 4 in appendix A to part 60 of this chapter for moisture content of the stack gas. (e) Method 5 in appendix A to part 60 of this chapter for the concentration of PM.  Each PM test run must consist of a minimum run time of three hours and a minimum sample volume of 3.75 dscm (135 dscf). (f) Method 10 in appendix A to part 60 of this chapter for the concentration of CO, using the continuous sampling option described in section 7.1.1 of the method. Each CO test run must consist of a minimum run time of one hour. (g) Method 318 in appendix A to this part for the concentration of formaldehyde or CO. (h) Method to determine the free formaldehyde content of each resin lot in appendix A of this subpart.

[15] 40 C.F.R. § 63.1178 provides as follows: (a) You must control emissions from each cupola as follows: (1) Limit emissions of particulate matter (PM) from each existing, new, or reconstructed cupola to 0.05 kilograms (kg) of PM per megagram (MG) (0.10 pound [lb] of PM per ton) of melt or less. (2) Limit emissions of carbon monoxide (CO) from each new or reconstructed cupola to either of the following: (i) 0.05 kg of CO per MG (0.10 lb of CO per ton) of melt or less. (ii) A reduction of uncontrolled CO emissions by at least 99 percent. (b) You must meet the following operating limits for each cupola: (1) Begin within one hour after the alarm on a bag leak detection system sounds, and complete in a timely manner, corrective actions as specified in your operations, maintenance, and monitoring plan required by § 63.1187 of this subpart. (2) When the alarm on a bag leak detection system sounds for more than five percent of the total operating time in a six-month reporting period, develop and implement a written quality improvement plan (QIP) consistent with the compliance assurance monitoring requirements of § 64.8(b)–(d) of 40 CFR part 64. (3) Additionally, for each new or reconstructed cupola, maintain the operating temperature of the incinerator so that the average operating temperature for each three-hour block period never falls below the average temperature established during the

3) MFS has failed to install, adjust and continually operate a bag leak detection system for each fabric filter as required in 40 C.F.R. § 63.1181.[16]

4) MFS has failed to submit an operations, maintenance, and monitoring plan as required by 40 C.F.R. § 63.1187.[17]

_____

performance test.

[16] 40 C.F.R. § 63.1181 provides, in relevant part, as follows: To comply with the PM standards, you must meet all of the following: (a) Install, adjust, maintain, and continuously operate a bag leak detection system for each fabric filter. (b) Do a performance test as specified in § 63.1188 of this subpart and show compliance with the PM emission limits while the bag leak detection system is installed, operational, and properly adjusted. (c) Begin corrective actions specified in your operations, maintenance, and monitoring plan required by § 63.1187 of this subpart within one hour after the alarm on a bag leak detection system sounds. Complete the corrective actions in a timely manner. (d) Develop and implement a written QIP consistent with compliance assurance monitoring requirements of 40 CFR 64.8(b) through (d) when the alarm on a bag leak detection system sounds for more than five percent of the total operating time in a six-month reporting period.

[17] 40 C.F.R. § 63.1187 provides, in relevant part, as follows: (a) An operations, maintenance, and monitoring plan must be submitted to the Administrator for review and approval as part of your application for the title V permit. (b) The operations, maintenance, and monitoring plan must include the following: (1) Process and control device parameters you will monitor to determine compliance, along with established operating levels or ranges for each process or control device. (2) A monitoring schedule. (3) Procedures for properly operating and maintaining control devices used to meet the standards in §§ 63.1178 and 63.1179 of this subpart. These procedures must include an inspection of each incinerator at least once per year. At a minimum, you must do the following as part of an incinerator inspection: (i) Inspect all burners, pilot assemblies, and pilot sensing devices for proper operation. Clean pilot sensor if necessary. (ii) Ensure proper adjustment of combustion air, and adjust if necessary. (iii) Inspect, when possible, all internal structures (such as baffles) to ensure structural integrity per the design specifications. (iv) Inspect dampers, fans, and blowers for proper operation. (v) Inspect motors for proper operation. (vi) Inspect, when possible, combustion chamber refractory lining. Clean, and repair or replace lining if necessary. (vii) Inspect incinerator shell for proper sealing, corrosion, and/or hot spots. (viii) For the burn cycle that follows the inspection, document that the incinerator is operating properly and make any necessary adjustments. (ix) Generally observe whether the equipment is maintained in good operating condition. (x) Complete all necessary repairs as soon as practicable. (4) Procedures for keeping records to document compliance. (5) Corrective actions you will take if process or control device parameters vary from the levels established during performance testing. For bag leak detection system alarms, example corrective actions that may be included in the operations, maintenance, and monitoring plan include: (i)

21

5) MFS has failed to submit reports, including a performance test report; startup, shutdown and malfunction plans and reports; an operations, maintenance and monitoring plan; and necessary semiannual reports as required by 40 C.F.R. §§ 63.1193 and 63.10.[18]

(Pl. Ex. 88. at 1.)

---

Inspecting the fabric filter for air leaks, torn or broken bags or filter media, or any other condition that may cause an increase in emissions. (ii) Sealing off defective bags or filter media. (iii) Replacing defective bags or filter media, or otherwise repairing the control device. (iv) Sealing off a defective fabric filter compartment. (v) Cleaning the bag leak detection system probe, or otherwise repairing the bag leak detection system. (vi) Shutting down the process producing the particulate emissions.

[18] 40 C.F.R. § 63.1193 provides, in relevant part, as follows: You must prepare and submit reports to the Administrator as required by this subpart and § 63.10 of the general provisions in subpart A of this part. These reports include, but are not limited to, the following: (a) A performance test report, as required by § 63.10(d)(2) of the general provisions in subpart A of this part, that documents the process and control equipment operating parameters during the test period, the test methods and procedures, the analytical procedures, all calculations, and the results of the performance tests. (b) A startup, shutdown, and malfunction plan, as described in § 63.6(e)(3) of the general provisions in subpart A of this part, that contains specific procedures for operating and maintaining the source during periods of startup, shutdown, and malfunction and a program of corrective action for malfunctioning process and control systems used to comply with the emission standards. In addition to the information required by § 63.6(e)(3), your plan must include the following: (1) Procedures to determine and record what caused the malfunction and when it began and ended. (2) Corrective actions you will take if a process or control device malfunctions, including procedures for recording the actions taken to correct the malfunction or minimize emissions. (3) An inspection and maintenance schedule for each process and control device that is consistent with the manufacturer's instructions and recommendations for routine and long-term maintenance. (c) A report of each event as required by § 63.10(b) of the general provisions in subpart A of this part, including a report if an action taken during a startup, shutdown, or malfunction is inconsistent with the procedures in the plan as described in § 63.6(e)(3) of the general provisions in subpart A of this part. (d) An operations, maintenance, and monitoring plan as specified in § 63.1187 of this subpart. (e) A semiannual report as required by § 63.10(e)(3) of the general provisions in subpart A of this part if measured emissions exceed the applicable standard or a monitored parameter varies from the level established during performance testing. The report must contain the information specified in § 63.10(c) of the general provisions, as well as the relevant records required by § 63.1192(b) of this subpart. (f) A semiannual report stating that no excess emissions or deviations of monitored parameters occurred during the reporting period as required by § 63.10(e)(3)(v) of the general provisions in subpart A of this part if no deviations have occurred.

Citing the Air Resources Regulations, Defendant DiLazaro advised MFS that the PaDEP:

> [W]ill refuse to renew an operating permit to a source that is operating in violation of the Clean Air Act or the regulations promulgated thereunder that are applicable to the Source. . . . [T]he [PaDEP] has determined that MFS is currently operating out of compliance with NESHAP regulations.  Unless compliance is achieved, the [PaDEP] cannot renew Title V Operating Permit #48-00020.

> It is also important to note that Section 412 of the Department's Air Resources Regulations, 25 Pa. Code § 127.412,[19] provides that if the Department finds that a permit applicant has an existing or continuing violation or lacks the intention or ability to comply with the Air Pollution Control Act or the rules and regulations of the Department,

---

[19] 25 Pa. Code § 127.412 provides, in relevant part, as follows:

(b) Each applicant for an operating permit shall, as part of the application or on a periodic basis as authorized under subsection (j), submit a compliance review on a form provided by the Department signed by a corporate officer or other responsible official of the facility and containing a verification that the information contained in the application is true and correct to the best of the signatory's belief formed after reasonable inquiry.
. . .
(f) If the Department finds that the applicant or related party has an existing or continuing violation or lacks the intention or ability to comply with the act, or the rules or regulations promulgated under the act, or a plan approval operating permit or order of the Department, as indicated by past or present violations, the Department will attempt to resolve the violations or lack of intention or ability to comply informally.

(g) If the Department is unable to resolve the violation or lack of intention or ability to comply on an informal basis, the Department will place the violation and may place the lack of intention or ability to comply on the compliance docket. The violation or lack of intention or ability to comply shall remain on the compliance docket until it is resolved to the satisfaction of the Department.

(h) An operating permit will not be issued to an applicant or related party if a violation or lack of intention or ability to comply at a source owned or operated by the applicant or a related party appears on the compliance docket.

(i) A permittee or applicant may appeal to the EHB a violation or lack of intention or ability to comply which the Department places on the compliance docket.

and the Department is unable to resolve the violations or lack of intention or ability to comply informally, then the Department will place the violation, and may place the lack of intention or ability to comply, on the compliance docket. An operating permit will not be renewed where the applicant has a violation or lack of intention or ability to comply that is listed on the compliance docket.

As you know, the Department has been attempting to informally resolve violations at MFS for several years. During numerous meetings and discussions with MFS, some of which have involved the U.S. Environmental Protection Agency, MFS has stated that it lacks the ability to comply with the requirements in the NESHAP regulations because the configuration of existing equipment at the facility will not allow for required performance testing. Pursuant to 25 Pa. Code § 127.412, a lack of ability to comply with the NESHAP regulations is a basis for not renewing a Title V Permit.

Furthermore, Section 422 of the Department's Air Resources Regulations, 25 Pa. Code § 127.422[20] provides that the Department will refuse to issue an operating permit where, in the design of the source, provisions are not made for adequate verification of compliance, including source testing. In a situation like this where provisions have not been made to allow for required NESHAP testing and verification of compliance with NESHAP limits an operating permit cannot be issued or renewed.

The Department also has concerns that MFS lacks the intention to bring the facility into compliance. This concern is based on the fact that required testing was to be completed, at the latest, by June 2, 2003, and has still not been performed. In addition, on July 13, 2005, the Department asked MFS [to] revise a plan approval application that it submitted to the Department on January 29, 2004 in accordance with the decision in State of New York, et al. v. USEPA, et al., 413

---

[20] 25 Pa. Code § 127.422 provides, in relevant part, as follows: The Department will deny or refuse to revise or renew an operating permit to a source to which one or more of the following applies:

. . .

(2) In the design of the source, provision is not made for adequate verification of compliance, including source testing or alternative means to verify compliance.

F.3d 3 (D.C. Cir. June 24, 2005).[21]  The Department renewed that request in a letter dated August 15, 2005 to Paul Bruder, Esquire.[22] Since that time the Department has not received any information from MFS regarding a revised plan approval application and has seen no additional movement on the part of MFS to control odors from the facility or to reconfigure equipment so that NESHAP testing can be performed.

(Pl. Ex. 88 at 2.)

On February 9, 2006, Mr. Hauff responded to Defendant DiLazaro's letter.  (Pl. Ex. 89.)

Mr. Hauff attempted to explain MFS's position on the NESHAP non-compliance issue "and also

to fill in some of the gaps that [DiLazaro] left in his letter."  (Hauff, 2/17/10, p.m., 60:12-16.)  In

summary, Mr. Hauff addressed the critical deficiencies of MFS's Title V Permit application

highlighted by Defendant DiLazaro and explained:

> The problem with conducting compliance testing is not the lack of test ports but the way in which Subpart DDD is written and the configuration of the MFS plant.  PA DEP is well aware of these issues.  The PA DEP cannot reasonably expect MFS to spend in excess of $1.0 million to reconfigure the plant air pollution controls to make our plant "fit" EPA's Subpart DDD standard without reducing emissions at all, simply to attempt to perform a compliance test safely and effectively.

(Pl. Ex. 89 at 4.)

---

[21] On June 24, 2005, before action could be taken on MFS's plan approval application, a decision from the United States Court of Appeals for the District of Columbia, State of New York v. U.S. EPA, 413 F.3d 3 (D.C. Cir. 2005), changed the applicable law.  Prior to this decision, a facility was allowed to increase its emission of one pollutant in order to reduce its emission of a different pollutant.  As a result of this decision, MFS would not be able to increase its sulfide dioxide emission by 496 tons as requested in order to reduce emission of other pollutants, specifically carbonyl sulfide and hydrogen sulfide.  (Def. Ex. 82.)  Consequently, the PaDEP could not, at that time, approve MFS's plan approval application which contained provisions that would violate the decision.  Equipment to be installed would have reduced carbonyl and hydrogen sulfide emission, but increased sulfide dioxide emission.

[22] Paul Bruder represented MFS.

On February 26, 2006, one week after Mr. Hauff sent this letter to Defendant DiLazaro, MFS stopped operating the mineral wool plant.  (Hauff, 2/17/10, p.m., 60:20-21.)  When asked why MFS ceased operations, Mr. Hauff replied, "Well, because of the uncertainty of receiving our operating permit.  We were coming up on certain contractual limitations or points of contract with not only our customers but also some of our vendors, and we had to have assurance that we were going to be able to supply them beyond those points of the contract."  (Id. at 61:9-16.)

After the mineral wool plant stopped operating, MFS was approached by potential buyers of the plant.  The first potential buyer was Armstrong, MFS's principal client.  (Id. at 64:16-20.)  Approximately fourteen Armstrong representatives visited the plant, completed a walkthrough, took pictures, and received a tutorial on the operation.  (Id. at 64:22-65:3.)

The second potential buyer was Thermafiber, which was the largest owner of mineral fiber-producing facilities in the United States.  (Id. at 65:4-6.)  After MFS purchased several truckloads of mineral wool from Thermafiber, the company inquired if MFS's mineral wool plant was for sale.  Mr. Hauff met with Thermafiber's Chief Executive Officer in Bethlehem to discuss the possibility of Thermafiber purchasing the plant.  (Id. at 66:10-25.)  Thermafiber remained interested in purchasing the mineral wool plant while MFS operated under the permit shield, but, according to Mr. Hauff, Thermafiber desired "assurance that [the] Title V operating permit would be issued and be usable.  They didn't want to put a lot of money into a plant that they couldn't operate."  (Id. at 87:23-88:1.)

vii.　　Consent Decree Between EPA and MFS

In 2005 and 2006, when MFS was corresponding with PaDEP employees, MFS was also negotiating with the EPA, a federal agency, about regulatory and compliance issues.  The EPA

threatened fines against MFS at a rate of $30,000 a day for non-compliance with NESHAP from June 2, 2002 to June 2, 2003, and fines at a rate of $34,000 a day from December 2005 onward for the same reason.

On September 20, 2005, Mr. Zagami wrote a letter to Chris Day, the Assistant U.S. Attorney handling the MFS matter with the EPA.  (Def. Ex. 51.)  In the letter, Mr. Zagami explained, "I actually advised you that, in light of EPA's actions, EPA is leaving MFS with no alternative except to shut down."  (Id. at 2.)

On December 20, 2005, the EPA filed a lawsuit against MFS in federal court in the Eastern District of Pennsylvania alleging non-compliance with NESHAP.  In August 2006, a resolution was reached between the EPA and MFS.  On August 10, 2006, Mr. Hauff sent Defendant DiLazaro a supplemental response to the January 11, 2006 Deficiency Letter, summarizing the conditions of the settlement between MFS and the EPA.  (Pl. Ex. 36.)  Mr. Hauff advised Defendant DiLazaro that an agreement had been reached between MFS and the EPA concerning MFS's request for an alternative NESHAP test method.  (Hauff, 2/17/10, p.m., 67:17-18.)  The letter reads:

> As the United States Environmental Protection Agency ("EPA") has advised the Pennsylvania Department of Environmental Protection ("PaDEP"), MFS has negotiated an agreement in principle with EPA to resolve the pending litigation involving MFS's alleged failure to conduct compliance testing in the manner specified by the federal NESHAP (40 C.F.R. Part 63) Subpart DDD ("MACT").  The agreement in principle contemplates that, due to MFS's unique configuration, MFS will implement an agreed upon alternative test method to demonstrate compliance with MACT within six months of re-starting its manufacturing operations.

(Pl. Ex. 36 at 1.)

On March 9, 2007, the EPA and MFS filed with the court a notice of the Consent Decree settling the litigation.[23]  (Pl. Ex. 34.)  As stated in the Consent Decree:

> The express purpose of the Parties entering into this Consent Decree is to further the objectives of the Clean Air Act and the regulations promulgated thereunder, to ensure Defendant's compliance with the requirements of the mineral wool NESHAP at this Facility including the opportunity for Defendant to ascertain compliance using the Alternative Test Method as provided in this Decree below . . . .

(Pl. Ex. 34 ¶ 5.)  The Consent Decree authorized MFS to use an alternative test method to demonstrate compliance with mineral wool NESHAP.  The parties agreed that MFS would pay a civil penalty in the amount of $109,000 to the United States for violations that were described in the Complaint.  (Id. ¶ 36.)

The Consent Decree expressly stated that it was not to serve as a Title V Permit nor did it relieve MFS of the obligation to comply with other statutes or regulations.  The Consent Decree provided as follows:

> 70.  This Consent Decree is not and shall not be construed as a permit issued pursuant to Subchapter V of the Clean Air Act [Title V Permit], nor as a modification of any existing permit so issued, nor shall it in any way relieve Defendant of its obligations to comply with permits, if any, otherwise required for any portion of its Facility, and with any other applicable federal, state and local law or regulation. This Consent Decree shall not be interpreted to excuse Defendant from any obligation to comply with any new permit, or modification of existing permits, in accordance with applicable federal, state and local laws and regulations.
>
> 71.  Nothing herein shall be construed as relieving Defendant of the duty to comply with the Clean Air Act and its implementing regulations, and all applicable permits issued under that act and regulations.

---

[23] The negotiations that led to the settlement of the federal lawsuit and the March 9, 2007 notice of the Consent Decree followed the February 16, 2006 closing of the MFS plant.

28

(Id. ¶¶ 70-71.)

On March 23, 2007, over one year after MFS ceased operating its plant, the United States published notice of the proposed Consent Decree in the Federal Register and solicited comments for a period of thirty days pursuant to 28 C.F.R. § 50.7.[24]  In the Motion for Entry of Consent (Pl. Ex. 35), the United States explained that the PaDEP filed a comment requesting that the United States consider a number of specific modifications to the terms of the proposed Consent Decree. (Pl. Ex. 35 ¶ 7(1).)  Moreover, the United States noted that "after subsequent discussions with EPA, [PaDEP] ultimately agreed to entry of the Decree. . . . The United States notes that EPA had invited [PaDEP] to consider joining EPA in the case but the [PaDEP] declined."  (Id.)  Citing paragraph 70 of the Consent Decree, *supra*, the United States emphasized that the Decree provisions "do not provide an alternative from or substitute for any of the required state permits or approvals."  (Id. ¶ 7(5).)

---

[24] 28 C.F.R. § 50.7 provides, in relevant part, as follows: Consent judgments in actions to enjoin discharges of pollutants.

(a) It is hereby established as the policy of the Department of Justice to consent to a proposed judgment in an action to enjoin discharges of pollutants into the environment only after or on condition that an opportunity is afforded persons (natural or corporate) who are not named as parties to the action to comment on the proposed judgment prior to its entry by the court.

(b) To effectuate this policy, each proposed judgment which is within the scope of paragraph (a) of this section shall be lodged with the court as early as feasible but at least 30 days before the judgment is entered by the court.  Prior to entry of the judgment, or some earlier specified date, the Department of Justice will receive and consider, and file with the court, any written comments, views or allegations relating to the proposed judgment.  The Department shall reserve the right (1) to withdraw or withhold its consent to the proposed judgment if the comments, views and allegations concerning the judgment disclose facts or considerations which indicate that the proposed judgment is inappropriate, improper or inadequate and (2) to oppose an attempt by any person to intervene in the action.

In its comment to the Consent Decree, the PaDEP expressed concern regarding the ramifications of MFS's failure to demonstrate compliance with mineral wool NESHAP and the Decree's effect on the PaDEP's permitting authority.  The PaDEP suggested that the Decree should require that within forty-eight hours of failing the compliance test, MFS must shut down the facility for initial failure to demonstrate compliance with mineral wool NESHAP.  The United States declined to add the "shutdown" provision to the Consent Decree.  (Id. ¶ 7(8).)  However, the United States once again noted:

> The Decree provision for the compliance plan, or the process outlined in the Decree for development and delivery of the same, does not usurp any of PADEP's authority reserved in Paragraph 70 of the proposed Decree, to take any actions within its authority regarding MFS's Title V operating permit.
> . . .
> PADEP raises the issue that resolution of alleged malodor issues at the Facility are not addressed in the Decree.  The United States agrees with PADEP that the state regulations regarding regulation of malodors are beyond the scope of relief requested in the complaint filed in this case to enforce the federal mineral wool NESHAP requirements.  EPA has recommended that PADEP contact MFS directly and work out those concerns.

(Id.)  On August 14, 2007, the Consent Decree was approved and entered by the court.

viii.   Briefing Memorandum

On December 17, 2007, representatives from MFS and the PaDEP, including Defendant Bedrin, Regional Director of the PaDEP, and Defendant Robbins, as counsel to the PaDEP, attended a meeting in Secretary McGinty's office to discuss the renewal of MFS's Title V Operating Permit.  The meeting with the Secretary had been requested by MFS.  To prepare the Secretary for this meeting, Defendant Robbins put together a Briefing Memorandum.  (Pl. Ex. 6.)  In the Memorandum, Defendant Robbins described MFS's failure to perform the testing required

by mineral wool NESHAP and MFS's failure to address the technical deficiencies at the mineral

wool plant delineated in Defendant DiLazaro's January 11, 2006 Deficiency Letter to Mr. Hauff.

Defendant Robbins recited MFS's "history of malodor problems," including the NOVs and the

FEO issued by the PaDEP.  The Memorandum included a summary of the interaction between

MFS and the EPA over the years and a reference to the State of New York decision, which

affected MFS's plan approval application, as noted *supra* in footnote 21.

Defendant Robbins attached a number of documents to the Briefing Memorandum.  He

included nearly a dozen letters from PaDEP representatives, Thomas Zagami, counsel for MFS,

and Assistant U.S. Attorney Chris Day, and the letter from State Representative Rooney urging

PaDEP Secretary McGinty to review the MFS case.  In addition,  Defendant Robbins attached

three newspaper articles discussing fraud allegations against certain MFS employees.

Defendant Robbins recommended to the Secretary in the Briefing Memorandum that the

PaDEP should not issue a Title V operating permit to MFS at that time.  In addition, Defendant

Robbins suggested that "[b]y issuing a permit to a facility that has not demonstrated an ability to

comply, the Department opens itself to an appeal by a third party, which could very well be

Lower Saucon Township in this case, or a group of interested citizens."  (Id. at 6.)  Nevertheless,

Defendant Robbins wrote, "Renewal of the permit can and should take place after a

demonstration of compliance with applicable requirements."  (Id.)

ix.    January 2008 Draft Permit

Shortly after the December 17, 2007 meeting with Secretary McGinty, the PaDEP sent a

Draft Title V Operating Permit ("Draft Permit") to MFS.  (Pl. Ex. 8.)  The Draft Permit is forty-

five pages long and each page contains the word "PROPOSED" in bold-face capital letters in the

bottom-right corner.  At least ten pages feature the phrase "***Permit Shield In Effect***" in

bold-face type surrounded by asterisks.  (Id. at 30-39.)  The Draft Permit contained ninety-two

conditions on which the issuance of the Title V Permit would be based.[25]

Mr. Hauff testified that ninety of the ninety-two conditions "seemed to be pretty

straightforward and standard."  (Hauff, 2/17/10, p.m., 87:8-9.)  However, MFS vehemently

contested two conditions in the Draft Permit.  Mr. Hauff testified that these conditions were a

"poison pill."  (Hauff, 2/18/10, a.m., 109:6-11.)  The first contested condition is number 27.  The

Draft Permit notes that the authority for condition 27 is derived from the Air Resources

Regulations, *supra*, and the Consent Decree entered into by MFS and the EPA, *supra*.  Condition

27 provided, in relevant part, as follows:

> (l) If EPA determines that the initial performance test results fail to
> demonstrate compliance with the emission limitations set for[th] in
> 40 C.F.R. § 63.1178, MFS, Inc. will cease operation of cupolas at the
> facility within 24 hours of notification of disapproval.  If MFS, Inc.
> wishes to restart cupolas they shall first submit a plan ("Compliance
> Plan") to EPA and the Department which describes those measures
> MFS, Inc. shall undertake to achieve compliance with the mineral
> wool NESHAP, which may include but are not limited to upgrading
> or  replacing  the  existing  control  device(s),  along  with  an

---

[25] The PaDEP has authority to issue a Title V permit to a facility that is operating out of
compliance with state or federal regulations.  35 P.S. § 4007.2 provides, in relevant part, as
follows: In addition to the other enforcement provisions of this act, the department may issue a
permit . . . to a source that is out of compliance with this act, the Clean Air Act or the regulations
promulgated under either this act or the Clean Air Act.  Any such permit must contain an
enforceable schedule requiring the source to attain compliance.  The compliance schedule may
contain interim milestone dates for completing any phase of the required work, as well as a final
compliance date, and may contain stipulated penalties for failure to meet the compliance
schedule.  If the permittee fails to achieve compliance by the final compliance date, the permit
shall terminate.  The permit shall be part of an overall resolution of the outstanding
noncompliance and may include the payment of an appropriate civil penalty for past violations
and shall contain such other terms and conditions as the department deems appropriate.  See
also Pa. Code 25 § 127.445 (providing similar authority to the PaDEP).

implementation schedule for the commencement and completion of each significant construction and/or facility milestone.  Operations may not begin until the Compliance Plan has been approved by EPA and the Department and necessary approvals or permits are obtained by MFS, Inc. including, but not limited to, Air Quality Plan Approvals.

(Pl. Ex. 8 at 22.)

The second contested condition is number 28.  The Draft Permit notes that the authority

for condition 28 is also derived from the Air Resources Regulations, 25 Pa. Code § 127.512,

entitled "Operating Permit Terms and Conditions."[26]  Condition 28 provided as follows:

The owner or operator shall cease operations of this facility upon notification by the Department that violation of Section C, Condition #003[27] has occurred.  Within 30 days of being notified, the permitte [sic] shall submit a plan to abate the malodors to the Department for approval.  Resumption of operation at the facility is contingent upon receipt of approval from the Department of the proposed odor abatement plan.

---

[26] 25 Pa. Code § 127.512 provides, in relevant part, as follows:

(a) Each permit issued to a Title V facility shall, at a minimum, contain the permit terms and conditions required by this section.
. . .
(c) The permit shall contain provisions stating the following:
(1) The permittee shall comply with conditions of the operating permit.  Noncompliance with the permit constitutes a violation of the Clean Air Act and the act is grounds for one or more of the following:
(i)      Enforcement action.
(ii)     Permit termination, revocation and reissuance or modification.
(iii)    Denial of a permit renewal application.
. . .
(4) The permit does not convey property rights of any sort, or an exclusive privilege.

[27] Section C, Condition #003 provides: The permittee may not permit the emission into the outdoor atmosphere of any malodorous air contaminants from any source in such a manner that the malodors are detectable outside the property of the person on whose land the source is being operated.

(Pl. Ex. 8 at 22.)  MFS objected to conditions 27 and 28 in a letter to the PaDEP.  However, as

Mr. Hauff testified, MFS was unable to appeal the Draft Permit to the Environmental Hearing

Board. (Hauff, 2/17/10, p.m., 88:20-22.)  MFS would have been entitled to appeal the terms of

the Draft Permit if the Permit was intended to be a final decision by the PaDEP.[28]  The Draft

Permit, however, was merely a proposal and was not intended to be a final decision.  Its terms

were still subject to negotiation.

On January 16, 2009, over six months after filing the instant lawsuit, MFS received

another Draft Title V Operating Permit from the PaDEP ("Second Draft Permit").  (Pl. Ex. 9.)

This Second Draft Permit did not contain the closure requirement that was set forth in conditions

27 and 28 of the Draft Permit.

### B.      Testimony of Becky Easley

Becky Easley has been an employee of the PaDEP since August 1999.  (Becky Easley

Trial Testimony ["Easley"], February 22, 2010 ["2/22/10"], p.m., 3:20-23.)  At the time of her

testimony, Ms. Easley was an Air Quality Specialist, responsible for inspecting facilities that

have air quality permits in her designated geographic work area.  (Id. at 4:15-18.)  The MFS

mineral wool plant was located within Ms. Easley's work area.  Her duties included investigating

a complaint of an odor and determining if the odor is a "malodor," which is an odor that is

objectionable to the public.  (Id. at 15:3-7.)  Ms. Easley visited MFS's facility approximately

twenty-two times in response to complaints about odors.  She confirmed malodors being emitted

---

[28] 35 P.S. § 4010.2 provides: Any person aggrieved by an order or other administrative action of the department [PaDEP] issued pursuant to this act or any person who participated in the public comment process for a plan approval or permit shall have the right, within thirty days from actual or constructive notice of the action, to appeal the action to the hearing board . . .

34

from MFS four or five times.  (Id. at 15:17-25.)  The other seventeen or eighteen times, Ms.

Easley told the complainant that the odor was not strong or persistent enough to be considered a

"malodor."  (Id. at 16:1-5.)[29]  Ms. Easley drafted and issued the November 8, 2001 NOV sent to

MFS for a confirmed malodor.  (Pl. Ex. 12; Def. Ex. 6.)  Ms. Easley and her supervisor, Ronald

Mordosky, decided to issue the NOV to MFS after Eric Garner of the PaDEP completed an

investigation following a citizen complaint.  (Easley, 2/22/10, p.m., 6:13-17; 25:5-11.)  The four

Defendants in this case were not involved with the issuance of the November 8, 2001 NOV.  (Id.

at 6:25-7:11.)

On February 5, 2003, Ms. Easley drafted and issued another NOV to MFS for confirmed

malodor.  (Id. at 8:16-23.)  Again, Ms. Easley and Mr. Mordosky decided to issue this NOV.  The

four Defendants in this case were not involved in issuing the February 5, 2003 NOV.  (Id. at 9:1-

7.)  To determine the source of the odor, Ms. Easley visited the homes of two complainants,

spoke with them and determined that the odor was strong and persistent enough to be classified

as a malodor.  She then drove down and upwind from the facilities in the area to confirm the

source of the malodor.  (Id. at 14:1-9.)

Bethlehem Wastewater is another facility located within Ms. Easley's designated work

area.  On March 6, 2002, Ms. Easley filed an Inspection Report after visiting the wastewater

plant.  (Pl. Ex. 25.)  Ms. Easley explained that Mark Miller, a Water Quality Specialist with the

---

[29] Ms. Easley testified that a malodor is determined by a member of the Department.  The
member or inspector would only have to speak to one complainant to confirm that an odor is a
malodor.  (Easley, 2/22/10, p.m., 15:1-10); (Robbins, 2/24/10, p.m., 15:11-13, 20:23-25, 21:1.)
The Jury also saw the videotaped trial deposition of Ronald Mordosky (Ronald Mordosky
Videotaped Trial Deposition ["Mordosky"], 2/22/10, a.m., 57.)  Mr. Mordosky also confirmed
that no Defendant was involved in issuing any of the NOVs.

PaDEP, accompanied her on the Bethlehem Wastewater inspection.  (Easley, 2/22/10, p.m., 9:17-19.)  Mr. Miller was present for the inspection because the Water Quality Program division of the PaDEP, to which he was assigned, was the "lead program" covering Bethlehem Wastewater.  She testified that the Water Quality Program "would be responsible for trying to correct [major problems]."  (Id. at 9:20-24.)  If Ms. Easley had discovered a malodor violation at the Bethlehem Wastewater facility during her inspection, the Water Quality Program would be responsible for issuing a NOV.  (Id. at 10:2.)  Ms. Easley testified that Defendants in this case did not work for the Water Quality Program, and had no responsibility for issuing NOVs to Bethlehem Wastewater.  (Id. at 10:3-8.)

Ms. Easley is also familiar with odors emitted from Bethlehem Landfill.  (Id. at 12:4-6.)  However, she is not responsible for issuing NOVs to Bethlehem Landfill because the PaDEP program covering Bethlehem Landfill is the Solid Waste Program.  Defendants did not work for the Solid Waste Program and had no responsibility for issuing NOVs to Bethlehem Landfill.  (Id. at 12:11-18.)

On September 7, 2006, Ms. Easley prepared a memorandum for Defendant DiLazaro featuring the subject line "MFS Hydrogen Sulfide Data."  (Def. Ex. 59.)  The memorandum has three introductory paragraphs and six pages of "MFS Hydrogen Sulfide Analyzer Monthly Data" covering the period from March 2004 to February 2006.  Ms. Easley testified that Defendant DiLazaro asked her to write a memo on the data collected from an air sampler.  (Easley, 2/22/10, p.m., 39:6-7.)

The introduction to the memorandum provides, in part:

The Department installed a Hydrogen Sulfide monitoring station at

> the Lower Saucon Sportsmen Association.  This monitor was
> installed in response to odor complaints made against MFS, Inc.,
> located in the City of Bethlehem, Northampton County.  The
> monitoring station is located approximately one half mile to the north
> east of the MFS, Inc. facility.  Parameters measured on an hourly
> basis at the monitoring station include: ambient temperature,
> hydrogen sulfide concentration, solar wind speed, vector wind
> direction, and vector wind speed.

(Def. Ex. 59 at 1.)

The data featured in the memorandum reflects the amount of hydrogen sulfide in the

ambient air in parts per billion.  The term "ambient air" refers to general outside air and is not

specific to any one location or facility.  (Easley, 2/22/10, p.m., 37:5-10.)  In other words, an

inspector cannot read the data obtained from an ambient air monitor and pinpoint the source of

the hydrogen sulfide.  (Id. at 37:18-21.)  Ms. Easley testified that data collected by the ambient

air monitor did not serve as a basis to establish a malodor violation.  (Id. at 27:22-25.)

Ms. Easley's September 7, 2006 memorandum notes that the most abundant

concentration of hydrogen sulfide in the ambient air occurred on March 1, 2004, at thirty parts

per billion coming from a 256 degree wind vector direction.  The memorandum further states,

"MFS, Inc. ceased production on February 17, 2006.  The monitoring station data shows that no

readings of greater than 2 parts per billion hydrogen sulfide were recorded after this date."  (Def.

Ex. 59 at 1.)

At trial, MFS confronted Ms. Easley with ambient air monitoring data for January 2,

2009, nearly three years after MFS ceased operation.  The reading displayed that at 10:00 a.m. on

January 2, 2009, the ambient air monitor showed forty-five parts per billion of hydrogen sulfide

coming from a 257 degree wind vector direction (Easley, 2/22/10, p.m., 40:17-22.), an amount

larger than readings obtained when MFS was operating its plant and from a similar direction.

### C.    Testimony of Defendant Thomas DiLazaro

Defendant DiLazaro is a former employee of the PaDEP.  As noted above, in June 2007,

he retired after working approximately thirty-five years at the PaDEP and the Pennsylvania

Department of Environmental Resources.  In 1992, Defendant DiLazaro became Air Quality

Program Manager, and he remained in that position until his retirement in 2007.  (Thomas

DiLazaro Trial Testimony ["DiLazaro"], 2/22/10, p.m., 48:10-23.)  He testified that during his

entire tenure at the PaDEP, he was never reprimanded.  (Id. at 52:5-7.)  As Air Quality Program

Manager, Defendant DiLazaro was in charge of the air program in the Northeast Region, which

covered eleven counties in northeast Pennsylvania.  His office was comprised of three groups,

one of which was called the Title V group.  (Id. at 49:5-8; 49:22-25.)  The Title V group was

responsible for issuing Title V operating permits in accordance with Title V of the federal Clean

Air Act of 1990.

Defendant DiLazaro managed a staff of approximately thirty employees.  (Id. at 49:9.)

Directly below him was the operations chief who handled complaints and reviewed inspections.

Below the operations chief were supervisors and below the supervisors were staff members who

conducted actual inspections.  Included in the Title V group were engineers who reviewed

operating permits and made decisions on pending Title V applications.  (Id. at 51:4-7.)

Defendant Wejkszner, who succeeded Defendant DiLazaro as Air Quality Program Manager,

was in charge of the engineering services section of the Title V group.  (Id. at 51:12.)

### i.    Title V Permits Generally

Defendant DiLazaro provided a comprehensive summary of the process of obtaining a

Title V Permit.  First, a company must submit an application.  Once the PaDEP deems the

application complete, a technical review is commenced and a draft permit is developed.  "That

draft permit is then sent to the company for review and asked for comments.  And then there's

negotiations back and forth on the terms and the conditions in the permit."  (Id. at 55:20-22.)

Once the PaDEP and the company have agreed on the terms of the draft permit, it is forwarded to

the EPA for further review.  Defendant DiLazaro explained that the draft permit is also published

in a local newspaper for three consecutive days to ensure that the public is aware of the pending

Title V permit application.  Local public agencies and authorities in any neighboring state (in this

case, New Jersey) also have the opportunity to comment on the Title V application and to request

a hearing.  (Id. at 56:1-13.)  The company, the PaDEP, the EPA, the public, and neighboring

states have to be in agreement before a Title V Permit is issued.  During this lengthy process,

companies are entitled to continue operating under a "permit shield."  (Id. at 57:12-14.)

On October 7, 1998, Defendant DiLazaro issued to MFS a Title V Operating Permit.

(Def. Ex. 2.)  The Permit provided, in part:

> This permit is issued for a fixed term of 5 years.  The terms and
> conditions of the expired permit shall automatically continue pending
> issuance of a new Title V permit, provided the permittee has
> submitted a timely and complete application and paid applicable fees
> required under 25 Pa. Code Chapter 127, Subchapter 1 and the
> Department is unable, through no fault of the permittee, to issue or
> deny a new permit before the expiration of the previous permit.

(Def. Ex. 2 at 6.)

Defendant DiLazaro testified that in 2003 many Title V renewal applications were

submitted.  At that time, approximately one-hundred facilities in the Northeast Region required

Title V operating permits.  Only five PaDEP employees were assigned to review renewal

applications.  (DiLazaro, 2/22/10, p.m., 53:23-54:1.)  In 2003, MFS submitted a timely and complete Title V renewal application, but the PaDEP was unable to issue or deny a new permit before the expiration of MFS's existing permit.  Consequently, MFS was entitled to continue to operate under its 1998 Title V Permit in accordance with the "permit shield" provision.  (Def. Ex. 29.)

      ii.    Field Enforcement Order

On Friday, January 24, 2003, Defendant DiLazaro met with his supervisor, William McDonnell, to discuss the MFS case.  (DiLazaro, 2/22/10, p.m., 67:10-15.)  Defendant DiLazaro testified that Mr. McDonnell directed him to immediately issue an order to MFS mandating its compliance with malodor regulations.  (Id. at 69:4.)  After the meeting with Mr. McDonnell, Defendant DiLazaro and Mr. Mordosky drafted a FEO, and later reviewed it with Mr. McDonnell and Defendant Robbins, the attorney for the PaDEP.  (Id. at 67:19-25.)  That same Friday, the PaDEP issued a FEO to MFS for failure to undertake measures necessary to sufficiently address the malodor problem at the facility stemming from the November 8, 2001 NOV.  (Pl. Ex. 11; Def. Ex. 12.)

As described above, on February 24, 2003, MFS filed an appeal of the January 24, 2003 FEO.  (Def. Ex. 19.)  Ultimately, in January 2004, the PaDEP rescinded the FEO and MFS withdrew its appeal, allowing the EHB to dismiss the appeal as moot.  Defendant DiLazaro attributed the retraction to the ongoing negotiations between the PaDEP and MFS, and MFS's submission of a new plan approval application.  (DiLazaro, 2/22/10, p.m., 73:1-13; Def. Ex. 82.)  The proposed plan was for MFS to install a thermal oxidizer to control malodorous emissions and a new device to control particulate matter being emitted from the cupolas.  The equipment to

be installed would reduce MFS's carbonyl sulfide and hydrogen sulfide emissions, but it would increase sulfide dioxide emissions.[30]  (DiLazaro, February 23, 2010 ["2/23/10"], a.m., 6:14-16; Def. Ex. 82.)  MFS's proposed plan addressed the malodor emissions and would enable MFS to do NESHAP testing without the need of an alternative test method, which at the time was a request still pending with the EPA.  (Id. at 7:1-3.)

In a letter dated February 3, 2004 to Jack Cahalan, Township Manager of Lower Saucon Township, regarding MFS's plan approval application, Defendant DiLazaro stated:

> The proposed equipment consists of a high efficiency cyclone to reduce particulate emissions followed by a thermal oxidizer to reduce the malodors.
> . . .
> Since MFS has submitted the plan approval application . . . the parties have agreed to focus on processing and addressing questions associated with the application rather than on litigating over the [January 24, 2003 FEO].

(Def. Ex. 38 at 1.)

Similarly, in a letter dated February 5, 2004 to Susan M. Wilson, Executive Director of Citizens Advisory Council, Defendant DiLazaro explained:

> Residents of Lower Saucon Township, Northampton County have been concerned about malodorous emissions from the [MFS] facility and DEP has investigated numerous complaints.  DEP and MFS have been working on a solution to the problem, which has resulted in the company submitting a Plan Approval Application for technical review.

(Def. Ex. 40.)

---

[30] As noted in footnote 21, *supra*, a court decision prevented the compliance plan in the application from being instituted.  The PaDEP requested MFS to submit a revised plan. Defendant DiLazaro noted in his Deficiency Letter dated January 11, 2006 that no application with a revised plan was submitted.

In the same week, Defendant DiLazaro sent letters nearly identical to the Wilson letter to Pennsylvania State Senator Lisa Boscola (Def. Ex. 41), State Representative Robert Freeman (Def. Ex. 42), State Representative Patrick Browne (Def. Ex. 43), and Hellertown resident John Raeside (Def. Ex. 44).

iii.     Defendant DiLazaro's Public Comments

In May 2003, a newspaper article was published noting the discovery of benzene sourced from MFS in ambient air readings.  (DiLazaro, 2/22/10, p.m., 83:19-25, 84:1-12.)  Defendant DiLazaro testified that he told the reporter that MFS was cooperating with the PaDEP, but the reporter neglected to include these comments in the article.  According to Defendant DiLazaro, "[t]hey wrote some other stuff which a lot of it was kind of out of context and didn't make a lot of sense."  (Id. at 84:6-7.)  Further, in a letter dated June 24, 2003, Defendant DiLazaro wrote to Mr. Zagami, "[c]oncerning the newspaper article, I requested the reporter include a statement that MFS is continuing to cooperate with the Department on the resolution of this issue. Unfortunately, it did not appear in the article."  (Def. Ex. 30.)

As Air Quality Program Manger, Defendant DiLazaro was required to attend township meetings in his region.  (Dilazaro, 2/22/10, p.m., 80:12-15.)  He attended approximately five meetings in Lower Saucon Township to discuss citizen complaints regarding malodors.  (Id. at 80:24-25.)  Defendant DiLazaro kept the Township informed of the investigation into nuisance-level hydrogen sulfide readings in the area.  With Mr. Zagami's input and assistance as counsel for MFS, Defendant DiLazaro created a PowerPoint presentation in preparation for a township meeting in October 2003.  (Def. Ex. 32.)  In the presentation, he sought to address citizen concerns about chemicals in the air, as mentioned in the May 2003 newspaper article.  (DiLazaro,

2/23/10, a.m., 44:16-18.)  The Township, however, "was not satisfied with the hydrogen sulfide

monitoring.  They wanted further monitoring done, and we were advised to do further

monitoring." (DiLazaro, 2/22/10, p.m., 82:9-14.)  Defendant DiLazaro was told by his

supervisor Mr. McDonnell, "to try to comply with the Township's request and do further

monitoring."  Id.

> iv.    MFS's Title V Application

As noted above, in the Deficiency Letter sent to Mr. Hauff on January 11, 2006,

Defendant DiLazaro explained that the PaDEP had reviewed MFS's Title V renewal application

and had determined that several deficiencies existed.  (Def. Ex. 54.)  In essence, the letter alerted

Mr. Hauff that MFS continued to operate out of compliance with mineral wool NESHAP.  (Id. at

2.)  Until MFS had achieved compliance, the PaDEP could not renew the Title V Permit.

Defendant DiLazaro confirmed in his testimony that the Deficiency Letter served to notify MFS

of the deficiencies at the mineral wool plant, and to provide MFS with the opportunity to correct

any problems that impeded renewal of the Title V Permit.  At that point in 2006, however, the

application to renew the Title V Permit was still pending and had not been denied.  Moreover,

the January 11, 2006 letter did not require MFS to cease operating.  (DiLazaro, 2/23/10, a.m.,

26:6-8.)

### D.    Testimony of Jack Cahalan

Jack Cahalan was the Township Manager of Lower Saucon Township since November

2003.  (Jack Cahalan Trial Testimony ["Cahalan"], 2/23/10, a.m., 79:21-80:2.)  Mr. Cahalan

testified that he is familiar with the MFS facility because he received complaints from citizens at

Township Council meetings about odors coming from the plant.  (Id. at 80:17-18.)  Mr. Cahalan

also reviewed notes of Council meetings held before he became Township Manager.  These notes
showed that at several meetings, there had been discussions about odors emanating from the
MFS plant.  (Id. at 81:1-2.)

On January 27, 2004, Mr. Cahalan sent a letter to Secretary McGinty of the PaDEP at the
request of the Township Council, with copies sent to State Senator Boscola, State Representative
Freeman, and State Representative Browne.  (Id. at 82:19-20; Def. Ex. 37 at 2.)  The letter stated:
"The purpose of this letter is to advise you of the Township Council's dissatisfaction with the
monitoring and enforcement process that has been conducted to date by the Department of
Environmental Protection (DEP) regarding malodor complaints emanating from MFS, Inc. . . .
During 2001, 2002 and 2003, DEP received numerous complaints from township residents
concerning the malodor from the MFS plant."  (Id. at 1.)

One week after sending the letter to Secretary McGinty, Mr. Cahalan received a
memorandum from Mr. Mordosky, summarizing all malodor complaints made against MFS by
citizens from October 2001 until January 2004.  (Def. Ex. 39.)  The three-page complaint log
revealed sixty-four complaints from various locations and at various times of the day.  Of the
sixty-four complaints, six resulted in a NOV being issued.

In a letter dated August 17, 2005 to Defendant DiLazaro, Mr. Cahalan stated, "[t]he air
pollution has been created over the years.  This facility [MFS mineral wool plant] has been going
on too long and while we understand compliance is preferred over penalties and enforcements,
citizens of the area should not have to continue to suffer because of the delays."  (Cahalan,
2/23/10, a.m., 95:7-11.)

### E.       Testimony of Defendant Michael Bedrin

Defendant Michael Bedrin is the Regional Director of the PaDEP, Northeast Regional

Office, located in Wilkes-Barre, Pennsylvania.  (Michael Bedrin Trial Testimony ["Bedrin"],

2/23/10, p.m., 4:18-20.)  As Regional Director, Defendant Bedrin oversees, among other things,

the Air Quality, Water, and Waste Programs of the PaDEP.  In this position, Defendant Bedrin

has authority to issue NOVs and FEOs, and to shut down and fine facilities, including companies

that are violating NESHAP standards.  (Id. at 16:13-19; 104:3-10.)  Prior to obtaining this

position in June 2004, Defendant Bedrin was Chief Counsel for the PaDEP.  (Id. at 4:18-23, 5:7-

10.)  As Chief Counsel, Defendant Bedrin oversaw all PaDEP legal affairs and supervised

approximately eighty lawyers.  (Id. at 6:5-6.)

Defendant Bedrin first became familiar with MFS around June 2007, when the PaDEP

filed comments to the proposed Consent Decree between MFS and the EPA.  (Id. at 17:11-14.)

Several months later, Defendant Bedrin became aware that MFS had requested a meeting with

Secretary McGinty to discuss renewal of its Title V Operating Permit.  (Id. at 20:6-18.)  The

typical practice of the Secretary's Office is to send out a request for a Briefing Memorandum

before a meeting is held.  (Id. at 20:19-25.)  The Memorandum sent to the Secretary follows a

standard form or template.  (Id. at 20:25.)  In preparation for the December 17, 2007 meeting,

Defendant Robbins prepared, and Defendant Bedrin reviewed, the Briefing Memorandum for

Secretary McGinty.  (Pl. Ex. 6.)

By December 2007, MFS had entered into a Consent Decree with the EPA which allowed

MFS to demonstrate compliance with mineral wool NESHAP using an alternative test method.

According to Defendant Bedrin, the PaDEP's understanding of the significance of the Consent

Decree was that MFS could continue to operate under its Title V permit shield and to perform an alternative test method to show compliance with NESHAP.  If MFS passed the test and otherwise was in compliance with NESHAP, then the PaDEP could reissue the Title V Operating Permit. (Bedrin, 2/23/10, p.m., 24:9-16.)

Defendant Bedrin attended the December 2007 meeting in Secretary McGinty's office. At the meeting, Mr. Zagami, counsel for MFS, was afforded the opportunity to be heard on a number of issues, including the potential sale of MFS,[31] the NOVs issued by the PaDEP, and the FEO appeal.  (Id. at 28:1-2.)  Secretary McGinty participated in the meeting and suggested that the parties come up with a Title V permit that would address the lingering NESHAP and malodors issues.  (Id. at 31:3-7.)

After leaving Secretary McGinty's office, Defendant Bedrin, Defendant Robbins, Mr. Zagami, and Paul Bruder, another counsel for MFS, conferred to discuss how to proceed.  They decided that the best course of action would be to allow the PaDEP to draft a Title V permit, send it to MFS for review, and discuss any outstanding issues that hindered renewal of the Title V permit.  (Id. at 31:18-32:1.)  Upon returning to his office, Defendant Bedrin contacted Defendant Wejkszner and informed him about the meeting with MFS representatives.  (Id. at 32:9-19.)

---

[31] In a letter dated October 18, 2007 to Defendant Robbins, Mr. Zagami explained that as a result of the PaDEP's actions, "MFS has not been able to enter into serious negotiations for the sale of the facility to a third party."  (Def. Ex. 68 at 1.)  Further, MFS did not consider operating under a permit shield as a "viable or realistic business option."  (Id. at 2.)  Defendant Bedrin testified that an owner of a facility operating under a permit shield, rather than a renewed Title V permit, could transfer a facility to a new owner.  In other words, a potential buyer may purchase a facility that is operating under a permit shield without any adverse action being taken against it by the PaDEP.  (Bedrin, 2/23/10, p.m., 36:22-37:8.)  There is no dispute on this fact, despite the contention of MFS that it would be in a better position to sell its plant with a Title V permit in place.

On January 18, 2008, the PaDEP sent MFS a draft of the Title V Permit.  (Pl. Ex. 8.)

Defendant Bedrin testified that this Draft Permit was "not final" and "not binding" on MFS.

(Bedrin, 2/23/10, p.m., 41:1.)  Rather, Defendant Bedrin explained that he invited comments on

the draft and anticipated ongoing negotiations about the proposed conditions.  (Id. at 47:1-8.)  As

described *supra*, the Draft Permit contained conditions 27 and 28, which among other things,

mandated MFS to shut down its facility if MFS failed to meet the limits established under the

alternative test method.   Defendant Bedrin admitted that these provisions were "tough" and

"they were meant to be tough."  (Id. at 44:9-11.)

In a letter dated January 28, 2008 to Defendant Robbins, Mr. Zagami explained that

conditions 27 and 28 were troublesome and not acceptable to MFS.  (Def. Ex. 73.)  In response,

Defendant Robbins noted that Mr. Zagami's letter was:

> [S]urprisingly devoid of any recommended changes, which is unusual
> where a company has been provided with a draft permit and given an
> opportunity to comment.  That is the primary purpose of providing a
> draft permit as opposed to simply issuing the permit in final form.  If
> you wish to propose any changes, the Department would be happy to
> review them.

(Def. Ex. 74.)

Notwithstanding this initial impasse, Defendant Bedrin testified that the PaDEP

continued to scrutinize the conditions in the Draft Permit and evaluate how to balance legal

requirements with MFS's demands.  (Bedrin, 2/23/10, p.m., 56:1-58:22.)  The PaDEP and MFS

corresponded on several occasions in 2008, notably through letters dated January 30, 2008;

February 14, 2008; February 25, 2008; and March 10, 2008.  (Def. Ex. 77.)  Finally, on January

16, 2009, the PaDEP issued another proposed Title V permit to MFS.[32]  This Second Draft

Permit did not contain the "shutdown" provisions in conditions 27 and 28.  (Pl. Ex. 9.)

Defendant Bedrin testified that even though the PaDEP had the authority to shut down MFS

because it was operating out of compliance with mineral wool NESHAP, he preferred to try to

work with the facility and achieve compliance rather than to force the facility to stop operating.

(Bedrin, 2/23/10, p.m., 115:21-24.)

### F.    Testimony of Defendant Mark Wejkszner

Defendant Mark Wejkszner is the current Air Quality Program Manager for the Northeast

Region of the PaDEP.  (Mark Wejkszner Trial Testimony ["Wejkszner"], February 24, 2010

["2/24/10"], a.m., 4:15-16.)  Before being promoted to Air Quality Program Manager in October

2007, Defendant Wejkszner worked as the Chief of New Source Review for the PaDEP.  (Id. at

5:2-3.)  In that position, he first became aware of MFS as a regulated corporation when, in 2004,

MFS submitted a plan approval application.  He became personally involved with MFS in late

2007 when he became Air Quality Program Manager.  (Id. at 6:10-13.)

On October 3, 2007, Defendant Wejkszner attended a meeting with Mr. Zagami and

Defendant Robbins to discuss the pending Title V permit application.  (Id. at 6:19-22.)  At the

time, MFS had not operated its plant for over eighteen months.  At the meeting, MFS

representatives informed the PaDEP that it was having difficulty finding a buyer for the plant

because it did not have a renewed Title V Permit.  (Id. at 22:1-7.)  Defendant Wejkszner

reiterated to Mr. Zagami that the PaDEP would not renew the Title V Permit until MFS complied

---

[32] This Second Title V Draft Permit was issued to MFS months after the instant lawsuit
was filed on May 29, 2008, as noted *supra*.

with NESHAP standards and addressed deficiencies raised by Defendant DiLazaro in his letter to

Mr. Hauff.  Defendant Wejkszner informed MFS that it could continue to operate under the

permit shield and run the alternative test as described in the Consent Decree with the EPA while

the Title V application was pending.  (Id. at 7:6-19.)  Of the eighty-seven Title V facilities in the

Northeast Region, twenty-seven are operating under a permit shield while their Title V renewal

applications are pending.  (Id. at 8:4-9.)  Defendant Wejkszner also testified that it is common for

facilities operating under a permit shield to change ownership.  (Id. at 35:25-36:1.)

On December 17, 2007, Mr. Zagami and Defendants Robbins and Bedrin, among others,

attended a meeting with Secretary McGinty.  Defendant Wejkszner did not attend this meeting.

(Id. at 11:9-10.)  After the meeting, Defendant Wejkszner learned that the PaDEP and MFS

agreed that the PaDEP would prepare a Draft Title V Permit and submit it to MFS

representatives for their review and comments.  (Id. at 11:15-17.)  Defendant Wejkszner did not

draft the proposed Permit, but he did review it before being sent to MFS.  (Id. at 11:23-25.)

After the PaDEP sent MFS the Draft Permit, Defendant Wejkszner learned that MFS

objected to conditions 27 and 28, the "shutdown" provisions.  MFS never submitted suggested

language on how to revise conditions 27 and 28 even though, in Defendant Wejkszner's

experience, "when we're doing these Title Vs . . . there's a lot of negotiation going on."  (Id. at

30:23-31:1.)

In early 2008, Defendant Wejkszner and others at the PaDEP continued to discuss how to

address MFS's lingering deficiencies.  By March 2008, the PaDEP decided to alter the language

in the draft permit to remove the "shutdown" provisions of conditions 27 and 28.  (Id. at 17:2-7.)

Ultimately, in January 2009, the PaDEP submitted a Second Draft Permit to MFS, which did not

contain the "shutdown" requirements.

### G.    Testimony of Defendant Sean Robbins

Defendant Sean Robbins is an attorney with the Governor's Office of General Counsel and is assigned to the PaDEP.  (Sean Robbins Trial Testimony ["Robbins"], 2/24/10, a.m., 40:22-23.)  In this capacity, Defendant Robbins provides the PaDEP with legal advice and represents the PaDEP in administrative and court proceedings.  (Id. at 41:17-19.)  Defendant Robbins does not have authority to shut down a facility or to revoke a permit.  (Id. at 50:10-18.)

Defendant Robbins first became involved with MFS when the PaDEP issued the January 24, 2003 FEO.  When the FEO was being prepared, Defendant Robbins was asked to provide legal advice.  (Id. at 41:25-42:2.)  Defendant Robbins also represented the PaDEP after MFS appealed the FEO.  (Id. at 43:3-5.)  As noted above, the PaDEP rescinded the FEO and MFS withdrew its appeal after MFS submitted a plan approval application for the installation of a thermal oxidizer at the facility.  (Id. at 44:1-5.)

Defendant Robbins attended a few meetings at Lower Saucon Township with Defendant DiLazaro.  (Id. at 46:25-47:1.)  The Township requested the meetings to express its concern about malodors emanating from MFS and to be apprised of how the PaDEP was handling the matter.  Defendant Robbins also attended meetings with representatives of the PaDEP, MFS, and the EPA where the parties discussed the mineral wool NESHAP compliance issue.  (Id. at 47:13-19.)

Defendant Robbins testified that as of February 16, 2006, when MFS ceased operating, the PaDEP had the authority to revoke the permit shield and to deny outright MFS's Title V Permit because MFS had failed to comply with state and federal regulations.  (Id. at 88:20-24.)

The PaDEP also had the option to assess civil penalties against MFS for failure to comply with the regulations or to order a shutdown of the facility.  (Id. at 89:1-8.)

At some point in early 2006, Defendant Robbins spoke on the telephone with Richard Caplan, an attorney for Armstrong, a potential buyer of the MFS plant.  (Robbins Deposition, 2/18/10, p.m., 55:1-17.)  Defendant Robbins explained in his deposition, which was read into the record, that "the discussions were about our enforcement actions or position concerning MFS.  If I recall correctly, he wanted to know what - - how the department was involved with MFS. . . . I probably would have outlined the malodor concerns that we had and the MACT compliance issues."  (Id. at 55:20-25, 56:1-2.)

> i.      Defendant Robbins's Comments on the Consent Decree

On April 24, 2007, Defendant Robbins sent a letter on behalf of the PaDEP to the United States Department of Justice commenting on the proposed Consent Decree between the EPA and MFS.  (Def. Ex. 62.)  While the PaDEP sent comments to the proposed Consent Decree, it never filed formal objections to the proposed Decree.  (Robbins, 2/24/10, a.m., 58:2-4.)  In general, the PaDEP was concerned that the Consent Decree did not adequately address the deficiencies identified by the PaDEP.  As Defendant Robbins explained in his letter:

> While the terms of the proposed Consent Decree are designed to bring MFS into compliance with 40 C.F.R. Part 63, Subpart DDD [Mineral wool NESHAP], the company is currently out of compliance and has a renewal application for its Title V operating permit pending before the Department, which is the permitting agency responsible for the review of the application.  Generally, a person may not operate a stationary source in Pennsylvania unless the Department has issued to the person a permit to operate the source in response to a written application (25 Pa. Code § 127.402).  The Department will refuse to renew a permit in certain instances, such as those where the source is likely to violate the Clean Air Act or the regulations thereunder that

are applicable to the source; where in the design of the source, provision is not made for adequate verification of compliance, including source testing or alternative means to verify compliance; or where the applicant or a related party has a violation or lack of intention or ability to comply listed on the compliance docket (25 Pa. Code § 127.422). The Department believes that all of these bases for denying a permit renewal application apply in this case. Although provisions are included in the proposed Consent Decree to address some of these issues, not all of the outstanding compliance issues, especially a clear demonstration of compliance with the emission limits in 40 C.F.R. § 63.1175, have been satisfied. Therefore, the Title V permit cannot be renewed unconditionally at this time.

(Def. Ex. 62 at 2.)

The PaDEP also wanted to alert federal authorities of the outstanding malodor issue pending before the Department. According to Defendant Robbins, the EPA does not have the authority to deal with issues relating to alleged malodor in Pennsylvania. Further, the EPA does not have its own malodor regulation, but rather defers to each state to regulate malodors. (Robbins Deposition, 2/18/10, p.m., 35: 24-36:22.)

On October 3, 2007, Defendant Robbins and Defendant Wejkszner attended a meeting with MFS representatives. At the meeting, Mr. Zagami expressed concerns about MFS not having a renewed Title V Permit. (Robbins, 2/24/10, a.m., 80:5-22.) Mr. Zagami explained that MFS was having difficulty selling the facility and entering into contracts because it was operating under a permit shield. In response, Defendant Robbins explained that the PaDEP could not issue a renewed Title V Permit because there were outstanding compliance issues and MFS had not yet performed its alternative test method as required under NESHAP regulations. Defendant Robbins reiterated that despite the PaDEP's regulatory concerns, MFS could continue to operate under the permit shield while the facility performed the NESHAP test. If MFS

performed the test and demonstrated that it could operate in compliance with regulations and without malodors, then the PaDEP would reissue the Title V Permit.  (Id. at 81:18-82:5.)

In a letter dated October 18, 2007, Mr. Zagami wrote to Defendant Robbins that MFS had been prejudiced by the PaDEP's actions and, consequently, "MFS has not been able to enter into serious negotiations for the sale of the facility to a third party."  (Def. Ex. 68.)  Moreover, MFS did not consider operating under a permit shield as a "viable or realistic business option."  (Id.)

Defendant Robbins replied to Mr. Zagami in a letter dated October 24, 2007.  (Def. Ex. 69.)  In the letter, Defendant Robbins explained, "we have informed MFS several times that it may operate under its permit application shield, most recently during our October 3, 2007 meeting."  (Id. at 1.)  Defendant Robbins continued:

> The Department has held MFS's Title V renewal application in abeyance in order to provide MFS with opportunities to address outstanding compliance issues.  We have done this for some time, rather than issue a denial, and feel that this is clearly an additional demonstration of good faith and fair dealing on the part of the Department.  MFS has the option of requesting that the Department issue a decision on its Title V renewal application without submitting any additional information.  The Department would reluctantly act on such a request, however it should be noted that any subsequent renewal application would need to be accompanied by the required permit application fees and forms.

(Id. at 3.)

ii.      December 2007 Meeting with Secretary McGinty

On December 17, 2007, Defendant Robbins attended a meeting with MFS representatives in Secretary McGinty's office to discuss renewal of MFS's Title V Permit.  In preparation for the meeting, Defendant Robbins prepared a Briefing Memorandum for Secretary McGinty to educate her on the issues to be discussed at the meeting.  (Pl. Ex. 6.)  In the "Background" section of the

memorandum, Defendant Robbins wrote that "MFS also has a history of malodor problems."  He

refers, *inter alia*, to the January 24, 2003 FEO issued to MFS and MFS's subsequent appeal,

even though the PaDEP eventually rescinded the FEO and EHB dismissed the appeal as moot.

(Id. at 2.)

Defendant Robbins attached various correspondence to the eight-page Briefing

Memorandum.  He included two letters dated August 17, 2005 and March 31, 2006 from Jack

Cahalan, Lower Saucon Township Manager, requesting an update on the Department's

enforcement action against MFS.  Defendant Robbins also attached two letters dated February

21, 2003 and March 4, 2004 from State Representative Rooney to Secretary McGinty, in which

Representative Rooney stated that the actions taken by the PaDEP against MFS are "not

warranted and are grossly disproportionate to the facts and circumstances . . . ."  (Id. at 7-8.)

Defendant Robbins submitted the Briefing Memorandum to Defendant Bedrin for his review.

(Robbins, 2/24/10, a.m., 96:13-14.)  Defendant Robbins said that Defendant Wejkszner also may

have received a copy of the Memorandum.  (Robbins Deposition, 2/18/10, p.m., 52:10-14.)

iii.     January 2008 Draft Permit

At the meeting, Mr. Zagami presented his position on the contact between MFS and the

PaDEP, and the reasons why MFS needed to operate under a renewed Title V Permit.  (Robbins,

2/24/10, a.m., 97:1-2.)  As noted above, the meeting concluded with an understanding that the

PaDEP would draft a Title V Permit for MFS to review and consider.  Defendant Robbins was

consulted on the terms of the Draft Permit, including the "shutdown" provisions of conditions 27

and 28.  (Id. at 97:18-21.)  On January 18, 2007, Defendant Robbins sent the Draft Permit to Mr.

Zagami by e-mail.

In a letter dated February 14, 2008 to Secretary McGinty, Mr. Zagami requested "that the two conditions [27 and 28] be deleted from the Proposed Permit."  (Def. Ex. 75.)  On February 25, 2008, Defendant Robbins responded to Mr. Zagami's letter.  (Def. Ex. 76.)  Defendant Robbins wrote that the PaDEP would alter the "shutdown" provision language of the proposed Permit:

> While the Department appreciates the concerns you expressed in your January 30, 2008 and February 14, 2008 correspondence regarding Condition #28, it cannot simply agree to delete the proposed language.  The Department will, however, agree to amend the condition to state:
>
>> Within 30 days of being notified of a violation of 25 Pa. Code § 123.31 or Section C, Condition #003,[33] Permittee shall submit a plan to abate the emission of malodorous air contaminants into the outdoor atmosphere, together with an implementation schedule, to the Department for review and approval. The abatement plan should be in accordance with 25 Pa. Code § 123.31.  If the plan is approved by the Department, MFS shall implement the plan in accordance with the approved implementation schedule.  Nothing in this condition limits the Department's authority or right to take an enforcement action for violations of 25 Pa. Code § 123.31 or Section C, Condition #003, which may include assessment of civil penalties or an order to cease operation of the facility.

(Def. Ex. 76 at 4.)  Defendant Robbins testified that a violation of Condition #003, referred to in the amended provision, would likely result in a NOV being sent to MFS.  (Robbins, 2/24/10, p.m., 18:23.)

---

[33] Section C, Condition #003 provides as follows: "The permittee may not permit the emission into the outdoor atmosphere of any malodorous air contaminants from any source in such a manner that the malodors are detectable outside the property of the person on whose land the source is being operated."

In a letter dated March 10, 2008, Mr. Zagami responded to Defendant Robbins's letter and repeated MFS's contention that the actions of the Department have damaged and prejudiced MFS. (Def. Ex. 77.)  Mr. Zagami concluded by explaining, "[i]n light of your apparent unwillingness to change your position, MFS has little choice now except to attempt to mitigate its damages by dismantling the plant and selling whatever machinery, equipment and parts that it can."  (Id. at 4.)[34]

On April 22, 2008, Defendant Robbins responded to Mr. Zagami by letter.  (Def. Ex. 78.) In the correspondence, Defendant Robbins tracked the history of relations between MFS and the PaDEP.  With regard to the Draft Permit, Defendant Robbins stated:

> Rather than simply rejecting MFS's requests to remove certain conditions from the draft compliance permit, the Department has attempted to engage MFS in negotiations over the permit terms with the hope of reaching a mutually agreeable resolution.  In fact, your January 30, 2008 letter in response to receipt of the draft compliance permit was void of any recommended changes and simply criticized the Department and the terms of the draft permit.  The Department responded to your January 30, 2008 letter with correspondence dated February 11, 2008, expressing its surprise at the lack of any recommended changes by MFS and indicating that such a response was uncommon where a draft permit was provided to a company for review and comment.  The Department also explicitly invited you to comment on the terms, whereupon you insisted on the removal of Condition Nos. 027 and 028 in Section C of the draft compliance permit.
>
> Once again, in an effort to establish terms for a compliance permit, the Department proposes to amend Section C, Condition No. 027. Specifically, the Department proposes a change in the wording of paragraph i to state:
>
> > If EPA disapproves the alternate test method based on

---

[34] As noted *supra*, MFS closed the mineral wool plant on February 16, 2006.  Two years later, in March 2008, MFS made the decision to dismantle the plant and sell the assets.

> the results of the validation test, EPA shall specify the deficiencies in writing.  All review and approval will be governed by the review and approval procedures found in Section VIII of the Consent Decree, entered in the matter of U.S.A. v. MFS, Inc., Civil Action No. 05-6656 (E.D. Pa.).
>
> We believe this grants MFS considerable leeway in satisfying Department permitting requirements and strongly urge MFS to give due consideration to this proposed change.

(Def. Ex. 78 at 2-3.)

On May 29, 2008, Defendant Robbins once again wrote to Mr. Zagami about conditions 27 and 28 of the Draft Permit.  (Def. Ex. 80.)  In the letter, Defendant Robbins offered another draft of the contested conditions.  Defendant Robbins also remarked that the PaDEP did not intend to interfere with a possible sale of the MFS facility.  Specifically, Defendant Robbins wrote:

> First, we reiterate our disagreement with your contention that the Department somehow caused MFS severe or irreparable damage or that it has prevented MFS from securing an air quality permit or selling the facility.  As we indicated previously, the Department remains open to meeting and discussing its concerns with any prospective purchaser and representatives from MFS, including permit transfer issues.  We note that the Department has not been contacted by any prospective purchaser to discuss outstanding Department concerns and no one has scheduled a recent file review to examine the Department's public files on the MFS facility.  Such a file review would presumably be part of a due diligence search associated with the sale of the facility.[35]

(Def. Ex. 80 at 1.)

---

[35] This letter was written on May 29, 2008.  Defendant Robbins, as noted above, did have a conversation in early 2006 with an attorney for Armstrong about department actions involving MFS.

On May 29, 2008, the same day Defendant Robbins wrote this last letter to Mr. Zagami, MFS filed the instant lawsuit.

## III.    LEGAL STANDARD

In ruling on a Fed. R. Civ. P. 50(b) motion, the court must determine whether viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury reasonably could find liability.  See Eshelman v. Agere Sys., Inc., 554 F.3d 426, 433 (3d Cir. 2009) (citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)).  Judgment as a matter of law should be granted "where the 'record is critically deficient of the minimum quantum of evidence in support of the verdict.'"  Id. (quoting Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083 (3d Cir. 1995)).  "[I]n performing this narrow inquiry, [the court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury."  Id. (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)); see also Ambrose v. Twp. of Robinson, Pa., 303 F.3d 488, 492-93 (3d Cir. 2002).  In ruling on a Rule 50 motion, a court must review the entire trial record, drawing all reasonable inferences in favor of the nonmovant.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

Entry of judgment as a matter of law is a "sparingly" invoked remedy.  CGB Occup. Therapy, Inc. v. RHA Health Servs., Inc., 357 F.3d 375, 383 (3d Cir. 2004).  However, more than a "scintilla of evidence" is needed to sustain a liability verdict.  Ambrose, 303 F.3d at 492; see also Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003) (describing the legal standard of a Fed. R. Civ. P. 50 motion).  "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly

have found its verdict."  Eshelman, 554 F.3d at 433 (quoting Gomez, 71 F.3d at 1083).

## IV.    DISCUSSION

### A.    Defendants Bedrin, Wejkszner, And Robbins Are Entitled To Judgment As A Matter Of Law On MFS's First Amendment Retaliation Claim

In response to Special Interrogatory Nos. 1-3 on the verdict form (Doc. No. 112), the Jury

found that MFS proved by a preponderance of the evidence that Defendants Bedrin, Wejkszner,

and Robbins "violated Plaintiff's right not to be retaliated against for exercising its First

Amendment rights."[36]  (Doc. No. 112.)  Here, MFS contends that Defendants performed acts of

retaliation after MFS requested and had a meeting with Secretary McGinty to discuss its pending

Title V Permit application.  For the following reasons, there is insufficient evidence from which a

reasonable jury could find liability on the retaliation claim.

The First Amendment to the United States Constitution provides, "Congress shall make no

law . . . abridging the freedom of speech, or of the press; or of the right of the people peaceably to

assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend I.  The

right to petition government is the right at stake in this case.  "At its core, the right of petition

protects a personal right to bring complaints about public policy directly to officers of the

government."  Ferrone v. Onorato, 298 Fed. App'x 190, 193 (3d Cir. 2008).

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff, such

as MFS, must demonstrate that: 1) it engaged in an activity protected by the First Amendment;

2) it suffered an adverse action; and 3) the protected activity was a substantial or motivating factor

---

[36] In the Opinion dated September 28, 2009 on Defendants' Motion for Reconsideration of the Denial of Summary Judgment, the Court dismissed Defendant DiLazaro as a Defendant in Count I (First Amendment Retaliation Claim).  (Doc. No. 40 at 22.)

in the alleged retaliatory action.  Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).  "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity."  Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Ambrose, 303 F.3d at 493).

### i.  Protected Activity

Formal grievances directed at public officials qualify as protected activity under the Petition Clause of the First Amendment.  Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003). Defendants concede that MFS engaged in protected activities when MFS through its representatives requested a meeting with Secretary McGinty and subsequently met with her on December 17, 2007 to discuss, among other things, the renewal status of the pending Title V Permit application.  (Doc. No. 121 at 32.)

### ii.  Adverse Action and Motivating Factor

Under the second element of the retaliation claim, MFS must prove that each Defendant individually responded to MFS's protected activity with a retaliatory act.  The test to determine whether an action is adverse is whether it is "sufficient to deter a person of ordinary firmness from exercising his constitutional rights."  Miller v. Mitchell, 598 F.3d 139, 152 (3d Cir. 2010) (quoting Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003)).  Here, MFS contends that it suffered an adverse action when Defendants 1) submitted a "misleading" Briefing Memorandum to Secretary McGinty in preparation for the meeting between the parties on December 17, 2007, and 2) inserted two "onerous" conditions in the Draft Title V Permit after the meeting.  Under the third element of the retaliation claim, MFS must prove that the evidence demonstrates that Defendants were motivated to take these actions as a result of the request for or meeting with

Secretary McGinty.  Defendants argue that the two claims do not constitute adverse actions as a matter of law.  Moreover, Defendants submit that the evidence shows the protected activity was not a substantial or motivating factor for their actions and, with respect to the two conditions in the Draft Permit, they would have insisted on these conditions and taken the same action even if MFS had not requested and attended the meeting with Secretary McGinty.

a.  <u>Briefing Memorandum</u>

During trial, MFS argued that the Briefing Memorandum drafted by Defendant Robbins, reviewed by Defendants Bedrin and Wejkszner, and submitted to Secretary McGinty before the December 17, 2007 meeting, constituted an adverse action "because it was grossly misleading and riddled with material omissions, making the petition for and subsequent meeting with her futile." (Doc. No. 166 at 61.)  MFS contended that the Memorandum did not present MFS's "side of the story."

The trial evidence shows that in October 2007, MFS representatives requested a meeting with Secretary McGinty to voice concerns over the pending Title V Operating Permit renewal application.  Secretary McGinty granted the request and Defendant Robbins was directed to prepare a Briefing Memorandum to get Secretary McGinty "up to speed" and to educate her about MFS.  (Robbins Deposition, 2/18/10, p.m., 51:23-52:3.)  Defendant Robbins prepared, and Defendants Bedrin and Wejkszner reviewed, an internal eight-page memorandum to Secretary McGinty with about a dozen attachments, including, among other items, correspondence between the parties including a letter of complaint sent by Mr. Zagami, counsel for MFS, and a letter from Representative Rooney criticizing the Department's handling of MFS.  (Pl. Ex. 6.)  Attached letters stated that "MFS was being prejudiced" by the PaDEP's actions, that the PaDEP was "not

dealing with MFS in 'good faith' and reneging on promises" and that "actions taken by [Pa]DEP against MFS are 'not warranted and are grossly disproportionate to the facts and circumstances.'" (Pl. Ex. 6 at 7-8.)  Defendant Robbins recommended in the Memorandum that the PaDEP "withhold reissuance of the Title V Permit until MFS performs the required NESHAP testing and demonstrates compliance with the PM limit."  Ultimately, "[r]enewal of the permit can and should take place after a demonstration of compliance with applicable requirements."  (Id. at 6.)

The evidence shows that at the meeting in Secretary McGinty's office, Mr. Zagami was afforded the opportunity to be heard on a number of issues, including the potential sale of MFS, the NOVs issued by the PaDEP, and the FEO appeal.  (Bedrin, 2/23/10, p.m. 28:1-2.)[37]  The evidence does not show that Secretary McGinty ignored Mr. Zagami's complaints, disregarded his representations, or was prejudiced in any way by the Memorandum.  Instead, the testimony adduced at trial shows that Secretary McGinty participated in the meeting and broke whatever impasse may have existed between MFS and the PaDEP by suggesting that the parties come up with a Title V Permit that would address the lingering NESHAP and malodor issues.  She suggested this solution despite the statement in the Memorandum that "NERO[38] recommends that the Title V Permit not be reissued at this time."  (Id. at 31:3-7.)[39]  Before the meeting, Defendant

_____

[37] Mr. Hauff , MFS's General Manager, did not attend the meeting on December 17, 2007 with Secretary McGinty.  Moreover, he never spoke to Defendants Bedrin or Wejkszner.  (Hauff, 2/18/10, a.m. 6:13-25.)

[38] NERO is an acronym for "Northeast Regional Office."

[39] MFS never complied with NESHAP requirements through the day it ceased operating and, as noted *supra*, the treatment of MFS by the PaDEP for this violation was consistent from 2002 to 2009.  Mr. Hauff confirmed that the test was never done (Hauff, 2/18/10, a.m., 42:18, 25, 43:1.)  Again, given the history of the malodor issues involving MFS's plant, the Jury found in response to Interrogatories 24, 28, 32, and 36 that each Defendant "could reasonably believe that

Robbins recommended that once MFS addressed the outstanding issues, the PaDEP would likely reissue the Title V Permit. The meeting resulted in a change in the position of the PaDEP from one of requiring MFS to demonstrate compliance before being issued a permit to one of issuing a conditional permit without requiring compliance in the first instance. Consequently, the only reasonable inference that arises from the meeting is that MFS accomplished the goal it sought when it requested the meeting with Secretary McGinty: to unfreeze what it considered to be the stalled permit renewal process.

The Briefing Memorandum submitted to Secretary McGinty contained a condensed version of the ongoing relationship between MFS and the PaDEP over about a nine-year period. It was nothing more than a summary of the interaction between the regulators and MFS. The evidence does not demonstrate that Secretary McGinty requested or Defendants intended the Memorandum to be an unabridged recitation of the complete history of the MFS plant or of the relationship of MFS with the PaDEP. There is no evidence that any Department employee expected the Memorandum to be that inclusive. It was simply a Briefing Memorandum, which by its very name was meant to be brief or concise. Defendant Robbins followed a template and included information he deemed relevant based on his experience as an attorney with the Governor's Office assigned to the PaDEP.

The introductory paragraph of the Memorandum states as follows:

> The Department has not reissued MFS's Title V Permit as a result of MFS's failure to comply with all of the requirements of the Mineral

---

MFS was emitting malodors caused by hydrogen sulfide based upon the evidence available to him."

> Wool Manufacturing NESHAP, including: (1) performance of required
> emission testing and demonstration of compliance with the NESHAP
> particulate limit; (2) failure to operate a baghouse leak detection
> system; (3) failure to submit an operations, maintenance and
> monitoring plan; and (4) failure to satisfy additional NESHAP
> reporting requirements. In addition, MFS has a history of malodor
> problems, which they have not taken steps to address, including
> submission of a revised plan approval application for the installation
> of odor control equipment. The Department sent MFS a technical
> deficiency letter on January 11, 2006 identifying these issues, however
> those deficiencies have still not been adequately addressed and MFS
> has not demonstrated to the Department's satisfaction that it can
> operate in compliance with applicable regulatory requirements.
> Therefore, NERO recommends that the Title V permit not be reissued
> at this time.

(Pl. Ex. 6 at 1.)

The Briefing Memorandum contained a section headed: "RECOMMENDATION." It

stated as follows:

> The NERO recommends that the Department withhold reissuance of the Title
> V Permit until MFS performs the required NESHAP testing and demonstrates
> compliance with the PM limit. Under Sections 402 and 422 of the Air
> Resources Regulations (25 Pa Code §§ 402 and 422), the Department cannot
> simply renew an operating permit where there has not been a sufficient
> demonstration by the facility that it will operate in compliance with applicable
> requirements. By issuing a permit to a facility that has not demonstrated an
> ability to comply, the Department opens itself to an appeal by a third party,
> which could very well be Lower Saucon Township in this case, or a group of
> interested citizens.

> The Department has informed MFS that it may operate under the permit shield
> provision in the Air Resources Regulations pending renewal (25 Pa. Code §
> 127.403), provided operation is done in accordance with the Air Pollution
> Control Act, The Clean Air Act and the regulations promulgated thereunder.
> Aside from the NESHAP testing and demonstration of compliance with the
> PM limit, MFS has still not completed the other NESHAP requirements
> referenced above (the need to install and operate baghouse leak detection
> systems (40 C.F.R. §63.1181), submission of an operations, maintenance and
> monitoring plan (40 C.F.R. § 63.1187) and compliance with additional

reporting requirements (40 C.F. R. §§ 63.1193 and 63.10)).  Accordingly, the Department encouraged MFS to address these issues as quickly as possible (see January 11, 2006 and October 24, 2007 letters from DEP attached). Malodor issues also remain a concern and if they are generated from the operation of the facility while operating under the permit shield, could result in a shut down order or compliance order.  Renewal of the permit can and should take place after a demonstration of compliance with applicable requirements.

(Pl. Ex. 6 at 6.)

MFS has set forth in its post-trial memorandum what it contends are the misleading statements contained in the Briefing Memorandum that prevented the Secretary from getting "MFS's side of the story."  None are actions that would have deterred a person of ordinary firmness or a company like MFS or its representatives from exercising a First Amendment right to request and attend the December 2007 meeting with Secretary McGinty.  Furthermore, there is no evidence that they influenced Secretary McGinty to take any action against MFS.  The statements alleged to be misleading are the following:

> By way of example, the Defendants stated in the Briefing Memorandum that the Department issued a Field Compliance Order (FCO)[40] to MFS on January 24, 2003 after attempting to have the company resolve malodor _violations_"' (emphasis added), but the Defendants failed to disclose that, inter alia: (i) at the time of the FCO, the Mineral Wool Plant had only received _one_ notice of violation for a single incident in its 36 years of operation (as opposed to "malodor violations"); (ii) the notice of violation cited in the FCO, moreover, was based upon a single complaint by one individual and otherwise did not comply with applicable law; (iii) Defendant Robbins was involved personally in the issuance of the FCO and had personal knowledge of the facts relating thereto; (iv) the FCO was withdrawn by PaDEP.

---

[40] MFS refers here to the Field Enforcement Order (FEO) of January 24, 2003.  The Field Compliance Order (FCO) and the FEO are the same Order.

In addition, and by way of further example, the jury learned that the Defendants omitted from their briefing memorandum the material fact that PaDEP has <u>never</u> met its burden of proof that MFS has never violated the applicable malodor laws (despite the PaDEP issuing to MFS numerous legally and/or factually deficient NOVs); and that there has never been an adjudication by any court or governing body that MFS was ever in violation of the applicable malodor laws. Furthermore, the Defendants failed to disclose that the mineral wool plant received no notices of violations for alleged malodor in the first 30 years and last two years of its operations, and that all of the NOVs came during a time when MFS was appealing the Field Enforcement Order. The Defendants also failed to disclose that the Bethlehem Sewage Treatment Plant admitted to being a source of hydrogen sulfide malodor in that area for years.

By way of additional examples, the jury also learned that the defendants falsely represented that the EPA had denied MFS'[s] request for both an alternative test limit and an alternative test method in connection with MACT and failed to disclose that MFS had conducted stack testing and was operating within all applicable emission standards based on that testing, including as much as 50 times lower than the applicable standard for SO2. Furthermore, the Defendants gave Secretary McGinty an old newspaper article from 2004 relating to irrelevant, scandalous claims about MFS by a former disgruntled employee who had been discharged by MFS, which Defendant Robbins admitted was not relevant, leading to the reasonable inference that it was attached to prejudice the Secretary against MFS in retaliation for MFS having petitioned her to address the Defendants' mistreatment of MFS. Moreover, the Defendants failed to disclose that the Northeast Regional office made false public comments about MFS, including that MFS was emitting benzene, of which Defendant Robbins admitted he had knowledge.

(Doc. No. 166 at 61-64) (citations to the trial transcript omitted).

The first major complaint with the Briefing Memorandum relates to the malodor issue.

The Memorandum, which essentially deals with the lack of compliance with mineral wool

NESHAP regulations, states:

MFS also has a history of malodor problems. The Department received numerous malodor complaints and verified several malodor

violations when the facility was operating.  Officials from Lower Saucon Township have expressed their concerns over malodors from the facility and the Regional Air Manager and Department counsel met with officials from the Township on a number of occasions to update them on what was being done to address both malodors and NESHAP issues at the facility.  (See attached letters from Lower Saucon Twp.)

The Department issued a Field Compliance Order (FCO) to MFS on January 24, 2003 after attempting to have the company resolve malodor violations informally.  Issuance of the FCO, which was appealed to the Environmental Hearing Board by MFS, initiated a long and involved plan approval process for installation of odor control equipment at the facility.  The equipment, however, was never installed.  The plan approval process eventually ended in June 2005 following a decision from the U. S. District Court for the District of Columbia, striking down the Pollution Control Project (PCP) exemption to NSR requirements, which is explained in greater detail below.

(Pl. Ex. 6 at 20.)  The Briefing Memorandum also refers to the need to install odor control equipment to reduce or prevent malodors at MFS and to an April 27, 2004 meeting with representatives of MFS, the PaDEP, and the EPA to resolve NESHAP and malodor issues.

In regard to the malodor problem, the Jury found in Interrogatory Nos. 24, 28, 32, and 36 that Defendants proved by a preponderance of the evidence "that they could reasonably believe that Plaintiff [MFS] was emitting malodors caused by hydrogen sulfide based on the evidence available to him."  (Doc. No. 112.)  The evidence in the record to support this finding consists of, among other things, the NOVs issued to MFS and the testimony of Becky Easley, the PaDEP Air Quality Specialist, who confirmed four or five times that malodors were being emitted from the MFS facility.  Ms. Easley would visit with homeowners complaining about an odor and make a determination if the odor was strong and persistent enough to be classified as a malodor.  If she was satisfied that there was a malodor, she would then attempt to confirm the source of the

malodor.  In addition, there was evidence that citizen complaints about odors being emitted from

the MFS plant were the subject of public town-hall meetings of Lower Saucon Township.

Viewing the evidence in the light most favorable to MFS and considering the finding of the Jury

that Defendants had a reasonable belief that MFS was emitting malodors, it is clear that Defendant

Robbins drafted the Briefing Memorandum to educate the Secretary on the malodor problems

MFS had with the PaDEP.  The fact that MFS was dissatisfied with the Memorandum because it

did not contain information about malodors that it would have liked to be included does not rise to

the level of an adverse action that would have deterred a person of ordinary firmness from

exercising a constitutional right.  MFS simply overlooks the fact that the evidence shows that the

Memorandum from counsel to his client was meant to be concise and not as expansive as MFS

asserts it should have been.

        The same is true for MFS's other complaints about the Briefing Memorandum.  First,

Defendants did not falsely represent that the EPA had denied MFS's request for both an

alternative test limit and an alternative test method in connection with MACT.  The phrase

"alternate test limit" apparently refers to the mineral wool NESHAP standards.  There is no

evidence that the EPA consented to allow MFS to use an alternative test standard.  There is

evidence that in 2003 the EPA consented to the use of an alternative test method in order to

comply with the standards in mineral wool NESHAP.  In 2001, MFS sent a request to Defendant

DiLazaro to be considered for either a different testing method or a different test standard in order

to demonstrate compliance with mineral wool NESHAP.  Defendant DiLazaro informed MFS that

the request would have to be made to the EPA.  The EPA sent MFS a letter in 2003 that declined

the request because alternative testing options existed to demonstrate compliance with the current

PM emission limits under Subpart DDD, which is contained in mineral wool NESHAP

regulations.  MFS's representative Mr. Hauff believed that the letter permitted MFS to perform an

alternative test method and this interpretation was confirmed by Defendant DiLazaro.  In the

Consent Decree of 2007 with the EPA, there was a provision that allowed MFS to perform an

agreed upon alternative test method.  Despite being given permission to use an alternative test

method in both instances in 2003 and 2007, MFS never carried out the alternative test method and

never complied with the standards of mineral wool NESHAP.  The error on page three of the

Memorandum in stating "[o]n April 9, 2003, EPA sent MFS a letter rejecting their request for an

alternate limit or test method" (Pl. Ex. 6 at 3) is only incorrect with respect to the request for an

alternate test method, which was not rejected by the EPA.  In the context of the entire eight-page

Briefing Memorandum, this error does not amount to an act of retaliation or an adverse action.

The important fact, as stressed several times in the Memorandum, was that MFS never complied

with mineral wool NESHAP and for this primary reason and others the PaDEP would not approve

the application and issue a Title V Permit.[41]

In addition, MFS's dissatisfaction with Defendant Robbins's choice of attachments to the

Briefing Memorandum and its attempt to cherry-pick through the eight-page Memorandum

amounts at best to a dissatisfaction over word choice and content.  The content of the

---

[41] MFS also complains about a 2004 newspaper article containing information from a
disgruntled employee and the failure to disclose that in 2003 Defendant DiLazaro was quoted in
a newspaper article falsely accusing MFS of emitting benzene.  These events are remote from the
December 2007 meeting with the Secretary and do not constitute adverse actions.  Given the
manner in which MFS through counsel pursued matters with the PaDEP, neither of these claims
would have deterred MFS from exercising its First Amendment right to request and meet with
the Secretary.  The same is true regarding the failure to include information about MFS
conducting stack testing and having a low SO2 (sulfide dioxide) emission level.

Memorandum is not indicative of a vendetta against MFS by Defendants and falls short of supporting a constitutional violation.  Moreover, there is no evidence in the record that, had MFS been aware of the information it claims was omitted or misleadingly inserted in the Briefing Memorandum, it would have been deterred from requesting or attending the meeting with Secretary McGinty.  The contention of MFS that the Briefing Memorandum was intentionally drafted in a misleading manner is totally inconsistent with the outcome of the meeting.  If the Briefing Memorandum had been misleading to the extent claimed by MFS, the result would have been no further negotiations over the renewal permit until MFS demonstrated compliance with applicable regulations.  However, the meeting had the opposite effect.  MFS received what it had reasonably sought - a Title V Permit, albeit a draft, but one that was subject to the normal process of negotiation and potential renewal.[42]

The evidence does not support an inference that the request for the meeting with the Secretary was a substantial or motivating factor to include or exclude information claimed to be adverse to MFS in the Briefing Memorandum.  Defendant Robbins, as counsel to the Department, prepared the Memorandum by following a template and, as an attorney writing a memorandum for

_____

[42] In Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990), the Supreme Court held that an act as trivial as failing to hold a birthday party when intended to punish an employee for exercising her free speech rights constituted an adverse action.  But see Johnson v. Heimbach, No. 03-2483, 2003 WL 22838476, at *6 (E.D. Pa. Nov. 25, 2003) (finding that evaluations containing false perceptions, derogatory written comments, inadequately grounded conclusions of job effectiveness, and unkind words from colleagues would not deter a person of ordinary firmness from exercising First Amendment right); Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526, 542 (D.N.J. 2003) (holding that public disagreement in the press with plaintiff not sufficient to deter a person of ordinary firmness from exercising his First Amendment rights).  Retaliation cases are fact specific and the alleged adverse action must be viewed in light of the totality of the facts presented.  What may be an adverse action in one case may not be an adverse action in another case.

70

a client, is afforded latitude in deciding on its content within the framework of the template.  The

information included in the Memorandum and the attachments show that the Department took a

consistent position over the years towards MFS in dealing with its inability to comply with

mineral wool NESHAP and to eliminate the odor problem.  Defendant Bedrin, whose

involvement with MFS began shortly before the Briefing Memorandum was prepared, was

himself educated through the Memorandum on the history of MFS's contact with the Department.

Neither Defendant Bedrin nor Wejkszner had any personal involvement with the matters which

MFS claims are misleading or omitted from the Memorandum.[43]  Accordingly, when the evidence

is viewed in the light most favorable to MFS, the second and third elements of a First Amendment

retaliation claim have not been established in regard to the Briefing Memorandum.

b.    Draft Permit

MFS also argues that conditions 27 and 28 in the Draft Permit sent to them following the

meeting with Secretary McGinty were "onerous" adverse actions.  On January 18, 2008, following

the December 2007 meeting, the PaDEP sent a Draft Title V Operating Permit to MFS.  (Pl. Ex.

8.)  Defendants did not draft this document, but Defendant Robbins was consulted on its terms,

including the "shutdown" provisions of conditions 27 and 28, and Defendants Bedrin and

Wejkszner reviewed it before it was sent to MFS.

The Draft Permit is forty-five pages long, and each page contains the word "PROPOSED"

in bold-face capital letters in the bottom-right corner.  At least ten pages feature the phrase

"***Permit Shield In Effect***" in bold-face type surrounded by asterisks.  (Id. at 30-39.)  The

---

[43] Defendant Wejkszner attended a meeting with Mr. Zagami in October 2007 to discuss the status of the Title V Permit and was aware of unresolved matters holding up the issuance of the Permit.

Draft Permit contains ninety-two conditions, including the two "shutdown" provisions.  Mr. Hauff

testified that these conditions were a "poison pill."  (Hauff, 2/18/10, a.m., 109:6-11.)  Defendant

Bedrin admitted that these provisions were "tough" and "they were meant to be tough."  (Bedrin,

2/23/10, pm., 44:9-11.)  However, the evidence shows that this Draft Permit was "not final" and

"not binding" on MFS, but was subject to negotiation.  (Id. at 41:1.)

Condition 27 covered the ongoing mineral wool NESHAP noncompliance by MFS, and

condition 28 dealt with future malodor problems that might arise at the plant.  Each contained a

"shutdown" provision for noncompliance.  At trial, MFS claimed that based on the onerous terms

of conditions 27 and 28 and Defendants' history of egregious conduct, a reasonable conclusion

was that Defendants were not negotiating, but rather were retaliating against MFS for exercising

its constitutional right.  However, the evidence does not support this claim and no reasonable jury

could make such a finding when viewing the evidence in the light most favorable to MFS.

First, as already noted, the evidence shows beyond peradventure that Defendants, in

proposing the conditions in the Draft Permit, were acting within their authority to ensure

compliance with state and federal environmental regulations.  Under the Air Pollution Control

Act, 35 P.S. § 4004, *supra* n.3, the PaDEP has the right to:

> (9)(i) Issue orders to any person owning or operating an air
> contamination source, or owning or possessing land on which such
> source is located, if such source is introducing or is likely to introduce
> air contaminants into the outdoor atmosphere in excess of any rate
> provided for by this act, any rule or regulation promulgated under this
> act or any plan approval or permit applicable to such source, or at
> such a level so as to cause air pollution.  Any such order may require
> the cessation of any operation or activity which is introducing air
> contaminants into the outdoor atmosphere so as to cause air pollution.
> . . . .
> (27)  Do any and all other acts and things not inconsistent with any

72

provision of this act, which it may deem necessary or proper for the effective enforcement of this act and the rules or regulations promulgated under this act.

Moreover, 35 P.S. §4007.2 provides, in relevant part, as follows:

In addition to the other enforcement provisions of this act, the department may issue a permit . . . to a source that is out of compliance with this act, the Clean Air Act or the regulations promulgated under either this act or the Clean Air Act. . . . If the permittee fails to achieve compliance by the final compliance date, the permit shall terminate. The permit shall be part of an overall resolution of the outstanding noncompliance and may include the payment of an appropriate civil penalty for past violations and shall contain such other terms and conditions as the department deems appropriate.

Second, the record is replete with evidence that the Draft Permit was intended to be just that - a draft. Although Mr. Hauff testified that he felt that conditions 27 and 28 were not negotiable, this claim at best is Mr. Hauff's unsupported opinion and constitutes only a scintilla of evidence on this point. His opinion was based on a review of documents presented during discovery, and not based on his knowledge of events when they actually happened. (Hauff, 2/18/10, a.m., 113:1-5.) The letters between Defendant Robbins and MFS's counsel at the time show that the Draft Permit was subject to negotiation.

The Draft Permit speaks for itself - the word "Proposed" is highlighted in bold-face capital letters on every page. MFS was invited to comment on and participate in negotiations on the terms of the conditions contained in the Draft Permit. (Id. at 47:1-8.) MFS, however, never submitted suggested language on how to revise conditions 27 and 28. Moreover, in a letter dated February 11, 2008, Defendant Robbins replied to Mr. Zagami's rejection without negotiation of conditions 27 and 28. Defendant Robbins noted that Mr. Zagami's letter was:

[S]urprisingly devoid of any recommended changes, which is unusual

73

> where a company has been provided with a draft permit and given an
> opportunity to comment.  That is the primary purpose of providing a
> draft permit as opposed to simply issuing the permit in final form.  If
> you wish to propose any changes, the Department would be happy to
> review them.

(Def. Ex. 74.)

In the context of this case, the fact that MFS was dissatisfied with conditions of the Draft

Title V Permit does not prove that an adverse action occurred as a result of activity protected by

the First Amendment.  MFS chose not to enter into negotiations over the terms of conditions 27

and 28, and under applicable statutes and regulations had no right to dictate to the PaDEP the

terms that it believed should have been included in the Title V Permit.  As noted in the Statement

of Facts, *supra*, Defendants were required to enforce state environmental regulations, and by law

had the discretion to propose strict conditions to ensure compliance.  Disagreement with lawful

acts of a regulator does not give rise to the existence of an adverse action.

Defendant Bedrin testified that even though MFS refused to participate in the revision of

the permit, PaDEP officials continued to scrutinize the conditions in the Draft Permit and evaluate

how to balance federal requirements with MFS's demands.  (Bedrin, 2/23/10, pm., 56:1-58:22.)

In a letter dated February 25, 2008, Defendant Robbins proposed that the PaDEP would alter the

language of the "shutdown" provisions.  (Def. Ex. 76.)  Again, in a letter dated April 22, 2008,

Defendant Robbins attempted to modify condition 27 to address MFS's objection.  (Def. Ex. 78.)

As Defendant Robbins wrote in his letter:

> Rather than simply rejecting MFS's requests to remove certain
> conditions from the draft compliance permit, the Department has
> attempted to engage MFS in negotiations over the permit terms with
> the hope of reaching a mutually agreeable resolution.  In fact, your
> January 30, 2008 letter in response to receipt of the draft compliance

74

was void of any recommended changes and simply criticized the Department and the terms of the draft permit. The Department responded to your January 30, 2008 letter with correspondence dated February 11, 2008, expressing its surprise at the lack of any recommended changes by MFS and indicating that such a response was uncommon where a draft permit was provided to a company for review and comment. The Department also explicitly invited you to comment on the terms, whereupon you insisted on the removal of Condition Nos. 027 and 028 in Section C of the draft compliance permit.

Once again, in an effort to establish terms for a compliance permit, the Department proposes to amend Section C, Condition No. 027. Specifically, the Department proposes a change in the wording of paragraph i to state:

> If EPA disapproves the alternate test method based on the results of the validation test, EPA shall specify the deficiencies in writing. All review and approval will be governed by the review and approval procedures found in Section VIII of the Consent Decree, entered in the matter of U.S.A. v. MFS, Inc., Civil Action No. 05-6656 (E.D. Pa.).

We believe this grants MFS considerable leeway in satisfying Department permitting requirements and strongly urge MFS to give due consideration to this proposed change.

(Def. Ex. 78 at 2-3.)

In addition, MFS claims that it never emitted malodors in the history of its operation of the mineral wool plant. For this reason, MFS contends that inserting condition 28 with its "shutdown" provision was an adverse action. However, the Jury found that each Defendant proved by a preponderance of the evidence that he "could reasonably believe that Plaintiff was emitting malodors caused by hydrogen sulfide based upon the evidence available to him." (Doc. No. 112, Special Interrogatory Nos. 24, 28, 32, 36.) Consequently, the evidence demonstrates that Defendants had a substantial basis for inserting condition 28 into the Draft Permit and again

were operating within their lawful authority.[44]

MFS also argues that it suffered an adverse action when Defendants sought to re-write the Consent Decree entered into with the EPA by including conditions 27 and 28. However, the evidence presented at trial confirms that it was within the PaDEP's purview to require conditions beyond the minimal requirements set forth by the federal government in the Consent Decree. The Decree was not a substitute for any required state permit or approval. The Consent Decree provided in paragraphs 70 and 71 as follows:

> 70. This Consent Decree is not and shall not be construed as a permit issued pursuant to Subchapter V of the Clean Air Act, nor as a modification of any existing permit so issued, nor shall it in any way relieve Defendant [MFS] of its obligations to comply with permits, if any, otherwise required for any portion of its Facility, and with any other applicable federal, state and local law or regulation. This Consent Decree shall not be interpreted to excuse Defendant from any obligation to comply with any new permit, or modification of existing permits, in accordance with applicable federal, state and local laws and regulations.

> 71. Nothing herein shall be construed as relieving Defendant of the duty to comply with the Clean Air Act and its implementing regulations, and all applicable permits issued under that act and regulations.

(Pl. Ex. 34 ¶¶ 70 - 71.)

MFS maintains that the 2007 Consent Decree "ensure[s] compliance by MFS with all aspects of the Mineral wool NESHAP." (Doc. No. 166 at 67.) The record shows, however, that

---

[44] On cross-examination of Defendant Wejkszner, Plaintiff's counsel asked the witness, "Can you insert a provision in the Title V operating permit that is contrary to the regulations of your department?" (Wejkszner, 2/24/10, a.m., 28:7-8.) No evidence supported the implication raised by this question. After a discussion with counsel, the Court gave the Jury the following instruction: "There is no evidence in the record that the defendants did not have the discretion and the authority under the pertinent regulations to insert the conditions they placed in the draft permit." (Colloquy, 2/24/10, a.m., 76:25-77:3.)

MFS never performed the alternative test method agreed upon in the Consent Decree. Accordingly, when the PaDEP issued the Draft Permit in 2008, it had legitimate concerns about the ability of MFS to comply with the regulations.  Pursuant to 25 Pa. Code § 127.422, the PaDEP "will deny or refuse to revise or renew an operating permit to a source" if "[i]n the design of the source, provision is not made for adequate verification of compliance, including source testing or alternative means to verify compliance."  Despite this authority and the other powers it possessed, the PaDEP never denied MFS's Title V Permit application, never ordered MFS to cease operations, never imposed a civil penalty on MFS, and was willing to negotiate the terms of the Draft Permit that were objectionable to MFS while MFS had the right to operate its plant under the permit shield.  By April 22, 2008, Defendant Robbins and the PaDEP even agreed that the procedures in the Consent Decree would govern deficiencies arising from the alternate test method.  The PaDEP and Defendants used great restraint over the years and worked with MFS to achieve compliance with mineral wool NESHAP and malodor regulations rather than force the facility to cease operations.  (Bedrin, 2/23/20, p.m., 115:21-24.)  Consequently, discretion remained at all times with the PaDEP whether to issue the Draft Title V Permit and, if issued, to propose conditions 27 and 28.

MFS was never relieved of its obligation to abide by pertinent Pennsylvania statutes and regulations when it entered into the Consent Decree with the EPA.  Similar to the lack of evidence of an adverse action arising from the Briefing Memorandum, there is no evidence that MFS would not have requested and attended the meeting with Secretary McGinty had it known that ultimately conditions 27 and 28 would be included in the Draft Permit.  Under all these circumstances, conditions 27 and 28 do not constitute an adverse action or an act of retaliation, but were a

reasonable exercise of the regulatory power entrusted to Defendants.[45]  When viewing the

evidence in the light most favorable to MFS, no reasonable jury could find that Defendants were

motivated to include conditions 27 and 28 in the Draft Permit in retaliation for MFS making a

request for and meeting with Secretary McGinty.  Once again, MFS has failed to prove the second

and third elements of a First Amendment retaliation claim.

      iii.    <u>Causation</u>

    MFS did not prove it suffered an adverse action, the first prerequisite of a retaliation

violation.  Even if it had proven retaliatory conduct, MFS has failed to prove the necessary

element of causation.  To establish the requisite causal connection in a First Amendment

retaliation claim, a plaintiff must prove either 1) an unusually suggestive temporal proximity

between the protected activity and the allegedly retaliatory action or 2) a pattern of antagonism

coupled with timing to establish a causal link.  <u>DeFlaminis</u>, 480 F.3d at 267; <u>see also</u> <u>Krouse v.

Am. Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir. 1997).  "In the absence of that proof the

plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact

should infer causation."  <u>DeFlaminis</u>, 480 F.3d at 267 (citing <u>Farrell v. Planters Lifesavers Co.</u>,

206 F.3d 271, 281 (3d Cir. 2000)).

    According to MFS, during the trial, "MFS presented significant evidence for the [J]ury to

---

[45] In MFS's Response to the Post-Trial Motion, it argues that the change by Defendants of
the shutdown requirement from 48 hours to 24 hours after the meeting with the Secretary
constitutes an adverse action.  (Doc. No. 166 at 68-69.)  The PaDEP had recommended in its
comments to the Consent Decree that there be a 48-hour shutdown provision.  In proposed
conditions 27 and 28 the time was reduced to 24 hours for noncompliance.  Again, conditions 27
and 28 were subject to negotiation and any proposed time period was within Defendants'
discretion under the applicable statutes and regulations.  The same reasoning applies to MFS's
argument that removing a dispute resolution provision after the meeting with the Secretary
constitutes an adverse action.  (Doc. No. 166 at 69.)

find that Defendants' adverse actions were motivated by MFS's petition and meeting with Secretary McGinty because, among other things, the subsequent actions increased in intensity by being more antagonistic, more unfounded, and more harmful," referring to the Briefing Memorandum and conditions 27 and 28 of the Draft Permit that were prepared and distributed in temporal proximity to the request for and meeting with the Secretary.  (Doc. No. 166 at 70.) MFS's position is unsupported by the evidence for several reasons.

First, MFS has failed to prove the elements of retaliatory action.  Accordingly, regardless of the temporal proximity of the meeting with Secretary McGinty and the preparation of the Briefing Memorandum and the Draft Permit, there is no causal connection between a protected activity and an alleged retaliatory action.

Second, there is no evidence that Defendants Robbins, Bedrin, and Wejkszner individually proceeded with a pattern of antagonism toward MFS before or after the December 17, 2007 meeting with Secretary McGinty.[46]  To the contrary, as described above, the evidence shows that Defendants attempted to work with MFS in order to put the mineral wool plant in a position where the PaDEP could lawfully and responsibly issue a Title V Operating Permit.  This effort

---

[46] Antagonism established at trial was mainly attributable to Defendant DiLazaro who is not a defendant in the First Amendment retaliation claim.  Defendant DiLazaro retired in June 2007, did not participate in the meeting with Secretary McGinty or in the preparation of the Briefing Memorandum or the Draft Permit.  Defendant Robbins was present at Lower Saucon Township public meetings, but there is no evidence he condoned the comments made by Defendant DiLazaro as reported in a newspaper article.  Moreover, Defendant Robbins was involved in the incident involving the 2003 FEO when the environment hearing Judge said that the actions of the PaDEP evidenced hostility toward MFS and that Defendant DiLazaro and his staff were acting like "little children."  This evidence of antagonism does not amount to a "pattern of antagonism" and did not occur in temporal proximity to the 2007 meeting with Secretary McGinty.

culminated in 2008, when Defendant Robbins corresponded with Mr. Zagami on several

occasions, urging him to propose changes in the language of the Draft Permit rather than

stonewalling the process.  Defendants attempted to engage MFS in this process, but to no avail.

MFS assumed a defensive position, and chose not to negotiate.

Defendants' actions in regard to the Memorandum and Draft Permit were not unfounded.

Secretary McGinty requested the Briefing Memorandum because she granted the request of MFS

for a meeting with her.  Defendant Robbins, as an attorney preparing a memorandum for a client,

had latitude on the scope of its content within the framework of the template.  Moreover,

Defendants had authority under applicable statutes and regulations to insert conditions 27 and 28

in the Draft Title V Permit.  MFS never conducted the alternative test method agreed upon with

the EPA in the Consent Decree, never complied with mineral wool NESHAP or resolved the odor

problem.  Rather than forcing MFS to remain closed, which it had voluntarily done in February

2006 even before the Consent Decree was finalized, after the meeting with Secretary McGinty,

Defendants exercised their lawful discretion as employees of the PaDEP and issued an appropriate

Draft Permit.  Pennsylvania law is clear.  The PaDEP may employ actions "it may deem necessary

or proper for the effective enforcement of this act and the rules or regulations promulgated under

this act."  35 P.S. § 4004 (27).

When regulators such as Defendants propose lawful terms in a Draft Permit, or draft an

internal memorandum for their supervisor, or in the case of an attorney for his or her client, this

conduct is not evidence of antagonism.  If such conduct of a regulator could amount to

antagonism under the law, it would inhibit a public employee from performing his or her duties in

the best interest of the public.  The kind of inference MFS seeks to be drawn from the evidence

cannot be countenanced.

Additionally, the evidence does not show that Defendants' actions after the meeting with Secretary McGinty harmed MFS to the extent that it raises an inference of antagonism. The record is clear that MFS ceased operations on February 16, 2006, nearly two years before the meeting with Secretary McGinty and the issuance of the Draft Permit. In a letter dated September 5, 2005 to Assistant U.S. Attorney Chris Day, Mr. Zagami explained, "I actually advised you that, in light of EPA's actions, EPA is leaving MFS with no alternative except to shut down." (Def. Ex. 51 at 2.) Despite Mr. Hauff's testimony that Defendants' actions also caused the plant to shut down in 2006, the closure occurred well before the meeting with Secretary McGinty in December 2007. Mr. Hauff testified when asked why MFS ceased operations: "Well, because of the uncertainty of receiving our operating permit. We were coming up on certain contractual limitations or points of contract with not only our customers but also some of our vendors, and we had to have assurance that we were going to be able to supply them beyond those points of the contract. So upper management decided, in order to achieve some of that – those goals, we'd shut the plant down." (Hauff, 2/17/10, p.m., 61:9-16.) The threat of an exorbitant fine by the EPA also contributed to the decision to shut down the plant in 2006. (Id. at 61:18-19.) Given that MFS closed its plant well before requesting a meeting with Secretary McGinty, that the meeting resulted in a change of the position of the PaDEP to one of issuing a Draft Permit, that after the meeting MFS was not entitled under the law to dictate the terms of a renewed Title V Permit, and that Defendants were acting within their lawful scope of authority, no inference of antagonism, let alone a pattern of antagonism, arises from the evidence. In sum, MFS has not proven a causal connection between any action, let alone an adverse one, and First Amendment protected activity.

81

Finally, when a plaintiff has brought a First Amendment retaliation claim against a government official in his individual capacity, the Third Circuit has poignantly observed:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individuals capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard, we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask courts to second guess the actors' decisions.

DeFlaminis, 480 F.3d at 267-68.

This case falls squarely within the admonition of the Third Circuit. Defendants acted appropriately in a "charged atmosphere." At the same time that the PaDEP and Defendants had to assuage the feelings of angry residents living close to the plant, the Department and its employees attempted to enforce environmental statutes and regulations without forcing a viable business in Pennsylvania to shut down. Defendants' actions were appropriate given the circumstances. MFS failed to prove the element of causation and failed to show that Defendants

82

took any impermissible adverse actions against them for engaging in protected activity.[47]

### B.   Defendants Are Entitled To Judgment As A Matter Of Law On MFS's Due Process Claims

In response to Special Interrogatory Nos. 4, 5, and 7 on the verdict form (Doc. No. 112), the Jury found that MFS proved by a preponderance of the evidence that Defendants DiLazaro, Bedrin, and Robbins "violated Plaintiff's right to procedural due process under the Fourteenth Amendment."[48]  (Doc No. 112.)  In response to Special Interrogatory Nos. 8-11 (Doc. No. 112), the Jury found that MFS proved by a preponderance of the evidence that each Defendant "violated Plaintiff's right to substantive due process under the Fourteenth Amendment." (Doc. No. 112.)  The Fourteenth Amendment prohibits state action that "deprive[s] any person of life, liberty, or property, without due process of law," and encompasses both a procedural and substantive due process component.  U.S. Const. amend XIV, §1.  For the following reasons, there is insufficient evidence from which a reasonable jury could find liability on the two due process claims.[49]

---

[47] This case does not implicate the burden shifting element of a retaliation claim - that Defendants would have taken the same actions against MFS even if MFS had not engaged in protected activities - because MFS has failed to prove its initial claim of retaliation for exercising its First Amendment right to petition.  In any event, the PaDEP took a consistent position with MFS from 2003 to 2008 over its failure to comply with mineral wool NESHAP and to resolve the odor problems.

[48] The Jury found that Defendant Wejkszner did not violate MFS's right to procedural due process.  (Doc. No. 112, Special Interrogatory No. 6.)

[49] At the outset, MFS argues that Defendants' Fed. R. Civ. P. 50(b) post-trial motion contains arguments concerning MFS's procedural due process claim that are waived because they were not raised in their motion under Fed. R. Civ. P. 50(a).  In general, a defendant's failure to raise an issue with sufficient specificity in a Rule 50(a) motion waives that defendant's right to later raise the issue in a Rule 50(b) motion.  See Exxon Shipping Co. v. Baker, 554 U.S. 471, 486 n.5 (2008).  Here, MFS's interpretation of Rule 50 is overly restrictive.  Rule 50(a) is essentially

i.     <u>Procedural Due Process</u>

To prove a procedural due process violation, a plaintiff must demonstrate 1) the asserted individual interests are encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and 2) if protected interests are implicated, whether the procedures available provide plaintiff with due process of law.  <u>See</u> <u>Robb v. City of Phila.</u>, 733 F.2d 286, 292 (3d Cir. 1984); <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 233-34 (3d Cir. 2006).  Procedural due process is the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" <u>City of Los Angeles v. David</u>, 538 U.S. 715, 717 (2003) (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)).

The Supreme Court has set forth three factors a court should consider in determining whether a party received due process of law: 1) the private interest that will be affected by the official action, 2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of substitute procedural safeguards, and 3) the government's interest, including the fiscal and administrative burdens that additional and substitute procedures would entail.  <u>David</u>, 538 U.S. at 716.

The first step in the analysis must be to "identify the exact contours of the underlying right Plaintiff[] claim[s] was violated to determine whether [he or she has] alleged deprivation of

---

a notice provision requiring the moving party to give the other party sufficient notice of its argument so that the non-moving party has an opportunity to address those claims during a jury trial.  <u>Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.</u>, 140 F.3d 494, 519 n.18 (3d Cir. 1998).  It is sufficient for Rule 50(b) purposes if the Rule 50(a) motion gives implicit notice of the movant's contention.  <u>Parkway Garage, Inc. v. City of Philadelphia</u>, 5 F.3d 685, 691 (3d Cir. 1993).  In this case, the parties submitted pre-trial briefs and the Court heard lengthy oral argument throughout the trial on the pertinent issues.  Accordingly, MFS received adequate notice of the issues it claims Defendants have waived, and there is no reason for the Court to decline to consider arguments that Defendants have raised in the Rule 50(b) motion.

a constitutional right at all." Culinary Service of Delaware Valley, Inc. v. Borough of Yardley,

No. 09-4182, 2010 WL 2600683, at *4 (3d Cir. June 30, 2010). "The procedural component of

the Due Process Clause does not protect everything that might be described as a 'benefit' . . . .

[Plaintiff] 'must, instead, have a legitimate claim of entitlement to it.'" Town of Castle Rock,

Colo. v. Gonzales, 545 U.S. 748, 756 (2005) (quoting Board of Regents of State Colleges v.

Roth, 408 U.S. 564, 577 (1972)). Second, "[o]nce we determine that the interest asserted is

protected by the Due Process Clause, the question then becomes what process is due to protect

it." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing Morrissey v. Brewer, 408 U.S. 471,

481 (1972)).

        a.      Fourteenth Amendment Interests

        1.      Property Interest

Here, MFS claims a property interest in the "control, use and enjoyment of the mineral

wool plant, the permits associated with that plant and the business itself for purposes of its

procedural due process claim."[50]  (Doc. No. 166 at 101.)

---

[50] MFS has asserted a property interest in a Title V Operating Permit. Putting aside the evidence that Defendants have never denied MFS a Title V Permit, Pennsylvania courts have repeatedly held that permits and licenses are a mere privilege, and do not constitute a property right of the holder. See Tri-State Transfer Co. v. Dept. of Envtl. Prot., 722 A.2d 1129, 1133 n.3 (Pa. Commw. Ct. 1999); Crooks v. Pa. Securities Comm'n, 706 A.2d 360, 362 (Pa. Commw. Ct. 1998) (finding no "unrestricted right to possess a license" and "[t]he right to a business or profession is not a guaranteed privilege, but may be regulated and conditioned"); Plowman v. Dept. of Transp., 635 A.2d 124 (Pa. 1993) (holding that a driver's license is a privilege and not a right); 1412 Spruce, Inc. v. Pa. Liquor Control Bd., 453 A.2d 382 (Pa. Commw. Ct. 1982) (explaining that restaurant liquor license is a privilege and not personal property). Even 25 Pa. Code § 127.512(c)(4) provides that the permit does not convey property rights of any sort, or an exclusive privilege. Although under Pennsylvania law MFS does not have a property right in the Title V Operating Permit, federal law appears to be the opposite. See Independent Enterprises, Inc. v. Pittsburgh Water & Sewer Authority, 103 F.3d 1165, 1179 n.12 (3d Cir. 1997) (in cases involving governmental permission for some intended use of land such as permits, those matters

The Third Circuit has held that a business itself constitutes a protected property right

under the Fourteenth Amendment.  In <u>College Savings Bank v. Florida PrePaid Postsecondary</u>

<u>Education Expense Board</u>, the Third Circuit explained:

> Clearly, a business is an established property right entitled to
> protection under the Fourteenth Amendment.  <u>See, e.g.,</u> <u>Duplex</u>
> <u>Printing Press Co. v. Deering</u>, 254 U.S. 443, 465, 41 S.Ct. 172, 176,
> 65 L.Ed. 349 (1921) (finding that a "business . . . is a property right,
> entitled to protection against unlawful injury of interference . . . .");
> <u>United States v. Tropiano</u>, 418 F.2d 1069, 1076 (2d Cir. 1969) ("The
> right to pursue a lawful business including the solicitation of
> customers necessary to the conduct of such business has long been
> recognized as a property right within the protection of the Fifth and
> Fourteenth Amendments to the Constitution.") (citations omitted);
> <u>Small v. United States</u>, 333 F.2d 702, 704 (3d Cir. 1964) ("The right
> to pursue a lawful business or occupation is a right of property which
> the law protects against intentional and unjustifiable interference.  A
> cause of action based upon such an interference is analogous to one
> based upon unlawful interference with existing contracts, and is
> governed by the same principles.").

131 F.3d 353, 361 (3d Cir. 1997) (citations omitted).

Moreover, in cases involving governmental permission for some intended use of land

such as permits, those matters implicate a fundamental property interest in the ownership of land.

<u>Independent Enterprises</u>, 103 F.3d at 1179 n.12.  Accordingly, MFS has adequately shown that it

had a property interest subject to procedural due process protection in the mineral wool business

and in the permit it sought in order to remain in business.

## 2.    <u>Liberty Interest</u>

MFS also claims a liberty interest in its reputation coupled with its right to pursue a

---

implicate the fundamental property interest in the ownership of land).  Accordingly, the Court
will apply federal law and will treat the Title V Permit as a property interest afforded procedural
due process protection.

business occupation without undue and arbitrary governmental interference.  (Doc. No. 166 at

102-03.)  In Paul v. Davis, the Supreme Court explained that in the due process context, injury to

reputation alone does not implicate a protected liberty interest under the Fourteenth Amendment.

424 U.S. 693 (1976).  In other words, "[d]efamation, by itself, is a tort actionable under the laws

of most States, but not a constitutional deprivation."  Siegert v. Gilley, 500 U.S. 226, 233 (1991);

see also Sturm v. Clark, J.J., 835 F.2d 1009, 1012 (3d Cir. 1987) ("Absent the alteration or

extinguishment of a more tangible interest, injury to reputation is actionable only under state

defamation law.").

　　　To make out a due process claim for deprivation of a liberty interest in reputation, a

plaintiff must satisfy the "stigma-plus" test.  Plaintiff must "show a stigma to his reputation plus

deprivation of some additional right or interest."  Hill, 455 F.3d at 236.  In order "[t]o satisfy the

'stigma' prong of the test, it must be alleged that the purportedly stigmatizing statements 1) were

made publically, and 2) were false."  Id.; see also Logan v. Salem Baptist Church of Jenkintown,

No. 10-144, 2010 WL 3155261, at *4 (E.D. Pa. July 30, 2010).

　　　MFS has presented evidence that meets the "stigma" element of the test with respect to

Defendant DiLazaro.  Viewing the evidence in the light most favorable to MFS, there is evidence

that Defendant DiLazaro made public comments concerning MFS, including that MFS was a

known air polluter, a known nuisance, the source of odors in Lower Saucon region, and an

emitter of benzene, which was a toxic, cancer-causing agent.  (Hauff, 2/17/10, p.m., 11:7-11.)

Mr. Hauff, the representative of MFS, was not present when Defendant DiLazaro made these

comments in early 2003.  Instead, Mr. Hauff read them in a newspaper article reporting on a

Lower Saucon Town Hall meeting.  (Hauff, 2/18/10, a.m., 9:10-12.)  Defendant DiLazaro

implied in his testimony that the article contained troubling information, but insisted that it was taken out of context.  From all this evidence the Jury may have inferred that at least in part, false, public information was imparted by Defendant DiLazaro.  Thus, the stigma part of the test is satisfied as to Defendant DiLazaro.

However, there is no evidence that Defendants Bedrin or Robbins made similar comments about MFS.  Accordingly, Defendants Bedrin and Robbins would not be liable for deprivation of a liberty interest in reputation.[51]

MFS contends that it has presented evidence from which a reasonable jury could conclude that it was deprived of an additional right or interest which is the "plus" element of the test.  In this regard, MFS argues that the additional rights or interests adversely affected were the right to be protected against First Amendment retaliation, the right to equal protection under the Fourteenth Amendment, and the liberty and property interests described *supra*.  (Doc. No. 166 at 103.)

With respect to the liberty interest, MFS's claim is not well-defined.  MFS is required to prove in the first instance that it was subject to "stigma" plus the deprivation of some additional right or interest before a liberty interest is established.  A reputational liberty interest cannot be the additional interest under the "stigma-plus" test because that would be syllogistically impossible and the equivalent of putting the cart before the horse.  Some other interest or right must be adversely affected, along with stigma to reputation before a liberty interest is shown to exist.  Until a deprivation of this additional interest or right is proven, no liberty interest is

---

[51] The Jury found that Defendant Wejkszner did not violate MFS's procedural due process right.  (Doc. No. 112, Special Interrogatory No. 6.)

present.[52]

With respect to a property interest, the Court has already held, *supra*, that MFS has a protected property right in its business and the Title V Permit. This property right satisfies the "plus" element of the "stigma-plus" test. Therefore, MFS has presented evidence to satisfy the "stigma-plus" test in regard to Defendant DiLazaro and has accordingly proven that it has a liberty interest subject to procedural due process protection.

b.      Due Process of Law

Having established protected property and liberty interests in its business and the Title V Operating Permit, the next element that MFS must prove is that the procedures available to it did not afford it due process or the opportunity to be heard at a meaningful time and in a meaningful manner.

Under Third Circuit precedent, a state affords requisite due process when it provides reasonable remedies to rectify legal errors by an administrative body. Cohen v. City of Philadelphia, 736 F.2d 81, 86 (3d Cir. 1984), *cert. denied*, 469 U.S. 1019 (1984). An administrative appeal procedure, with a mechanism for subsequent judicial review, is constitutionally sufficient. Id.; see also Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 680-82 (3d Cir. 1991).

In Pennsylvania, the Environmental Hearing Board (EHB) exists to consider and rule

---

[52] Moreover, MFS points to two additional rights it alleges it was deprived of: 1) the right to be free of First Amendment retaliation, and 2) the right to equal protection under the Fourteenth Amendment. The Court has already held that there was no deprivation of First Amendment rights under a retaliation theory, *supra*. Further, the Court finds that the evidence does not establish a violation of the equal protection clause of the Fourteenth Amendment, *infra*. Therefore, these two alleged rights also do not satisfy the second element of the "stigma-plus" test.

upon administrative appeals from final PaDEP actions, including final actions affecting permits. 35 P.S. §7514(c).  Regulations at 25 Pa. Code § 1021 govern practice and procedure before the EHB.  Central to the process are on-the-record hearings, conducted pursuant to the Administrative Agency Law, 2 Pa. C. S. § 501 *et seq.*, as well as agency-specific EHB regulations, see 35 P.S. § 7514; 25 Pa. Code §§ 1021.116-1021.133.  EHB adjudications are subject to judicial review by the Commonwealth Court of Pennsylvania.  See 2 Pa. C. S. §702; 42 Pa. C. S. §763.

MFS argues that in several situations the evidence shows that it was deprived of procedures required under the due process clause.  (Doc. No. 166 at 103-113.)  First, in regard to the appeal of the FEO in 2001, MFS argues that the appeal was not meaningful.  The evidence shows that MFS was aware of EHB procedures and utilized its administrative remedies when it appealed the January 24, 2003 FEO.  Directions on how to appeal the FEO are featured directly above Defendant DiLazaro's name on the FEO.  (Pl. Ex. 11.)  In this situation, MFS utilized available procedure and appellate remedies, which led in part to the PaDEP rescinding the FEO in 2004.  It is true that the FEO was issued on a Friday based on a Notice of Violation (NOV) issued in November 2001 and that MFS was required to respond in one business day.[53] However, the FEO was a final action or order and MFS exercised its right to appeal to the EHB.

---

[53] MFS attacks this NOV and other NOVs as being factually and legally deficient and that their issuance deprived MFS of due process because they were not appealable.  A NOV is only a notice.  Until an FEO is issued or some other final action is taken by the PaDEP against MFS, the NOV is not appealable to the EHB.  However, if there is a final action based on the issuance of an NOV, MFS is permitted to raise on appeal that the NOV was factually and legally deficient. Due process does not require that every action of an administrative body be a final one and that there be a meaningful opportunity to be heard on appeal with respect to every internal and external decision made by a regulatory agency.

The comments of the EHB Judge that Defendants DiLazaro and Robbins were acting "childish" and "evidenced hostility" did not undermine the right to appeal the FEO.  MFS was represented by counsel before and after filing the appeal and had a meaningful opportunity to be heard on appeal.  The appeal was withdrawn by MFS only because a settlement was reached with the PaDEP.

Second, MFS argues that it did not have the right to appeal the Draft Title V Permit containing conditions 27 and 28.[54]  (Doc. No. 166 at 112-13.)  MFS overlooks that fact the Draft Permit was merely a proposal subject to negotiation.  Had MFS chosen to negotiate the terms of the Draft, it would have been afforded a meaningful opportunity to do so in a meaningful manner.  MFS chose not to negotiate.  MFS also had the right to request that the PaDEP issue the Draft Permit in final form.  It would have been a final Order, and could have been challenged in an appeal to the EHB.  Once again, MFS made the voluntary decision not to request that the Draft Permit be issued as a final one.

Moreover, in connection to the Title V Permit renewal process, Pennsylvania law provides that if an application to renew a Title V Permit is duly filed, but the permit is not renewed prior to its expiration, the party seeking renewal has the right to challenge the PaDEP's failure to renew the permit by filing an appeal to the EHB pursuant to 25 Pa. Code § 127.446(d), *supra*.  Under this provision of the Code, MFS had the right to appeal the PaDEP's failure to

---

[54] Any argument MFS makes about being unable to appeal the Draft Title V Permit issued in January 2008 or the outcome of the prior December 2007 meeting with Secretary McGinty does not apply to Defendant DiLazaro who resigned from the PaDEP in June 2007.  Like the other Defendants, DiLazaro is sued in his individual capacity and cannot be held responsible for conduct in which he did not participate.  In addition, as noted, the Jury specifically found that Defendant Wejkszner did not violate MFS's procedural due process right.  (Doc. No. 112, Interrogatory No. 6.)  Therefore, this argument also does not apply to Defendant Wejkszner.

issue the Title V Permit within thirty days of October 31, 2003.  For the next four years, MFS chose not to appeal the failure to renew the permit to the EHB and to take advantage of this procedure afforded to an applicant under Pennsylvania law.  Defendant Robbins even reminded Mr. Zagami in a letter dated October 24, 2007, "MFS has the option of requesting that the Department issue a decision on its Title V renewal application without submitting any additional information."  (Def. Ex. 69 at 3.)  After making the request, MFS would be entitled to file an appeal to the EHB, but MFS chose not to make the request and pursue an appeal.

Despite the decision not to file an appeal regarding the Title V Permit, MFS still had available a substitute safeguard to allow it to continue to operate.  The evidence shows that a permit renewal applicant may choose to continue to operate under its existing Title V Permit while its renewal application is pending pursuant to the "permit shield" provision in its Title V Permit and under 25 Pa. Code § 127.446(c), *supra*.  The decision by MFS in 2006 not to operate its plant under the permit shield was a voluntary business decision made by MFS, and its reluctance to avail itself of an administrative remedy cannot be the basis of a violation of procedural due process.

Finally, MFS argues that procedural due process was violated by Defendants making material misrepresentations and omissions in the Briefing Memorandum given to Secretary McGinty in order to frustrate the meeting with her.  There is no evidence that the meeting was frustrated in any manner.  As noted at length above, Mr. Zagami requested the meeting with Secretary McGinty.  On December 17, 2007, Mr. Zagami attended a meeting in Secretary McGinty's office, where he was afforded the opportunity to describe the status of MFS's Title V Permit application and the history of MFS's interaction with the PaDEP.  The record is clear that

this meeting with Secretary McGinty was meaningful in time and manner, as evidenced by the

subsequent issuance of and the attempted negotiations over the Draft Title V Permit.  A private

meeting with a public employee in charge of a department does not trigger a right to appeal nor

do mere negotiations over a draft permit.

Consequently, the evidence shows that a full judicial mechanism was in place to allow

MFS to challenge the administrative decision on the renewal of the Title V Permit.  See, e.g.,

Midnight Sessions, Ltd. v. City of Phila., 945 F.2d 667, 680 (3d Cir. 1991) (finding that a full

judicial mechanism was available and thus rejected a procedural due process challenge).

Contrary to MFS's argument, there is no evidence that these procedures were "sham procedures."

Accordingly, the Court will enter judgment as a matter of law in favor of Defendants DiLazaro,

Bedrin, and Robbins on MFS's procedural due process claim since no reasonable jury viewing

the evidence in the light most favorable to MFS could find otherwise.

ii.     Substantive Due Process

In response to Special Interrogatory Nos. 8-11 on the verdict form (Doc. No. 112), the

Jury found that MFS proved by a preponderance of the evidence that Defendants DiLazaro,

Bedrin, Wejkszner, and Robbins "violated Plaintiff's right to substantive due process under the

Fourteenth Amendment." (Doc. No. 112.)  The Due Process Clause of the Fourteenth

Amendment "contains a substantive component that bars arbitrary, wrongful government action

'regardless of the fairness of the procedures used to implement them.'"  Zinerman v. Burch, 494

U.S. 113, 125 (1990) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)); Boyanowski v.

Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000).  To establish a substantive due

process claim under 42 U.S.C. § 1983, plaintiff must prove 1) the particular interest at issue is

93

protected by the Fourteenth Amendment, and 2) the government's deprivation of that protected

interest "shocks the conscience." Gottlieb v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d

Cir. 2001).

To meet this standard, MFS must present evidence of state action that "'shocks the

conscience,' which encompasses 'only the most egregious official conduct.'" Chainey v. Street,

523 F.3d 200, 219 (3d Cir. 2008) (quoting United Artists Theatre Circuit, Inc. v. Twp. of

Harrington, 316 F.3d 392, 400 (3d Cir. 2003)); see also Ryan v. Lower Merion Twp., 205 F.

Supp. 2d 434 (E.D. Pa. 2002) (finding that actions of township officials in arbitrarily delaying

decision and ultimately denying application for taproom permit could satisfy "shock the

conscience" standard). "The conduct must be 'intended to injure in some way unjustifiable by

any government interest.'" Newman v. Beard, 617 F.3d 775, 782 (3d Cir. 2010) (quoting County

of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)).

The Third Circuit has held that three standards may support a finding that government

action shocks the conscience: 1) deliberate indifference; 2) gross negligence or arbitrariness; or

3) intent to cause harm. Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008).[55]  The

---

[55] The Court charged the Jury using a hybrid of these elements because two applied in this case.  The jury instruction reads as follows:

> To establish a claim for a violation of substantive due process rights under the Fourteenth Amendment, a plaintiff must prove two elements by a preponderance of the evidence.  First, a plaintiff must prove that it has a protected property or liberty interest.  Second, a plaintiff must prove that the government's deprivation of that property or liberty interest shocks the conscience. The shocks-the-conscience standard only encompasses the most egregious conduct.  Allegations of mere negligence are insufficient to constitute a substantive due process violation.

> The relevant level of arbitrariness required in order to find a violation

Third Circuit has held that "where the state actor had ample time for deliberation before engaging in the allegedly unconstitutional conduct, the appropriate standard will be deliberate indifference." Patrick v. Great Valley Sch. Dist., 296 Fed. App'x 258, 261-62 (3d Cir. 2008). The Supreme Court has directed that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Lewis, 523 U.S. at 850.

The Third Circuit has observed that substantive due process "is an area of law famous for its controversy, and not known for its simplicity." DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 598 (3d Cir. 1995) (internal quotation omitted). It is clear, however, that the first step in evaluating a due process claim is to identify the exact contours of the underlying right a plaintiff claims was violated. Chainey, 523 F.3d at 219; see Reno v. Flores, 507 U.S. 292, 302 (1993) (finding that analysis "must begin with a careful description of the asserted right"); Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). In this case, MFS has asserted that it is entitled to substantive due process protection in regard to both property and liberty

---

of substantive due process involves not merely action that is unreasonable but rather something more egregious. For the purpose of due process, government conduct is arbitrary and irrational where it is not rationally related to a legitimate government purpose.

In evaluating whether a defendant's conduct rises to the level of shocks-the-conscience, you may consider whether a defendant's conduct was deliberately indifferent. In evaluating deliberate indifference, you may consider whether a defendant has ample time for deliberation before engaging in his conduct.

(Jury Charge, 3/2/10, a.m., 71:8-72:4.)

interests.  The Court will discuss each one in turn.

a.      Fourteenth Amendment Interests

1.      Property Interest

"While property interests are protected by procedural due process even though the interest

is derived from state law rather than the Constitution, substantive due process rights are created

only by the Constitution."  Stubbs v. Nutter, No. 10-3200, 2010 WL 3421015, at *4 (E.D. Pa.

Aug. 30, 2010) (quoting Regents of the Univ. of Michigan v. Ewing, 474 U.S. 214, 229 (1985)

(Powell, J. concurring)).  Thus, "not all property interests worthy of procedural due process

protection are protected by the concept of substantive due process."  Reich v. Beharry, 883 F.2d

239, 244 (3d Cir. 1989).  Rather, "for a property interest to be protected for purposes of

*substantive due process*, it must be 'fundamental' under the United States Constitution."  Hill,

455 F.3d at 235 n.12 (emphasis in original).  If the right is not fundamental, there is no

substantive due process issue and state conduct will be upheld so long as the state complies with

procedural due process.  Nicholas v. Pa. State Univ., 227 F.3d 133, 142 (3d Cir. 2000).

Here, MFS claims a property interest "in the control, use and enjoyment of its property

and in the operation of the mineral wool manufacturing plant on that property."  (Doc. No. 166 at

80.)  The Third Circuit has stated that "ownership is a property interest worthy of substantive due

process protection."  DeBlasio, 53 F.3d at 600; see Nicholas, 227 F.3d at 141 ("[W]e have so far

limited non-legislative substantive due process review to cases involving real property

ownership."); Wrench Transp. Sys., Inc. v. Bradley, 340 Fed. App'x 812, 815 (3d Cir. 2009)

(finding that real property interests can be protected by substantive due process); M&M Stone

Co. v. Pa. Dept. of Envtl. Prot., No. 07-4784, 2008 WL 4467176, at *21 (E.D. Pa. Sept. 29,

2008) (recognizing that zoning decisions, building permits, or other governmental permission required for some intended use of land owned by the plaintiffs implicate the fundamental property interest in the ownership of land). See also Bello v. Walker, 840 F.2d 1124, 1126 (3d Cir. 1988) (holding that due process can be violated when municipal officials deny a building permit application).

In DeBlasio, supra, the court further stated:

> Thus, in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily and irrationally reached. Where the plaintiff so alleges, the plaintiff has, as a matter of law, impliedly established possession of a property interest worthy of substantive due process protection.

DeBlasio, 53 F.3d at 601.[56]  Consequently, "one would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership." Id.  Accordingly, based on the evidence presented here, MFS has adequately shown that it had a property interest subject to substantive due process protection in the control, use, and enjoyment of its property.

2.      Liberty Interest

MFS has also claimed a liberty interest based on its "fundamental right to operate its business [that] has been affected in conjunction with the harm to its reputation."  (Doc. No. 98 at

---

[56] In United Artists Theatre Circuit, Inc. v. Township of Warrington, Pa., 316 F.3d 392 (3d Cir. 2003), the Third Circuit abrogated in part Bello and its progeny, including DeBlasio.  In light of the U.S. Supreme Court decision in County of Sacramento v. Lewis, supra, the Third Circuit held in United Artists that the "shocks the conscience" standard governed in substantive due process cases rather than the less demanding "improper motive" standard that originated in Bello.  The Third Circuit's holding in DeBlasio and Bello on property interests that are protected under substantive due process, however, was not discussed in United Artists and remains controlling law.

21.)  In Thomas v. Independence Township, the Third Circuit explained that "the liberty to pursue a calling or occupation . . . is secured by the Fourteenth Amendment."  463 F.3d 285, 297 (3d Cir. 2006) (quoting Piecknick v. Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994) ("The right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and 'property' concepts of the Fifth and Fourteenth Amendments.")).[57]  Since MFS as a corporation does have a right to operate its business in the same way that a person would have the right to follow a chosen profession, MFS has shown a liberty interest under the Fourteenth Amendment.

b.    Defendants' Actions Do Not Shock The Conscience

As noted above, in evaluating a substantive due process claim, the court must consider "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  Lewis, 523 U.S. at 847 n.8.  "[T]he measure of what is conscience shocking is no calibrated yard stick," and "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another."  Kaucher, 455 F.3d at 425-26 (quoting Lewis, 523 U.S. at 847, 850).  Indeed, the question of whether a given action "shocks the conscience" has an "elusive" quality to it.  Estate of Smith v.

---

[57] Defendants argue that the liberty interest outlined in Piecknick applies only to individuals, not corporations.  In Daniels v. Williams, the Supreme Court stated when reviewing a history of the liberty interest that "[t]his history reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta . . . was 'intended to secure the individual from the arbitrary exercise of the powers of government.'"  474 U.S. 327, 330 (1986) (quoting Hurtado v. California, 110 U.S. 516, 527 (1884) (internal citations omitted)).  The Supreme Court, however, has not limited Fourteenth Amendment protection only to individuals.  A corporation has standing to bring constitutional claims on its own behalf and is a person within the meaning of the Fourteenth Amendment.  Addiction Specialists, Inc. v. The Township of Hampton, 411 F.3d 399, 407 n.6 (3d Cir. 2005).

Marasco, 318 F.3d 497, 509 (3d Cir. 2003).

Assuming protected property and liberty interests, MFS still must present evidence that Defendants' actions "impinged upon" those interests and that Defendants' actions in so doing shock the conscience.  In this case, the record is devoid of evidence that Defendants unlawfully impinged upon MFS's property and liberty interests in the use and enjoyment of its property and the right to conduct its business.  As a polluter, albeit a lawful one so long as it complies with federal and state law, MFS operated in a regulated industry.  To the extent that Defendants required MFS to comply with governing law and regulations, they affected MFS's ability to operate its business.  Defendants, however, were operating within their lawful authority as delegated to them by state and federal law despite the fact that MFS was highly disgruntled by their actions.  Under the facts here, Defendants' conduct does not "shock the conscience."

As noted, MFS's Title V Operating Permit application has never been denied, and to this day MFS is entitled to operate under the permit shield.  In this way, this case is easily distinguishable from M&M Stone, Bello, and other cases cited *supra*, where state action resulted in the actual denial of a permit or license.  The evidence here shows that Defendants remained open to renewing MFS's Title V Permit so long as it complied with relevant statutes and regulations.  By law, MFS had the right to continue to operate under the permit shield.  Thus, MFS was not deprived of the use of its property in any impermissible way.

To meet its burden of proving that Defendants' conduct toward it "shocked the conscience," MFS argues that the Jury found that Defendants "DiLazaro and Robbins developed a deep-seated animus and ill-will towards MFS" and that Defendants "Bedrin and Wejkszner subsequently acquiesced and participated in this pattern of wrongful conduct with DiLazaro and

Robbins." (Pl. Ex. 4 ¶¶ 56-57.)  While the record does contain evidence of hostility by

Defendant DiLazaro and, to a lesser extent, by Defendant Robbins, there is no evidence of

hostility by Defendants Bedrin and Wejkszner.  Although MFS maintains that this hostility

culminated with onerous conditions being placed in the Draft Title V Permit, MFS overlooks the

fact that Defendant DiLazaro had no involvement with the issuance of the Draft Permit and that

the other Defendants were acting within their authority and pursuant to a legitimate governmental

objective in seeking "tough" conditions.  The Draft Permit only served as a "jumping off point"

for negotiations.

Regardless, Defendants had the authority under Pennsylvania's Air Pollution Control Act

to insert conditions 27 and 28 in the Draft Permit.  These conditions were included pursuant to a

legitimate governmental objective.  MFS's history of noncompliance with mineral wool

NESHAP and failure to stem odor problems could not be ignored by the Department or

Defendants.  The conditions were necessary to protect the environment and concomitantly the

public.  See Highway Materials, Inc. v. Whitemarsh Twp., No. 04-4195, 2010 WL 2680996, at

*6 (3d Cir. July 7, 2010) (finding that activities of state actors that do not "transgress the 'outer

limit' of legitimate governmental action . . . do not give rise to a federal substantive due process

claim") (internal quotation omitted); Vorum v. Canton Twp., 308 Fed. App'x 651, 653 (3d Cir.

2009) ("[A] state actor's decision is not conscience-shocking if it is related to a legitimate

governmental objective.").

In addition, the evidence shows that Defendants never ordered MFS to shut down, never

imposed a civil penalty on MFS, and never denied renewal of the Title V Permit.  Defendants

sought to work with MFS and encouraged MFS to operate under its permit shield.  The evidence

demonstrates that MFS voluntarily made a business decision to cease operations in February

2006 in view of mounting regulatory problems.  The record confirms that the EPA, not the

PaDEP, threatened fines against MFS at a rate of $30,000 per day for noncompliance with

mineral wool NESHAP regulations from June 2, 2002 to June 2, 2003, and fines at a rate of

$34,000 per day beginning in December 2005.  In the face of these crippling penalties, MFS

chose to shut down its plant, as evidenced by the letter dated September 20, 2005 from Mr.

Zagami to Assistant U.S. Attorney Chris Day, which states, "I actually advised you that, in light

of EPA's actions, EPA is leaving MFS with no alternative except to shut down."  (Def. Ex. 51 at

2.)  Mr. Hauff testified that the actions of Defendants also influenced the decision to shut down.

Nonetheless, frustration with lawful actions of a regulator which lead to a voluntary decision to

close a plant does not rise to the level of a substantive due process violation.

The evidence admitted at trial shows that Defendants' actions were rational and

appropriate, rather than egregious and outrageous, even when viewing the evidence of claimed

animus offered by MFS in the light most favorable to the company.  When operating in a highly

regulated industry, some animus between a regulator and the regulated will naturally arise,

especially when a business makes a request which is not granted.  Sometimes a lawsuit will

follow, but a court should not readily convert itself into a mechanism to settle disputes between a

company and regulators when the law affords the regulator latitude in decision-making.

See Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 285 (3d Cir. 2004) ("What is clear is that this

[shocks the conscience] test is designed to avoid converting federal courts into super zoning

tribunals."); Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992) (finding that city's

actions were grounded on "the presumption that the administration of government programs is

based on a rational decisionmaking process that takes account of competing social, political, and economic forces"); Nicini v. Morra, 212 F.3d 798, 814 (3d Cir. 2000) (explaining that "second-guess[ing]" actions "from hindsight" is "not our task").

The Court has examined in detail all the incidents in the record that MFS claims amount to conscience shocking conduct by Defendants (Doc. No. 166 at 87-97.)  None of these incidents are so egregious that it rises to the level of "shocks the conscience."  Most relate to the malodor issue and MFS's complaint about how they were being treated by the PaDEP.  For example, the contentions of MFS on the malodor issues are as follows:

> (1) MFS was held to a standard that was different from the applicable standard in Pennsylvania for compelling a company to install equipment to deal with alleged malodor;[58] (2) MFS was held to a standard that was different than the applicable standard in Pennsylvania for the issuance of NOVs for alleged malodor, which required certain procedures to be followed and findings to be made, before a notice of violation could be properly issued; (3) The PaDEP bears the burden of proof that an odor rises to the level of a malodor, that the malodor rises to the level of a public nuisance, that the public nuisance is being caused by a specific source, and that the PaDEP has never met its burden of proof with respect to MFS; (4) the burden of proof relating to malodor was shifted, contrary to applicable law, from the PaDEP and on to MFS; (5) there has never been a finding by the Environmental Hearing Board or any court that MFS has ever been in violation of Pennsylvania's malodor laws; (6) the Defendants used the Field Enforcement Order after it was withdrawn by the PaDEP as a basis for further adverse action against MFS contrary to applicable law; (7) the underlying field inspection report for the first notice of violation issued to MFS for alleged malodor on November 7, 2001 (as well as for other of the NOVs issued to MFS) makes no

---

[58] MFS contends here that they were held to a different standard for compelling a company to install equipment to deal with alleged malodor.  The testimony of Defendants Robbins (2/24/10, p.m., 19:14-25, 20:1-4) and Bedrin (2/19/10, a.m., 42:20-25, 43:1-10) that MFS relies upon does not support this allegation.  A Defendant acknowledging that there is an applicable standard that must be considered before imposing conditions does not raise an inference that he did not do so.

finding that any odor (let alone a malodor) was coming from MFS or that the alleged odor at the complainant's home rose to the level of a malodor/public nuisance; (8) the underlying field inspection report relating to the March 4, 2003 NOV did not support the issuance of an NOV for alleged malodor yet Defendant DiLazaro, who was working closely with Defendant Robbins, caused the NOV to be issued to MFS while the appeal of the Field Enforcement Order was pending and while MFS was petitioning government officials; (9) the notices of violation for alleged malodor that were issued to MFS were concentrated in a brief period of time during the Mineral Wool Plant's 30-year history of operations, and those notices of violation came at a time that MFS was petitioning officials at the PaDEP and elected officials in Pennsylvania for a redress of grievances against Defendants DiLazaro, Robbins and their staff; (10) MFS was singled out publicly as a known nuisance and/or the source of all malodor to the exclusion of other sources; (11) in November 2005, Defendant DiLazaro privately acknowledged to Defendant Robbins and to his air quality inspectors that there were other sources of malodor to be investigated when a complaint was received, and those other sources included the Bethlehem Sewage Treatment Plant, the ISEI Bethlehem Landfill, and Con[n]ective Power. . . ."

(Doc. No. 166 at 87-89) (citations to record omitted).

Even when viewing these claims in the light most favorable to MFS, a close analysis

reveals that they do not "shock the conscience," but reflect matters involving Defendants who are

responsible for regulating a company that has the potential to cause great harm to the

environment and public if certain procedures or standards were not followed.  The laws and

regulations promulgated to insure clean air give broad discretion to regulators.  A standard for

one plant may have to be varied when applied to another due to the unique nature or

configuration of a plant or the product it produces.  Whether regulators should investigate other

polluters, whether they met their burden in proving that an odor was a malodor, whether the EHB

ever made a finding that MFS was a source of malodors, and whether a NOV was issued during

the pendency of an appeal of a FEO in the context of the facts of this case do not amount to

"deliberate indifference," or arbitrary or egregious misconduct.

The same is true of the other claims of MFS.  With respect to each claim, Defendants were acting within the scope of the discretion afforded to them under statutes and regulations. Under the Statement of Facts, *supra*, the Court has set forth at length the statutes and regulations governing clean air and mineral wool facilities.  None were violated by Defendants in this case. The Jury found that Defendants "could reasonably believe that Plaintiff [MFS] was emitting malodors caused by hydrogen sulfide based upon the evidence available to him."  (Doc. No. 112, Special Interrogatories 24, 28, 32, and 36.)  Moreover, neither the PaDEP or Defendants ever ordered MFS to shut down its plant, but attempted to work with its representatives and allowed it to continue to operate for years under the permit shield, despite the odor issue and even the failure of MFS to comply with mineral wool NESHAP.  Under all these circumstances, no reasonable jury could find that Defendants violated MFS's substantive due process rights.[59]

## C.    Defendants Are Entitled To Judgment As A Matter Of Law On MFS's Equal Protection Claim

In response to Special Interrogatory Nos. 12, 13, and 15 on the verdict form (Doc. No. 112), the Jury found that MFS proved by a preponderance of the evidence that Defendants DiLazaro, Bedrin, and Robbins "treated Plaintiff differently than similarly situated corporations

---

[59] The Court has examined the balance of the evidence relied upon by MFS to establish the violation of substantive due process.  They relate to the SO2 emissions and the problems and uncertainty that MFS had, or any regulated business would have, when a permit is not issued. They also raise claims regarding the meeting with Secretary McGinty in December, 2007 and conditions 27 and 28 in the Draft Title V Permit issued in January 2008.  None of these matters rise to the level of egregious misconduct by Defendants.

in violation of its right to equal protection under the Fourteenth Amendment."[60]   (Doc. No. 112.)

The Fourteenth Amendment prohibits state action which "den[ies] to any person within its

jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, §1.  For the following

reasons, the Jury's verdict cannot stand as a matter of law.

       The Equal Protection Clause of the Fourteenth Amendment protects a person or a

corporation against intentional and arbitrary discrimination in the enforcement of a law, whether

occasioned by express terms of a statute or by improper execution by government officials.

Kaplan v. Chertoff, 481 F. Supp. 2d 370, 392 (E.D. Pa. 2007).  The Equal Protection Clause

"'does not forbid all classifications' but 'simply keeps governmental decisionmakers from

treating differently persons who are in all relevant respects alike.'"  Keystone Redevelopment

Partners, LLC v. Decker, No. 10-1054, 2011 WL 43707, at *18 (3d Cir. Jan. 7, 2011) (Fisher, J.,

concurring and dissenting).  In this case, the type of equal protection claim asserted by MFS is

known as a "class-of-one" equal protection claim.  Village of Willowbrook v. Olech, 528 U.S.

562, 564 (2000).  To establish a claim for a violation of the Equal Protection Clause based on a

class-of-one theory, a plaintiff must demonstrate that: 1) it "has been intentionally treated

differently from others similarly situated," and 2) "there is no rational basis for the difference in

treatment."  Id.  These challenges fail when "there is any reasonably conceivable state of facts

that could provide a rational basis for the classification."  Heller v. Doe, 509 U.S. 312, 320

(1993); see also Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008) (explaining

class-of-one theory).

---

       [60] The Jury found that Defendant Wejkszner did not violate MFS's right to equal
protection.  (Doc. No. 112, Special Interrogatory No. 14.)

i.     Similarly Situated and Intentional Treatment

The first step in an equal protection analysis is to ascertain whether the plaintiffs were treated differently than similarly situated entities.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 394 (3d Cir. 2010). "Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects."  Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir. 2008).

MFS claims here that other facilities located near MFS were polluters and emitters of malodors and that MFS was treated differently from these facilities by Defendants.  The other facilities located near MFS are Bethlehem Wastewater, Bethlehem Landfill, Waylite, and Connectiv.  Each is subject to Pennsylvania malodor regulations and enforcement by the PaDEP. The evidence presented at trial shows that these entities are distinct from MFS's mineral wool facility in certain ways, but all discharge potentially odorous, or malodorous, emissions.  Ronald Mordosky, District Supervisor of the Air Quality Program, testified that he received citizen odor complaints about Bethlehem Landfill and Bethlehem Wastewater.  (Mordosky, 2/22/10, a.m., 59:13-23.)  Evidence presented at trial shows that a landfill and sewage treatment plant can emit hydrogen sulfide.  As one district court explained, "any two entities will look sufficiently dissimilar if examined at a microscopic level; the court will assume these entities are similar enough for purposes of equal protection."  Holt Cargo Sys., Inc. v. Delaware River Port Auth., 20 F. Supp. 2d 803, 826 (E.D. Pa. 1998).  Since Bethlehem Landfill and Bethlehem Wastewater emitted hydrogen sulfide and were subject to being regulated by the PaDEP, for purposes of the

equal protection clause they are similarly situated.[61]

Although these entities are similarly situated to MFS, the evidence still must show that MFS was treated in a materially different manner in order to prevail.  With respect to Defendants DiLazaro and Robbins, the evidence demonstrates that neither official treated MFS differently for the simple reason that they did not have authority to regulate the other facilities.[62]

The record shows that Defendant DiLazaro's position at the PaDEP was Air Quality Program Manager.  In that capacity, Defendant DiLazaro had authority to fine, shut down, or otherwise regulate only those facilities within the jurisdiction of the Air Quality Program.  At trial, Becky Easley, an Air Quality Specialist with the PaDEP, explained how the PaDEP allocated responsibility in separate divisions within the agency.  She testified, for example, that in 2002, Mark Miller, a Water Quality Specialist with the PaDEP, accompanied her on an inspection of Bethlehem Wastewater.  (Easley, 2/22/10, p.m., 9:17-19.)  Mr. Miller was present for the inspection because the Water Quality Program, where he was an employee, was the "lead

---

[61] No evidence was presented that Waylite and Connectiv emitted hydrogen sulfide so they are not similarly situated to MFS.  To control odors, the Bethlehem wastewater plant adds potassium permanganate and magnesium hydroxide to its process.  There is no evidence that these chemicals could be added to the manufacturing process at MFS.  There is evidence that another mineral wool plant operated in the Northeast Region which had odor problems investigated by the PaDEP.  A consent decree and agreement was reached with operators of this plant whereby a thermal oxidizer would be installed to control the odors.

[62] To prove its equal protection claim at trial, MFS employed a "shotgun" approach in an attempt to impute to Defendants DiLazaro and Robbins the overall authority of the PaDEP to regulate companies that affect the environment.  The evidence does not support this effort.  MFS did not prove that regulating these nearby facilities was within the authority of Defendants DiLazaro and Robbins.  The evidence also shows that Defendants DiLazaro, Bedrin, and Robbins were not the employees of the PaDEP who issued the NOVs.  Their information about the NOVs was sourced from the work product of other employees of the PaDEP.  Moreover, the Jury found in its answer to Interrogatory Number 14 that Defendant Wejkszner did not violate the equal protection clause.  (Doc. No. 112, Interrogatory No. 14.)

program" covering Bethlehem Wastewater, meaning that the Water Quality Program "would be responsible for trying to correct [major problems]." (Id. at 9:20-24.)  In other words, if Ms. Easley had discovered a malodor violation at Bethlehem Wastewater during her inspection, the Water Quality Program would issue a NOV.  (Id. at 10:2.)  Ms. Easley testified that Defendant DiLazaro did not work for the Water Quality Program, and he did not have responsibility for issuing NOVs to Bethlehem Wastewater.  (Id. at 10:3-8.)  Ms. Easley presented similar testimony with respect to Bethlehem Landfill, which fell under the jurisdiction of the Solid Waste Program of the PaDEP, not the Air Quality Program.  Plaintiff never proved that Defendant DiLazaro had the authority to issue a NOV to Bethlehem Wastewater or Bethlehem Landfill.[63]

Defendant Robbins, as an attorney with the Pennsylvania Governor's Office assigned to the PaDEP, does not have the authority to issue a NOV, a FEO, or an order to shut down a facility.  (Robbins, 2/24/10, a.m., 50:10-18.)  Instead, his professional role is to represent the PaDEP in administrative proceedings and consult on environmental regulatory issues.  Plaintiff did not prove that Defendant Robbins had the power to issue a NOV to Bethlehem Wastewater or Bethlehem Landfill or any other facility.  Consequently, the record does not reflect that these two Defendants in their individual capacity were governmental decisionmakers who intentionally treated MFS differently from nearby facilities.

Furthermore, MFS presented no evidence that Defendant Bedrin treated MFS differently

---

[63] MFS argues that the evidence shows that Defendant DiLazaro privately directed that other sources be investigated for malodor when a complaint was made about MFS, and this raises the inference that he knew other sources were emitting hydrogen sulfide.  (Doc. No. 166 at 115, n. 188.)  This evidence does not prove that Defendant DiLazaro had the authority to issue NOVs to other facilities not subject to the jurisdiction of the Air Quality Program which he supervised. It also does not prove that other facilities were actually emitting malodors.

from other similarly situated facilities located near the MFS plant.  Defendant Bedrin, as

Regional Director of the Northeast Office of the PaDEP, had the authority to issue fines and

otherwise regulate all facilities that were within his jurisdiction, including the MFS mineral wool

plant and nearby facilities.  The evidence shows, however, that Defendant Bedrin had no

involvement with MFS until late 2007 when MFS requested a meeting with Secretary McGinty,

over one and one-half years after MFS voluntarily stopped operating its plant.  Defendant

Bedrin's involvement in this case is limited to his review of the Briefing Memorandum, his

attendance at the meeting with Secretary McGinty, and his review of the Draft Title V Permit

issued to MFS in 2008, which contained conditions 27 and 28.  He had no part in the NOVs

issued from 2001 to February 2004.  Moreover, MFS presented no evidence that Defendant

Bedrin drafted and negotiated Title V Permits for companies similarly situated to MFS, or that

other companies did not have to comply with "onerous" or "tough" permit conditions as well.

See, e.g., Sharratt v. Murtha, No. 08-229, 2010 WL 1212563, at *4 (W.D. Pa. Mar. 26, 2010)

(dismissing Equal Protection claim where plaintiff made "no allegations whatsoever" of different

treatment, compared to other similarly situated people).  Consequently, the record is devoid of

evidence that Defendant Bedrin violated MFS's right to equal protection under the Fourteenth

Amendment.

ii.     Rational Basis

Even if MFS had established that it was treated differently from similarly situated

facilities, MFS must show that Defendants acted irrationally in order to prevail on this claim.

See Artway v. Att'y Gen. of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996).  "[R]ational-basis review in

equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic'" of

government activity.  Holt, 20 F. Supp. 2d at 825 (quoting Heller, 509 U.S. at 319); see also FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) (finding that governmental action will be found rational "if there is any reasonably conceivable state of facts" that could support it). "Governmental commercial regulation or activity 'carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality' such that 'the varying treatment of different groups . . . is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.'" Holt, 20 F. Supp. 2d at 827-28 (quoting Swin Res. Sys., Inc. v. Lycoming County, 883 F.2d 245, 256 (3d Cir. 1989) (internal quotations omitted)).

The evidence does not show that Defendants acted arbitrarily or irrationally in their actions respecting MFS on the malodor issue or the noncompliance with mineral wool NESHAP. In response to complaints about odor emanating from the MFS facility, NOVs were issued by employees of the PaDEP involved in that process.  As a follow-up to this process, Defendant DiLazaro directed the installation of an ambient air monitor which at times tracked hydrogen sulfide potentially sourced from MFS from 2004 to 2006.  MFS presented evidence of high levels of hydrogen sulfide in the ambient air well after MFS shut down its mineral wool facility. Nevertheless, the existence of other emitters of hydrogen sulfide in the area, either before, during, or after MFS shut down in 2006, does not undermine Defendants' authority to regulate MFS and respond to confirmed odors sourced from the MFS facility.

The PaDEP and Defendants have extensive discretion in enforcing state environmental protection laws.  Defendant DiLazaro had the discretion to install the ambient air monitor and Defendants Bedrin and Robbins had the discretion to enforce compliance with malodor

regulations through condition 28 of the Draft Title V Permit.  Again, in Special Interrogatory

Nos. 24, 28, 32, and 36, the Jury found that each Defendant "could reasonably believe that

Plaintiff was emitting malodors caused by hydrogen sulfide based upon the evidence available to

him."  (Doc. No. 112.)  In regard to mineral wool NESHAP noncompliance by MFS, the Court

has already noted that Defendants acted rationally and in furtherance of a legitimate

governmental objective in its treatment of MFS.  Accordingly, there was a rational basis for the

treatment of MFS by Defendants.  No reasonable jury, in viewing the evidence relied upon by

MFS in support of its equal protection claim in the light most favorable to it, could find

otherwise.  Defendants are entitled to judgment as a matter of law on this claim too.

### D.      Defendants Are Entitled To Qualified Immunity On All Federal Claims

The doctrine of qualified immunity protects government officials "from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800,

818 (1982).  "This immunity is broad in scope and protects 'all but the plainly incompetent or

those who knowingly violate the law.'"  Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007)

("Curley II") (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In resolving claims of qualified immunity, a court must decide: 1) whether the facts

alleged or shown by plaintiff make out a violation of a constitutional right, and 2) whether that

right was clearly established at the time of defendants' misconduct.  Saucier v. Katz, 533 U.S.

194, 121 S.Ct. 2151 (2001).  In Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815-16 (2009),

the Court refined the two-prong Saucier test and held that trial judges are permitted to exercise

discretion in deciding which of the two prongs of the qualified immunity test should be addressed

first in light of the circumstances.

Here, with regard to the first prong, since the Court has concluded that no constitutional violations were committed by Defendants, they are entitled to qualified immunity and dismissal of the constitutional claims.  The application of qualified immunity could end there because the Court is not required to analyze the second step of the qualified immunity test under Saucier if no constitutional violation occurred.  As the Supreme Court stated, "[i]f, and only if, the court finds a violation of a constitutional right," the court moves to the second step of the qualified immunity analysis.  Scott v. Harris, 550 U.S. 372, 377 (2007); see also Curley v. Klem, 298 F.3d 271, 277 (2002) ("Curley I") ("If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary."); Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002) ("If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity."); Reedy v. Evanson, 615 F.3d 197, 223-34 (3d Cir. 2010) (quoting Saucier, 533 U.S. at 201) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").  Nonetheless, given the unique factual circumstances in this case, the Court is compelled to discuss the second prong.  Regardless of whether a constitutional violation has been proven, for the following reasons, no reasonable official in a Defendants' position would clearly understand that his conduct violated an established constitutional right in the situation he confronted.

Under the second prong of the qualified immunity analysis, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."  Saucier, 533

U.S. at 202.  "The contours of the right [at issue] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier, 533 U.S. at 201).

"To decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the [official] to determine whether a reasonable state actor could have believed his conduct was lawful.  Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010).  The qualified immunity standard leaves ample room for mistaken judgments.  Id. at 254 (quoting Harlow, 457 U.S. at 818-19).  Therefore, "if a reasonable officer is not on notice that his or her conduct under the circumstances is clearly unlawful, then the application of qualified immunity is appropriate."  Ray v. Township of Warren, No. 09-4353, 2010 WL 4723199, at *2 (3d Cir. Nov. 23, 2010).  An official's actions are judged from the perspective of an "objectively reasonable [state actor] under the circumstances, and we endeavor to avoid hindsight."  Id. at *3 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).

In this case, the four alleged constitutional violations at issue are First Amendment Retaliation, Procedural and Substantive Due Process, and Equal Protection.  As mentioned, the Court has determined *supra* that no violations occurred.  Nevertheless, under the facts of this case, no reasonable regulator in Defendants' position would understand that his conduct violated the asserted constitutional rights.  Examining the existing law regarding the rights in question and the conduct of each Defendant separately confirms that each Defendant is entitled to the

benefit of qualified immunity on each claim.

i.      First Amendment Retaliation

MFS alleges that Defendants Bedrin, Wejkszner, and Robbins[64] violated MFS's right to not be retaliated against for exercising its First Amendment right to request and attend a meeting with Secretary McGinty to discuss the renewal of the Title V Permit.  As noted above, MFS contends that the retaliation consisted of Defendants submitting a "misleading" Briefing Memorandum to Secretary McGinty, and Defendants inserting two "onerous" conditions into the Draft Permit after the meeting.  For purposes of qualified immunity, the Court must determine whether a reasonable official in the position of a Defendant would be on notice that his conduct in regard to the Briefing Memorandum and conditions 27 and 28 in the Draft Permit was unlawful retaliatory action.  See Ray, 2010 WL 4723199, at *2.

As discussed in greater detail above, the evidence shows that Defendant Robbins was directed to prepare the Briefing Memorandum to educate Secretary McGinty on MFS and its interaction with the PaDEP.  The document was only a summary of this interaction over the years.  As with any summary, not every detail was included.  The Memorandum was meant to be a concise internal memorandum rather than an expansive report.  The Memorandum itself and the surrounding evidence show no signs of deliberate, misleading action and qualified immunity leaves ample room for mistaken judgments.  A reasonable official in Defendant Robbins' position would not believe that submitting this kind of memorandum, as directed by the Secretary, would amount to unlawful conduct, even if certain details were left out or mistakes were made.

---

[64] Defendant DiLazaro was not a defendant on this claim.

114

Defendants Bedrin and Wejkszner reviewed the Briefing Memorandum before it was given to Secretary McGinty. Defendant Bedrin was personally involved with MFS since the fall of 2007. Defendant Wejkszner was involved earlier because he replaced Defendant DiLazaro in 2006 and attended a meeting in October 2007 with counsel for MFS. An official in their shoes in reviewing the Briefing Memorandum would have no reason to believe that the Briefing Memorandum was "grossly" misleading and that his conduct in regard to this Memorandum was in some way unlawful.

MFS also claims that the inclusion of "onerous" conditions 27 and 28 in the Draft Permit was retaliatory action. Defendants knew that MFS had not complied with mineral wool NESHAP and had every reason to believe MFS could be emitting malodors. The statutes and regulations of Pennsylvania afforded them the discretion to insert strict conditions in the Draft Permit in order to regulate malodors and ensure compliance with mineral wool NESHAP. Thus, the insertion of tough conditions in a proposed permit when faced with evidence of years of noncompliance is hardly an act that a reasonable regulator would know to be unlawful.

ii.     Procedural and Substantive Due Process

A reasonable official in a Defendant's position would also not know that his conduct violated procedural and substantive due process. Regarding procedural due process, Defendants had the responsibility to enforce environmental laws, which in Pennsylvania afford a regulated company the opportunity to have a meaningful review of its claim. The Environmental Hearing Board (EHB) exists to consider appeals from final actions of the PaDEP, including final actions affecting permits. 35 P.S. § 4010.2. The procedure before the EHB comports with due process. MFS appealed the FEO issued in 2003 and was aware of the appeal process in place if it wished

115

to challenge treatment by the PaDEP.  In many instances, it chose not to do so, but instead relied on its counsel to attempt to settle matters with the Department.

With respect to the Title V Permit renewal application, MFS had the option of taking an appeal to the EHB, but chose not to do so.  Although no final decision was made on Title V Permit renewal before the meeting with Secretary McGinty in December 2007, a substitute procedural safeguard was in place in the form of a regulation allowing a company to operate under a permit shield.  Moreover, the actions of departmental employees in regard to the FEO in 2001, and the meeting with Secretary McGinty in 2007 did not deprive MFS of any procedural protections.  Under all the circumstances here, no reasonable official in a Defendant's position would clearly know that there was a risk of an erroneous deprivation of a property or liberty interest through departmental procedures.

Furthermore, no reasonable regulator with the discretion afforded to Defendants under the statutes and regulations would know that his conduct was unlawful in the situation he confronted. He would not know that his conduct "shocks the conscience" in violation of substantive due process.  See Saucier, 533 U.S. 194.  While MFS was dissatisfied with the conduct of Defendants, such conduct was far short of being egregious.  In fact, in an area of the law not known for its simplicity, the Court, in preparing the instructions on the law for the Jury, had to determine which of the three possible standards was applicable based on the facts presented at trial.  Ultimately, the Court decided on instructing the Jury on two standards to determine if an action "shocks the conscience:" 1) deliberate indifference, and 2) arbitrariness.  See n. 55.  If the appropriate legal standard to be applied here required careful study by the Court (Colloquy, 2/24/10, p.m., 65-68.), it is difficult to perceive how a reasonable official in the shoes of

116

Defendants at the time of the alleged violation would clearly know that his conduct "shocks the conscience."

As noted numerous times above, Defendants had the discretion to treat MFS in the manner shown by the evidence. They had the discretion to insert conditions 27 and 28 in the Draft Permit and to take other action over time in regard to MFS. Defendants and others employed by the PaDEP attempted over the years to work with MFS and used restraint in order to allow it to stay in business. Again, dissatisfaction by a company such as MFS with the conduct of regulators would be expected. However, the complaints made by MFS about the conduct of Defendants do not rise to the level of "shocks the conscience." A reasonable regulator in the position of Defendants would not believe that his conduct would violate substantive due process.

   iii. <u>Equal Protection</u>

A reasonable official in the position of Defendants DiLazaro, Robbins, and Bedrin would not clearly know that he treated MFS differently from other businesses nearby or that there was no rational basis for difference in treatment. First, Defendants DiLazaro and Robbins could not take action against the Bethlehem Wastewater and Bethlehem Landfill facilities which were near MFS even if they were a source of malodor. Defendant DiLazaro's division within the PaDEP had no jurisdiction over these facilities and Defendant Robbins, as counsel, has no authority to issue a NOV. Therefore, their failure to issue a NOV to these facilities does not reflect unequal treatment, but instead reflects their lack of authority. Second, Defendant Bedrin's involvement in this case essentially arose in the second half of 2007 when as Regional Director he was involved with the request for and meeting with Secretary McGinty and the Draft Permit. The

claim of unequal treatment arises primarily from the issuance of NOVs from 2001 to February 2004.  No NOVs were issued to MFS after February 2004.  Additionally, Defendant Bedrin's knowledge of the NOVs would only arise from his review of the Briefing Memorandum and conversations with others involved with the meeting with Secretary McGinty, rather than his own involvement with their issuance.

Third, and most important, the Jury found in answering Special Interrogatory Nos. 24, 28, 32, and 36 that each Defendant "could reasonably believe that Plaintiff was emitting malodors caused by hydrogen sulfide based upon the evidence available to him."  (Doc. No. 112.)  Such emissions constituted a rational basis for the issuance of the NOVs by Department employees and for the PaDEP's attempt over the years to deal with malodor problems, culminating in condition 28 in the Draft Permit.  Accordingly, no reasonable official standing in the shoes of a Defendant would know that he treated MFS differently from another business and that his conduct rose to the level of violating the equal protection clause.

Regarding each constitutional claim, MFS cites numerous court decisions that "are but a few examples that would provide fair warning to a reasonable government official in Defendants' shoes for each applicable constitutional violation."  (Doc. No. 166 at 122.)[65]  However, there

_____

[65] With regard to First Amendment Retaliation, MFS cites Rutan v. Republican Party, 497 U.S. 62, 76 (1990); Hartman v. Moore, 547 U.S. 250, 256 (2006); Larsen v. Senate of Pa., 154 F.3d 82, 94 (1998); Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Eichenlaub v. Township of Indiana, 385 F.3d 274, 277 (3d Cir. 2004); Thomas v. Independence Township, 463 F.3d 285, 296 (3d Cir. 2006); Monteiro v. City of Elizabeth, 436 F.3d 397, 404 (3d Cir. 2006).  (Doc. No. 166 at 122-24.)  With regard to Procedural Due Process, MFS cites Thomas, 463 F.3d at 297.  (Doc. No. 166 at 124.)  With regard to Substantive Due Process, MFS cites County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998); Lonzetta Trucking and Excavating Co. v. Schan, 144 Fed. App'x 206, 212 (3d Cir. 2005).  (Doc. No. 166 at 124.)  With regard to Equal Protection, MFS cites Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Desi's Pizza, Inc. v. City of Wilkes-Barre, 321 F.3d 411, 415-16, 423-26 (3d Cir. 2003); Ryan v. Lower

must be "sufficient precedent at the time of the action, factually similar to the plaintiff's

allegations, to put the defendant on notice that his or her conduct is constitutionally prohibited."

Keystone, 2011 WL 43707, at *18 (Fisher, J., concurring and dissenting) (quoting Mckee v. Hart,

436 F.3d 165, 171 (3d Cir. 2006)).  Each case cited by MFS turns on its own facts, which are

quite different from the facts in this case.  None involved treatment of a company by the PaDEP

and application of the environmental statutes and regulations in play here.  The cases cite general

propositions of law and elements of the claims that apply in this case, but the facts of each

decision are so different from the facts here that they do not afford a Defendant knowledge that

his actions would amount to a constitutional violation.  Each Defendant must be afforded

qualified immunity given the trial evidence presented.

     iv.    Questions of Historical Fact

     The ultimate determination of qualified immunity is a matter of law which must be

resolved by the Court.[66]  Hunter v. Bryant, 502 U.S. 224, 228 (1991); Carswell v. Borough of

Homestead, 381 F.3d 235, 242 (3d Cir. 2004).  In Curley II, the Third Circuit noted that the

application of the Saucier test "presents perplexing logical and practical problems."  499 F.3d at

---

Merion Township, 205 F. Supp. 2d 434, 442 (E.D. Pa. 2002).  (Doc. No. 166 at 124-125.)

    [66] The Court explained in the Opinion on the Motion for Reconsideration of the Order
denying summary judgment in part, "[t]he Court is not holding that qualified immunity is not
warranted in this case as a matter of law.  The Court simply finds that there are genuine issues of
material fact throughout the record which prevent the Court from finding as a matter of law that
qualified immunity applies at the summary judgment stage.  The Court may later find, after the
close of evidence at trial, either by motion of a party or sua sponte, that as a matter of law,
Defendants are entitled to qualified immunity."  (Doc. No. 40 at 28 n.11.)  Furthermore, in
deciding the Post-Trial Motion for Judgment as a Matter of Law, the Court is required to view
the evidence adduced at trial and not the evidence presented by the parties on the Motion for
Summary Judgment, which may differ from the trial evidence.  See Reeves v. Sanderson
Plumbing Products, Inc., supra.

208.  Although "[i]mmunity ordinarily should be decided by the court long before trial . . . often the facts are intensely disputed, and our precedent makes clear that such disputes must be resolved by a jury after a trial."  Id.  Implicit in the Third Circuit's holding is that a district court may find qualified immunity after a jury trial.  In Curley I, the Third Circuit suggested the use of special interrogatories to a jury as a means to resolve historical disputes, thereby establishing a set of historical facts.  298 F.3d at 279; see also Carswell, 381 F.3d at 242 ("District Courts may use special interrogatories to allow juries to perform this function [of determining disputed historical facts]").  A court would use these historical facts to determine if qualified immunity should apply.  However, "[t]he fundamental challenge lies in the nature of the questions that compose the test."  Curley II, 499 F.3d at 208.  "[T]rying to separate the ultimate from the underlying questions is no easy matter . . . ."  Id. at 211.

The Court submitted to the Jury four questions with regard to each Defendant which it believed were of "historical fact" to assist it in resolving the qualified immunity issue.  They were as follows:

> 1) Do you find by a preponderance of the evidence that Defendant (Name) believed that his conduct in regard to Plaintiff was proper under the law and regulations of Pennsylvania and the United States?
>
> 2) Do you find by a preponderance of the evidence that Defendant (Name) could reasonably believe that Plaintiff was emitting malodors caused by hydrogen sulfide based upon the evidence available to him?
>
> 3)  Do you find by a preponderance of the evidence that Defendant's (Name) actions prevented Plaintiff from operating its plant or selling the plant to an interested buyer?
>
> 4)  Do you find by a preponderance of the evidence that

> Defendant's (Name) conduct could be based on a reasonable
> mistake of fact under the circumstances he was confronted
> with in regard to Plaintiff?[67]

(Doc. No. 112 at 6.)

The Jury responded "Yes" to Nos. 2 and 3, and responded "No" to Nos. 1 and 4, as to

each Defendant.  In retrospect, however, only No. 2 of the four interrogatories is helpful to the

Court in resolving the qualified immunity issue.  The other three interrogatories are not helpful

because they contain defects that undermine their reliability.  Although judges should seek a

jury's guidance in resolving disputed historical facts, it is often difficult to formulate proper

factual questions that fit a given set of facts and do not tread on a legal principle, especially in a

case as factually complex as this one.  The more complex the facts, the more difficult it is to draft

useful questions.  It is a daunting task for a trial judge and counsel.

Here, No. 2 is helpful because it covers a disputed fact at trial and is clearly drafted.  The

Jury found that each Defendant could reasonably believe that MFS was emitting malodors caused

by hydrogen sulfide based on the evidence available to him.  The question tracks the standard for

qualified immunity with the language "reasonably believes" and takes into account the situation

in which a Defendant was confronted.

No. 1 essentially seeks a legal conclusion on the issue of liability on each claim.  It is

simply too vague because there is no definition of which laws or regulations it is meant to cover.

Moreover, the Court is the judge of the law and this question intrudes on this province.

Defendants correctly point out that No. 3 contains the defect of using the word "or" in the

---

[67] The Interrogatories are covered in Special Interrogatories (Doc. No. 112) as to
Defendant DiLazaro (Nos. 24-27); as to Defendant Bedrin (Nos. 28-31); as to Defendant
Wejkszner (Nos. 32-35); as to Defendant Robbins (Nos. 36-39).

question.  It asks the Jury to determine whether a Defendant's actions prevented MFS from

operating its plant, or selling the plant to an interested buyer.  No. 3 is unclear because there is no

way of knowing which of the two factual alternatives the Jury is referring to in its answer.  A

verdict slip should avoid a question that combines two issues where a "yes" or "no" may refer to

either issue.  Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 212 n.9 (3d Cir. 2009).

Finally, No. 4 is too vague given the intricate nature of the facts in this case.  What

element of a Defendant's conduct does the question refer to?  What circumstances was a

Defendant confronted with in regard to MFS?  Historical facts should be far more precise, yet in

a case such as this one it is exceedingly difficult to focus a lens on precise, helpful questions.

The Court and counsel struggled to formulate appropriate questions.  (Charge Conference,

3/1/2010, at 81-105, 116-137.)  A hindsight review of the four Interrogatories convinces the

Court that only one is helpful to the task of determining the applicability here of qualified

immunity.

Considering the facts of this case, the Court concludes that each Defendant is protected

by the cloak of qualified immunity.  This conclusion is reached not only because MFS has failed

to present evidence upon which a reasonable jury viewing the evidence in the light most

favorable to it could find liability on the constitutional claims, but also because on the facts, a

reasonably objective regulator would not know that his conduct was unlawful.  Ray v. Township

of Warren, No. 09-4353, 2010 WL 4723199 (3d Cir. Nov. 23, 2010).  Consequently, each

Defendant is immune from suit under the protection of qualified immunity on all of MFS's

federal claims.

**E.** **Defendants Are Entitled To Judgment As A Matter Of Law On MFS's State Claim For Intentional Interference With Prospective Contractual Relations**

In response to Special Interrogatory Nos. 16-23 on the verdict form (Doc. No. 112), the Jury found that MFS proved by a preponderance of the evidence that each Defendant "intentionally interfered with a contractual or prospective contractual relation of" MFS and that no Defendant proved by a preponderance "that he was acting within the scope of his employment when he did so." (Doc. No. 112.) For the following reasons, the Jury did not have a reasonable basis to make these findings based on the evidence presented at trial.

i.     Defendants are Entitled to Sovereign Immunity on the State Claim

Defendants argue that they are entitled to Judgment as a Matter of Law because MFS's state law tort claim is barred under the doctrine of sovereign immunity. Article I, § 11 of the Pennsylvania Constitution reads, in relevant part, "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the legislature may by law direct." The Pennsylvania Legislature has invoked sovereign immunity for officials and employees of the Commonwealth, except in those instances where immunity is specifically waived by the General Assembly.[68] Commonwealth employees acting within the scope of their employment enjoy the same immunity as the Commonwealth itself. Bowman v. Reilly, No. 09-1322, 2009 WL 1636021, at *2 (E.D. Pa. June 10, 2009).

There are two exceptions to sovereign immunity for Commonwealth employees. The

-----

[68] 1 Pa.C.S. § 2310 states in pertinent part: [I]t is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

first is waiver.  The General Assembly has waived sovereign immunity, and consented to suit, in

nine instances.  42 Pa. Cons. Stat. § 8522(b).  They are as follows:  1) the operation of any motor

vehicle in the possession or control of a Commonwealth party; 2) acts of health care employees

of Commonwealth agency medical facilities or institutions; 3) the care, custody or control of

personal property in the possession or control of a Commonwealth party; 4) a dangerous

condition of Commonwealth agency real estate and sidewalks; 5) a dangerous condition of

highways created by potholes, sinkholes, or other similar conditions; 6) the care, custody and

control of animals in the possession or control of a Commonwealth party; 7) the sale of liquor at

Pennsylvania liquor stores; 8) acts of members of Pennsylvania military forces; and 9) the

administration, manufacture, and use of a toxoid or vaccine not manufactured in the

Commonwealth.  Id.  Intentional interference with a prospective contractual relationship is not

listed as an exception.  (Doc. No. 40 at 24.)

The second is that sovereign immunity only applies to those officials and employees of

Commonwealth agencies acting within the scope of their employment.  Suit may be brought

against officials and employees of Commonwealth agencies not acting within the scope of their

employment.  Generally, employees act within the scope of their employment whenever they are

"exercising the authority delegated to [them]."  New York Cen. & Hudson River R.R. v. United

States, 212 U.S. 481, 494 (1909).  The question of whether an individual has acted within his or

her scope of employment is generally one of fact for the jury to decide; however, the issue can be

decided as a matter of law by the Court where the facts and inferences drawn from them are not

in dispute.  Strothers v. Nassan, No. 08-1624, 2009 WL 976604, at *8 (W.D. Pa. Apr. 9, 2009).

In determining whether a defendant was acting within the scope of employment, the

Pennsylvania Superior Court has adopted the standard set forth in the Restatement (Second) of

Agency ("Restatement") § 228.  Butler v. Flo-Ron Vending Co., 557 A.2d 730, 736 (Pa. Super.

Ct. 1989).  Since the Pennsylvania Supreme Court has not expressly held that § 228 of the

Restatement is the standard in Pennsylvania, the Third Circuit has predicted that adoption of the

Restatement standard in Butler by the Pennsylvania Superior Court would be followed by the

Supreme Court.  Aliota v. Graham, 984 F.2d 1350, 1358 (3d Cir. 1993).  Likewise, the Third

Circuit has predicted the Pennsylvania Supreme Court would adopt other relevant Restatement

provisions.  Id.

The standard under § 228 for determining whether the conduct of an employee was within

the scope of employment was set forth in Bowman, supra:

> Conduct of an employee is within the scope of employment only if:
> (1) it is of the kind that the employee is employed to perform; (2) it
> occurs substantially within the authorized time and space limits; (3)
> it is calculated, at least in part, by a purpose to serve the employer;
> and (4) if force is intentionally used by the employee against another,
> it is not unexpected by the employer.[69]

2009 WL 1636021, at *3.  An act by a Commonwealth official or employee which does not

satisfy each of these criteria is outside the scope of employment and is not covered by state

sovereign immunity.  Id.

In this Opinion, the Court has already discussed the broad authority granted to Defendants

under Pennsylvania statutes and regulations.  To effectuate the overriding policy of "protect[ing]

the air resources of the Commonwealth," 35 P.S. § 4002(a), the legislature has conferred

extensive powers and duties upon the PaDEP and its employees under the Air Pollution Control

---

[69] The fourth Restatement criteria has no relevance here because this case does not involve the use of force.

125

Act, 35 P.S. § 4004, *supra* n.1.  Viewing the evidence presented in this case in the light most

favorable to Plaintiff, the record shows that Defendants acted within their statutory and

regulatory authority to protect the environment and concomitantly the public health and welfare

in Pennsylvania.  The actions taken by each Defendant, even those actions questioned by MFS,

were of the kind he is employed to perform, and all conduct occurred while each was on the job.

They were done substantially within the authorized time and space limits of Defendants'

employment and calculated to serve the PaDEP.  The record is devoid of evidence upon which a

reasonable jury could find that Defendants did not act to "serve the[ir] employer," or, in the case

of Defendant Robbins, his client.  Insofar as the Jury found that each Defendant failed to prove

by a preponderance of the evidence that he was acting within the scope of his employment (Doc.

No. 112, Interrogatories 17, 19, 21, 23), legally sufficient evidence does not exist for a reasonable

jury to make this finding.

> As one district court has aptly ruled:

> > The actions of the Individual Defendants that the Plaintiffs complain
> > of were all conducted within the scope of their official duties . . . .
> > The Defendants may have resented the Plaintiffs, but their actions
> > still fell within their official duties.  See Jones. v. Penn. Minority
> > Business Development Authority, 1998 WL 199653 (E.D. Pa. Apr.
> > 23, 1998) (even when assuming prejudicial motivations behind
> > defendant's denial of loan to plaintiffs, Court still recognized that
> > decision was within scope of duties). Also, the challenged decisions
> > would never [have] been made if the Individual Defendants [] were
> > not granted the authority to do so as Commonwealth officials. No
> > reasonable jury could find that the Individual Defendants, regardless
> > of their motivations, were acting outside of the scope of their
> > employment when they made the decisions that anger Plaintiffs.

St. Germain v. Pa. Liquor Control Bd., No. 98-5437, 2000 WL 39065, at *3 (E.D. Pa. Jan. 19,

2000); see also Feliz v. Kintock Group, 297 Fed. App'x 131, 137 (3d Cir. 2008) (holding that

126

while plaintiff "may take issue with the manner in which they performed their duties, there can be no question that the Commonwealth defendants were acting within the scope of their employment in the instant case").

The same rationale is true in this case.  At trial, Mr. Hauff explained his dissatisfaction with Defendants' actions.  For example, he asserted that MFS could not operate under the permit shield because it was "unpredictable" if it would be rescinded by Defendants.  MFS was dissatisfied with the content of the Briefing Memorandum.  MFS decided not to negotiate the Draft Permit because the terms were too "onerous."  MFS made these business decisions voluntarily, despite its counsel's repeated allegation that the PaDEP "prejudiced" MFS. Nevertheless, to paraphrase the court in St. Germain, *supra*, MFS may have resented Defendants for their conduct, and believed that they were operating in an uncertain regulatory environment, but statutes and regulations make clear that Defendants' conduct was in furtherance of the mission of the PaDEP and within the scope of their employment.

The Court has examined carefully the reasons advanced by MFS as to why Defendants' conduct did not fall within the parameters of the "scope of employment" (Doc. No. 166 at 140-46.)  Of the twenty-three examples cited, all involve conduct within the scope of employment, some of which have already been discussed in this Opinion.  Only the first one is worthy of discussion: "DiLazaro falsely and publicly stated that, *inter alia*, MFS was a proven nuisance and was emitting benzene, a carcinogen."  (Doc. No. 166 at 141.)  The evidence to support this assertion is sourced from the testimony of MFS general manager Hauff.  He said that in early 2003 Defendant DiLazaro made these public comments.  Mr. Hauff was not present when Defendant DiLazaro made these comments.  He read them in a newspaper article reporting on a

Lower Saucon Town Hall meeting.  (Hauff, 2/17/10, p.m. 11:7-11; 2/18/10, a.m. 9:10-12.)  MFS argued that these comments interfered with its prospective contractual relations and were not protected by sovereign immunity.

Defendants claimed sovereign immunity as a defense to the state law claim of intentional interference with prospective contractual relations.  The prospective contractual relations identified by MFS were: 1) the sale of the plant to Armstrong and Thermafiber after MFS stopped operating in 2006;[70] 2) the continued sale of mineral wool to Armstrong; 3) interference with MFS's ability to enter into and maintain long term supply agreements for raw materials, including blast furnace slag, which was necessary to operate a mineral wool plant; and 4) preventing MFS from convincing prior or new employees to work at the mineral wool plant under the cloud of uncertainty caused by Defendants' conduct.

First, Defendant DiLazaro's public comments occurred in early 2003.  MFS stopped operating the mineral wool plant on February 16, 2006.  The potential sale of the plant occurred after the closing.  Defendant DiLazaro's public comments about three years earlier were too remote in time to affect the sale.  In fact, both Armstrong and Thermafiber took steps to investigate the potential purchase after the closing of the plant, despite Defendant DiLazaro's public comments years earlier.  Second, the sale of mineral wool to Armstrong continued to the date the plant was closed and was not affected by Defendant DiLazaro's public comments.  Third, regarding MFS's ability to enter into long term supply agreements, Armstrong was MFS's primary customer since 1970, with the relationship generally governed by five year renewable

---

[70] Thermafiber, Inc. contacted MFS in September 2007.  (Hauff, 2/17/10, p.m., 66:8-12.)

contracts.  In 2006, the two companies were even working to launch a new Armstrong product.

There is no evidence that Defendant DiLazaro's comments caused Armstrong in any way to stop

doing business with MFS or affected the sale of the plant.

Finally, there is no evidence that Defendant DiLazaro's public comments affected any

individual employment decision.  This claim is raised by MFS in connection with the uncertainty

of whether it would receive an operating permit, not Defendant DiLazaro's comments.  (Doc. No.

166 at 155 n.312.)  While some of Defendant DiLazaro's public comments on the surface are

unfounded, it was still part of his job to attend town-hall meetings and to discuss issues of

concern with area residents.  To defeat sovereign immunity, a claim of acting outside the scope

of one's employment must have relevance to the state law action in issue.  Here, Defendant

DiLazaro's comments in 2003 have no relevance to prospective interference with contractual

relations years later.  The only relevance the comments have in this case is to prove animosity by

Defendant DiLazaro to MFS.  However, acts of an employee may be within the scope of

employment even if the employee acted disobediently, Commonwealth v. Cox, 476 A.2d 1012,

1014 (Pa. Commw. 1984).  "This liability of the employer may extend even to intentional or

criminal acts committed by the servant."  Butler v. Flo-Ron Vending Co., 557 A.2d 730, 736 (Pa.

Super. Ct. 1989).  Although neither Cox nor the cases relied upon in Butler in support of the

statements of law cited involve a claim of sovereign immunity, their holdings apply as precedent

to show when someone acts within the scope of employment and are relevant to the facts elicited

at trial.

Consequently, viewing the evidence in the light most favorable to MFS, no reasonable

jury could find that Defendants acted outside the scope of their employment and they are entitled

to the benefit of sovereign immunity on the state law claim.

        ii.      **Defendants are Entitled to Judgment as a Matter of Law
on the State Claim**

      While the Court has found that sovereign immunity applies to each Defendant, the absence of sovereign immunity would still result in dismissal of the state law claim.  MFS argues that Defendants unlawfully interfered with four prospective contractual relations involving the sale of the plant, the sale of mineral wool, long term supply agreements for raw materials, including blast furnace slag, and its employment relationship with prior or new employees who work at the plant.  Under Pennsylvania law, the elements of a cause of action for intentional interference with a prospective contractual relation are:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Crivelli v. Gen. Motor Corp., 215 F.3d 386, 394 (3d Cir. 2000) (citing Strickland v. Univ. of

Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)).[71]

---

[71] At the parties' request, the Court instructed the Jury on the tort of intentional interference with a prospective contractual relation.  (Jury Charge, 3/2/10, a.m., 74:2-75:14.) Interrogatory Nos. 16, 18, 20, and 22 (Doc. No. 112) asked whether Plaintiff proved by a preponderance of the evidence that each Defendant "intentionally interfered with a contractual or prospective contractual relation of the Plaintiff."  (Doc. No. 112) (emphasis added).  The Court now recognizes that combining two causes of action in one interrogatory with the word "or" could lead to confusion and should not be used in the future.  See Acumed LLC v. Advanced

Pursuant to Pennsylvania law, "[p]rospective contractual relations are, by definition, not as susceptible of definite, exacting identification as is the case with an existing contract with a specific person" and there is recognition in the law that "[a]nything that is prospective in nature is necessarily uncertain." Kelly-Springfield Tire Co. v. D'Ambro, 596 A.2d 867, 871 (Pa. Super. Ct. 1991). Stated differently, a prospective contractual relationship is "something less than a contractual right, something more than a mere hope." Cornell Cos., Inc. v. Borough of New Morgan, 512 F. Supp. 2d 238, 270-71 (E.D. Pa. 2007).

In determining the "reasonable likelihood or probability" of a prospective contractual relationship, a court must apply an objective standard. Phillips v. Selig, 959 A.2d 420, 428-29 (Pa. Super. Ct. 2008). "In so doing, Pennsylvania courts have consistently required more evidence than the existence of a current business or contractual relationship." Id. (refusing to find a prospective contractual relation based upon evidence of an existing contractual relationship); Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979) (declining to find a prospective contractual relationship based on evidence that the parties had renewed a year-to-year lease for mineral rights for ten consecutive years); Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (holding no prospective contract when university administrator's contract was not renewed after twenty-five years on the job).

---

Surgical Servs., 561 F.3d 199, 212 n.9 (3d Cir. 2009). Neither party objected to the charge or the interrogatories as written. In MFS's Memorandum of Law Opposing Defendants' Post-Trial Motion (Doc. No. 166), MFS argues that the evidence is sufficient to show a violation of the tort of intentional interference with prospective contractual relations. MFS does not discuss the second tort of intentional interference with existing contractual relations. The Court has closely examined the record in this case and finds no evidence to support the verdict with respect to a finding on intentional interference with contractual relations. Accordingly, the discussion herein focuses on whether the Jury had a reasonable basis to find that Defendants intentionally interfered with MFS's prospective contractual relations.

131

"In determining whether an actor's conduct in intentionally interfering with an existing

contract or a prospective contractual relation of another is improper or not," Pennsylvania courts

consider the following factors:

> (a) The nature of the actor's conduct; (b) the actor's motive; (c) the
> interests of the other with which the actor's conduct interferes; (d) the
> interests sought to be advanced by the actor; (e) the social interests in
> protecting the freedom of action of the actor and contractual interests
> of the other; (f) the proximity or remoteness of the actor's conduct to
> the interference; and (g) the relations between the parties.

Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 98 (Pa. Super. Ct. 2009)

(citing Adler v. Epstein, 393 A.2d 1175, 1184 (Pa. 1978)) (quoting Restatement (Second) of

Torts § 767). The "nature of the actor's conduct is a chief factor" in determining whether the

conduct is improper. Crivelli, 215 F.3d at 395. Moreover, "[t]he presence of a privilege is not

an affirmative defense, rather, the absence of such privilege is an element of the cause of action

which must be pleaded and proven by the plaintiff." Odyssey Water Servs., LLC v. BFI Waste

Sys. of N. Am., Inc., No. 05-1929, 2007 WL 674594, at *11 (E.D. Pa. Feb. 28, 2007) (quoting

Bahleda v. Hankinson Corp., 323 A.2d 121, 122-23 (Pa. Super. Ct. 1974)).

    a.    <u>Prospective Contractual Relations Involving Sale of MFS Facility</u>

Viewing the evidence in the light most favorable to Plaintiff, MFS has demonstrated that

there existed a prospective contractual relation between MFS and potential buyers of the mineral

wool facility, Armstrong and Thermafiber. As Mr. Hauff testified, after the mineral wool plant

closed in February 2006, MFS was approached by potential purchasers of the plant. The first

potential buyer was Armstrong, MFS's principal client. (Hauff, 2/17/10, p.m., 64:16-20.)

Approximately fourteen Armstrong representatives visited and walked through the plant, took

pictures, and received a tutorial on the operations.  (<u>Id.</u> at 64:22-65:3.)

The second potential buyer was Thermafiber, which was the largest owner of mineral fiber-producing facilities in the United States.  (<u>Id.</u> at 65:4-6.)  After MFS purchased several truckloads of mineral wool from Thermafiber, the company inquired if MFS's mineral wool plant was for sale.  Mr. Hauff met with Thermafiber's CEO, who was also the President and Chief Financial Officer, in Bethlehem to discuss the possibility of Thermafiber purchasing the plant.  (<u>Id.</u> at 66:10-25.)  Mr. Hauff said that Thermafiber remained interested in purchasing the mineral wool plant while MFS operated under the permit shield, but Thermafiber desired "assurance that [the] Title V operating permit would be issued and be usable."  (<u>Id.</u> at 87:23-25.) It is clear from the evidence that there existed a potential buyer of the plant and a prospective contractual relation.

The evidence offered to prove intentional interference by Defendants with the prospective sale of the facility essentially involved Defendant Robbins.  He communicated with Armstrong about compliance issues at the mineral wool plant, and he is the only Defendant who had any contact with a potential purchaser.  In his deposition, which was read into evidence, Defendant Robbins explained that at some point in early 2006, he spoke on the telephone with Richard Caplan, an attorney for Armstrong.  (Robbins Deposition, 2/18/10, p.m., 55:1-17.)  Defendant Robbins stated that "the discussions were about our enforcement actions or position concerning MFS.  If I recall correctly, he wanted to know what - - how the department was involved with MFS . . . . I probably would have outlined the malodor concerns that we had and the MACT compliance issues."  (<u>Id.</u> at 55:20-25, 56:1-2.)  In comparison, Defendants Bedrin, Wejkszner, and DiLazaro were aware that MFS was interested in selling its facility in 2007, but had no

conversations with representatives of Armstrong or Thermafiber.  MFS also relies on evidence that Defendants did not issue the Title V Permit sought by MFS.

Even though MFS proved the existence of a prospective contractual relation with Armstrong and Thermafiber involving the sale of the mineral wool facility, the state law claim still fails because the second and third elements of the intentional interference claim were not proven here.  The record is deficient of evidence of purposeful action by Defendants specifically intended to prevent a prospective relation from occurring.  Moreover, Defendants' actions were entirely justified given the relations between the parties.

When Defendant Robbins spoke with Armstrong's attorney, he told the truth about the PaDEP's malodor concerns and the NESHAP compliance problem.  At that point in 2006, MFS was not in compliance with mineral wool NESHAP and still had the lingering malodor problem.  Further, as discussed *supra*, the Jury found that each Defendant could reasonably believe that MFS was emitting malodors.  Although Defendant Robbins conversed with a potential purchaser, he was merely providing truthful information which cannot be the basis of an intentional interference with prospective contractual relations claim.

As the Pennsylvania Superior Court has recently noted:

> One who intentionally causes a third party not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
>
> (a) truthful information, or
>
> (b) honest advice within the scope of a request for the advice.

Walnut St. Assocs., 982 A.2d at 99 (quoting Restatement (Second) of Torts § 772).  With regard

134

to § 772(a), comment b explains that:

> There is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another.  The interference in this instance is clearly not improper.  This is true even though the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another.  It is also true whether or not the information is requested.

Walnut St. Assocs., 982 A.2d at 99 (quoting Restatement (Second) of Torts § 772 cmt. b).

There is no evidence that Defendant Robbins did not truthfully answer questions posed by a representative of a purchaser of the plant.  MFS presented no evidence that Defendant Robbins, in discussing MFS with the representative of Armstrong, was motivated by a desire to block the sale, or that he sought to advance any improper interest.  Given his position at the PaDEP, he was justified in providing information to Armstrong regarding the inquiry into outstanding compliance issues with MFS.

Further, in a letter to Mr. Zagami dated May 29, 2008, Defendant Robbins summarized the PaDEP's position regarding the potential sale of MFS's facility:

> First, we reiterate our disagreement with your contention that the Department somehow caused MFS severe or irreparable damage or that it has prevented MFS from securing an air quality permit or selling the facility.  As we indicated previously, the Department remains open to meeting and discussing its concerns with any prospective purchaser and representatives from MFS, including permit transfer issues.  We note that the Department has not been contacted by any prospective purchaser to discuss outstanding Department concerns and no one has scheduled a recent file review to examine the Department's public files on the MFS facility.  Such a file review would presumably be part of a due diligence search

associated with the sale of the facility.[72]

(Def. Ex. 80 at 1.)

The evidence demonstrates that Defendant Robbins not only acted within his discretion to provide truthful information to Armstrong in 2006, but also that the PaDEP and Defendants were willing to take steps to assist in a potential sale of the mineral wool facility, as confirmed by the correspondence.  No reasonable jury could find that Defendants' actions rose to the level of an intent to harm a prospective relation from occurring.  In fact, three Defendants (Bedrin, Wejkszner, and DiLazaro) never even spoke to representatives of Armstrong or Thermafiber.  Moreover, Defendants acted within the scope of their authority when they and the PaDEP refused to unconditionally renew MFS's Title V Permit before MFS demonstrated compliance with the matters outlined in the January 11, 2006 Deficiency Letter.

Mr. Hauff testified that Defendants' reluctance to renew MFS's permit resulted in Thermafiber deciding not to purchase the mineral wool facility.  Thermafiber's decision was based on the unpredictability of whether the permit shield would be rescinded or approved.  Mr. Hauff testified that there was no assurance that the plant could continue to operate from day-to-day or for how long.  (Hauff, 2/17/10, p.m., 76:12-23.)  Nevertheless, as the Court has detailed *supra*, MFS could have operated its mineral wool plant lawfully under the permit shield.  MFS presented no evidence that Defendants intended to suddenly withdraw the permit shield.  Rather, the evidence shows that Defendants made clear that they were willing to negotiate with MFS on the terms of the Draft Title V Permit.  They cannot be held liable for the state law claim because

---

[72] This letter was written approximately two years after Defendant Robbins' conversation with the attorney for Armstrong.

136

Thermafiber made a business decision not to purchase the facility without a Title V Permit in place or because Armstrong decided not to purchase a facility with compliance issues.  Because Defendants acted within the scope of their authority to enforce environmental laws in a regulated industry, no reasonable jury could find that Defendants intentionally and impermissibly interfered with MFS's prospective contract to sell the facility or acted without justification.

> **b.**    Prospective Contract with Armstrong for
>             Continued Sale of Mineral Wool

MFS argued at trial that Defendants intentionally interfered with MFS's prospective contract with Armstrong for the continued sale of mineral wool by denying MFS a Title V Permit and forcing the facility to shut down.  Mr. Hauff testified that MFS was prejudiced by Defendants' actions because "[w]e were coming up on certain contractual limitations or points of contract with not only our customers but also some of our vendors, and we had to have assurance that we were going to be able to supply them beyond those points of the contract."  (Hauff, 2/17/10, p.m., 61:9-16.)  For this reason, MFS insisted that its Title V Permit be renewed.

Viewing the evidence in the light most favorable to MFS, the relationship with Armstrong was sufficiently established to warrant the inference that a prospective contractual relation between the parties for the continued sale of mineral wool was likely.  While MFS operated the mineral wool facility, Armstrong was its principal client.  MFS supplied Armstrong with 100% of its mineral wool requirements from 1990 until MFS stopped operating the plant in February 2006.  (Hauff, 2/17/10, a.m., 76:4-7.)  MFS also worked closely with Armstrong's engineers to attempt to create the highest noise reduction coefficient ceiling tile in the world, which would have been a revolutionary product to improve indoor air and noise quality.  (Id. at

77:17-78.5.)  MFS and Armstrong entered into a long-term purchasing contract which was
revised and renewed every five years.  (Id. at 78:7-15; 79:1-4.)  The most recent contract between
Armstrong and MFS was set to expire in April 2007, but the contract was terminated in 2006
when MFS shut down the mineral wool plant.  (Hauff, 2/18/10, a.m., 10:9-11.)  Accordingly,
MFS has proven a prospective contractual relation with Armstrong for the continued sale of
mineral wool.

Considering the above-listed factors under Restatement (Second) of Torts § 767,
Defendants' actions in regard to the Title V Permit were proper and justified under the
circumstances and did not intentionally interfere with the continued sale of mineral wool to
Armstrong.  Defendants are state government employees who were entrusted by law with the
discretion to make decisions on how to regulate a polluting facility.  Defendants' interest was to
regulate a polluter, albeit a lawful one if it abided by state and federal regulations, and to ensure
MFS's compliance with relevant laws.  Once again, the relationship between the parties, one
being a regulator and the other being lawfully regulated, is a critical factor in determining that
Defendants acted properly and did not intentionally interfere with the continued sale of mineral
wool by MFS to Armstrong.  Though MFS chose not to operate under the permit shield and
resented Defendants' actions which led MFS in part to make a decision to close its plant and
cancel the contract with Armstrong, the evidence shows that the actions taken by Defendants
were within the scope of their authority and justified.

c.  Long Term Supply Agreements and<br>Employee Retention and Hiring

MFS argues that Defendants interfered with MFS's ability to enter into and maintain long

138

term supply agreements, including agreements for blast furnace slag, which were necessary to operate the mineral wool plant.  MFS also argues that MFS was prevented from retaining employees and soliciting new ones as a result of the cloud of uncertainty caused by Defendants' conduct.

These two claims are based upon the premise that MFS could not make commitments without a Title V Permit in place.  The uncertainty of operating under a permit shield caused MFS to close its plant, sell assets, terminate existing agreements, and dismiss employees. According to the evidence, the decisions of MFS were business decisions based upon the fact that regulators were not giving MFS what it believed it deserved.  Again, Defendants were justified and acted within their authority in not issuing a renewed Title V Permit to MFS and in allowing MFS to continue to do business under the permit shield.

Moreover, in regard to all four claims of prospective interference with contractual relations, MFS has failed to prove that it suffered actual legal damage as a result of Defendants' conduct.  Each claim involves justifiable conduct by Defendants and an absence of proof that MFS suffered damage as a result of unjustified conduct.  Regardless of how the conduct is cast, Defendants were not responsible for any harm to MFS.  It was MFS that had the malodor problem and failed to comply with mineral wool NESHAP.  Because MFS did not obtain a Title V Permit, and had to operate under a permit shield, it blamed the PaDEP and Defendants for business setbacks.  However, Defendants acted within the law and regulations in their treatment of MFS and showed great restraint over the years in permitting it to operate under the permit shield.  Consequently, no reasonable jury could find that Defendants improperly interfered with any prospective contractual relation identified here.  Defendants are entitled to judgment as a

matter of law on MFS's state tort claim for intentional interference with prospective contractual relations.

### F.        In The Alternative, A New Trial Is Warranted In This Case

Defendants seek, in the alternative, a new trial pursuant to Fed. R. Civ. P. 59(a).[73]  Rule 59(a) provides in relevant part: "The court may, on motion, grant a new trial on all or some of the issues - and to any party - as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ."  A new trial may be granted "'when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand' or when the court believes the verdict results from jury confusion." Brown v. Nutritional Mgmt. Servs. Co., 370 Fed. App'x 267, 269-70 (3d Cir. 2010) (quoting Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 (3d Cir. 2001); Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, 729 F.2d 1530, 1538 (5th Cir. 1984)).  However, "[a] new trial cannot be granted . . . merely because the court would have weighed the evidence differently and reached a different conclusion." Markovich v. Bell Helicopter Textron, Inc., 805 F. Supp. 1231,

---

[73] Under Fed. R. Civ. P. 50(c), the Court must rule on Defendants' Motion for New Trial. Rule 50(c) provides as follows:

Granting the Renewed Motion; Conditional Ruling on a Motion for a New Trial.

(1) In General.  If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed.  The court must state the grounds for conditionally granting or denying the motion for a new trial.

(2) Effect of a Conditional Ruling.  Conditionally granting the motion for a new trial does not affect the judgment's finality; if the judgment is reversed, the new trial must proceed unless the appellate court orders otherwise.  If the motion for a new trial is conditionally denied, the appellee may assert error in that denial; if the judgment is reversed, the case must proceed as the appellate court orders.

1235 (E.D. Pa. 1992).

The Jury's verdict is contrary to the great weight of the evidence in many crucial respects as discussed above in regard to the constitutional and state law claims. For example, in February 2006, MFS voluntarily made a business decision to cease operating the mineral wool facility because it could not obtain from the regulators what it sought. Defendants did not order MFS to shut down, did not threaten to close the plant, did not impose a civil fine or penalty. Defendants never denied the application for the Title V Operating Permit. MFS was protected at all times under the law by the permit shield, and it was free to operate while its application was pending. Moreover, there is no evidence MFS was prejudiced by the content of the Briefing Memorandum and Defendants Bedrin, Wejkszner, and Robbins acted within the scope of their authority in regard to conditions 27 and 28 of the Draft Permit. The evidence demonstrates that when MFS filed the instant lawsuit, Defendants were still considering the terms of the Draft Permit to try to satisfy MFS's concerns and to allow the company to resume operations. Notably, MFS never suffered any cognizable damages as a result of Defendants' actions. No reasonably jury could find otherwise on the constitutional and state law claims asserted in this case.

In addition, it is evident that MFS sued Defendants because it resented the malodor citations and other decisions that Defendants and their PaDEP colleagues made in the course of carrying out their responsibility to protect the environment and the public. Although a regulated entity has constitutional and common law rights, it would be unjust based on the evidence presented at trial to hold Defendants liable in their individual capacity for lawfully performing their statutory and regulatory duties. Consequently, a miscarriage of justice would result if the verdicts against Defendants DiLazaro, Bedrin, Wejkszner, and Robbins were allowed to stand.

Therefore, a new trial is warranted.

## V.     CONCLUSION

The Court has an "obligation to uphold the jury's [verdict] if there exists a reasonable basis to do so." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989). When viewing the evidence in the light most favorable to MFS, there is insufficient evidence from which a reasonable jury could find in favor of MFS and against Defendants DiLazaro, Bedrin, Wejkszner, and Robbins. Each Defendant is protected by qualified and sovereign immunity and entitled to judgment in his favor.

MFS would like to hold each Defendant accountable in his individual capacity if at any time he knew about or made a decision in regard to MFS during his employment at the PaDEP. However, the evidence does not support such liability as to each Defendant. This is not a conspiracy case in which a statement of a conspirator of a party during the course of and in furtherance of the conspiracy is admissible against the party. Each Defendant is entitled to individual consideration of the evidence offered against him. When the Court engages in such an analysis, the gossamer thread of evidence that MFS has sought to use in order to weave sustainable verdicts here falls short of accomplishing its task. This action is also not a case against the PaDEP, which is immune from suit in federal court under the Eleventh Amendment to the United States Constitution. Under all the circumstances, the Court will grant Defendants' Post-Trial Motion for Judgment as a Matter of Law and vacate the Judgment entered against each Defendant on March 5, 2010 (Doc. No. 115).

An appropriate Order follows.